UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re Subpoenas in<br>JEANNE PAHLS et al.,<br><br>    Plaintiffs<br><br>v.<br><br>BOARD OF COUNTY COMMISSIONERS<br>FOR COUNTY OF BERNALILLO, et al.,<br><br>    Defendants<br><br><br>and EXECUTIVE OFFICE OF THE<br>PRESIDENT OF THE UNITED STATES<br><br>    Third-Party Movant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Misc. No. _____ |

**EXECUTIVE OFFICE OF THE PRESIDENT'S MOTION TO QUASH
SUBPOENA *AD TESTIFICANDUM* AND *DUCES TECUM* ISSUED IN
PAHLS, ET AL. V. BOARD OF COUNTY COMMISSIONERS FOR COUNTY
OF BERNALILLO, ET AL., CIV. A. NO. 1:08-CV-53 (D.N.M.)**

COMES NOW the Executive Office of the President of the United States, by and through

the undersigned counsel, and, pursuant to Federal Rule of Civil Procedure 45, hereby moves to

quash the subpoena dated May 23, 2008 issued by plaintiffs, Jeanne Pahls, et. al, in Jeanne Pahls

et. al. v. Board of County Commissioners for the County of Bernalillo, et al., Civil Action No.

08-53 (D. N.M)(LH/ACT).  As set forth in the accompanying memorandum of points and

authorities, plaintiffs' subpoena should be quashed because plaintiffs have not and cannot

demonstrate the heightened and particularized need for, or relevance of, the information they

seek, as required when a litigant seeks non-party discovery from the Executive Office of the

President.

Dated: June 6, 2008                    Respectfully submitted,

                                       GREGORY KATSAS
                                       Acting Assistant Attorney General

                                       JOHN O'QUINN
                                       Deputy Assistant Attorney General

                                       JEFFREY A. TAYLOR
                                       United States Attorney

                                       ARTHUR R. GOLDBERG (D.C. 180661)
                                       Assistant Director

                                         /s/ Karen Richardson
                                       KAREN RICHARDSON
                                       Senior Counsel
                                       Federal Programs Branch, Civil Division
                                       United States Department of Justice
                                       P.O. Box 883, 20 Massachusetts Ave., NW
                                       Washington, D.C. 20044
                                       Tel:    (202) 514-3374
                                       Fax:    (202) 616-8460
                                       E-mail: Karen.Richardson@usdoj.gov
                                       Attorneys for the Third-Party Movant,
                                       the Executive Office of the President

# ATTACHMENT 1

## Plaintiffs' Subpoena
## Served on May 23, 2008

LEGAL DEPARTMENT



May 23, 2008

Karen Richardson
Civil Division
United States Department of Justice
Federal Programs Branch
20 Massachusetts Avenue, NW
Room 6126
Washington, DC 20001

**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
LEGAL DEPARTMENT
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500
F/212.549.2651
WWW.ACLU.ORG

**OFFICERS AND DIRECTORS**
NADINE STROSSEN
*PRESIDENT*

ANTHONY D. ROMERO
*EXECUTIVE DIRECTOR*

RICHARD ZACKS
*TREASURER*

Re:    Pahls v. Board and County of Bernalillo, 1:08-cv-53
       (LH)(ACT)

Dear Ms. Richardson:

   Please find enclosed a subpoena to the White House Office of
Presidential Advance in connection with the above-referenced litigation.
Thank you for agreeing to accept service.  The subpoena sets a date of
June 12, 2008 for the production of documents and a 30(b)(6) deposition.
We understand that the deposition date may need to be moved to
accommodate the Advance Office witness(es) and defense counsel.

   With the exception of the compliance deadline, this subpoena is
identical to the subpoena already in your possession, but that your office
asserts was improperly served.  Having followed the instructions for
service provided to them by a White House Deputy General Counsel,
Plaintiffs do not concede that service was improper, but send a second
subpoena to ameliorate any possible disagreement on this point.

   As we discussed on the phone earlier today, the Court has imposed
a June 20, 2008 deadline for Plaintiffs to amend their complaint and join
additional parties.  As a result, it is imperative that Plaintiffs complete this
deposition on or before Friday, June 13, 2008, so that there is adequate
time for Plaintiffs to amend their complaint and join additional parties.

   Particularly in light of the fact that the government already has
actual knowledge of the documents and deposition testimony that
Plaintiffs seek, Plaintiffs trust the government will work expeditiously
with them to ensure that it is possible for Plaintiffs to meet their court-

1

imposed deadline. As we discussed, to ease the time pressure, Plaintiffs intend to petition the court for a 30-day extension of the deadline to amend the complaint and join additional parties. Of course, Plaintiffs cannot

count on the Court granting their extension request. Plaintiffs will keep the government apprised of the status of their extension motion.

Because this is a 30(b)(6) subpoena, the subpoena already lists the specific subjects and nature of the information and materials sought from the Advance Office. More information about the lawsuit is available in Plaintiffs' Complaint, which is also enclosed.

This litigation arose out of the President's visit to Los Ranchos de Albuquerque, New Mexico on August 27, 2008. On that day, the President attended a fundraiser for Senator Pete Domenici at the estate of Los Ranchos de Albuquerque Mayor Larry Abraham.

A number of individuals gathered along the President's motorcade route to express their views to the President. Some individuals expressed their disagreement with the President, especially on the war in Iraq. These individuals were forced to stand approximately 150 yards away from the President's motorcade route. Parked police cars and officers on horseback were positioned between the protesters and the President, such that it would have been very difficult if not impossible for the President to see the protesters' signs.

Meanwhile, a group of presidential supporters, some of whom were holding up a sign that read "God Bless George Bush! We Pray For You," were permitted to stand much closer, directly alongside the road where the President's car passed.

Plaintiffs filed suit, arguing that this disparate treatment violates their First Amendment rights to be free from discrimination based on the content and viewpoint of their speech.

The subpoena seeks information about the role played by Advance Office representatives and volunteers that day, including how they interacted with others to decide where demonstrators could be placed.

Plaintiffs also need information concerning the specific listed policies and procedures in order to determine if Defendants were acting pursuant to any Advance Office policies or procedures. For these reasons as well, Plaintiffs need information about similar occurrences in the past involving Advance Office employees, representatives or agents.

Please let us know if you have any questions regarding this

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

2

subpoena.  I can be reached at (212) 519-7806 or ccrump@aclu.org.

Sincerely,

Catherine Crump

Enclosures

cc:     Ernestina Cruz, Counsel for the County Defendants
        Kathryn Levy, Counsel for the City Defendants

AMERICAN.CIVIL LIBERTIES
UNION FOUNDATION

3

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| JEANNE PAHLS, et al, <br><br> Plaintiffs, <br><br> v. <br><br> BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF BERNALILLO, et al., <br><br> Defendants. | SUBPOENA IN A CIVIL CASE <br><br> 1:08-cv-53 (LH)(ACT) <br><br> PENDING IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO |

TO:    Office of Presidential Advance
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

c/o Karen Richardson
Civil Division
United States Department of Justice
Federal Programs Branch
20 Massachusetts Avenue, NW
Room 6126
Washington, DC 20001

[ ] YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

[X] YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
In the above case regarding the subject matters identified under the heading "Categories for Deposition" in Exhibit A, which is attached.

| PLACE | DATE AND TIME |
|---|---|
| ACLU of the National Capital Area, 1400 20th St. NW, Suite 119 Washington, DC 20036 | Thursday, June 12, 2008, 10:00 am <br><br> Recorded by video and/or stenographic mean |

[X] YOU ARE COMMANDED to produce and permit inspection and copying of the documents requested under the heading "Request for Documents" in Exhibit A at the place, date, and time specified below.

| PLACE | DATE AND TIME |
|---|---|
| ACLU of the National Capital Area, 1400 20th St. NW, Suite 119, Washington, DC 20036 | Thursday, June 12, 2008, 10:00 am |

1

[ ] YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE<br>May 23, 2008 |
|---|---|
| American Civil Liberties Union, of Counsel to Plaintiff |  |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Catherine Crump
ACLUF
125 Broad Street
18th Floor
New York, NY 10004
(212) 519-7806

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

2

AO88 (11/91) Subpoena in a Civil Case

| PROOF OF SERVICE | | |
|---|---|---|
| **SERVED** | DATE | PLACE |
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)  PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**EXHIBIT A**

**DEFINITIONS**

**CATEGORIES FOR DEPOSITION**

1. Reasons, facts, and/or other information concerning why Plaintiffs were required to stand approximately 150 yards away from the President's motorcade route while a group of presidential supporters was permitted to be closer to the route.

2. The name, affiliation, and contact information of individuals responsible for deciding where Plaintiffs and other demonstrators were permitted to stand.

3. Reasons, facts, and/or other information concerning any claim or belief that Plaintiffs posed a safety, security, or other kind of threat to the President or anyone else.

4. Communications concerning the incident involving Plaintiffs and/or actions taken as a result of the August 27, 2007 incident involving Plaintiffs.

5. White House policies, procedures, guidelines, and/or training materials concerning:

    A. Expressive activities or speech, including, but not limited to, policies concerning placement of demonstrators and protesters;

    B. Discrimination or non-discrimination against speakers based on content or viewpoint;

6. Other complaints of First Amendment/free speech violations by individuals demonstrating along presidential motorcade routes.

**REQUEST FOR DOCUMENTS**

1. All documents concerning each of the foregoing categories for deposition.

4

# ATTACHMENT 2

Plaintiffs' Complaint in
*Pahls et al. v. Board of County
Commisioners for the County of
Bernalillo, et al. (Civ. Action No.
08-00053)(D. N.M.) LH/ACT*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Civil Action No.


JEANNE PAHLS,
REBECCA WILSON,
ALMA ROSA SILVA BANUELOS,
CARTER BUNDY,
JASON CALL,
MARY LOU "MITZI" KRAFT,
MERIMEE MOFFITT,
LAURA LAWRENCE,
STUART T. "TERRY" RILEY,
CODEPINK WOMEN FOR PEACE, ALBUQUERQUE CHAPTER,
STOP THE WAR MACHINE,

     Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF BERNALILLO,
BERNALILLO COUNTY SHERIFF'S DEPARTMENT,
CITY OF ALBUQUERQUE,
ALBUQUERQUE POLICE DEPARTMENT,
JOHN/JANE DOES 1-5, in their individual capacities,

    Defendants.

---

## COMPLAINT AND JURY DEMAND

---

## I.     INTRODUCTION

1.     This is a case arising out of the August 27, 2007 appearance by President George

W. Bush at a fundraiser for Senator Pete Domenici at the Los Ranchos de Albuquerque estate of

Mayor Larry Abraham. Defendants engaged in content and viewpoint discrimination by placing

plaintiffs – individuals peacefully expressing disagreement with the views of the President – at

least 150 yards away from the driveway of the fundraiser site, while allowing a group of the President's supporters to stand just across from the driveway of the fundraiser site. The disparate treatment accorded plaintiffs was based solely on the content and viewpoint of plaintiffs' speech, in violation of their First and Fourteenth Amendment rights.

## II.    JURISDICTION AND VENUE

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Remedies are provided by 42 U.S.C. § 1983.

3.    In the event some of the defendants turn out to be federal actors, then this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and this action is also authorized and instituted pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

4.    The practices alleged herein to be unlawful were committed within the jurisdiction of the United States District Court of New Mexico. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## III.    PARTIES

5.    Plaintiff Jeanne Pahls is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

6.    Plaintiff Rebecca Wilson is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

7.    Plaintiff Alma Rosa Silva Banuelos is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

8.    Plaintiff Carter Bundy is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

2

9.      Plaintiff Merimee Moffitt is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

10.     Plaintiff Laura Lawrence is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

11.     Plaintiff Stuart T. "Terry" Riley is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

12.     Plaintiff Mary Lou "Mitzi" Kraft is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

13.     Plaintiff Jason Call is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

14.     Plaintiff Stop the War Machine is an unincorporated grassroots, anti-war organization based in Albuquerque, New Mexico. Stop the War Machine is primarily engaged in efforts that involve expressions of free speech with regard to weapons, war-related spending, and the military industrial complex. Also, its members are often involved in organizing events so that individuals can express their disagreements with the President and other top administration officials when those individuals visit New Mexico.

15.     CODEPINK Women for Peace is a 501(c)(3) non-profit corporation that has its headquarters in Venice, California. It is an organization focused primarily on ending the war in Iraq. It was formed in November, 2002, and is open to both women and men. There are over 250 active local groups around the country and the world, including a volunteer, local chapter in Albuquerque, New Mexico. CODEPINK, the Albuquerque Chapter, is the plaintiff in this case. The organization is consistently engaged in organizing gatherings so that individuals can express their disagreement with the President and his policy on the Iraq War.

3

16.     Defendant Board of County Commissioners for the County of Bernalillo ["County"] is a local governmental entity organized and existing under the laws of the State of New Mexico, and is a "person" subject to suit herein.

17.     Defendant the Bernalillo County Sheriff's Department ("BCSD") is an agency of the County responsible for general law enforcement.

18.     Defendant City of Albuquerque ("City") is a municipality and government entity within the State of New Mexico. Defendant City is constitutionally responsible for the training, supervision, acts, omissions, conduct, policies (written or unwritten), patterns, practices, customs and procedures of the public employees acting within the scope of their duties who worked for the Albuquerque Police Department, at all relevant time frames.

19.     Defendant the Albuquerque Police Department ("APD") is an agency of Albuquerque, New Mexico responsible for general law enforcement.

20.     Defendants John/Jane Does 1-5 (or "real name(s) unknown" as per N.M. Stat. Ann. § 38-2-6 (1978)) are persons whose identities are currently unknown to plaintiffs. Upon information and belief, the Does are local, state, or federal actors who were involved in making and/or implementing policy decisions that led to violations of plaintiffs' First and Fourteenth Amendment rights by discriminating against plaintiffs based on the content and viewpoint of plaintiffs' speech. They are sued in their individual capacities.

### IV.     FACTUAL ALLEGATIONS

21.     On August 27, 2007, President Bush visited Albuquerque, New Mexico to attend a fundraiser for Senator Pete Domenici.

4

22.     The fundraiser took place at the Los Ranchos de Albuquerque estate of Mayor
Larry Abraham at 7205 Rio Grande Boulevard NW – a semi-rural area not far from
Albuquerque.

23.     Prior to the President's visit, various individuals, including some of the plaintiffs,
decided to find a peaceful way of showing the President that not all Americans shared his views,
especially those on the Iraq War.  They determined that they would try to stand peacefully along
his travel route with signs expressing their disapproval.

24.     Plaintiff Jeanne Pahls, who is one of the organizers of Stop the War Machine, sent
out emails informing individuals on the Stop the War Machine email news bulletin that people
would be assembling peacefully to express their disagreement with the President on the day of
the fundraiser.

25.     Plaintiff Rebecca Wilson, the director of the Albuquerque chapter of CODEPINK,
informed fellow members of CODEPINK about the event.

26.     On the day of the fundraiser, Ms. Pahls arrived at the event site at approximately
8:00 to 8:30 am.  At the event site, Ms. Pahls spoke to an officer from the BCSD, who told her
that people would be allowed to gather on the shoulders of Rio Grande Blvd. either north or
south of the driveway leading into Mayor Abraham's estate.

27.     Rio Grande Blvd. is a two-lane road that runs north and south through the town of
Los Ranchos de Albuquerque, and Mayor Abraham's estate is situated on the west side of Rio
Grande Blvd.  The driveway leading into the Mayor's estate runs perpendicular to Rio Grande
Blvd.

28.     As time passed, a larger group of people started gathering on Rio Grande Blvd.
south of the Mayor's driveway.  Ms. Pahls, however, along with a few other individuals decided

5

to gather on the part of Rio Grande that was north of the Mayor's driveway. At that point, none of the people knew whether the President's motorcade would be coming from the north or south of Rio Grande. The BCSD office who spoke with Ms. Pahls did not know either, but stated that he thought the President's motorcade might be coming from north of Rio Grande. Ms. Pahls thus decided to stay on the northern part of Rio Grande.

29. Among the individuals who later gathered on the northern part of Rio Grande Blvd. were plaintiffs Laura Lawrence and Mary Lou "Mitzi" Kraft. Ms. Lawrence, a journalist who writes under her maiden name "Paskus," is also an active member of CODEPINK. Ms. Lawrence heard about the gathering through the organization, and decided that she would attend the gathering to peacefully voice her disapproval to the President. She also decided that she would take her 19-month old daughter along in a stroller.

30. Ms. Kraft heard about the gathering from Ms. Pahls and Stop the War Machine. After having spoken to her grandson, who was serving in the military and had been back from Iraq for almost a year, Ms. Kraft decided that she also wanted to peacefully voice her disagreement with the war. She decided that she would carry a sign telling the President to bring the troops back home.

31. While driving to the gathering, Ms. Lawrence saw Ms. Kraft walking, and offered Ms. Kraft a ride in her car. Ms. Lawrence and Ms. Kraft arrived some time after Ms. Pahls, and parked her car on Chamisal Road, which intersects Rio Grande Blvd. in an area north of the Mayor's driveway. While walking south on Rio Grande towards the Mayor's estate, Ms. Lawrence and Ms. Kraft ran into Ms. Pahls. Ms. Lawrence and Ms. Kraft, along with Ms. Lawrence's daughter, decided to join Ms. Pahls' group.

6

32.     Among the individuals gathered on the south side was plaintiff Terry Riley, a member of the Albuquerque Chapter of Veterans for Peace. Mr. Riley was there with his 90-year old, wheelchair-bound mother. Having arrived at 8:30 am, Mr. Riley had parked at the Village Hall, which was approximately half a mile south of Mayor Abraham's estate on Rio Grande Blvd. Mr. Riley then proceeded to walk north on Rio Grande towards the Mayor's estate, pushing his mother's wheelchair, until the police would not allow them to move any further north.

33.     At the point where Mr. Riley was stopped, there were several parked police cars and officers on horseback. The parked police cars and officers on horseback formed a barricade that blocked people from moving further north on Rio Grande Blvd. Mr. Riley asked if he and his mother were permitted to go any further north so that they could be closer to the Mayor's driveway, but were told that they could not. Mr. Riley held up a sign that said, "Good Riddance to Gonzales. Who's Next? Bush, I Hope", while his mother held up a sign that said, "Peace Takes Work, War Takes Lives".

34.     Another person standing on the portion of Rio Grande Blvd. south of the Mayor's driveway was plaintiff Carter Bundy. Mr. Bundy is a former attorney who serves as the legislative director of the American Federation of State, County and Municipal Employees ("AFSCME"). Having also arrived at approximately 8:30 am, Mr. Bundy parked at the Village Hall and walked north on Rio Grande towards the Mayor's home. He then asked an officer from BCSD how close to the Mayor's driveway he could stand. The BCSD officer said that the entire area near the Mayor's estate was a PNM (utility company) easement, and was therefore unsure whether Mr. Bundy could stand on the easement at all. The BCSD officer eventually called Mr. Bundy on Mr. Bundy's cell phone, and informed him that he could stand on that area, but only

7

where Road Runner Lane intersected with Rio Grande Blvd. This was approximately 300 yards south of the Mayor's driveway. Only later did Larry Kronen, an attorney with plaintiffs, inform Mr. Bundy and other individuals that they could move closer, to an area that was approximately 150 to 200 yards from the Mayor's driveway.

35.    Between approximately 9:30 and 10:00 am, Ms. Wilson, Merimee Moffitt, and about 12 to 15 other members of CODEPINK arrived at the gathering. Ms. Wilson, Ms. Moffitt, and the other members of CODEPINK all situated themselves where the majority of people were gathered, on the shoulders of Rio Grande Blvd. south of the Mayor's driveway. Ms. Wilson and the other members of CODEPINK held up pink peace symbols, as well as signs that said, "Walk in their [soldiers'] Shoes," and "Delete Him [Bush]."

36.    Around the time that the members of CODEPINK arrived, plaintiff Jason Call arrived. Prior to that, Mr. Call, a high school math teacher who is running for Congress, had been involved in a "Honk to Impeach Bush" rally. Also situating himself on the southern portion of Rio Grande along with the majority of others, Mr. Call moved as far up as the police would allow. Mr. Call, who heard about the gathering through a Stop the War Machine email, wore a t-shirt that said "Bush is an International Terrorist," while holding up signs saying "Honk to Impeach Bush-Cheney," "Defend the Constitution – Impeach Bush," and "War, Famine, Pestilence, Death" – with pictures of President Bush, Vice President Cheney, Secretary Rice, and Secretary Rumsfeld underneath.

37.    Although the majority of people were gathered on the south end of Rio Grande Blvd., Ms. Pahls, Ms. Kraft, Ms. Lawrence, and Ms. Lawrence's daughter remained on the portion of Rio Grande Blvd. that was north of the Mayor's driveway. Larry Kronen moved between the two groups until police told him he had to stay on the south end of Rio Grande. In

8

addition, at some point prior to the President's arrival, members of the BCSD forced Ms. Pahls and the other individuals on the north end of Rio Grande to the south end, where most of the other people were gathered. Ms. Pahls' group objected peacefully to moving to the south end because they thought that the President's motorcade would be coming from the north side of Rio Grande Blvd. She informed the BCSD officers that another BCSD officer had given her permission to stand on the north end. The officers from the BCSD nevertheless made them move to the other end.

38.     Sometime after 10:00 am, plaintiff Alma Rosa Silva Banuelos, a community organizer who heard about the gathering from a Stop the War Machine email, arrived at the gathering. By the time Ms. Banuelos arrived, there were already numerous people present. Ms. Banuelos first drove her car from the south end of Rio Grande Blvd. to the north end, where she saw several police officers situated by the shoulders of the road. She then proceeded to make a U-turn, and drove back from the north end to the south end, where the majority of people were gathered. While driving back towards the south end of Rio Grande Blvd., Ms. Banuelos saw a small group of Presidential supporters standing on the shoulder of Rio Grande Blvd. just across from the Mayor's driveway.

39.     There were nine individuals – two adults and seven children – among the group supporting the President. Several of them were holding American flags and two individuals held up a banner that said, "God Bless George Bush! We pray for you!"

40.     All of the individuals who were peacefully expressing their disagreement with the President – including the plaintiffs – were forced to stay in the area on Rio Grande Blvd. that was at least 150 yards south of the Mayor's driveway.

9

41.    There was no legitimate basis for treating plaintiffs differently from the President's supporters.

42.    Larry Kronen, who was standing with plaintiffs behind the parked police cars and the officers on horseback, asked if the police could move some of the cars so that plaintiffs' view of the north end of Rio Grande Blvd. would not be obstructed. Suspecting that the President's motorcade would be arriving from the north end, the people on the south end wanted their view of the north end to be clear. The police agreed to move only one of the several cars.

43.    Prior to the President's arrival, Alice Lloyd drove up to Ms. Wilson, Ms. Moffitt, and other individuals on Rio Grande Blvd. in a beige Chevrolet Tahoe with her 13-year old daughter. Ms. Lloyd offered some of the plaintiffs a place to stand and to hold up their signs. The place was a property belonging to Ms. Lloyd's friend, and was approximately the third property north of Mayor Abraham's estate on Rio Grande Blvd. Because the woman's property was north of the Mayor's driveway, plaintiffs would have been more visible to the President as the President's motorcade later arrived from the north side of Rio Grande. In addition, plaintiffs would not have been blocked from the President's view by the parked police cars and officers on horseback. The BCSD, however, informed Ms. Lloyd that she had to move her car immediately, and refused to allow some of the plaintiffs to go north with Ms. Lloyd to the woman's property.

44.    After some additional time passed, Mr. Riley asked if he and his wheelchair-bound mother could move to the area of Rio Grande Blvd. north of the Mayor's driveway so that the President could see their signs. The officer replied that the motorcade would be arriving at any minute, and that it would not be safe for Mr. Riley and his mother to be there. The motorcade, however, did not arrive for at least 20 minutes until after the conversation took place.

10

45.     At around noon, the President's motorcade approached the area from the north and proceeded to enter Mayor Abraham's estate.  The President's motorcade never passed by plaintiffs, who were standing south of the Mayor's estate.

46.     The President's view of the individuals on the south end of Rio Grande Blvd. was obstructed by the parked police cars and officers on horseback.  It would have been difficult, if not impossible, for someone sitting in the President's car to have seen or read plaintiffs' signs.

47.     The majority of people stayed until 15 minutes after the President entered Mayor Abraham's estate for the fundraiser.  A few people, including Ms. Lawrence and Ms. Pahls, stayed until after the fundraiser.  This occurred after 1:00 pm.

48.     There were approximately 70 people standing outside Mayor Abraham's estate attempting to express their disapproval to the President in a peaceful manner.

49.     Plaintiffs' purpose in gathering outside of Mayor Abraham's estate was to express their disagreement with the President as well as the Iraq War through peaceful means.  At no time did they intend to or give any indication that they would disrupt the event or resort to violence.

50.     At all times, the practice or policy perpetuating content and viewpoint discrimination (against any speech disagreeing with the President) was set by defendants, including Doe defendants.

51.     The Presidential Advance Manual, prepared by the Office of Presidential Advance, includes a section called "Preparing for Demonstrators."  In that section, the Manual provides that members of the Presidential Advance team should "work with the Secret Service and have them ask the local police department to designate a protest area where demonstrators can be placed, preferably not in view of the event site or motorcade route" (emphasis added).

11

The description from the Manual is consistent with what occurred here. Plaintiffs – whom the Manual would label as "demonstrators" – were placed in an area south of the Mayor's estate, and kept at a distance such that they were "not in view of the event site or motorcade route."

52.     Chief Deputy David Linthicum of the BCSD was quoted in the newspapers as saying that the Secret Service, in consultation with the Sheriff's Department, were the ones who decided that the supporters of the President could stand just across from the Mayor's driveway.

53.     Defendants, the County, the City, the BCSD and APD each have a municipal policy of discriminating against individuals based on the viewpoint and content of their speech, or in the alternative, have followed orders from federal actors to adopt and enforce this policy of discriminating against individuals based on the viewpoint and content of their speech.

54.     Defendants are in violation of plaintiffs' First and Fourteenth Amendment rights for creating, adopting, and enforcing an unconstitutional practice or policy of discriminating against plaintiffs based on the viewpoint and content of plaintiffs' speech, and therefore are guilty of depriving plaintiffs of their right to peacefully express their disagreement with the President and the President's views.

## V.     CAUSE OF ACTION

**(Action Pursuant to 42 U.S.C. § 1983 for state actors, and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for any potential federal actors )**

55.     Plaintiffs hereby incorporate all preceding paragraphs of this Complaint as though fully stated herein.

56.     Defendants violated plaintiffs' First and Fourteenth Amendment rights by establishing and enforcing a policy of disparate treatment based solely on the viewpoint and content of plaintiffs' speech.

12

## VI.    RELIEF

A.    Declare that the actions of defendants in discriminating against the viewpoint and content of plaintiffs' speech are violations of plaintiffs' First and Fourteenth Amendments rights,

B.    Grant plaintiffs damages for the violations of their rights under the First and Fourteenth Amendments of the United States Constitution,

C.    Grant Plaintiffs such other relief as they may be entitled to, and

D.    Award Plaintiffs reasonable attorney's fees and costs.


**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 15th day of January, 2008.

George Bach
Staff Attorney
American Civil Liberties Union
    of New Mexico
P.O. Box 566
Albuquerque, NM  87106
(505) 243-0046
gbach@aclu-nm.org

Christopher A. Hansen (pro hac vice pending)
Catherine Crump (pro hac vice pending)
Josh Hsu (pro hac vice pending)
American Civil Liberties Union Foundation
125 Broad Street, 18th floor
New York City, NY 10004
(212) 549-2606
chansen@aclu.org
ccrump@aclu.org
jhsu@aclu.org

13

# ATTACHMENT 3

# Plaintiffs' Previous Subpoena Served on the U.S. Attorney's Office

LEGAL DEPARTMENT



May 13, 2008

Office of Presidential Advance
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

> Re:    Pahls v. Board and County of Bernalillo, 1:08-cv-53
> (LH)(ACT)

To Whom It May Concern:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
LEGAL DEPARTMENT
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212 549 2500
F/212 549 2651
WWW.ACLU ORG

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

Please find enclosed a subpoena to the White House Office of
Presidential Advance in connection with the above-referenced litigation.
The subpoena sets a date of May 30, 2008 for the production of documents
and a 30(b)(6) deposition. We understand that the deposition date may
need to be moved to accommodate the Advance Office witness(es) and
defense counsel.

Because this is a 30(b)(6) subpoena, the subpoena already lists the
specific subjects and nature of the information and materials sought from
the Advance Office. More information about the lawsuit is available in
Plaintiffs' Complaint, which is also enclosed.

This litigation arose out of the President's visit to Los Ranchos de
Albuquerque, New Mexico on August 27, 2008. On that day, the
President attended a fundraiser for Senator Pete Domenici at the estate of
Los Ranchos de Albuquerque Mayor Larry Abraham.

A number of individuals gathered along the President's motorcade
route to express their views to the President. Some individuals expressed
their disagreement with the President, especially on the war in Iraq. These
individuals were forced to stand approximately 150 yards away from the
President's motorcade route. Parked police cars and officers on horseback
were positioned between the protesters and the President, such that it
would have been very difficult if not impossible for the President to see
the protesters' signs.

Meanwhile, a group of presidential supporters, some of whom
were holding up a sign that read "God Bless George Bush! We Pray For
You," were permitted to stand much closer, directly alongside the road
where the President's car passed.

Plaintiffs filed suit, arguing that this disparate treatment violates their First Amendment rights to be free from discrimination based on the content and viewpoint of their speech.

The subpoena seeks information about the role played by Advance Office representatives and volunteers that day, including how they interacted with others to decide where demonstrators could be placed.

Plaintiffs also need information concerning the specific listed policies and procedures in order to determine if Defendants were acting pursuant to any Advance Office policies or procedures. For these reasons as well, Plaintiffs need information about similar occurrences in the past involving Advance Office employees, representatives or agents.

Please let us know if you have any questions regarding this subpoena. I can be reached at (212) 519-7806 or ccrump@aclu.org.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Sincerely,

Catherine Crump

Catherine Crump

Enclosures

cc:    Ernestina Cruz, Counsel for the County Defendants
       Kathryn Levy, Counsel for the City Defendants

2

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

JEANNE PAHLS, et al,

        Plaintiffs,

v.

BOARD OF COUNTY
COMMISSIONERS FOR THE COUNTY
OF BERNALILLO, et al.,

        Defendants.

SUBPOENA IN A CIVIL CASE

1:08-cv-53 (LH)(ACT)

PENDING IN THE UNITED STATES
DISTRICT COURT FOR THE
DISTRICT OF NEW MEXICO

TO:    Office of Presidential Advance
        The White House
        1600 Pennsylvania Avenue NW
        Washington, DC 20500

        c/o United States Attorney's Office
        555 4th Street, NW
        Washington, DC 20530

2008 MAY 15 A 10:44 RECEIVED

[ ] YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

[X] YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
In the above case regarding the subject matters identified under the heading "Categories for Deposition" in Exhibit A, which is attached.

| PLACE | DATE AND TIME |
|---|---|
| ACLU of the National Capital Area, 1400 20th St. NW, Suite 119 Washington, DC 20036 | May 30, 2008, 10:00 am |
| | Recorded by video and/or stenographic mean |

[X] YOU ARE COMMANDED to produce and permit inspection and copying of the documents requested under the heading "Request for Documents" in Exhibit A at the place, date, and time specified below.

| PLACE | DATE AND TIME |
|---|---|
| ACLU of the National Capital Area, 1400 20th St. NW, Suite 119, Washington, DC 20036 | May 30, 2008, 10:00 am |

[ ] YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the

matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE<br>May 13, 2008 |
|---|---|
| *Catherine Crump*<br>American Civil Liberties Union, of Counsel to Plaintiff | |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Catherine Crump
ACLUF
125 Broad Street
18th Floor
New York, NY 10004
(212) 519-7806

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

AO88 (11/91) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)    PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that

person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) if a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)    DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim

3

## EXHIBIT A

## DEFINITIONS

## CATEGORIES FOR DEPOSITION

1.  Reasons, facts, and/or other information concerning why Plaintiffs were required to stand approximately 150 yards away from the President's motorcade route while a group of presidential supporters was permitted to be closer to the route.

2.  The name, affiliation, and contact information of individuals responsible for deciding where Plaintiffs and other demonstrators were permitted to stand.

3.  Reasons, facts, and/or other information concerning any claim or belief that Plaintiffs posed a safety, security, or other kind of threat to the President or anyone else.

4.  Communications concerning the incident involving Plaintiffs and/or actions taken as a result of the August 27, 2007 incident involving Plaintiffs.

5.  White House policies, procedures, guidelines, and/or training materials concerning:

    A.  Expressive activities or speech, including, but not limited to, policies concerning placement of demonstrators and protesters;

    B.  Discrimination or non-discrimination against speakers based on content or viewpoint;

6.  Other complaints of First Amendment/free speech violations by individuals demonstrating along presidential motorcade routes.

## REQUEST FOR DOCUMENTS

1.  All documents concerning each of the foregoing categories for deposition.

4

# ATTACHMENT 4

# Declaration of Spencer Geissinger

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| In re Subpoena in<br>JEANNE PAHLS, et al., | : | |
| | : | |
| Plaintiffs | : | Misc. No. _____ |
| | : | |
| v. | : | |
| | : | |
| BOARD OF COUNTY COMMISSIONERS<br>FOR THE COUNTY OF BERNALILLO, et al., | : | |
| | : | |
| Defendants | : | |
| | : | |
| EXECUTIVE OFFICE OF THE PRESIDENT, | : | |
| | : | |
| Third Party Respondent. | : | |

**DECLARATION OF SPENCER GEISSINGER**

I, Spencer Geissinger, under penalty of perjury, do hereby declare as follows:

1.       I am the Director of the Office of Presidential Advance within the Executive Office of the President. I was appointed as Director in September 2007.

2.       The Office of Presidential Advance ("Advance Office") plans and coordinates the logistics for all Presidential domestic and international travel and events. For any given event, the Advance Office works with over a dozen offices within and outside of the Executive Office of the President, as well as with representatives of the host venue, to coordinate their various roles in facilitating the event. Planning by the Advance Office for a Presidential event begins weeks, and in some cases, months, before the event occurs.

3.       I have reviewed the subpoena issued by the Plaintiffs and the information they have requested concerning the President's August 27, 2007 visit to a private home in New Mexico, and information about Advance policies and procedures for handling demonstrators and protestors generally, and about complaints by other demonstrators along motorcade routes. The subpoena apparently was received by the White House Counsel's Office on May 19, 2008.

4.       The date set by the Plaintiffs' subpoena for the production of requested documents and for a third-party deposition of a representative of the Office of Presidential Advance is June 12, 2008. It would be extremely burdensome, if not impossible, to conduct the investigation necessary to respond completely and appropriately to the Plaintiffs' demand for information and to prepare a witness to testify by the date set forth on the subpoena.

5.      The individuals likely to have information, if any, about the private event in New Mexico on August 27, 2007 are those members of the Advance team who traveled to New Mexico for the event. Those individuals are not employees of the Executive Office of the President, but rather, Advance Office volunteers. None of those individuals resides in Washington, DC. Therefore, it will require a coordination of schedules, and potential travel, to investigate the issues raised in the subpoena before June 12, 2008.

6.      As has been publicly reported, the President will be traveling to Europe for the U.S.-European Union Summit and other affairs of state from June 9-16, 2008. The President will be visiting 5 different countries during this foreign trip. Several members of my staff have been traveling overseas in preparation for this trip. The attention of many of the staff in my office will be focused primarily on the substantial logistical issues surrounding this Presidential travel until the trip concludes on June 16, 2008.

7.      Members of the Advance Office, including myself, are also currently planning two additional near-term foreign trips by the President, to Asia in July for the G-8 Summit, and again to Asia for the Olympics in August. As one would expect, foreign travel by the President involves substantially greater planning and logistical coordination with the President's security detail and with the host countries. The planning for these trips is actively underway and involves foreign travel by members of the Advance Office, including myself.

8.      The three foreign trips by the President over the next three months are in addition to the President's routine domestic travel schedule, the planning for which our office is also heavily involved at present.

9.      The Plaintiffs' request for information about "other complaints of First Amendment/free speech violations demonstrating along motorcade routes" is vague as to the meaning of what constitutes a "complaint." To conduct an investigation as to whether any complaints, even informal complaints, may have been raised throughout the 7.5 years of this Administration would potentially involve the need to contact scores of Advance Office volunteers and former employees located throughout the country, and a search of the White House email system spanning the entire time of this Administration, encompassing millions of emails.

SPENCER GEISSINGER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re Subpoenas in | ) | |
| JEANNE PAHLS et al., | ) | |
| | ) | Misc. No. _____ |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOARD OF COUNTY COMMISSIONERS | ) | |
| FOR COUNTY OF BERNALILLO, et al., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |
| and EXECUTIVE OFFICE OF THE | ) | |
| PRESIDENT OF THE UNITED STATES | ) | |
| | ) | |
| Third-Party Movant | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
EXECUTIVE OFFICE OF THE PRESIDENT'S MOTION TO QUASH
SUBPOENA *AD TESTIFICANDUM* AND *DUCES TECUM* ISSUED IN
PAHLS, ET AL. V. BOARD OF COUNTY COMMISSIONERS FOR
COUNTY OF BERNALILLO, ET AL., CIV. A. NO. 1:08-CV-53 (D.N.M.)**

**PRELIMINARY STATEMENT**

The Executive Office of the President of the United States ("White House" or "Executive

Office of the President") respectfully asks that this Court quash the subpoena *ad testificandum*

and subpoena *duces tecum* that plaintiffs in a civil action pending in the United States District

Court for the District of New Mexico have caused to be issued and served under Rule 45 of the

Federal Rules of Civil Procedure. Plaintiffs' subpoena directs the White House "Office of

Presidential Advance" to produce witnesses pursuant to Rule 30(b)(6) of the Federal Rules of

Civil Procedure to testify as to six different categories of information, including among other

things, "White House policies, procedures, guidelines, and/or training materials concerning . . .

[e]xpressive activities or speech . . . ." Ex. A to Plfs' Subpoena served on May 23, 2008

(subpoena attached hereto as Attachment 1). Plaintiffs also seek production of "all documents

concerning each of the foregoing categories for deposition." Id.

The plaintiffs' lawsuit in the District of New Mexico arose out of an alleged incident that

occurred during a fund-raising event for Senator Pete Domenici in August, 2007 in Albuquerque,

New Mexico, an event that President George W. Bush attended.  Plaintiffs are individuals who

chose to engage in a protest against the President and the Iraq War outside of the private ranch

where the fund-raising event was held.  Plaintiffs allege that the defendants, local law

enforcement officials with the City of Albuquerque and the County of Bernalillo, forced them to

stand farther away from the Presidential motorcade route, while permitting supporters of the

President to stand closer to the route.  Plaintiffs contend that through these alleged actions,

defendants engaged in content and viewpoint discrimination in violation of plaintiffs' rights

under the First and Fourteenth Amendments.  Plaintiffs further speculate that other "federal

actors" may have played a part in where plaintiffs were asked to stand when the presidential

motorcade passed on its way to the fund-raiser.  Based upon this speculation, plaintiffs indicate

in their Complaint that they intend to add the unknown "federal actors" as defendants if

information comes to light implicating their involvement in the incident.

Now – four months after plaintiffs filed their Complaint and mere weeks before the

deadline to amend their Complaint to add new parties – plaintiffs seek discovery from the White

House, a non-party.  Plaintiffs' third-party subpoena must be denied because they simply cannot

demonstrate the heightened and particularized need for, or relevance of, the information they

seek, as they are required to do when seeking non-party discovery from the Executive Office of

the President.  The Supreme Court has recognized that the White House is unlike other litigants

and has emphasized the necessity of protecting the Executive Branch at its highest level from

vexatious litigation that might distract it from the energetic performance of its duties.  <u>Cheney v.

United States District Court for the District of Columbia</u>, 542 U.S. 367, 382 (2004).  Plaintiffs'

request here does not even meet the standards set forth in Federal Rule 45 for typical third-party

discovery, let alone the exacting, heightened standards established by the Supreme Court for

obtaining discovery from the White House.

     Indeed, plaintiffs cannot demonstrate any need, much less a heightened need, for the

discovery they seek.  Plaintiffs' unsupported supposition that local law enforcement officers may

have been instructed by certain "federal actors" where demonstrators (whether those protesting or

in support of the President) could stand along a particular motorcade route based upon orders by

the White House or as a result of White House policy is based on nothing more than speculation.

It unquestionably would be disruptive to White House functions if courts were to allow *any* third-

party discovery against the White House in civil litigation.  It would be doubly vexatious if such

discovery were allowed merely on the basis of such rank speculation by the requesting party.

     Plaintiffs also fail to demonstrate a particularized need for them to obtain from the White

House the information they seek.  Plaintiffs can ascertain whether or not a representative of the

White House was in any way responsible for the defendants' alleged actions by making

appropriate discovery requests to the defendants themselves.  Indeed, that is precisely what

plaintiffs informed the District Court in New Mexico that they would do.  <u>See</u> Joint Status Report

and Provisional Discovery Plan at 2 ("Plaintiffs need discovery from the named Defendants in

order to identify the John/Jane Doe Defendants.  Once Plaintiffs have obtained this discovery,

they will amend their Complaint to reflect the identities of the [additional] Defendants.").
Plaintiffs have established no foundation to justify the discovery burden they seek to impose on
the White House, a non-party to the underlying case in New Mexico.

Even if third-party civil discovery from the White House were appropriate under
Cheney's exacting standards – which it is not – Rule 45 mandates that plaintiffs' subpoena be
quashed. A subpoena must be quashed if it "subjects a person to undue burden" or "fails to
allow a reasonable time to comply." Fed. R. Civ. P. 45(c)(3)(A). The plaintiffs' requests will
greatly burden the already limited resources of the White House. Moreover, plaintiffs filed their
Complaint in January, but waited months before serving a subpoena on the White House on May
23, 2008. The subpoena, which has a return date of June 12, 2008, simply does not allow the
White House a reasonable time to comply. The White House should not be forced to shoulder
the burden caused by plaintiffs' delay in seeking this third-party discovery.

In sum, subpoenas directed to the Executive Office of the President are subject to a
heightened and "exacting" standard that plaintiffs here do not meet. Accordingly, plaintiffs'
subpoena must be quashed in its entirety.

## BACKGROUND

1.    Plaintiffs' Lawsuit

On August 27, 2007, President George W. Bush attended a fund-raising event held on
behalf of Senator Pete Domenici at the Los Ranchos de Albuquerque estate of Larry Abraham,
the Mayor of Albuquerque. Complaint ¶¶ 21-22 (attached hereto as Attachment 2). Plaintiffs
claim that local officials, including law enforcement officials with the County of Bernalillo and
the City of Albuquerque, permitted individuals who were supporters of the President to stand

closer to the President's motorcade route than those individuals engaging in protests against the President, including the plaintiffs. Id. ¶¶ 23-46. In addition to bringing suit against the local authorities, including the City of Albuquerque and the Board of County Commissioners for the County of Bernalillo, plaintiffs also sued John and Jane Does as "persons whose identities are currently unknown to plaintiffs," but whom on "information and belief" include "federal actors who were involved in making and/or implementing policy decisions" that resulted in the allegedly discriminatory conduct. Id. ¶ 20.

     2.    <u>Plaintiffs' White House Subpoena</u>

Plaintiffs' subpoena, addressed to the "Office of Presidential Advance, The White House," was issued from this Court on May 13, 2008. <u>See</u> Plfs' Subpoena Served on May 23, 2008 (Att. 1). By agreement between counsel, service of the subpoena was accepted on behalf of the White House on May 23, 2008. In specific part, the subpoena directs the White House to produce witnesses under Fed. R. Civ. P. 30(b)(6) to testify as to the following categories of information:

> "1. Reasons, facts, and/or other information concerning why Plaintiffs were required to stand approximately 150 yards away from the President's motorcade route while a group of presidential supporters was permitted to be closer to the route.
>
> 2. The name, affiliation, and contact information of individuals responsible for deciding where Plaintiffs and other demonstrators were permitted to stand.
>
> 3. Reasons, facts, and/or other information concerning any claim or belief that Plaintiffs posed a safety, security, or other kind of threat to the President or anyone else.
>
> 4. Communications concerning the incident involving Plaintiffs and/or actions taken as a result of the August 27, 2007 incident involving Plaintiffs.

5.  White House policies, procedures, guidelines, and/or training materials concerning:

> A.   Expressive activities or speech, including, but not limited to, policies concerning placement of demonstrators and protestors;

> B.   Discrimination or non-discrimination against speakers based on content or viewpoint;

6.  Other complaints of First Amendment/free speech violations by individuals demonstrating along presidential motorcade routes."

*See* Exhibit A to Plfs' Subpoena (Att. 1). Plaintiffs' subpoena further requests "[a]ll documents concerning each of the foregoing categories for deposition." Id.

## ARGUMENT

**I.    PLAINTIFFS' SUBPOENA IS OBJECTIONABLE ON ITS FACE AND SHOULD BE QUASHED IN ITS ENTIRETY**

Plaintiffs' subpoena should be quashed in its entirety because they cannot demonstrate a heightened need for, or the relevance of, the discovery they seek, and because the subpoena would improperly burden the White House.

**A.    <u>Subpoenas Directed to The White House Are Subject to Heightened Scrutiny</u>**

Rule 45 of the Federal Rules of Civil Procedure prohibits courts from giving effect to subpoenas that "subject[] a person to undue burden." Fed. R. Civ. P. 45(c)(3)(A)(iv). When considering a motion to quash under Rule 45, district courts must balance the requesting party's need for material with the costs of compliance imposed on the responding party. See <u>North Carolina Right to Life, Inc. v. Leake</u>, 231 F.R.D. 49, 51 (D.D.C. 2005)("limiting discovery is appropriate when the burden of providing the documents outweighs the need for it."); <u>Linder v. Department of Defense</u>, 133 F.3d 17, 24 (D.C. Cir. 1998) ("Whether a burdensome subpoena is

reasonable 'must be determined according to the facts of the case,' such as the party's need for

the documents and the nature and importance of the litigation."). Factors that inform this inquiry

include "relevance, the need of the party for the documents, the breadth of the document request,

the time period covered by it, the particularity with which the documents are described and the

burden imposed." Leake, 231 F.R.D. at 51 (quotation marks omitted). In addition, where the

discovery request is directed to a non-party, as it is here, "concern for the unwanted burden thrust

upon non-parties is a factor entitled to special weight in evaluating the balance of competing

needs." Watts v. S.E.C., 482 F.3d 501, 509 (D.C. Cir. 2007) (quotation marks omitted).

  This case is not, however, typical civil litigation, and special considerations over and

above the normal Rule 45 standards apply when a party seeks information from the White House.

Indeed, even when the Executive Office of the President is a party to litigation, the Supreme

Court has recognized that "the high respect that is owed to the office of the Chief Executive . . .

is a matter that should inform the conduct of the entire proceeding, including the timing and

scope of discovery, . . . and that the Executive's constitutional responsibilities and status are

factors counseling judicial deference and restraint in the conduct of litigation against it . . . ."

Cheney v. United States District Court for the District of Columbia, 542 U.S. 367, 385 (2004)

(internal quotations and citations omitted). Particularly relevant to this case, the Supreme Court

stressed that courts are to "give recognition to the paramount necessity of protecting the

Executive Branch from vexatious litigation that might distract it from the energetic performance

of its constitutional duties." Id. at 382 (emphasis added).

  In accordance with these principles, the Supreme Court in Cheney emphasized that even

the criminal subpoenas at issue in United States v. Nixon, 418 U.S. 683 (1974), "were [first]

required to satisfy exacting standards of '(1) relevance; (2) admissibility; (3) specificity."
Cheney, 542 U.S. at 386 (citations omitted).[1]  These "exacting standards" apply *a fortiori* when a
party is seeking civil discovery from the Executive Office of the President.  As the Supreme
Court explained in Cheney, "[t]he need for information for use in civil cases, while far from
negligible, does not share the urgency or significance of the criminal subpoena requests in
Nixon."  Id. at 384; see also id. at 386 (noting that, in contrast to the "various constraints, albeit
imperfect, to filter out insubstantial legal claims" in the criminal justice system, "there are no
analogous checks in the civil discovery process.").  Heightened standards are even more
appropriate here, where the Executive Office of the President is not even a party to the civil case.

Moreover, "[a] party's need for information is only one facet of the problem."  Id. at 385.
The burden imposed on the White House by discovery orders is also an "important factor" to be
considered by the courts because of the special deference and "'[t]he high respect that is owed to
the office of the Chief Executive.'"  Id.  The courts must also be specially cognizant of the fact
that, owing to the high visibility of the Executive Office of the President, it is an easily
identifiable target for civil suits and corresponding discovery orders.  Id. at 386.

All of these considerations mandate that plaintiffs' subpoena, at a minimum, satisfy
heightened standards of relevance, admissibility, and specificity and not unduly burden the White
House.  Id.  As demonstrated below, plaintiffs cannot meet Rule 45 standards much less the

---

[1]  As the Cheney Court recognized, requiring these exacting standards to be met in Nixon served
"as an important safeguard against unnecessary intrusion into the operation of the Office of the
President," id. at 387, and was the means by which "the party requesting the information – the
special prosecutor – had satisfied his burden of showing the propriety of the [subpoena]
requests."  Id. at 388.

"exacting standards" set forth in <u>Cheney</u> "as an important safeguard against unnecessary intrusion into the operation of the Office of the President." <u>Id</u>. at 387.

**B.  Plaintiffs' Subpoena Must Be Quashed Because It Fails To Meet the Exacting Standards for Enforcing Subpoenas Directed To the White House**

**1.  Plaintiffs' Subpoena Is Based On Mere Speculation About White House Involvement In The Defendants' Conduct.**

A significant factor for this Court to consider in determining whether plaintiffs have met the heightened standards required to pursue discovery against the Executive Office of the President is whether plaintiffs have an urgent need for the discovery they seek. <u>Id</u>. at 384 (explaining that the need for information for use in civil cases does not share the urgency or significance of criminal subpoena requests). As noted earlier, this case involves civil litigation in which the federal government is not a party. Plaintiffs do not come close to satisfying the heightened standards that apply to subpoenas directed to the Executive Office of the President.

Plaintiffs' alleged need for the information sought from the White House is based on nothing more than speculation that defendants allowed supporters of the President to stay close, but told plaintiffs to move away from the Presidential motorcade route either on the orders of other "federal actors" or as a result of an alleged White House policy. Plaintiffs refer to some version of a Presidential Advance Manual that discusses the placement of "Demonstrators" on Presidential motorcade routes. <u>See</u> Complaint ¶ 51. That document, however, does not make plaintiffs' allegation of federal involvement any less speculative. Plaintiffs obviously assume that the County and City defendants took the actions alleged in the complaint as a result of the guidelines set forth in the manual. However, plaintiffs offer no factual support that these local law enforcement officials were even aware of the existence of the manual or its contents, let

alone that it guided their conduct.   Indeed, there is no indication that plaintiffs have obtained

information through discovery from those defendants that would be able to confirm such a

connection, if one exists.

Nor does plaintiffs' citation to a newspaper article in which a county law enforcement

official was purportedly quoted as saying that "the Secret Service," in consultation with the

Sheriff's Department, were the ones who decided that the supporters of the President could stand

just across from the Mayor's driveway, see Complaint ¶ 52, justify the discovery plaintiffs seek

from the *White House*.   Even if the statements were made, they would not corroborate plaintiffs'

belief that the Executive Office of the President – as opposed to the defendants or the Secret

Service[2] -- possesses information relevant to their allegations.

The discovery plaintiffs seek against the White House – a quintessential fishing

expedition – is precisely the type of vexatious litigation about which the Supreme Court was

concerned in Cheney.   Every Presidential administration has its detractors, making the White

House an obvious target of lawsuits.   See Cheney, 542 U.S. at 386 ("'In view of the visibility of'

the Office of the President and the 'effect of [its] actions on countless people,' [it is] an 'easily

identifiable target[] for suits for civil damages,'" quoting Nixon v. Fitzgerald, 457 U.S. 731, 753

(1982)).   So too, it is an easily identifiable target for third-party subpoena requests, which

similarly "distract a President from his public duties, to the detriment of not only the President

---

[2]   Plaintiffs have caused a similar subpoena to be directed to the United States Secret Service
from the United States District Court for the District of New Mexico.

and his office but also the Nation that the Presidency was designed to serve." Nixon v. Fitzgerald, 457 U.S. at 753.[3]

## 2. The Plaintiffs Can Obtain the Information They Seek Regarding Alleged White House Involvement in the August 27, 2007 Incident Without Encroaching Upon the Executive Office of the President.

Even if plaintiffs could demonstrate that they "need" to discover whether the White House or other federal actors had any involvement in the defendants' alleged conduct, they do not need to obtain such information from the White House. Instead, they can seek such information during discovery from the defendants themselves. The parties' discovery will either confirm or disprove plaintiffs' unsupported assumption that defendants' alleged conduct was either directly ordered by federal officials or somehow influenced by alleged White House policies or procedures.[4] Because the information they seek is available from other sources, plaintiffs must not be allowed to resort to invasive, time-consuming and burdensome discovery against the White House, a non-party.

---

[3]  Presidents travel in thousands of motorcades throughout their time in office, and crowds – both supporters and detractors – commonly stand along the motorcade routes. In most cases, the President relies upon the diligent efforts of local law enforcement officials to secure the motorcade route. To permit this type of invasive discovery of the White House based upon a purely speculative claim that a representative of the Executive Office of the President had something to do with those local authorities' placement of demonstrators in a disadvantageous position along the motorcade route would open the door to a torrent of unwarranted and burdensome third-party discovery demands on the White House.

[4]  Even if it were assumed *arguendo* that local law enforcement officials acted improperly by asking plaintiffs to stand away from the Presidential motorcade – and we stress that this is assumed only for the sake of argument as defendants strenuously deny that this ever happened – such conduct is not somehow transferrable to the White House. The Executive Office of the President is not a defendant in this litigation; there are no claims against it and plaintiffs have offered no evidence, or even a substantive allegation, of discriminatory conduct by anyone in the White House.

II.    **THE SUBPOENA SHOULD BE QUASHED BECAUSE IT FAILS TO PROVIDE A REASONABLE TIME FOR COMPLIANCE AND BECAUSE IT IMPOSES AN UNDUE BURDEN ON THE WHITE HOUSE**

Federal Rule of Civil Procedure 45 requires a party issuing a subpoena to a third-party to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(c)(1).  Under Rule 45(c), a court is required to quash a subpoena if it "fails to allow a reasonable time to comply," "requires disclosure of privileged or other protected matter" or "subjects a person to undue burden." Fed. R. Civ. P. 45(c)(3)(A).  Even if the subpoena were not objectionable on its face under the heightened standards of <u>Cheney</u>, plaintiffs' subpoena would have to be quashed pursuant to Rule 45 standards.

A.    **The Plaintiffs Have Not Provided the Executive Office of the President a Reasonable Time to Respond to the Subpoena**

Plaintiffs filed suit in New Mexico in January, 2008, yet waited until May 23, 2008, to properly serve the White House with the third-party subpoena.  The return date on the subpoena of June 12, 2008, gives a White House already burdened with demands from Congressional oversight and other important responsibilities barely three weeks to conduct a reasonable investigation to address plaintiffs' specific questions about the August, 2007 event, and to search for any responsive documents, including any electronic communications, and review any such documents for privilege and security concerns.  The twenty days between service of the subpoena and the deposition date do not provide sufficient time for the White House to comply with a witness conversant in all matters identified by plaintiffs.

Nor should this Court be persuaded by plaintiffs' presumed response that the urgency of the subpoena is due to the impending June 20th deadline set by the United States District Court

for the District of New Mexico to amend pleadings or add parties. The present situation is one of

plaintiffs' own creation for which the White House is not responsible. At the time they filed

their Complaint, plaintiffs presumed the involvement of other, unknown "local, state, or federal

actors." See Complaint ¶ 20. Even assuming for the sake of argument that any third-party

discovery directed to the White House would be appropriate under these circumstances, plaintiffs

have had four months since they filed their Complaint to issue third-party subpoenas, yet waited

less than a month before the June 20th deadline to issue and serve the subpoena on the White

House. If plaintiffs now complain about the urgency of the situation, they have only themselves

to blame. The White House cannot be made shoulder the burden caused by their dilatory

conduct.[5]

### B.    The Executive Office of the President Will Be Unduly Burdened If This Subpoena Is Not Quashed.

In evaluating whether a subpoena imposes an undue burden, a court should consider

"relevance, the need of the party for the documents, whether the request is cumulative and

duplicative, the time and expense required to comply with the subpoena (relative to the

responder's resources), and the importance of the issues at stake in the litigation." Linder v.

---

[5] In their cover letter to the undersigned counsel, plaintiffs' counsel suggests that in light of the fact that the "government already had actual knowledge of the documents and deposition testimony that Plaintiffs seek" the government can meet the deadline that the subpoena imposed. This statement is simply untrue. Plaintiffs improperly served the subpoena on the United States Attorney's Office on May 13, 2008, instead of on the White House. See Subpoena served on the United States Attorney's Office (Attachment 3). The White House did not receive actual notice of the subpoena until almost a week later on May 19, 2008. See Declaration of Spencer Geissinger ("Geissinger Decl.") ¶ 3 (attached hereto as Attachment 4). Whether the White House has sufficient time to comply with the subpoena must be based on when it was actually served with the subpoena, not based on when it had "knowledge" of the subpoena. In any event, even assuming that the subpoena had been properly served at an earlier date, a difference of 7-10 days is not material given the scope of the subpoena and the limited time to respond.

Calero-Portocarrero, 180 F.R.D. 168, 174 (D.D.C. 1998) (citing, inter alia, Fed. R. Civ. P.

26(b)(2)).  A court may also consider "the breadth of the document request, the time period

covered by it, the particularity with which the documents are described and the burden imposed."

Alexander v. FBI, 186 F.R.D. 21, 34 (D.D.C. 1998) (internal quotes and citation omitted).

Plaintiffs' speculation that their case would benefit from the information sought by the

White House is outweighed by the burden the subpoena will impose on the White House.

Plaintiffs', subpoena would require a considerable dedication of time by the Office of Presidential

Advance – time the office does not have –  to investigate the facts and prepare for the deposition.

Geissinger Decl. ¶ 4.[6]  The President just returned from a week-long trip to the Middle East and

will be traveling to Europe for the U.S.-European Union Summit and other affairs of state from

June 9-16, 2008.  Id. ¶ 6.  During that time, the President will be visiting a total of five different

countries.  Id. ¶ 5.  Accordingly, during the past several weeks and through the end of the trip on

June 16, 2008, members of the Advance Office have been and will be fully occupied in the

substantial issues surrounding a foreign Presidential trip, including traveling internationally to

the areas in question in advance of each stop.  Id. ¶ 6.  Moreover, members of the Advance

Office, including the Director of Presidential Advance, are currently planning two additional

near-term foreign trips by the President, including one to Asia in July for the G-8 Summit, and to

Asia again in August for the Olympics.  Id.  ¶ 7.  High-profile foreign travel, such as the trips that

the President is taking in June, July and August, requires substantial planning and coordination

with multiple agencies within the Executive Branch, the President's security detail and with

---

[6]  The Office of Presidential Advance ("Advance Office") is the office within the Executive
Office of the President which is responsible for planning, coordinating and overseeing all
domestic and foreign travel by the President.  See Geissinger Decl. ¶ 2.

-14-

multiple host countries. Geissinger Decl. ¶¶ 2 & 7. The Advance Office is currently fully

engaged in arranging for those upcoming European and Asian trips during this period of

particularly heavy travel by the President. Id. ¶ 7. The scheduled foreign trips are in addition to

the President's routine domestic travel schedule, the planning for which the Advance Office is

also currently responsible. Id. ¶ 8. In short, responding to plaintiffs' third-party subpoena,

including preparing for and appearing at a deposition, on such short notice – and where the

subpoena is based on nothing more than plaintiffs' speculation about White House involvement

in the alleged August, 2007 incident – would significantly burden the White House Advance

Office, which is challenged to meet the demands of the exceptional and intense current travel

schedule.[7]

In addition, plaintiffs request all "communications concerning the incident involving

Plaintiffs and/or actions taken as a result of the August 27, 2007 incident," Ex. A to Plfs'

Subpoena (Attachment 1). Preparing a response would require the White House to conduct a

search of the White House e-mail system to determine if any emails may be responsive to this

request. The subpoena also seeks testimony and documents concerning "[o]ther complaints of

First Amendment/free speech violations by individuals demonstrating along presidential

motorcade routes." Id. This aspect of plaintiffs' request is without time-restrictions and is vague

---

[7] It should also be noted that plaintiffs seek, among other things, a factual account of events
surrounding the Presidential visit to Albuquerque. See Ex. A to Plfs' Subpoena (categories 1-3)
(Att. 1). However, the individuals most likely to have information, if any, concerning where
individuals were permitted to stand outside of the private event in Albuquerque are those
members of the Advance team who traveled to Albuquerque for the event. See Geissinger Decl.
¶ 5. Those Advance Team members are volunteers, and not employees of the White House, and
do not reside in Washington, D.C. Id. Accordingly the White House is beholden to the
willingness and availability of those individuals to provide information necessary for a
representative of the White House to prepare and testify on the subjects into which plaintiffs
intend to inquire about the August 27, 2007 event in Albuquerque.

as to what constitutes "complaints." To conduct an investigation into whether any complaints, formal or informal, have been made concerning demonstrations along other Presidential motorcade routes dating back as far as 2001 would be no small matter. See Geissinger Decl. ¶ 9. Such an investigation could potentially require the Advance Office to contact scores of Advance Office volunteers and current and former employees located throughout the country to determine the existence, if any, of complaints made by individuals demonstrating along Presidential motorcade routes. Id. It would also require a search of millions of White House e-mails spanning years to determine if any such "complaints" have been made or discussed. Id. This search would necessarily compete for resources with the well-known demands for information, including e-mails, from Congressional oversight and other litigation.

In sum, given the scope of these requests and the fact that some of them do not contain temporal restrictions, the White House would have to expend considerable time and effort to determine which individuals may be potential custodians of responsive documents and which individuals could testify during a deposition as to the array of topics into which plaintiffs seek to inquire. Moreover, the documents plaintiffs seek, if they exist, would not only be irrelevant to the incident in question here, but could very well be protected by the attorney-client privilege and other applicable privileges.

As any casual observer knows, the Executive Office of the President is already facing tremendous responsibilities. To respond to plaintiffs' requests, the White House would have to prioritize the plaintiffs' third-party subpoena in this civil case above other pressing matters. Doing so would violate the premise that subpoenas to the government "properly accommodate the government's serious and legitimate concern that its employees' resources not be

-16-

commandeered into service by private litigants to the detriment of the smooth functioning of government operations." <u>Watts</u>, 482 F.3d at 509 (quotation marks omitted).

## CONCLUSION

For the reasons stated herein, the Executive Office of the President respectfully request that the subpoena *ad testificandum* and *duces tecum* issued by the American Civil Liberties Union on behalf of plaintiffs in *Jeanne Pahls et al. v. Board of County Commissioners for the County of Bernalillo, et al.*, Civil Action No. 08-53 (D.N.M.)(LH/ACT) be quashed under Federal Rule of Civil Procedure 45(c)(3)(A).  A proposed Order is attached for the convenience of the Court.

Dated: June 6, 2008                          Respectfully submitted,


                                             GREGORY KATSAS
                                             Acting Assistant Attorney General

                                             JOHN O'QUINN
                                             Deputy Assistant Attorney General

                                             JEFFREY A. TAYLOR
                                             United States Attorney

                                             ARTHUR R. GOLDBERG (D.C. 180661)
                                             Assistant Director

                                             /s/ Karen Richardson
                                             KAREN RICHARDSON
                                             Federal Programs Branch, Civil Division
                                             United States Department of Justice
                                             P.O. Box 883, 20 Massachusetts Ave., NW
                                             Washington, D.C. 20044
                                             Tel:    (202) 514-3374
                                             Fax:    (202) 616-8460

E-mail: Karen.Richardson@usdoj.gov
Attorneys for the Third-Party Movant,
the Executive Office of the President

## CERTIFICATE OF SERVICE

I hereby certify that, on June 6, 2008, a true and correct copy of Executive Office of the President's Motion to Quash Subpoena *Ad Testificandum* and *Duces Tecum* Issued in <u>Pahls, et Al. V. Board of County Commissioners for County Of Bernalillo, et Al., Civ. A. No. 1:08-cv-53 (D.N.M.)</u> and Memorandum in Support, was served via Federal Express, upon the following counsel:

Catherine Crump
Christopher A. Hansen
Josh Hsu
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2606

and by first class mail to:

George Bach
Staff Attorney
American Civil Liberties Union of New Mexico
P.O. Box 566
Albuquerque, New Mexico 87106
(505) 243-0046

Ernestina Cruz, Esq.
H. Nicole Werkmeister
Narvaez Law Firm, P.A.
P.O. Box 25967
Albuquerque, N.M. 87125-0967
(505) 247-1344

Kathryn Levy
City of Albuquerque Legal Department
P.O. Box 2248
Albuquerque, New Mexico 87103-2248
(505) 768-4525

*Karen Richardson*

Karen K. Richardson

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re Subpoena in | ) | |
| JEANNE PAHLS et al., | ) | |
| | ) | Misc. No. _____ |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOARD OF COUNTY COMMISSIONERS | ) | |
| FOR COUNTY OF BERNALILLO, et al., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |
| and EXECUTIVE OFFICE OF THE | ) | |
| PRESIDENT OF THE UNITED STATES | ) | |
| | ) | |
| Third-Party Movant | ) | |
| _____ | ) | |

**[PROPOSED]
ORDER**

The Court, being fully apprised of the Executive Office of the President of the United

States' Motion to Quash Subpoena *Ad Testificandum* and *Duces Tecum*, and any opposition

thereto, hereby finds the Motion is well-taken and is hereby GRANTED.  The subpoena issued

by the American Civil Liberties Union as counsel for plaintiffs in <u>Jeanne Pahls et al. v. Board of</u>

<u>County Commissioners for the County of Bernalillo, et al.</u>, Civil Action No. 08-53

(D.N.M.)(LH/ACT)**,** and directed to the White House Office of Presidential Advance is hereby

QUASHED, and no further response or objection thereto shall be required.

IT IS SO ORDERED, this ___ day of _____, 2008.

_____
UNITED STATES DISTRICT JUDGE