## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re Subpoenas in<br>JEANNE PAHLS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BOARD OF COUNTY COMMISSIONERS<br>FOR THE COUNTY OF BERNALILLO, *et al.*,<br><br>Defendants.<br><br>EXECUTIVE OFFICE OF THE<br>PRESIDENT OF THE UNITED STATES<br><br>Third-Party Movant. | )<br>)<br>)<br>)<br>)<br>)  No. 08-mc-0362 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### PLAINTIFFS' OPPOSITION TO THE EXECUTIVE OFFICE OF THE PRESIDENT'S MOTION TO QUASH SUBPOENA *AD TESTIFICANDUM* AND *DUCES TECUM*

### INTRODUCTION

The Complaint in this 42 U.S.C. § 1983 case, which is pending in the District of New Mexico, alleges that in August 2007, when President Bush visited Albuquerque, demonstrators expressing criticism of the President and his policies were forced to stand out of sight of the President's motorcade route, while pro-Bush demonstrators were allowed to stand on his route and at a place where he slowed down to make a turn. Plaintiffs (the anti-Bush demonstrators) allege that this discrimination against them based on their viewpoint violated their right under the First Amendment.

Plaintiffs' only contact was with local law enforcement. Plaintiffs sued local law enforcement seeking damages but alleged that local law enforcement acted according to

instructions from federal officials. Plaintiffs' subpoena to the Office of Presidential Advance (the "Advance Office") (Exhibit A) seeks to establish that fact, so that additional defendants can be added to the case if appropriate.

Several facts are critical to the disposition of this motion.

1. **Plaintiffs acted promptly.** Plaintiffs subpoenaed the Advance Office less than one month after the Court's Rule 16 conference, where the Court issued a schedule for discovery.

2. **Plaintiffs employed alternative means to obtain this information.** Plaintiffs first sent out informal letters to counsel for local law enforcement officers seeking the identities of federal actors. In response the County sent a letter stating that local law enforcement worked with federal officials during the event, but that their identities were not known. Plaintiffs subsequently deposed nine local law enforcement officers, also seeking to identify the federal employees who were involved. Every local law enforcement officer confirmed that federal officials dictated the differential treatment of the demonstrators. Every local law enforcement officer professed not to know the names or titles of a single federal official, except for one officer who named a single Secret Service agent.

3. **Plaintiffs have ample reason to believe that the Advance Office was responsible for the violation of their constitutional rights**. The official manual of the Office of Presidential Advance explicitly urges its operatives to ensure that demonstrators critical of the President be kept out of sight of the President and the news media. By contrast, the Secret Service (at least as a matter of formal policy), prohibits its agents from engaging in differential treatment of demonstrators based on viewpoint. In addition, plaintiffs' counsel have been involved in two similar cases in which testimony by officials or volunteers of the Advance Office confirmed that decisions to keep against anti-Bush demonstrators out of sight were made

not by Secret Service or local law enforcement but by the Office of Presidential Advance.    And

the Director of the Advance Office states that the Office plans and coordinates the logistics for

*all* Presidential events (Declaration of Spencer Geissinger, ¶ 2), thus confirming that the Office

was involved in the President's visit to Albuquerque.

4. **The movant has not demonstrated burdensomeness as required by law**.  For

example, the Advance Office has not even identified the personnel who worked the New Mexico

event, and thus cannot allege they are currently working on any other events.  Moreover, the

subpoena is narrowly focused, seeking information about one Presidential visit and related

policies and complaints.  Finally, in other lawsuits plaintiffs' counsel have deposed close to a

dozen full-time employees and/or volunteers of the Advance Office without any disruption of

that office (and indeed, without any objection).  Notably, the Secret Service in this case received

a nearly identical subpoena, and it complied with the subpoena without any objection of

burdensomeness.

5. **Time is of the essence**.  To the extent the government's motion alternatively seeks

additional time to respond, plaintiffs are constrained by the scheduling order of the United States

District Court for the District of New Mexico, where this case is pending.  Plaintiffs must file an

amended complaint naming any additional defendants, including any from the Office of

Presidential Advance, no later than July 21, 2008 – less than five weeks from now.

## STATEMENT OF THE CASE

### BACKGROUND

On August 27, 2007, President George W. Bush visited Albuquerque, New Mexico to

attend a fundraiser for Senator Pete Domenici.  Complaint ¶ 21 (Exhibit B).  Prior to the

President's visit, various individuals decided that they would peacefully express their

disagreement with the President's policies by holding up signs along his travel route on Rio Grande Boulevard  *Id.* ¶ 23.

The fundraiser took place at the estate of Mayor Larry Abraham.  *Id.* ¶ 22.  On the morning of the event, one of the individuals was told that protesters would be allowed to gather on the shoulders of Rio Grande Boulevard, near the entrance to the driveway leading into Mayor Abraham's estate.  *Id.* ¶ 26.  Some individuals gathered on the north side of the driveway.  *Id.* ¶ 28.  A larger group gathered on the south side.  *Id.*

However, at some point prior to the President's arrival, local law enforcement officials – consisting of officers from the Albuquerque Police Department ("APD") and the Bernalillo County Sheriff's Department ("BCSD") – forced all of the protesters to move south on Rio Grande Boulevard and to stand behind a barrier established by the officers approximately 150 yards away from the entrance to the driveway.  *Id.* ¶¶ 37, 40.

The President's motorcade approached the fundraiser site from the north, and, as a result, the President never passed by the protesters.  Moreover, the protesters were kept behind a barrier and at such a distance that their signs could not even be seen by the President.  *Id.* ¶ 46. Meanwhile, the local law enforcement officials did not move a group of Presidential supporters standing on the shoulder of Rio Grande Boulevard immediately across from the driveway.  *Id.* ¶¶ 38, 39.  Several of these supporters were holding American flags and two individuals held up a banner that said, "God Bless George Bush!  We pray for you!"  *Id.* ¶ 39.  These individuals were permitted to stand directly alongside the President's motorcade route, close to and in plain sight of his passing car, and at a point where the motorcade had to slow down to turn into the driveway.  *Id.* ¶¶ 38-39, 45.  In other words, while those disagreeing with the President were

kept out of sight, those who directed a positive message toward the President were allowed to stand where he would surely see them.

## PROCEDURAL HISTORY

On January 15, 2008, several of the protesters filed a complaint in the U.S. District Court for the District of New Mexico (Exhibit B), alleging violations of their First and Fourteenth Amendment rights because they were discriminated against based on the content and viewpoint of their speech.  Just three days after the complaint was filed, plaintiffs contacted counsel for local law enforcement to inquire about expedited discovery to ascertain the identities of the unknown federal actors (Exhibit C).  Counsel for the Board of County Commissioners for the County of Bernalillo and the Bernalillo County Sheriff's Department ("County defendants") responded that they would be willing to enter into an informal agreement to allow for limited, expedited discovery.  *Id.*  Despite initially confirming that they would agree to whatever the County would agree to, the City of Albuquerque and the Albuquerque Police Department ("City defendants") never responded to subsequent inquiries.

Thereafter, pursuant to an agreement with the County defendants, plaintiffs sent a letter on February 1, inquiring about the identities of any federal actors working at the August 2007 Presidential visit (Exhibit D).  The County defendants responded with a letter on February 18 indicating that while the County worked with various members of the Secret Service, they could not identify any of the federal actors (Exhibit E).

On February 18, the County defendants also filed their answer to the complaint.  The City defendants answered on March 3.  Magistrate Judge Alan Torgerson issued an initial scheduling order on March 10, 2008 (Exhibit F).  The order directed the parties to file a joint status report on April 14, 2008, and set the Rule 16 scheduling conference for April 22, 2008.

At the April 22 pretrial conference, plaintiffs' counsel apprised the Court of certain discovery issues, including the fact that plaintiffs were seeking to identify unknown federal actors, and that a couple of rounds of depositions might be needed to do so.  Because of the atypical path of discovery, and the need to amend the pleadings to add the federal actors after they were identified, plaintiffs' counsel requested a later deadline – closer to the end of discovery – to add parties or amend the pleadings.  After the conference, the Court issued a scheduling order (Exhibit G).  The Court set June 20, 2008 as the cutoff date by which plaintiffs had to add parties or amend their pleadings.  *Id*.  The final discovery cutoff date was set for August 20, 2008.  Just five business days after the Rule 16 Conference, on April 29, plaintiffs served their requests for production on both the City and County defendants.

On May 30, 2008, plaintiffs filed a motion to extend the deadline to add parties or amend pleadings until July 21, 2008.  Both the City and County defendants consented to the extension, and the Court granted the motion on June 2, 2008.

From June 3 to 6, plaintiffs deposed nine local law enforcement officials.  They included: (1) Lt. Brown, Lt. Parkins, and Commander Hetes of the APD; and (2) Lt. McCauley, Sgt. Mimms, Sgt. Dunlap, Lt. Thomas, Sgt. Rees, and Deputy Sheriff Linthicum of the BCSD.  Each of these local law enforcement officials stated under oath that it was federal officials, and not local law enforcement officials, who were the decision-makers during the President's August 27, 2007 visit to Albuquerque.  *See, e.g.*, Exhibits H &I (examples of deposition testimony from local law enforcement officials).  They were unable, however, to provide names of any of the federal officials with the exception of one officer, who provided the name of one Secret Service agent.  *Id*.

Plaintiffs also served third-party subpoenas for Rule 30(b)(6) depositions of the Secret Service and the Advance Office on May 10 and 13, respectively. Although plaintiffs' counsel abided by the instructions for service on the Advance Office provided by the White House Deputy Counsel, the Department of Justice took the position that the subpoena had not been properly served. To avoid a time-consuming dispute, plaintiffs served a new subpoena on May 23. The subpoena to the Advance Office noticed its 30(b)(6) deposition for June 12, 2008. The categories for the deposition and documents requested by plaintiffs were confined to the August 27, 2007 Presidential visit to Albuquerque, the policies that the Advance Office follows when planning for such events, and other complaints regarding similar discrimination along Presidential motorcade routes. Specifically, plaintiffs listed the following as the categories for deposition:

1. Reasons, facts, and/or other information concerning why Plaintiffs were required to stand approximately 150 yards away from the President's motorcade route while a group of presidential supporters was permitted to be closer to the route.

2. The name, affiliation, and contact information of individuals responsible for deciding where Plaintiffs and other demonstrators were permitted to stand.

3. Reasons, facts, and/or other information concerning any claim or belief that Plaintiffs posed a safety, security, or other kind of threat to the President or anyone else.

4. Communications concerning the incident involving Plaintiffs and/or actions taken as a result of the August 27, 2007 incident involving Plaintiffs.

5. White House policies, procedures, guidelines, and/or training materials concerning:

   A. Expressive activities or speech, including, but not limited to, policies concerning placement of demonstrators and protesters;

   B. Discrimination or non-discrimination against speakers based on content or viewpoint;

6. Other complaints of First Amendment/free speech violations by individuals demonstrating along presidential motorcade routes.

Advance Office Subpoena (Exhibit A).

Two weeks later, on June 6, the government moved in this Court to quash the subpoena. For the reasons that follow, that motion should be denied.

## ARGUMENT

### I.    LEGAL STANDARDS

The Federal Rules provide for liberal discovery to ensure that litigation proceeds with "the fullest possible knowledge of the issues and facts before trial." *Hickman v. Taylor,* 329 U.S. 495, 501 (1947). Rule 26(b)(1) provides that parties may obtain discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party" and "the court may order discovery of any matter relevant to the subject matter involved in the action." Accordingly, the Federal Rules provide a mechanism by which parties may obtain discovery from third parties through the issuance of subpoenas. *See* Fed. R. Civ. P. 45.

A court may quash or modify a subpoena if it "subjects a person to an undue burden." Fed. R. Civ. P. 45(c)(3)(A)(iv). Whether a subpoena imposes an undue burden depends on "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Alexander v. FBI,* 186 F.R.D. 21, 34 (D.D.C. 1998). A "party's need for the [discovery] and the nature and importance of the litigation" are also weighty factors. *Linder v. Department of Defense*, 133 F.3d 17, 24 (D.C. Cir. 1998).

When a witness seeks to avoid discovery, "[t]he burden of proving that a subpoena is oppressive is on the party moving to quash." *Northrop Corp. v. McDonnell Douglas Corp.,* 751 F.2d 395, 403 (D.C. Cir. 1984); *Linder,* 133 F.3d at 24 ("the agency has the burden of proving oppressiveness"). A showing of undue burden must be specific, and significantly, assertions of undue burden without "'specific estimates of staff hours needed to comply' will be 'categorically

rejected.'" *Flatow v. The Islamic Republic of Iran*, 196 F.R.D. 203, 207 (D.D.C. 2000)

(Lamberth, J.), *vacated in part on other grounds*, 305 F.3d 1249 (D.C. Cir. 2002) (quoting

*Association of Am. Physicians & Surgeons v. Clinton,* 837 F. Supp. 454, 458 n.2 (D.D.C. 1993));

*see also Alexander v. FBI*, 194 F.R.D. 305, 315 (D.D.C. 2000)

The government's motion to quash relies on *Cheney v. U.S. District Court*, 542 U.S.

367 (2004), for the proposition that subpoenas directed to the White House are subject to

heightened scrutiny.  Mot. to Quash at 6-9.  But *Cheney* is a far narrower precedent than the

government asserts, dealing only with discovery requests "directed [personally] to the Vice

President and other senior Government officials who … give advice and make recommendations

to the President," the disclosure of which would interfere with the Executive Branch's

"constitutional prerogatives."  542 U.S. at 385.  The Court explicitly distinguished "cases that do

not involve senior members of the Executive Branch," *id*., and reaffirmed the proposition that in

appropriate circumstances even the President himself can be subject to civil discovery.  *Id*. at 388

(citing *Clinton v. Jones*, 520 U.S. 681 (1997)).  Moreover, the Court emphasized the relative

unimportance of the discovery at issue in *Cheney*, which was sought

> not to remedy known statutory violations, but to ascertain whether FACA's [the
> Federal Advisory Commission Act's] disclosure requirements even apply to the
> NEPDG [National Energy Policy Development Group] in the first place. Even
> if FACA embodies important congressional objectives, the only consequence
> from respondents' inability to obtain the discovery they seek is that it would be
> more difficult for private complainants to vindicate Congress' policy objectives
> under FACA.

542 U.S. at 384-85.  The Court contrasted that situation with another case in which discovery

had been ordered directly against the President "where a court's ability to fulfill its constitutional

responsibility to resolve cases and controversies within its jurisdiction hinges on the availability

of certain indispensable information."  *Id*. at 385 (citing *United States v. Nixon*, 418 U.S. 683

(1974)).  *Cheney* stands, therefore, only for the proposition that relatively unimportant discovery

requests directed to senior Executive Branch officials, seeking information related to their

"advice and … recommendations to the President," are beyond the scope of proper discovery.

As we show below, that proposition has nothing to do with this case.

## II.    THE DISCOVERY SOUGHT BY PLAINTIFFS IS BASED ON A SOLID EVIDENTIARY FOUNDATION, CANNOT BE OBTAINED BY OTHER MEANS, AND INVOLVES THE CENTRAL FACTS IN AN IMPORTANT CASE INVOLVING FUNDAMENTAL CONSTITUTIONAL RIGHTS

The government asserts that the noticed 30(b)(6) deposition of the Advance Office is "a

quintessential fishing expedition" that is "based on nothing more than speculation" about any

involvement of Advance Office personnel.  Mot. to Quash at 9-10.  The evidence proves the

contrary.

### A.  The Subpoena Rests on a Solid Evidentiary Foundation

First, plaintiffs' counsel have litigated two other cases involving viewpoint

discrimination at Presidential events, and in each of these cases the Advance Office has been

identified as the relevant decision-maker.  In *Rank v. Hamm*, 2007 WL 894565 (No. 04-cv-997,

S.D.W.Va. March 21, 2007), the plaintiffs attended a non-political, government-sponsored

speech by President Bush on July 4, 2004 in Charleston, West Virginia.  *Id*. at *1.  After they

were admitted to the event, they removed their outer shirts to display t-shirts with messages

critical of the President.  *Id*. at *2.  When they refused to cover up their t-shirts, local law

enforcement officials arrested them and removed them from the event.  *Id*.  Discovery indicated

that the determination to remove the plaintiffs was done at direction of Advance Office

personnel.  *Id*. at *3.

Similarly, in *Weise v. Casper*, 507 F.3d 1260 (10th Cir. 2007), the plaintiffs attended a

public speech by President Bush in Denver, Colorado.  *Id*. at 1262.  They alleged that they were

forced to leave the event because officials working at the event discovered that their car had a bumper sticker that said "No More Blood For Oil." *Id*. There, a volunteer working at the event testified at deposition that personnel from the Advance Office asked him to remove the plaintiffs from the event, confirming that members of the Advance Office were the ultimate decision-makers. Deposition of Michael Casper (Exhibit J) at 6-8.

Second, plaintiffs' counsel obtained a redacted copy of the Presidential Advance Manual through discovery in the *Rank* case (Exhibit K). As mentioned above, the manual has a section called "Preparing for Demonstrators," which states that members of the Presidential Advance team should "work with the Secret Service and have them ask the local police department to designate a protest area where demonstrators can be placed, preferably not in view of the event site or motorcade route." Manual at 34. This description is entirely consistent with how plaintiffs were treated in the *Rank* case and in this case. Here, they were confined to a designated area, forced to stand approximately 150 yards beyond the driveway entering the event site, and blocked from the view of the motorcade. Complaint ¶¶ 37, 40, 46. The Advance Manual also makes clear that demonstrators who support the President are to be given favored treatment – indeed, should even be used to block or drown out any expression by those who are opposed. Manual at 34. That policy of the Advance Office also was implemented in Albuquerque. Complaint ¶ 51.

As already noted, all nine of the City and County law enforcement officers who have already testified in this action have confirmed that federal officials dictated the differential treatment of the demonstrators. Exhibits H & I. The federal officials known to be on the scene

were Secret Service agents and Advance Office operatives.[1]  We presume that government counsel here are not suggesting that it was the Secret Service that imposed this unconstitutional policy upon plaintiffs; the Secret Service has a formal policy that prohibits such discriminatory treatment of protesters: "In the absence of knowledge of specific facts or observable actions which would indicate that a demonstration group or individuals participating in a demonstration pose a security threat to a protectee, such demonstrators are to be treated as members of the general public.  Secret Service personnel shall not initiate any action to segregate such demonstration groups or demonstrators from public areas."  Exhibit L at 5.  While that formal policy does not prove that the Secret Service was not involved in the decision to discriminate against anti-Bush protesters during the President's visit to New Mexico, it certainly leaves the Advance Office as the more likely culprit.[2]

Third, the Advance Office's role as the decision-maker regarding non-security matters at Presidential events should come as no surprise given the very purpose of that office.  According to its Director, the Advance Office "plans and coordinates the logistics for *all* Presidential domestic and international travel and events."  Geissinger Decl. ¶ 2 (emphasis added).  It would thus be extraordinary for the Advance Office *not* to have been involved in the planning and coordination of the President's visit to Albuquerque.

---

[1]  The Advance Office admits that there were "members of the Advance Team who traveled to Albuquerque for the event."  Mot. to Quash at 15 n.7.

[2]  In still other cases of alleged viewpoint discrimination at Presidential appearances in which plaintiffs' counsel are (or have been) involved, the Secret Service has strenuously denied that it engages in viewpoint discrimination, citing its formal policy.  *See Moss v. U.S. Secret Service*, 2007 WL 2915608 (No. 06-cv-3045, D. Ore. Oct. 7, 2007) (denying motion to dismiss), *appeal pending*, No. 07-36018 (9th Cir., filed Nov. 30, 2007); *Acorn v. City of Philadelphia*, 2004 WL 1012693 at *2 (No. 03-cv-4312, E.D. Pa. May 6, 2004) ("It is also undisputed that the Secret Service has elaborate written regulations which specifically provide for non-discrimination on the basis of the views sought to be expressed by protesters.").

It is beyond dispute that the Advance Office is likely to have knowledge about what happened along Rio Grande Boulevard on August 27, 2007; a 30(b)(6) deposition of that Office "appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). The government's repeated assertion that the subpoena at issue is based on "nothing more than speculation" is simply not credible.

## B. Plaintiffs Have Exhausted Other Avenues of Discovery

Nor is it credible for the government to argue that plaintiffs have not attempted to obtain the information in question from other sources, or that they can successfully do so. Mot. to Quash at 11. Plaintiffs have already exhausted other avenues. First, even before the commencement of formal discovery – just three days after the complaint was filed – plaintiffs reached out to the attorneys for the local law enforcement officials in an attempt to identify the federal actors involved. Exhibit C. The attorneys reached an informal agreement with the County, *id.*, but not the City. In response to a letter sent by plaintiffs (Exhibit D), the County stated that the BCSD worked with various members of the Secret Service, but that the identities of the Secret Service officials were unknown. Exhibit E. Plaintiffs' first attempt to identify federal actors was therefore unsuccessful.

Second, plaintiffs promptly deposed nine City and County law enforcement officials, all of whom testified that federal officials were the ultimate decision-makers in terms of how to treat protesters. Exhibits H & I. The local law enforcement officials for the most part did not remember any names, but did mention the involvement of the Secret Service. They did not directly implicate the Advance Office. That, however, should not absolve the Advance Office from having to comply with the subpoena. Local law enforcement officials often assume, mistakenly, that all federal officials wearing suits and earpieces at a Presidential event are with

the Secret Service.  More importantly, the Advance Office is still likely to be the decision-maker

in matters like this even if the local law enforcement officials only took directions from the

Secret Service.  As the Advance Office's Manual states, members of the Advance team should

"work with the Secret Service and have them ask the local police department to designate a

protest area where demonstrators can be placed."  Manual (Exhibit K) at 34.  Thus, while the

local law enforcement officials may have interacted only with the Secret Service, the actual

directions may have come from the Advance Office.

In short, plaintiffs have already tried other avenues to ascertain the identities of the

federal actors, but those sources – despite confirming the involvement of federal actors – have

not been able to provide any names.

### C.  The Discovery Sought by Plaintiffs Involves the Central Facts in an Important Case Involving Fundamental Constitutional Rights

A "party's need for the [discovery] and the nature and importance of the litigation" are

weighty factors in the calculus of burden.  *Linder v. Department of Defense*, 133 F.3d 17, 24

(D.C. Cir. 1998).  Those factors weigh heavily in favor of enforcing the subpoena at issue here.

Unlike the peripheral discovery sought in *Cheney v. U.S. District Court, supra*, the deposition of

the Advance Office seeks to obtain information central to plaintiffs' case:  the identity of those

who directed that plaintiffs be pushed down the road and out of sight of the President because

their signs expressed criticism of him and his policies.  Plaintiffs need for this information is also

plain; without it, they will be unable to name the true malefactors in an amended complaint and

therefore, perhaps, be unable to recover damages for the violation of their constitutional rights.

And plaintiffs' requested discovery is important, because the New Mexico federal district court's

"ability to fulfill its constitutional responsibility to resolve cases and controversies within its

jurisdiction hinges on the availability of [this] indispensable information."  *Cheney*, 542 U.S. at

14

385 (describing to the situation in *United States v. Nixon*, 418 U.S. 683 (1974)).  No judicial responsibility exceeds the responsibility to protect the First Amendment rights of Americans to express their political views peacefully, but freely, in a public forum, and "peaceably to assemble, and to petition the Government" – including the President – "for a redress of grievances."  U.S. Const. Amend. I.

## III.    THE SUBPOENA DOES NOT POSE AN UNDUE BURDEN ON THE ADVANCE OFFICE

The subpoena at issue (Exhibit A) is narrowly focused on what happened in Albuquerque on August 27, 2007, and Advance Office policies and complaints directly relevant to that event. Providing a witness for the noticed deposition will not impose an undue burden on the Office. Contrary to the government's assertions, plaintiffs have not been dilatory in their pursuit of discovery, and have provided sufficient time for the Advance Office to comply.  The Office's complaints about the President's travel schedule do not excuse it from producing a modest quantity of documents and providing a single deponent.

### A.  Plaintiffs Acted Promptly in Serving the Subpoena

The government asserts that plaintiffs were dilatory in conducting discovery, and that the Advance Office should not be forced to comply with the subpoena on short notice.  The government repeatedly points to the fact that plaintiffs filed their complaint in mid-January but did not subpoena the Advance Office until May 23.  Mot. to Quash at 2, 4, 12-13.  This argument is inaccurate at best and misleading at worst.

The New Mexico court issued an initial scheduling order in this action on March 10, 2008 (Exhibit F), just one week after the City defendants filed their answer on March 3.  The Rule 16 pretrial conference was held on April 22, 2008.  As soon as the court issued a discovery order after the April 22 conference, plaintiffs promptly began discovery.  On April 29, just one

15

week after the Rule 16 conference, plaintiffs served their requests for production on both the City and County defendants. And a mere two weeks later, on May 10, plaintiffs served a subpoena on the Secret Service and three days later on the Advance Office. Because government counsel claimed that service on the Advance Office had been improper (although plaintiffs had made service as directed by White House Deputy Counsel), plaintiffs served a second subpoena 10 days later on May 23, with a compliance date of June 12. Plaintiffs' actions with respect to discovery were not dilatory in any way.

More importantly, between the time the complaint was filed in mid-January and the Rule 16 scheduling conference in mid-April, plaintiffs did seek to ascertain the identities of the federal actors. In fact, plaintiffs' counsel contacted counsel for the City and County defendants just days after the complaint was filed in an attempt to get informal, expedited discovery (Exhibits C&D). As explained above, however, these informal efforts did not produce any names. The Advance Office's claim that plaintiffs have been dilatory is simply not borne out by the record.

### B. The Subpoena is Narrowly Tailored and the Advance Office Has Sufficient Time To Comply

The Advance Office also argues that it is too busy to comply with the subpoena. Mot. to Quash at 13-17. This argument is unavailing for several reasons.

First, this Court has repeatedly held that a party moving to quash a subpoena based on assertions of burdensomeness must provide "specific estimates of staff hours needed to comply," *Flatow*, 196 F.R.D. at 207; failure to do so means that the claim will be "categorically rejected." *Id*. Here, the Director of the Advance Office states that the President is taking three trips abroad in June, July and August, and that the Advance Office has been busy preparing for those events. (Mot. to Quash at 14-15). But the motion to quash fails to provide a specific – or even a general – estimate of the staff hours needed to respond to the subpoena. *See Flatow*, 196 F.R.D. at 207

("bare assertions of a burden do not satisfy the specificity requirement of an undue burden objection."). The Advance Office says that the individuals most likely to have information about what happened in Albuquerque are members of the Advance Team who are not employees of the White House, and that the Office is therefore "beholden to the[ir] willingness and availability" in preparing a witness to testify. Mot. to Quash at 15 n.7. But the Office does not asset that these individuals are unwilling to assist or unavailable; indeed, the very fact that they are not White House employees suggests that they are not involved in the planning for the President's foreign travels. The Advance Office's apparent failure even to ascertain whether these individuals are willing and available to assist bespeaks a lack of good faith in responding to the subpoena.[3]

Second, plaintiffs' request is not overly broad. Unlike the discovery request in *Cheney,* which "ask[ed] for everything under the sky," 542 U.S. at 387, plaintiffs' subpoena is narrowly confined to a specific event – the August 27, 2007 protest – and to the policy that the Advance Office follows when preparing for such events and "complaints of First Amendment/free speech violations by individuals demonstrating along presidential motorcade routes." Each of these topics is directly related to how the Advance Office treats protesters, and they all lie comfortably within the broad definition of relevance for discovery.[4] As the *Cheney* court noted, "[t]he very

---

[3] In any event, the President's five-nation European trip has now ended. *See* http://www.whitehouse.gov/infocus/europe/2008/index.html ("The President and Mrs. Bush will travel to Europe from June 9 to June 16, 2008"); the Advance Office now can comply with its discovery obligations, even if it failed to do so earlier.

[4] Plaintiffs' counsel has offered to discuss limiting plaintiffs' requests to the extent the Advance Office feels they are too broad, but the Office has not shown interest in such discussions. Should the Court decide that the scope of category 6 is overbroad, it should modify that item, not quash the entire subpoena. *See Linder v. Nat'l Sec. Agency*, 94 F.3d 693, 698 (D.C. Cir. 1996) ("a modification of a subpoena is generally preferred to outright quashing"). Additionally, plaintiffs would consent to any reasonable extension of time that does not conflict with the New Mexico district court's scheduling order.

This Court should also be aware that there is a conference scheduled in New Mexico on June 20, 2008, and the plaintiffs intend to advise the New Mexico court of the pendency of this motion.

specificity of the subpoena requests serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President." *Id.*

Third, the government's assertions of burden are unpersuasive in light of the fact that the plaintiffs in *Rank v. Hamm*, No. 04-cv-0997 (D. W. Va.) deposed six individuals from the Advance Office, without objection. In *Rank*, plaintiffs deposed Michael Heath, a full-time Advance Office employee, three senior volunteers for the event, and two more junior volunteers. Plaintiffs are asking for far less in this case – just one deposition of one designated representative of the Office. It seems unlikely that this would be so burdensome as to prevent the Advance Office from performing its other obligations. Could the Office not meet its obligations if the employee who would be the designated deponent called in sick for a day or two?[5]

Fourth, the Secret Service has agreed to comply with an almost identical discovery request without objection. *See* Exhibit L. The Secret Service provides security for the President, and is presumably just as busy meeting its important obligations – including planning for the President's trips abroad – as the Advance Office. Nonetheless, the Secret Service had no objections to the scope, timeliness, or burdensomeness of Plaintiffs' subpoena.

---

[5] As already noted, the subpoena does not demand the presence of a senior Executive branch official who advises the President on matters of policy. While the motion to quash refers constantly to the "White House," the fact is that the Executive Office of the President is not the intimate operation that it was when it was created in 1939 in response to the Brownlow Committee's famous plea that "The President needs help." Joel Achenbach, *What Does a President Really Do All Day*, The Washington Post, April 27, 2008, at B-1. The EOP is now a bureaucracy of about 3,000 staffers, most working outside the White House. *Id.; see also* Library of Congress, Congressional Research Service: THE EXECUTIVE OFFICE OF THE PRESIDENT: AN HISTORICAL OVERVIEW (updated March 17, 2008), available at http://www.fas.org/sgp/crs/misc/98-606.pdf . The EOP includes such diverse agencies as the Council on Environmental Quality, the Office of National Drug Control Policy, and the Gulf Coast Recovery and Rebuilding Council. Library of Congress, *supra*, at 3-4. Exempting all of these agencies from relevant discovery is not what the Supreme Court had in mind when deciding the *Cheney* case.

In sum, plaintiffs' discovery requests are narrow and specific, and do not place an undue burden upon the Advance Office. Moreover, the Advance Office has failed to provide a proper accounting of the alleged burden its compliance would require.

## CONCLUSION

For these reasons, the motion to quash should be denied.

Respectfully submitted,

/s/ *Arthur B. Spitzer*

_____

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street NW, Suite 119
Washington DC 20036
Tel (202) 457-0804
Fax (202) 452-1868

Attorney for Plaintiffs

June 19, 2008

**ACLU**
FOUNDATION
AMERICAN CIVIL LIBERTIES UNION

May 23, 2008

Karen Richardson
Civil Division
United States Department of Justice
Federal Programs Branch
20 Massachusetts Avenue, NW
Room 6126
Washington, DC 20001

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
LEGAL DEPARTMENT
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500
F/212.549.2651
WWW.ACLU.ORG

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

Re:     Pahls v. Board and County of Bernalillo, 1:08-cv-53
        (LH)(ACT)

Dear Ms. Richardson:

        Please find enclosed a subpoena to the White House Office of
Presidential Advance in connection with the above-referenced litigation.
Thank you for agreeing to accept service.  The subpoena sets a date of
June 12, 2008 for the production of documents and a 30(b)(6) deposition.
We understand that the deposition date may need to be moved to
accommodate the Advance Office witness(es) and defense counsel.

        With the exception of the compliance deadline, this subpoena is
identical to the subpoena already in your possession, but that your office
asserts was improperly served.  Having followed the instructions for
service provided to them by a White House Deputy General Counsel,
Plaintiffs do not concede that service was improper, but send a second
subpoena to ameliorate any possible disagreement on this point.

        As we discussed on the phone earlier today, the Court has imposed
a June 20, 2008 deadline for Plaintiffs to amend their complaint and join
additional parties.  As a result, it is imperative that Plaintiffs complete this
deposition on or before Friday, June 13, 2008, so that there is adequate
time for Plaintiffs to amend their complaint and join additional parties.

        Particularly in light of the fact that the government already has
actual knowledge of the documents and deposition testimony that
Plaintiffs seek, Plaintiffs trust the government will work expeditiously
with them to ensure that it is possible for Plaintiffs to meet their court-

1

imposed deadline. As we discussed, to ease the time pressure, Plaintiffs intend to petition the court for a 30-day extension of the deadline to amend the complaint and join additional parties. Of course, Plaintiffs cannot

count on the Court granting their extension request. Plaintiffs will keep the government apprised of the status of their extension motion.

Because this is a 30(b)(6) subpoena, the subpoena already lists the specific subjects and nature of the information and materials sought from the Advance Office. More information about the lawsuit is available in Plaintiffs' Complaint, which is also enclosed.

This litigation arose out of the President's visit to Los Ranchos de Albuquerque, New Mexico on August 27, 2008. On that day, the President attended a fundraiser for Senator Pete Domenici at the estate of Los Ranchos de Albuquerque Mayor Larry Abraham.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

A number of individuals gathered along the President's motorcade route to express their views to the President. Some individuals expressed their disagreement with the President, especially on the war in Iraq. These individuals were forced to stand approximately 150 yards away from the President's motorcade route. Parked police cars and officers on horseback were positioned between the protesters and the President, such that it would have been very difficult if not impossible for the President to see the protesters' signs.

Meanwhile, a group of presidential supporters, some of whom were holding up a sign that read "God Bless George Bush! We Pray For You," were permitted to stand much closer, directly alongside the road where the President's car passed.

Plaintiffs filed suit, arguing that this disparate treatment violates their First Amendment rights to be free from discrimination based on the content and viewpoint of their speech.

The subpoena seeks information about the role played by Advance Office representatives and volunteers that day, including how they interacted with others to decide where demonstrators could be placed.

Plaintiffs also need information concerning the specific listed policies and procedures in order to determine if Defendants were acting pursuant to any Advance Office policies or procedures. For these reasons as well, Plaintiffs need information about similar occurrences in the past involving Advance Office employees, representatives or agents.

Please let us know if you have any questions regarding this

2

subpoena.  I can be reached at (212) 519-7806 or ccrump@aclu.org.

Sincerely,

Catherine Crump

Enclosures


cc:    Ernestina Cruz, Counsel for the County Defendants
       Kathryn Levy, Counsel for the City Defendants

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

JEANNE PAHLS, et al,

        Plaintiffs,

v.

BOARD OF COUNTY
COMMISSIONERS FOR THE COUNTY
OF BERNALILLO, et al.,

        Defendants.

SUBPOENA IN A CIVIL CASE

1:08-cv-53 (LH)(ACT)

PENDING IN THE UNITED STATES
DISTRICT COURT FOR THE
DISTRICT OF NEW MEXICO

TO:    Office of Presidential Advance
       The White House
       1600 Pennsylvania Avenue NW
       Washington, DC 20500

       c/o Karen Richardson
       Civil Division
       United States Department of Justice
       Federal Programs Branch
       20 Massachusetts Avenue, NW
       Room 6126
       Washington, DC 20001

[ ] YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

[X] YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
In the above case regarding the subject matters identified under the heading "Categories for Deposition" in Exhibit A, which is attached.

| PLACE | DATE AND TIME |
|---|---|
| ACLU of the National Capital Area, 1400 20th St. NW, Suite 119 Washington, DC 20036 | Thursday, June 12, 2008, 10:00 am |
|  | Recorded by video and/or stenographic mean |

[X] YOU ARE COMMANDED to produce and permit inspection and copying of the documents requested under the heading "Request for Documents" in Exhibit A at the place, date, and time specified below.

| PLACE | DATE AND TIME |
|---|---|
| ACLU of the National Capital Area, 1400 20th St. NW, Suite 119, Washington, DC 20036 | Thursday, June 12, 2008, 10:00 am |

1

[ ] **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE May 23, 2008 |
|---|---|
| *Catherine Crump* American Civil Liberties Union, of Counsel to Plaintiff |  |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Catherine Crump
ACLUF
125 Broad Street
18th Floor
New York, NY 10004
(212) 519-7806

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

2

AO88 (11/91) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)    PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that

person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)    DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## EXHIBIT A

## DEFINITIONS

## CATEGORIES FOR DEPOSITION

1. Reasons, facts, and/or other information concerning why Plaintiffs were required to stand approximately 150 yards away from the President's motorcade route while a group of presidential supporters was permitted to be closer to the route.

2. The name, affiliation, and contact information of individuals responsible for deciding where Plaintiffs and other demonstrators were permitted to stand.

3. Reasons, facts, and/or other information concerning any claim or belief that Plaintiffs posed a safety, security, or other kind of threat to the President or anyone else.

4. Communications concerning the incident involving Plaintiffs and/or actions taken as a result of the August 27, 2007 incident involving Plaintiffs.

5. White House policies, procedures, guidelines, and/or training materials concerning:

   A. Expressive activities or speech, including, but not limited to, policies concerning placement of demonstrators and protesters;

   B. Discrimination or non-discrimination against speakers based on content or viewpoint;

6. Other complaints of First Amendment/free speech violations by individuals demonstrating along presidential motorcade routes.

## REQUEST FOR DOCUMENTS

1. All documents concerning each of the foregoing categories for deposition.

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Civil Action No.

JEANNE PAHLS,
REBECCA WILSON,
ALMA ROSA SILVA BANUELOS,
CARTER BUNDY,
JASON CALL,
MARY LOU "MITZI" KRAFT,
MERIMEE MOFFITT,
LAURA LAWRENCE,
STUART T. "TERRY" RILEY,
CODEPINK WOMEN FOR PEACE, ALBUQUERQUE CHAPTER,
STOP THE WAR MACHINE,

     Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF BERNALILLO,
BERNALILLO COUNTY SHERIFF'S DEPARTMENT,
CITY OF ALBUQUERQUE,
ALBUQUERQUE POLICE DEPARTMENT,
JOHN/JANE DOES 1-5, in their individual capacities,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

### I.    INTRODUCTION

1.    This is a case arising out of the August 27, 2007 appearance by President George

W. Bush at a fundraiser for Senator Pete Domenici at the Los Ranchos de Albuquerque estate of

Mayor Larry Abraham.  Defendants engaged in content and viewpoint discrimination by placing

plaintiffs – individuals peacefully expressing disagreement with the views of the President – at

least 150 yards away from the driveway of the fundraiser site, while allowing a group of the

President's supporters to stand just across from the driveway of the fundraiser site. The disparate

treatment accorded plaintiffs was based solely on the content and viewpoint of plaintiffs' speech,

in violation of their First and Fourteenth Amendment rights.

## II.    JURISDICTION AND VENUE

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Remedies are provided

by 42 U.S.C. § 1983.

3.    In the event some of the defendants turn out to be federal actors, then this Court

has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and this action is also authorized and

instituted pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403

U.S. 388 (1971).

4.    The practices alleged herein to be unlawful were committed within the

jurisdiction of the United States District Court of New Mexico. Venue is proper in this Court

pursuant to 28 U.S.C. § 1391.

## III.    PARTIES

5.    Plaintiff Jeanne Pahls is a citizen of the United States and was at all relevant times

a resident of the State of New Mexico.

6.    Plaintiff Rebecca Wilson is a citizen of the United States and was at all relevant

times a resident of the State of New Mexico.

7.    Plaintiff Alma Rosa Silva Banuelos is a citizen of the United States and was at all

relevant times a resident of the State of New Mexico.

8.    Plaintiff Carter Bundy is a citizen of the United States and was at all relevant

times a resident of the State of New Mexico.

2

9.   Plaintiff Merimee Moffitt is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

10.   Plaintiff Laura Lawrence is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

11.   Plaintiff Stuart T. "Terry" Riley is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

12.   Plaintiff Mary Lou "Mitzi" Kraft is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

13.   Plaintiff Jason Call is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

14.   Plaintiff Stop the War Machine is an unincorporated grassroots, anti-war organization based in Albuquerque, New Mexico.  Stop the War Machine is primarily engaged in efforts that involve expressions of free speech with regard to weapons, war-related spending, and the military industrial complex.  Also, its members are often involved in organizing events so that individuals can express their disagreements with the President and other top administration officials when those individuals visit New Mexico.

15.   CODEPINK Women for Peace is a 501(c)(3) non-profit corporation that has its headquarters in Venice, California.  It is an organization focused primarily on ending the war in Iraq.  It was formed in November, 2002, and is open to both women and men.  There are over 250 active local groups around the country and the world, including a volunteer, local chapter in Albuquerque, New Mexico.  CODEPINK, the Albuquerque Chapter, is the plaintiff in this case. The organization is consistently engaged in organizing gatherings so that individuals can express their disagreement with the President and his policy on the Iraq War.

3

16.     Defendant Board of County Commissioners for the County of Bernalillo ["County"] is a local governmental entity organized and existing under the laws of the State of New Mexico, and is a "person" subject to suit herein.

17.     Defendant the Bernalillo County Sheriff's Department ("BCSD") is an agency of the County responsible for general law enforcement.

18.     Defendant City of Albuquerque ("City") is a municipality and government entity within the State of New Mexico. Defendant City is constitutionally responsible for the training, supervision, acts, omissions, conduct, policies (written or unwritten), patterns, practices, customs and procedures of the public employees acting within the scope of their duties who worked for the Albuquerque Police Department, at all relevant time frames.

19.     Defendant the Albuquerque Police Department ("APD") is an agency of Albuquerque, New Mexico responsible for general law enforcement.

20.     Defendants John/Jane Does 1-5 (or "real name(s) unknown" as per N.M. Stat. Ann. § 38-2-6 (1978)) are persons whose identities are currently unknown to plaintiffs. Upon information and belief, the Does are local, state, or federal actors who were involved in making and/or implementing policy decisions that led to violations of plaintiffs' First and Fourteenth Amendment rights by discriminating against plaintiffs based on the content and viewpoint of plaintiffs' speech. They are sued in their individual capacities.

### IV.     FACTUAL ALLEGATIONS

21.     On August 27, 2007, President Bush visited Albuquerque, New Mexico to attend a fundraiser for Senator Pete Domenici.

4

22. The fundraiser took place at the Los Ranchos de Albuquerque estate of Mayor Larry Abraham at 7205 Rio Grande Boulevard NW – a semi-rural area not far from Albuquerque.

23. Prior to the President's visit, various individuals, including some of the plaintiffs, decided to find a peaceful way of showing the President that not all Americans shared his views, especially those on the Iraq War. They determined that they would try to stand peacefully along his travel route with signs expressing their disapproval.

24. Plaintiff Jeanne Pahls, who is one of the organizers of Stop the War Machine, sent out emails informing individuals on the Stop the War Machine email news bulletin that people would be assembling peacefully to express their disagreement with the President on the day of the fundraiser.

25. Plaintiff Rebecca Wilson, the director of the Albuquerque chapter of CODEPINK, informed fellow members of CODEPINK about the event.

26. On the day of the fundraiser, Ms. Pahls arrived at the event site at approximately 8:00 to 8:30 am. At the event site, Ms. Pahls spoke to an officer from the BCSD, who told her that people would be allowed to gather on the shoulders of Rio Grande Blvd. either north or south of the driveway leading into Mayor Abraham's estate.

27. Rio Grande Blvd. is a two-lane road that runs north and south through the town of Los Ranchos de Albuquerque, and Mayor Abraham's estate is situated on the west side of Rio Grande Blvd. The driveway leading into the Mayor's estate runs perpendicular to Rio Grande Blvd.

28. As time passed, a larger group of people started gathering on Rio Grande Blvd. south of the Mayor's driveway. Ms. Pahls, however, along with a few other individuals decided

5

to gather on the part of Rio Grande that was north of the Mayor's driveway. At that point, none of the people knew whether the President's motorcade would be coming from the north or south of Rio Grande. The BCSD office who spoke with Ms. Pahls did not know either, but stated that he thought the President's motorcade might be coming from north of Rio Grande. Ms. Pahls thus decided to stay on the northern part of Rio Grande.

29.     Among the individuals who later gathered on the northern part of Rio Grande Blvd. were plaintiffs Laura Lawrence and Mary Lou "Mitzi" Kraft. Ms. Lawrence, a journalist who writes under her maiden name "Paskus," is also an active member of CODEPINK. Ms. Lawrence heard about the gathering through the organization, and decided that she would attend the gathering to peacefully voice her disapproval to the President. She also decided that she would take her 19-month old daughter along in a stroller.

30.     Ms. Kraft heard about the gathering from Ms. Pahls and Stop the War Machine. After having spoken to her grandson, who was serving in the military and had been back from Iraq for almost a year, Ms. Kraft decided that she also wanted to peacefully voice her disagreement with the war. She decided that she would carry a sign telling the President to bring the troops back home.

31.     While driving to the gathering, Ms. Lawrence saw Ms. Kraft walking, and offered Ms. Kraft a ride in her car. Ms. Lawrence and Ms. Kraft arrived some time after Ms. Pahls, and parked her car on Chamisal Road, which intersects Rio Grande Blvd. in an area north of the Mayor's driveway. While walking south on Rio Grande towards the Mayor's estate, Ms. Lawrence and Ms. Kraft ran into Ms. Pahls. Ms. Lawrence and Ms. Kraft, along with Ms. Lawrence's daughter, decided to join Ms. Pahls' group.

6

32. Among the individuals gathered on the south side was plaintiff Terry Riley, a member of the Albuquerque Chapter of Veterans for Peace. Mr. Riley was there with his 90-year old, wheelchair-bound mother. Having arrived at 8:30 am, Mr. Riley had parked at the Village Hall, which was approximately half a mile south of Mayor Abraham's estate on Rio Grande Blvd. Mr. Riley then proceeded to walk north on Rio Grande towards the Mayor's estate, pushing his mother's wheelchair, until the police would not allow them to move any further north.

33. At the point where Mr. Riley was stopped, there were several parked police cars and officers on horseback. The parked police cars and officers on horseback formed a barricade that blocked people from moving further north on Rio Grande Blvd. Mr. Riley asked if he and his mother were permitted to go any further north so that they could be closer to the Mayor's driveway, but were told that they could not. Mr. Riley held up a sign that said, "Good Riddance to Gonzales. Who's Next? Bush, I Hope", while his mother held up a sign that said, "Peace Takes Work, War Takes Lives".

34. Another person standing on the portion of Rio Grande Blvd. south of the Mayor's driveway was plaintiff Carter Bundy. Mr. Bundy is a former attorney who serves as the legislative director of the American Federation of State, County and Municipal Employees ("AFSCME"). Having also arrived at approximately 8:30 am, Mr. Bundy parked at the Village Hall and walked north on Rio Grande towards the Mayor's home. He then asked an officer from BCSD how close to the Mayor's driveway he could stand. The BCSD officer said that the entire area near the Mayor's estate was a PNM (utility company) easement, and was therefore unsure whether Mr. Bundy could stand on the easement at all. The BCSD officer eventually called Mr. Bundy on Mr. Bundy's cell phone, and informed him that he could stand on that area, but only

7

where Road Runner Lane intersected with Rio Grande Blvd. This was approximately 300 yards south of the Mayor's driveway. Only later did Larry Kronen, an attorney with plaintiffs, inform Mr. Bundy and other individuals that they could move closer, to an area that was approximately 150 to 200 yards from the Mayor's driveway.

35.     Between approximately 9:30 and 10:00 am, Ms. Wilson, Merimee Moffitt, and about 12 to 15 other members of CODEPINK arrived at the gathering. Ms. Wilson, Ms. Moffitt, and the other members of CODEPINK all situated themselves where the majority of people were gathered, on the shoulders of Rio Grande Blvd. south of the Mayor's driveway. Ms. Wilson and the other members of CODEPINK held up pink peace symbols, as well as signs that said, "Walk in their [soldiers'] Shoes," and "Delete Him [Bush]."

36.     Around the time that the members of CODEPINK arrived, plaintiff Jason Call arrived. Prior to that, Mr. Call, a high school math teacher who is running for Congress, had been involved in a "Honk to Impeach Bush" rally. Also situating himself on the southern portion of Rio Grande along with the majority of others, Mr. Call moved as far up as the police would allow. Mr. Call, who heard about the gathering through a Stop the War Machine email, wore a t-shirt that said "Bush is an International Terrorist," while holding up signs saying "Honk to Impeach Bush-Cheney," "Defend the Constitution – Impeach Bush," and "War, Famine, Pestilence, Death" – with pictures of President Bush, Vice President Cheney, Secretary Rice, and Secretary Rumsfeld underneath.

37.     Although the majority of people were gathered on the south end of Rio Grande Blvd., Ms. Pahls, Ms. Kraft, Ms. Lawrence, and Ms. Lawrence's daughter remained on the portion of Rio Grande Blvd. that was north of the Mayor's driveway. Larry Kronen moved between the two groups until police told him he had to stay on the south end of Rio Grande. In

8

addition, at some point prior to the President's arrival, members of the BCSD forced Ms. Pahls and the other individuals on the north end of Rio Grande to the south end, where most of the other people were gathered.  Ms. Pahls' group objected peacefully to moving to the south end because they thought that the President's motorcade would be coming from the north side of Rio Grande Blvd.  She informed the BCSD officers that another BCSD officer had given her permission to stand on the north end.  The officers from the BCSD nevertheless made them move to the other end.

38.     Sometime after 10:00 am, plaintiff Alma Rosa Silva Banuelos, a community organizer who heard about the gathering from a Stop the War Machine email, arrived at the gathering.  By the time Ms. Banuelos arrived, there were already numerous people present.  Ms. Banuelos first drove her car from the south end of Rio Grande Blvd. to the north end, where she saw several police officers situated by the shoulders of the road.  She then proceeded to make a U-turn, and drove back from the north end to the south end, where the majority of people were gathered.  While driving back towards the south end of Rio Grande Blvd., Ms. Banuelos saw a small group of Presidential supporters standing on the shoulder of Rio Grande Blvd. just across from the Mayor's driveway.

39.     There were nine individuals – two adults and seven children – among the group supporting the President.  Several of them were holding American flags and two individuals held up a banner that said, "God Bless George Bush!  We pray for you!"

40.     All of the individuals who were peacefully expressing their disagreement with the President – including the plaintiffs – were forced to stay in the area on Rio Grande Blvd. that was at least 150 yards south of the Mayor's driveway.

9

41.    There was no legitimate basis for treating plaintiffs differently from the President's supporters.

42.    Larry Kronen, who was standing with plaintiffs behind the parked police cars and the officers on horseback, asked if the police could move some of the cars so that plaintiffs' view of the north end of Rio Grande Blvd. would not be obstructed. Suspecting that the President's motorcade would be arriving from the north end, the people on the south end wanted their view of the north end to be clear. The police agreed to move only one of the several cars.

43.    Prior to the President's arrival, Alice Lloyd drove up to Ms. Wilson, Ms. Moffitt, and other individuals on Rio Grande Blvd. in a beige Chevrolet Tahoe with her 13-year old daughter. Ms. Lloyd offered some of the plaintiffs a place to stand and to hold up their signs. The place was a property belonging to Ms. Lloyd's friend, and was approximately the third property north of Mayor Abraham's estate on Rio Grande Blvd. Because the woman's property was north of the Mayor's driveway, plaintiffs would have been more visible to the President as the President's motorcade later arrived from the north side of Rio Grande. In addition, plaintiffs would not have been blocked from the President's view by the parked police cars and officers on horseback. The BCSD, however, informed Ms. Lloyd that she had to move her car immediately, and refused to allow some of the plaintiffs to go north with Ms. Lloyd to the woman's property.

44.    After some additional time passed, Mr. Riley asked if he and his wheelchair-bound mother could move to the area of Rio Grande Blvd. north of the Mayor's driveway so that the President could see their signs. The officer replied that the motorcade would be arriving at any minute, and that it would not be safe for Mr. Riley and his mother to be there. The motorcade, however, did not arrive for at least 20 minutes until after the conversation took place.

10

45.     At around noon, the President's motorcade approached the area from the north and proceeded to enter Mayor Abraham's estate.  The President's motorcade never passed by plaintiffs, who were standing south of the Mayor's estate.

46.     The President's view of the individuals on the south end of Rio Grande Blvd. was obstructed by the parked police cars and officers on horseback.  It would have been difficult, if not impossible, for someone sitting in the President's car to have seen or read plaintiffs' signs.

47.     The majority of people stayed until 15 minutes after the President entered Mayor Abraham's estate for the fundraiser.  A few people, including Ms. Lawrence and Ms. Pahls, stayed until after the fundraiser.  This occurred after 1:00 pm.

48.     There were approximately 70 people standing outside Mayor Abraham's estate attempting to express their disapproval to the President in a peaceful manner.

49.     Plaintiffs' purpose in gathering outside of Mayor Abraham's estate was to express their disagreement with the President as well as the Iraq War through peaceful means.  At no time did they intend to or give any indication that they would disrupt the event or resort to violence.

50.     At all times, the practice or policy perpetuating content and viewpoint discrimination (against any speech disagreeing with the President) was set by defendants, including Doe defendants.

51.     The Presidential Advance Manual, prepared by the Office of Presidential Advance, includes a section called "Preparing for Demonstrators."  In that section, the Manual provides that members of the Presidential Advance team should "work with the Secret Service and have them ask the local police department to designate a protest area where demonstrators can be placed, <u>preferably not in view of the event site or motorcade route</u>" (emphasis added).

11

The description from the Manual is consistent with what occurred here. Plaintiffs – whom the Manual would label as "demonstrators" – were placed in an area south of the Mayor's estate, and kept at a distance such that they were "not in view of the event site or motorcade route."

52.     Chief Deputy David Linthicum of the BCSD was quoted in the newspapers as saying that the Secret Service, in consultation with the Sheriff's Department, were the ones who decided that the supporters of the President could stand just across from the Mayor's driveway.

53.     Defendants, the County, the City, the BCSD and APD each have a municipal policy of discriminating against individuals based on the viewpoint and content of their speech, or in the alternative, have followed orders from federal actors to adopt and enforce this policy of discriminating against individuals based on the viewpoint and content of their speech.

54.     Defendants are in violation of plaintiffs' First and Fourteenth Amendment rights for creating, adopting, and enforcing an unconstitutional practice or policy of discriminating against plaintiffs based on the viewpoint and content of plaintiffs' speech, and therefore are guilty of depriving plaintiffs of their right to peacefully express their disagreement with the President and the President's views.

## V.     CAUSE OF ACTION

**(Action Pursuant to 42 U.S.C. § 1983 for state actors, and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for any potential federal actors )**

55.     Plaintiffs hereby incorporate all preceding paragraphs of this Complaint as though fully stated herein.

56.     Defendants violated plaintiffs' First and Fourteenth Amendment rights by establishing and enforcing a policy of disparate treatment based solely on the viewpoint and content of plaintiffs' speech.

12

## VI.    RELIEF

A.    Declare that the actions of defendants in discriminating against the viewpoint and content of plaintiffs' speech are violations of plaintiffs' First and Fourteenth Amendments rights,

B.    Grant plaintiffs damages for the violations of their rights under the First and Fourteenth Amendments of the United States Constitution,

C.    Grant Plaintiffs such other relief as they may be entitled to, and

D.    Award Plaintiffs reasonable attorney's fees and costs.


**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 15th day of January, 2008.


_____
George Bach
Staff Attorney
American Civil Liberties Union
    of New Mexico
P.O. Box 566
Albuquerque, NM  87106
(505) 243-0046
gbach@aclu-nm.org

Christopher A. Hansen (pro hac vice pending)
Catherine Crump (pro hac vice pending)
Josh Hsu (pro hac vice pending)
American Civil Liberties Union Foundation
125 Broad Street, 18th floor
New York City, NY 10004
(212) 549-2606
chansen@aclu.org
ccrump@aclu.org
jhsu@aclu.org

13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Civil Action No.


JEANNE PAHLS,
REBECCA WILSON,
ALMA ROSA SILVA BANUELOS,
CARTER BUNDY,
JASON CALL,
MARY LOU "MITZI" KRAFT,
MERIMEE MOFFITT,
LAURA LAWRENCE,
STUART T. "TERRY" RILEY,
CODEPINK WOMEN FOR PEACE, ALBUQUERQUE CHAPTER,
STOP THE WAR MACHINE,

      Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF BERNALILLO,
BERNALILLO COUNTY SHERIFF'S DEPARTMENT,
CITY OF ALBUQUERQUE,
ALBUQUERQUE POLICE DEPARTMENT,
JOHN/JANE DOES 1-5, in their individual capacities,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

### I.    INTRODUCTION

1.     This is a case arising out of the August 27, 2007 appearance by President George

W. Bush at a fundraiser for Senator Pete Domenici at the Los Ranchos de Albuquerque estate of

Mayor Larry Abraham.  Defendants engaged in content and viewpoint discrimination by placing

plaintiffs – individuals peacefully expressing disagreement with the views of the President – at

least 150 yards away from the driveway of the fundraiser site, while allowing a group of the President's supporters to stand just across from the driveway of the fundraiser site.  The disparate treatment accorded plaintiffs was based solely on the content and viewpoint of plaintiffs' speech, in violation of their First and Fourteenth Amendment rights.

## II.    JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Remedies are provided by 42 U.S.C. § 1983.

3.      In the event some of the defendants turn out to be federal actors, then this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and this action is also authorized and instituted pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

4.      The practices alleged herein to be unlawful were committed within the jurisdiction of the United States District Court of New Mexico.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## III.    PARTIES

5.      Plaintiff Jeanne Pahls is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

6.      Plaintiff Rebecca Wilson is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

7.      Plaintiff Alma Rosa Silva Banuelos is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

8.      Plaintiff Carter Bundy is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

2

9.      Plaintiff Merimee Moffitt is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

10.     Plaintiff Laura Lawrence is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

11.     Plaintiff Stuart T. "Terry" Riley is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

12.     Plaintiff Mary Lou "Mitzi" Kraft is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

13.     Plaintiff Jason Call is a citizen of the United States and was at all relevant times a resident of the State of New Mexico.

14.     Plaintiff Stop the War Machine is an unincorporated grassroots, anti-war organization based in Albuquerque, New Mexico. Stop the War Machine is primarily engaged in efforts that involve expressions of free speech with regard to weapons, war-related spending, and the military industrial complex. Also, its members are often involved in organizing events so that individuals can express their disagreements with the President and other top administration officials when those individuals visit New Mexico.

15.     CODEPINK Women for Peace is a 501(c)(3) non-profit corporation that has its headquarters in Venice, California. It is an organization focused primarily on ending the war in Iraq. It was formed in November, 2002, and is open to both women and men. There are over 250 active local groups around the country and the world, including a volunteer, local chapter in Albuquerque, New Mexico. CODEPINK, the Albuquerque Chapter, is the plaintiff in this case. The organization is consistently engaged in organizing gatherings so that individuals can express their disagreement with the President and his policy on the Iraq War.

3

16.     Defendant Board of County Commissioners for the County of Bernalillo ["County"] is a local governmental entity organized and existing under the laws of the State of New Mexico, and is a "person" subject to suit herein.

17.     Defendant the Bernalillo County Sheriff's Department ("BCSD") is an agency of the County responsible for general law enforcement.

18.     Defendant City of Albuquerque ("City") is a municipality and government entity within the State of New Mexico. Defendant City is constitutionally responsible for the training, supervision, acts, omissions, conduct, policies (written or unwritten), patterns, practices, customs and procedures of the public employees acting within the scope of their duties who worked for the Albuquerque Police Department, at all relevant time frames.

19.     Defendant the Albuquerque Police Department ("APD") is an agency of Albuquerque, New Mexico responsible for general law enforcement.

20.     Defendants John/Jane Does 1-5 (or "real name(s) unknown" as per N.M. Stat. Ann. § 38-2-6 (1978)) are persons whose identities are currently unknown to plaintiffs. Upon information and belief, the Does are local, state, or federal actors who were involved in making and/or implementing policy decisions that led to violations of plaintiffs' First and Fourteenth Amendment rights by discriminating against plaintiffs based on the content and viewpoint of plaintiffs' speech. They are sued in their individual capacities.

## IV.    FACTUAL ALLEGATIONS

21.     On August 27, 2007, President Bush visited Albuquerque, New Mexico to attend a fundraiser for Senator Pete Domenici.

4

22.     The fundraiser took place at the Los Ranchos de Albuquerque estate of Mayor Larry Abraham at 7205 Rio Grande Boulevard NW – a semi-rural area not far from Albuquerque.

23.     Prior to the President's visit, various individuals, including some of the plaintiffs, decided to find a peaceful way of showing the President that not all Americans shared his views, especially those on the Iraq War.  They determined that they would try to stand peacefully along his travel route with signs expressing their disapproval.

24.     Plaintiff Jeanne Pahls, who is one of the organizers of Stop the War Machine, sent out emails informing individuals on the Stop the War Machine email news bulletin that people would be assembling peacefully to express their disagreement with the President on the day of the fundraiser.

25.     Plaintiff Rebecca Wilson, the director of the Albuquerque chapter of CODEPINK, informed fellow members of CODEPINK about the event.

26.     On the day of the fundraiser, Ms. Pahls arrived at the event site at approximately 8:00 to 8:30 am.  At the event site, Ms. Pahls spoke to an officer from the BCSD, who told her that people would be allowed to gather on the shoulders of Rio Grande Blvd. either north or south of the driveway leading into Mayor Abraham's estate.

27.     Rio Grande Blvd. is a two-lane road that runs north and south through the town of Los Ranchos de Albuquerque, and Mayor Abraham's estate is situated on the west side of Rio Grande Blvd.  The driveway leading into the Mayor's estate runs perpendicular to Rio Grande Blvd.

28.     As time passed, a larger group of people started gathering on Rio Grande Blvd. south of the Mayor's driveway.  Ms. Pahls, however, along with a few other individuals decided

5

to gather on the part of Rio Grande that was north of the Mayor's driveway. At that point, none of the people knew whether the President's motorcade would be coming from the north or south of Rio Grande. The BCSD office who spoke with Ms. Pahls did not know either, but stated that he thought the President's motorcade might be coming from north of Rio Grande. Ms. Pahls thus decided to stay on the northern part of Rio Grande.

29.     Among the individuals who later gathered on the northern part of Rio Grande Blvd. were plaintiffs Laura Lawrence and Mary Lou "Mitzi" Kraft. Ms. Lawrence, a journalist who writes under her maiden name "Paskus," is also an active member of CODEPINK. Ms. Lawrence heard about the gathering through the organization, and decided that she would attend the gathering to peacefully voice her disapproval to the President. She also decided that she would take her 19-month old daughter along in a stroller.

30.     Ms. Kraft heard about the gathering from Ms. Pahls and Stop the War Machine. After having spoken to her grandson, who was serving in the military and had been back from Iraq for almost a year, Ms. Kraft decided that she also wanted to peacefully voice her disagreement with the war. She decided that she would carry a sign telling the President to bring the troops back home.

31.     While driving to the gathering, Ms. Lawrence saw Ms. Kraft walking, and offered Ms. Kraft a ride in her car. Ms. Lawrence and Ms. Kraft arrived some time after Ms. Pahls, and parked her car on Chamisal Road, which intersects Rio Grande Blvd. in an area north of the Mayor's driveway. While walking south on Rio Grande towards the Mayor's estate, Ms. Lawrence and Ms. Kraft ran into Ms. Pahls. Ms. Lawrence and Ms. Kraft, along with Ms. Lawrence's daughter, decided to join Ms. Pahls' group.

6

32.    Among the individuals gathered on the south side was plaintiff Terry Riley, a member of the Albuquerque Chapter of Veterans for Peace.  Mr. Riley was there with his 90-year old, wheelchair-bound mother.  Having arrived at 8:30 am, Mr. Riley had parked at the Village Hall, which was approximately half a mile south of Mayor Abraham's estate on Rio Grande Blvd.  Mr. Riley then proceeded to walk north on Rio Grande towards the Mayor's estate, pushing his mother's wheelchair, until the police would not allow them to move any further north.

33.    At the point where Mr. Riley was stopped, there were several parked police cars and officers on horseback.  The parked police cars and officers on horseback formed a barricade that blocked people from moving further north on Rio Grande Blvd.  Mr. Riley asked if he and his mother were permitted to go any further north so that they could be closer to the Mayor's driveway, but were told that they could not.  Mr. Riley held up a sign that said, "Good Riddance to Gonzales.  Who's Next?  Bush, I Hope", while his mother held up a sign that said, "Peace Takes Work, War Takes Lives".

34.    Another person standing on the portion of Rio Grande Blvd. south of the Mayor's driveway was plaintiff Carter Bundy.  Mr. Bundy is a former attorney who serves as the legislative director of the American Federation of State, County and Municipal Employees ("AFSCME").  Having also arrived at approximately 8:30 am, Mr. Bundy parked at the Village Hall and walked north on Rio Grande towards the Mayor's home.  He then asked an officer from BCSD how close to the Mayor's driveway he could stand.  The BCSD officer said that the entire area near the Mayor's estate was a PNM (utility company) easement, and was therefore unsure whether Mr. Bundy could stand on the easement at all.  The BCSD officer eventually called Mr. Bundy on Mr. Bundy's cell phone, and informed him that he could stand on that area, but only

where Road Runner Lane intersected with Rio Grande Blvd. This was approximately 300 yards south of the Mayor's driveway. Only later did Larry Kronen, an attorney with plaintiffs, inform Mr. Bundy and other individuals that they could move closer, to an area that was approximately 150 to 200 yards from the Mayor's driveway.

35.     Between approximately 9:30 and 10:00 am, Ms. Wilson, Merimee Moffitt, and about 12 to 15 other members of CODEPINK arrived at the gathering. Ms. Wilson, Ms. Moffitt, and the other members of CODEPINK all situated themselves where the majority of people were gathered, on the shoulders of Rio Grande Blvd. south of the Mayor's driveway. Ms. Wilson and the other members of CODEPINK held up pink peace symbols, as well as signs that said, "Walk in their [soldiers'] Shoes," and "Delete Him [Bush]."

36.     Around the time that the members of CODEPINK arrived, plaintiff Jason Call arrived. Prior to that, Mr. Call, a high school math teacher who is running for Congress, had been involved in a "Honk to Impeach Bush" rally. Also situating himself on the southern portion of Rio Grande along with the majority of others, Mr. Call moved as far up as the police would allow. Mr. Call, who heard about the gathering through a Stop the War Machine email, wore a t-shirt that said "Bush is an International Terrorist," while holding up signs saying "Honk to Impeach Bush-Cheney," "Defend the Constitution – Impeach Bush," and "War, Famine, Pestilence, Death" – with pictures of President Bush, Vice President Cheney, Secretary Rice, and Secretary Rumsfeld underneath.

37.     Although the majority of people were gathered on the south end of Rio Grande Blvd., Ms. Pahls, Ms. Kraft, Ms. Lawrence, and Ms. Lawrence's daughter remained on the portion of Rio Grande Blvd. that was north of the Mayor's driveway. Larry Kronen moved between the two groups until police told him he had to stay on the south end of Rio Grande. In

addition, at some point prior to the President's arrival, members of the BCSD forced Ms. Pahls and the other individuals on the north end of Rio Grande to the south end, where most of the other people were gathered. Ms. Pahls' group objected peacefully to moving to the south end because they thought that the President's motorcade would be coming from the north side of Rio Grande Blvd. She informed the BCSD officers that another BCSD officer had given her permission to stand on the north end. The officers from the BCSD nevertheless made them move to the other end.

38.    Sometime after 10:00 am, plaintiff Alma Rosa Silva Banuelos, a community organizer who heard about the gathering from a Stop the War Machine email, arrived at the gathering. By the time Ms. Banuelos arrived, there were already numerous people present. Ms. Banuelos first drove her car from the south end of Rio Grande Blvd. to the north end, where she saw several police officers situated by the shoulders of the road. She then proceeded to make a U-turn, and drove back from the north end to the south end, where the majority of people were gathered. While driving back towards the south end of Rio Grande Blvd., Ms. Banuelos saw a small group of Presidential supporters standing on the shoulder of Rio Grande Blvd. just across from the Mayor's driveway.

39.    There were nine individuals – two adults and seven children – among the group supporting the President. Several of them were holding American flags and two individuals held up a banner that said, "God Bless George Bush! We pray for you!"

40.    All of the individuals who were peacefully expressing their disagreement with the President – including the plaintiffs – were forced to stay in the area on Rio Grande Blvd. that was at least 150 yards south of the Mayor's driveway.

41.     There was no legitimate basis for treating plaintiffs differently from the President's supporters.

42.     Larry Kronen, who was standing with plaintiffs behind the parked police cars and the officers on horseback, asked if the police could move some of the cars so that plaintiffs' view of the north end of Rio Grande Blvd. would not be obstructed.  Suspecting that the President's motorcade would be arriving from the north end, the people on the south end wanted their view of the north end to be clear.  The police agreed to move only one of the several cars.

43.     Prior to the President's arrival, Alice Lloyd drove up to Ms. Wilson, Ms. Moffitt, and other individuals on Rio Grande Blvd. in a beige Chevrolet Tahoe with her 13-year old daughter.  Ms. Lloyd offered some of the plaintiffs a place to stand and to hold up their signs. The place was a property belonging to Ms. Lloyd's friend, and was approximately the third property north of Mayor Abraham's estate on Rio Grande Blvd.  Because the woman's property was north of the Mayor's driveway, plaintiffs would have been more visible to the President as the President's motorcade later arrived from the north side of Rio Grande.  In addition, plaintiffs would not have been blocked from the President's view by the parked police cars and officers on horseback.  The BCSD, however, informed Ms. Lloyd that she had to move her car immediately, and refused to allow some of the plaintiffs to go north with Ms. Lloyd to the woman's property.

44.     After some additional time passed, Mr. Riley asked if he and his wheelchair-bound mother could move to the area of Rio Grande Blvd. north of the Mayor's driveway so that the President could see their signs.  The officer replied that the motorcade would be arriving at any minute, and that it would not be safe for Mr. Riley and his mother to be there.  The motorcade, however, did not arrive for at least 20 minutes until after the conversation took place.

45.     At around noon, the President's motorcade approached the area from the north and proceeded to enter Mayor Abraham's estate.  The President's motorcade never passed by plaintiffs, who were standing south of the Mayor's estate.

46.     The President's view of the individuals on the south end of Rio Grande Blvd. was obstructed by the parked police cars and officers on horseback.  It would have been difficult, if not impossible, for someone sitting in the President's car to have seen or read plaintiffs' signs.

47.     The majority of people stayed until 15 minutes after the President entered Mayor Abraham's estate for the fundraiser.  A few people, including Ms. Lawrence and Ms. Pahls, stayed until after the fundraiser.  This occurred after 1:00 pm.

48.     There were approximately 70 people standing outside Mayor Abraham's estate attempting to express their disapproval to the President in a peaceful manner.

49.     Plaintiffs' purpose in gathering outside of Mayor Abraham's estate was to express their disagreement with the President as well as the Iraq War through peaceful means.  At no time did they intend to or give any indication that they would disrupt the event or resort to violence.

50.     At all times, the practice or policy perpetuating content and viewpoint discrimination (against any speech disagreeing with the President) was set by defendants, including Doe defendants.

51.     The Presidential Advance Manual, prepared by the Office of Presidential Advance, includes a section called "Preparing for Demonstrators."  In that section, the Manual provides that members of the Presidential Advance team should "work with the Secret Service and have them ask the local police department to designate a protest area where demonstrators can be placed, <u>preferably not in view of the event site or motorcade route</u>" (emphasis added).

11

The description from the Manual is consistent with what occurred here. Plaintiffs – whom the Manual would label as "demonstrators" – were placed in an area south of the Mayor's estate, and kept at a distance such that they were "not in view of the event site or motorcade route."

52.     Chief Deputy David Linthicum of the BCSD was quoted in the newspapers as saying that the Secret Service, in consultation with the Sheriff's Department, were the ones who decided that the supporters of the President could stand just across from the Mayor's driveway.

53.     Defendants, the County, the City, the BCSD and APD each have a municipal policy of discriminating against individuals based on the viewpoint and content of their speech, or in the alternative, have followed orders from federal actors to adopt and enforce this policy of discriminating against individuals based on the viewpoint and content of their speech.

54.     Defendants are in violation of plaintiffs' First and Fourteenth Amendment rights for creating, adopting, and enforcing an unconstitutional practice or policy of discriminating against plaintiffs based on the viewpoint and content of plaintiffs' speech, and therefore are guilty of depriving plaintiffs of their right to peacefully express their disagreement with the President and the President's views.

## V.     CAUSE OF ACTION

**(Action Pursuant to 42 U.S.C. § 1983 for state actors, and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for any potential federal actors )**

55.     Plaintiffs hereby incorporate all preceding paragraphs of this Complaint as though fully stated herein.

56.     Defendants violated plaintiffs' First and Fourteenth Amendment rights by establishing and enforcing a policy of disparate treatment based solely on the viewpoint and content of plaintiffs' speech.

## VI.    RELIEF

A.      Declare that the actions of defendants in discriminating against the viewpoint and content of plaintiffs' speech are violations of plaintiffs' First and Fourteenth Amendments rights,

B.      Grant plaintiffs damages for the violations of their rights under the First and Fourteenth Amendments of the United States Constitution,

C.      Grant Plaintiffs such other relief as they may be entitled to, and

D.      Award Plaintiffs reasonable attorney's fees and costs.


**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 15th day of January, 2008.

George Bach
Staff Attorney
American Civil Liberties Union
    of New Mexico
P.O. Box 566
Albuquerque, NM  87106
(505) 243-0046
gbach@aclu-nm.org

Christopher A. Hansen (pro hac vice pending)
Catherine Crump (pro hac vice pending)
Josh Hsu (pro hac vice pending)
American Civil Liberties Union Foundation
125 Broad Street, 18th floor
New York City, NY 10004
(212) 549-2606
chansen@aclu.org
ccrump@aclu.org
jhsu@aclu.org

**From:**      Josh Hsu
**To:**        Josh Hsu;
**Subject:**   RE: Pahls v. Bernalillo, No. 08-0053
**Date:**      Wednesday, June 18, 2008 8:29:07 AM

From: Catherine Crump
Sent: Thursday, January 31, 2008 12:52 PM
To: Tina Cruz
Subject: RE: Pahls v. Bernalillo, No. 08-0053

Dear Ms. Cruz,

Thank you for your email.  Your plan sounds good to us.  We will draft
something and then be in touch about the details.

Best wishes,

Catherine


-----Original Message-----
From: Tina Cruz [mailto:tcruz@narvaezlawfirm.com]
Sent: Mon 1/21/2008 10:37 AM
To: Catherine Crump
Cc: H. Nicole Werkmeister
Subject: RE: Pahls v. Bernalillo, No. 08-0053

Dear Ms. Crump:


Henry visited with our clients regarding your request to conduct expedited
discovery in this matter to ascertain the identities of potential federal
defendants.  We would propose entering into an informal agreement for
expedited, limited discovery.  We suggest that you send a letter addressing the
particular areas of inquiry and we could respond by letter on an expedited basis.
Alternatively, perhaps you could send an interrogatory and we would agree to
provide an answer on an expedited basis.  Please let me know your thoughts.


Sincerely,

Tina Cruz

Ernestina R. Cruz, Esq.

Narvaez Law Firm, P.A.

P.O. Box 25967

Albuquerque, New Mexico 87125

(505) 248-0500

(505) 247-1344

tcruz@narvaezlawfirm.com <mailto:tcruz@narvaezlawfirm.com>


Please be advised that this e-mail and any files transmitted with it are confidential attorney-client communication or may otherwise be privileged or confidential and are intended solely for the individual or entity to whom they are addressed. If you are not the intended recipient, please do not read, copy or retransmit this communication but destroy it immediately. Any unauthorized dissemination, distribution or copying of this communication is strictly prohibited.

---

From: Catherine Crump [mailto:ccrump@aclu.org]
Sent: Friday, January 18, 2008 11:42 AM
To: Tina Cruz
Subject: Pahls v. Bernalillo, No. 08-0053


Dear Ms. Cruz,

It was a pleasure to make your acquaintance earlier today, albeit by telephone. We would like to file our motion for expedited discovery by next Wednesday, so if you could please respond regarding your consent by Tuesday, January 22, that would be helpful. In response to your request, I've copied the main part of our draft motion for expedited discovery below.

Best wishes,

Catherine

---------

Courts have routinely found that good cause exists where discovery is necessary to ascertain the identity of defendants. See Knapp v. Americredit Fin. Serv., 204 F.R.D. 306, 308 (S.D. W. Va. 2001). In Knapp, the Court affirmed a magistrate order permitting limited discovery for the purpose of determining the identity of potential defendants. Id. The Court affirmed the magistrate's determination that the discovery would "further the goal of assuring that the necessary parties are joined and participating in this action at the earliest possible date" and that the discovery would permit the Court to make a substantive legal determination (on standing) "on a more complete record." Id. As in Knapp, plaintiffs only seek a limited order permitting discovery to assure that all the necessary parties are participating in this action at the earliest possible date.

Indeed, courts have emphasized that discovery should be permitted for the purpose of ascertaining the identity of defendants. See Wakefield v. Thompson, 177 F.3d 1160, 1163 (9th Cir. 1999) ("where the identity of the alleged defendant[ ][is] not [ ] known prior to the filing of a complaint[,] the plaintiff should be given an opportunity through discovery to identify the unknown defendants") (quoting Gillespie v. Civiletti, 629 F.2d 637 (9th Cir. 1980)) (brackets in original); Billman v. Indiana Dep't of Corr., 56 F.3d 785, 789 (7th Cir. 1995) (holding that Billman's "initial inability to identify the injurers is not by itself a proper ground for the dismissal of the suit. Dismissal would gratuitously prevent him from using the tools of pretrial discovery to discover the defendants' identity."); Munz v. Parr, 758 F.2d 1254, 1257 (8th Cir. 1985) ("Rather than dismissing the claim, the court should have ordered disclosure of Officer Doe's identity by other defendants named and served or permitted the plaintiff to identify the officer through discovery."); Maclin v. Paulson, 627 F.2d 83, 87 (7th Cir.1980) (when "a party is ignorant of defendants' true identity, it is unnecessary to name them until their identity can be learned through discovery or through the aid of the trial court.").

Second, expedited discovery in this instance would also serve the purpose of judicial economy. Specifically, it makes sense to have all the identities of defendants known before defendants are asked to answer the complaint to avoid a procedurally fractured case. For example, if the named defendants file a motion to dismiss, and then the Doe defendants - when later added - file their own separate motion to dismiss, the Court will potentially be burdened with having to duplicate its efforts in resolving issues that should only have to be resolved once. The two-tracked case is something the Court should seek to avoid for purposes of judicial economy.

Third, good cause exists because Doe defendants, who are likely to be federal officials, may be prejudiced if the Court allows the case to proceed without them

being identified.  Indeed, absent a procedure by which those federal officials can be identified, and obtain counsel to represent themselves in this action, their interests, and the interests of the White House or the federal government, may go unrepresented.  If plaintiffs, however, are able to identify the John/Jane Does at an early stage, the U.S. Attorney or other counsel for federal employees can participate essentially from the beginning of this case to protect their interests.

Fourth, good cause exists because the plaintiffs' discovery requests are as narrowly tailored as possible and do not unduly burden the defendants.  See Semitool Inc. v. Tokya Electron America, Inc., 208 F.R.D. 273, 276 (N.D. Cal. 2002) ("Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party.").  Plaintiffs' discovery request is exceedingly narrow. Plaintiffs seek limited depositions for the sole purpose of determining the identities of the individuals that worked with the APD and BCSD to enforce their policy of content and viewpoint discrimination.  There is no prejudice to the unnamed defendants because the plaintiffs merely want to identify them so that they may be served.  Plaintiffs will not delve into the primary issues in this case, which are likely to involve the justifications for treating plaintiffs differently from the supporters of the President.

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

February 1, 2008

Ernestina R. Cruz, Esq.
Narvaez Law Firm, P.A.
P.O. Box 25967
Albuquerque, New Mexico 87125

*Via FedEx and Email*

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
LEGAL DEPARTMENT
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500
F/212.549.2651
WWW.ACLU.ORG

OFFICERS AND DIRECTORS
NADINE STROSSEN
*PRESIDENT*

ANTHONY D. ROMERO
*EXECUTIVE DIRECTOR*

RICHARD ZACKS
*TREASURER*

Re:    *Pahls et al v. Board of County Commissioners for the
County of Bernalillo et al*, No. 1:08-cv-53

Dear Ms. Cruz,

A few weeks ago, we discussed plaintiffs' intent to file a motion for expedited discovery to ascertain the identities of any federal Doe defendants. As described in plaintiffs' Complaint, plaintiffs believe that employees of the Bernalillo County Sheriff's Department and other local law enforcement agencies may have determined where plaintiffs could stand at the direction of, or pursuant to a policy set by, federal actors.

In your email dated Monday, January 21, 2008, we learned that your client proposes that we enter into an informal agreement for limited, expedited discovery. The email suggested that we send a letter proposing specific areas of inquiry, to which your client would respond on an expedited basis.

Pursuant to that request, we ask that your client disclose information sufficient to identify (name, title, contact information) any federal actors who played a role in determining where plaintiffs and other demonstrators should be placed. This would include a brief mention of the nature of the role played by that officer. It would also include federal officers who set policy for the event, in addition to those present on the scene.

We ask that your clients respond to this request by Monday, February 11, 2008. If you have questions or concerns, please do not

hesitate to contact me by email (ccrump@aclu.org) or telephone (212) 519-7806.

Sincerely,

Catherine Crump

cc:     Kathryn C. Levy, Deputy City Attorney

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## ✠ NARVAEZ LAW FIRM, P.A.
### Attorneys and Counselors at Law

HENRY F. NARVAEZ
H. NICOLE WERKMEISTER
MARTIN R. ESQUIVEL
BRYAN C. GARCIA
ERNESTINA R. CRUZ
DENISE M. CHANEZ

Telephone
(505) 248-0500

Fax
(505) 247-1344

Mailing Address
P. O. Box 25967
Albuquerque, NM 87125-0967

Street Address
601 Rio Grande Boulevard NW
Albuquerque, NM 87104

February 18, 2008

*__Via U.S. Mail and e-mail__*

Catherine Crump
ACLU
125 Broad Street 18th Floor
New York, NY 10004

**Re:    Pahls, et. al. v. Board of County Commissioners, et. al.
        USDC District of New Mexico No. 08 CIV 00053 LH/ACT**

Dear Ms. Crump:

Per your earlier request, you asked that Bernalillo County provide information to identify any federal actors who played a role in determining where Plaintiffs and other demonstrators should be placed in connection with the August 2007 Presidential Visit to Albuquerque. The Bernalillo County Sheriff's Department worked with various members of the Secret Service in connection with the visit; however, the names, titles and contact information is unknown. Bernalillo County typically works with the Resident Agent in Charge (e.g. the "RAC Office") in connection with such visits. It is believed that the RAC Office would have the information you have requested on file. As such, I have been provided the name of James Helminski, Resident Agent in Charge, at the Albuquerque Secret Service Office. Mr. Helminski's phone number is 505-248-5290. Please let me know if you have any questions regarding the above.

Very truly yours,

NARVAEZ LAW FIRM, P.A.

By _Ernestina_
        ERNESTINA R. CRUZ, ESQ.

ERC:aab

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JEANNE PAHLS, REBECCA, WILSON,**
**ALMA ROSA SILVA BANUELOS,**
**CARTER BUNDY, JASON CALL,**
**MARY LOU "MITZI" KRAFT,**
**MERIMEE MOFFITT, LAURA LAWRENCE,**
**STUART T. "TERRY" RILEY,**
**CODEPINK WOMEN FOR PEACE, ALBUQUERQUE CHAPTER,**
**STOP THE WAR MACHINE,**

        **Plaintiffs,**

      **vs.**                        **No. Civ. 08-53  LH/ACT**

**BOARD OF COUNTY COMMISSIONERS FOR THE**
**COUNTY OF BERNALILLO, BERNALILLO COUNTY**
**SHERIFF'S DEPARTMENT, CITY OF ALBUQUERQUE,**
**ALBUQUERQUE POLICE DEPARTMENT,**
**JOHN/JANE DOES 1-5, in their individual capacities,**

        **Defendants.**

## INITIAL SCHEDULING ORDER

      This cause is assigned to me for scheduling, case management, discovery and other non-dispositive motions.

A Rule 16 scheduling conference will be held in my chambers, Suite 670, Pete V. Domenici United States Courthouse,

333 Lomas Blvd., Albuquerque, New Mexico, on **TUESDAY, APRIL 22, 2008, at 1:30 p.m.**[1]  At the Rule 16

scheduling conference, counsel will be prepared to discuss all claims and defenses, initial disclosures, discovery requests

and scheduling, any issues relating to disclosure or discovery of electronically-stored information, the timing of expert

disclosures and reports under Fed. R. Civ. P. 26(a)(2), and the use of scientific evidence and whether it is anticipated

that a Daubert[2] hearing is needed.  We will also discuss settlement prospects, alternative dispute resolution possibilities,

and consideration of consent pursuant to 28 U.S.C. § 636(c).  Parties represented by counsel need not attend.  If service

on all parties is not complete, plaintiff(s) appearing through counsel or *pro se* plaintiff(s) are responsible for notifying

all parties of the content of this order.

---

[1] Out of town *pro se* parties or counsel may appear by telephone.  Please advise my chambers at least 48 hours prior to the scheduling conference if you would like to appear by telephone.  Counsel appearing by telephone is responsible for placing the telephone conference call.

[2] Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993)

The parties, appearing through counsel or *pro se*, will **"meet and confer" no later than twenty-one (21) days** prior to the initial scheduling conference to discuss the nature and basis of their claims and defenses, the possibility of a prompt resolution or settlement, and to formulate a provisional discovery plan. Fed. R. Civil. P. 26(f). The time allowed for discovery is generally 120 to 180 days. The parties will cooperate in preparing a Joint Status Report and Provisional Discovery Plan (JSR) which follows the sample JSR obtainable from the Clerk of the Court.[3] The blanks for proposed dates should be filled in by the parties.[4] Plaintiff, or Defendant in removed cases, is responsible for electronically filing the JSR by **April 14, 2008**. Initial disclosures under Fed. R. Civ. P. 26(a)(1) must be made within fourteen (14) days of the meet-and-confer session.

Parties may not modify case management deadlines on their own. Good cause must be shown and the Court's express and written approval obtained for any modification of the dates to the case management deadlines that are established by the Court at the scheduling conference.

Counsel are required to comply with the Local Civil Rules of the United States District Court for the District of New Mexico, as well as the Federal Rules of Civil Procedure. Civility and professionalism will be required of counsel, and counsel must comply with "A Creed of Professionalism of the New Mexico Bench and Bar" (which can be found in the State Bar of New Mexico Bench and Bar Directory).

**IT IS SO ORDERED.**

ALAN C. TORGERSON
United States Magistrate Judge

---

[3] The form can also be located on the U.S. District Court external website, www.nmcourt.fed.us

[4] All attorneys <u>must</u> show their complete mailing address and telephone number(s) under the "Appearances" section of the JSR. DO NOT indicate the witness' address as "in care of" the attorney's office. The city or town of residence of each witness must be included so that the trial judge can take that information into consideration when determining the trial location.

2

| From: | cmecfbb@nmcourt.fed.us |
|---|---|
| To: | cmecfto@nmcourt.fed.us; |
| Subject: | Activity in Case 1:08-cv-00053-LH- |
| | ACT Pahls et al v. Board of County Commissioners for the County of Bernalillo et al Order |
| Date: | Tuesday, April 22, 2008 6:38:07 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

## U.S. District Court

## District of New Mexico - Version 3.0

**Notice of Electronic Filing**

The following transaction was entered on 4/22/2008 at 4:31 PM MDT and filed on 4/22/2008

| **Case Name:** | Pahls et al v. Board of County Commissioners for the County of Bernalillo et al |
|---|---|
| **Case Number:** | 1:08-cv-53 |
| **Filer:** | |
| **Document Number:** | 22 |

**Docket Text:**
ORDER by Judge Alan C. Torgerson Adopting Joint Status Report and Provisional Discovery Plan With Changes and Setting Case Management Deadlines. Discovery due by 8/20/2008; Plaintiffs' Expert Witness List due by 5/22/2008; Defendants' Expert Witness List due by 6/23/2008; Discovery motions due by 9/1/2008; Pretrial motions other than discovery due by 10/9/2008; Pretrial Order Plaintiffs to Defendants due by 11/13/2008; Pretrial Order Defendants to Court due by 11/24/2008; Plaintiffs to add parties or amend pleadings by 6/20/2008; Defendants to add parties or amend pleadings by 7/21/2008. Discovery Status Conference set for 6/20/2008 01:30 PM in Albuquerque - 670 Judge Alan C. Torgerson Chambers before Magistrate Judge Alan C. Torgerson. (kc)

**1:08-cv-53 Notice has been electronically mailed to:**
George L Bach, Jr gbach@aclu-nm.org
Ernestina R Cruz tcruz@narvaezlawfirm.com, abaker@narvaezlawfirm.com,

usdcnm@gmail.com
Kathryn Levy klevy@cabq.gov, jrlewis@cabq.gov, mchicoski@cabq.gov
H. Nicole Werkmeister nwerkmeister@narvaezlawfirm.com,
ehernandez@narvaezlawfirm.com
Christopher Allen Hansen chansen@aclu.org
Catherine Newby Crump ccrump@aclu.org
Josh Hsu jhsu@aclu.org

**1:08-cv-53 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**
Main Document

**Original filename:**
n/a

**Electronic document Stamp:**

[STAMP dcecfStamp_ID=1167529506 [Date=4/22/2008] [FileNumber=1545998-0
] [b70e60b261ce4b85b62022cf9499edf2ec803cfc80504f0c51881f37b3c39d567ff
5187db97668f089c6fe9538057fcc4b859853fdeb8cea1c2968e88ccc711f]]

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW MEXICO

2

3   JEANNE PAHLS, et al.,

4                              Plaintiffs,

5     -vs-                     NO:  1:08-cv-53

6

BOARD OF COUNTY COMMISSIONERS, et al.,

7

                             Defendants.

8
9

10            DEPOSITION OF MATTHEW THOMAS

11                  June 6, 2008
                    10:00 a.m.

12                  1410 Coal, S.W.
                    Albuquerque, New Mexico

13
14

        PURSUANT TO THE FEDERAL RULES OF CIVIL

15   PROCEDURE, this deposition was:

16   TAKEN BY:  CATHERINE CRUMP, ESQ.
                and CHRISTOPHER HANSEN, ESQ.

17              ATTORNEY FOR PLAINTIFFS

18   REPORTED BY:  Jan Gibson, CCR, RPR, CRR
                   Paul Baca Court Reporters

19                 500 Fourth Street, NW - Suite 105
                   Albuquerque, New Mexico  87102

20
21
22
23
24
25

34ce7f72-fe5a-4b65-8655-08cbae709514

Page 6

1   there's some representatives out of the office and
2   there's a presidential advance detail and it's
3   different people every time they show up. So I am
4   sure there were people from this office there.
5   Specifically who was on the advanced deal, I don't
6   recall. We do several of these a year.
7       Q.   Prior to that -- that meeting was two or
8   three before the generally arrived?
9       A.   Generally it's three to four days ahead of
10  time.
11      Q.   Prior to that meeting does the Secret
12  Service come out and sort of scout the location?
13      A.   No, not to my knowledge. The advanced
14  detail are the people that do that.
15      Q.   Prior to this meeting three or four days
16  in advance, they also don't ask you to scout the
17  location?
18      A.   Well, generally what happens is we go to
19  this briefing like we did, and they will have --
20  Secret Service has, you know, several individuals,
21  six, seven, eight, nine of them, whatever it is, in
22  specific areas. We will team up people or I will
23  team up my people with those people but I will also
24  coordinate with the City and we will decide who is
25  going to handle what and we will meet with the

Page 7

1   appropriate Secret Service people.
2       Q.   And do you remember the names of any of
3   the Secret Service people who were present?
4       A.   No.
5       Q.   The first person to talk at that meeting,
6   was it a Secret Service agent?
7       A.   You know, they are all run differently.
8   Sometimes there will be a representative of the
9   office here in town who will speak. Sometimes it
10  will be the guy running the advance detail. I mean,
11  in that particular incident, I don't recall
12  specifically.
13      Q.   Who was the Secret Service agent in charge
14  for that visit?
15      A.   I don't recall. You know, what happens is
16  we get a briefing sheet, and we deal with those
17  people, and they are such short-term duties, usually
18  the things are over and done with in a week. The
19  last thing we want, and I agree, they tell us don't
20  leave the things laying around and we don't leave
21  them around. We shred them. We are done with them
22  when the briefing is done.
23      Q.   So the briefing sheet that you -- were
24  there any documents handed out at the meeting?
25      A.   There's a briefing detail.

Page 8

1       Q.   You received a piece of paper at the
2   meeting?
3       A.   Correct.
4       Q.   Which you took back to your office?
5       A.   Generally, or he kept with me.
6       Q.   Does the piece of paper still exist?
7       A.   I'm sure it does somewhere but not with
8   us. I don't want my guys keeping that stuff around
9   and I don't want it around because it details the
10  names of contacts and telephone numbers of agents
11  and that's just good job security. I don't allow
12  that with my detectives dealing with the State
13  Police or APD or anywhere other agency. We don't
14  want those things getting out.
15      Q.   The E-mail that you got that said we are
16  going to have a meeting at the City Police
17  Department, was that from someone in your office or
18  someone from Secret Service?
19      A.   No, it generally would have been
20  somebody -- it comes down through -- the chief
21  usually is advised or the undersheriff is advised
22  and it comes down through the chief.
23      Q.   Would the name of any of the Secret
24  Service agents that were in charge of the event be
25  in the E-mail?

Page 9

1       A.   Coming from the agents themselves? No.
2       Q.   No, the E-mail that the chief sends you.
3   Assuming in this instance it was from the chief,
4   would it say, for example, "I want you to report to
5   such and such a place day after tomorrow because the
6   president is coming to town and talk to Special
7   Agent so-and-so of the Secret Service"?
8       A.   Generally not. It may. I know that they
9   have in the past. On this particular incident I
10  don't recall. Sometimes just "show up at this time
11  this place and go to the briefing for a visit."
12      Q.   Is the E-mail still in your computer
13  somewhere?
14      A.   I would have to look. Generally the
15  County system kicks things out. They generally
16  frown on 15,000 E-mails on any one profile but I
17  would have to look.
18      Q.   Is there an archiving system so when they
19  kick it out it goes onto a tape somewhere that's
20  accessible?
21      A.   That's an IT question. I assume. What I
22  know of IT stuff, generally everything is
23  retrievable at some point.
24      Q.   Did you exchange any other E-mails about
25  the event -- let's start with before the event

Page 18

1  him.  It wasn't a real tall guy.  Five eight, five
2  ten.  Somewhere around there, stocky, light-colored
3  hair.
4      **Q.   Age?**
5      A.   This is where I get in trouble with women
6  all the time.
7      **Q.   He is a guy.  He won't care.**
8      A.   I don't know, 30s.
9      **Q.   Race?**
10     A.   Caucasian.
11     **Q.   Have you worked with him since?**
12     A.   No, or before then, no.
13     **Q.   That description really narrows it down.**
14     A.   I'm sure.  It's like Albuquerque.  Five
15  seven and Hispanic.
16     **Q.   No offense but --**
17     A.   Dark hair.  I get that all the time.  That
18  helps.
19     **Q.   I should be asking scars and**
20  **distinguishing characteristics?**
21     A.   I didn't get that close to him.
22     **Q.   When you are out there on the site with**
23  **the Secret Service guy and your sergeants, is that**
24  **where you at least tentatively establish the inner**
25  **and outer parameters?**

Page 19

1      A.   Correct.
2      **Q.   Who makes the decision where the inner and**
3  **outer parameters are?**
4      A.   Secret Service.
5      **Q.   If the Secret Service says to you, "I want**
6  **it at this corner," and you think that corner is**
7  **farther than you think it needs to be, you would**
8  **nevertheless defer to the Secret Service?**
9      A.   Yeah, they have their briefing and
10  policies and I'm not going to get in the middle of
11  how they do things.  We let them set the parameters
12  and we will walk through.  We may make suggestions.
13  For instance, if we go down a road I may say, "Look,
14  we need another guy here, another guy here."  I will
15  be with the ERT guy and we will walk it down.
16     **Q.   After you then went out to the site and**
17  **walked it with the Secret Service and one or both of**
18  **your sergeants, what did you do next?**
19     A.   Probably nothing.  I'll tell those guys to
20  get the out borders out and do what they need to do
21  and then I will attend the briefings and I will have
22  an emergency response team in place about 8:00
23  o'clock in the morning.
24     **Q.   So you don't have anymore briefings with**
25  **your guys until essentially the morning of the**

Page 20

1  event?
2      A.   Yeah.  There's probably -- I mean, don't
3  get me wrong.  I mean, there's conversation
4  throughout while we are planning the thing.  I mean,
5  you know, we are looking for vehicles, probably
6  looking for equipment on occasion.  We may move how
7  things are done.  We may come up with better areas
8  and there may be other threats that come up during
9  the planning stages and we may add or remove people
10  or adjust accordingly.
11     **Q.   Prior to the day of the event did you have**
12  **any conversations with the sheriff himself about**
13  **this?**
14     A.   No, I didn't talk to the sheriff at all.
15     **Q.   There's a number two person.  His title is**
16  **undersheriff?**
17     A.   Yes, Sal Baragiola.
18     **Q.   Did you have any conversations with him?**
19     A.   No, in fact I was surprised the sheriff
20  was there.  I was unaware that he was in the
21  motorcade until he arrived, and when he arrived on
22  the premises I did not see him.  I try very hard not
23  to.
24     **Q.   Was he a motorcyclist or in a car or --**
25     A.   Who?

Page 21

1      **Q.   -- or in a car?  The sheriff?  You said**
2  **the sheriff was there?**
3      A.   He was with the president.  That's his
4  business.
5      **Q.   He was functioning as a dignitary, not a**
6  **law enforcement officer?**
7      A.   No, he wasn't -- I don't know.  Ask the
8  sheriff.  I'm not going to get into that.
9      **Q.   I understand that.  Although he is not**
10  **going to be sheriff much longer.**
11     A.   Maybe not.
12     **Q.   So we hear anyway.**
13     A.   My job is security, so I will protect the
14  people who are there.
15     **Q.   And during the event you never saw him?**
16     A.   No.
17     **Q.   So the morning of the event, what happens?**
18     A.   Probably had a briefing, and I know we did
19  with ERT and I had the ERT people in place at about
20  8:00 o'clock.  We will adjust accordingly.  You
21  know, I mean, parking areas will shift or, you know,
22  Secret Service may request additional people in one
23  spot or something.
24     **Q.   The briefing that you had the morning of**
25  **included only people from your department?**

6 (Pages 18 to 21)

34ce7f72-fe5a-4b65-8655-08cbae709514

Page 38

1  about this, but this is the way I remember his
2  testimony, his recollection is he called you and you
3  and the Secret Service agent consulted each other
4  and you relayed back to him instructions as to what
5  he should do.  Does that ring a bell?
6      A.   No.
7      Q.   Do you recall ever consulting the Secret
8  Service agent about the demonstrators during this
9  event?
10     A.   Yes.
11     Q.   What was the nature of that conversation?
12     A.   Okay.  Well, first of all -- well, I will
13  just let that go.  The only time I recall talking to
14  the Secret Service -- if I remember right there was
15  a Secret Service agent right here on the driveway at
16  Rio Grande with Sergeant Mimms, if I recall
17  correctly.  So if Ed talked to him, that was his
18  doing.  What I remember is Ed telling me about the
19  protesters, and I gave him some instructions about
20  that.  The only time that I really had any
21  substantive contact with Secret Service is the guy
22  who ran the site survey said, "Look, there's going
23  to be some people right across the roadway."
24        I said, "Okay."  He said, "They live
25  there, it's private property."  I said, "It's one of

Page 39

1  the things you have to deal with."  That was it.
2      Q.   What was that agent's name?
3      A.   The same guy that ran the site survey.  I
4  don't recall.
5      Q.   Larry Kronen is the name of the lawyer
6  that Sergeant Mimms was negotiating with on behalf
7  of the demonstrators on that date.  Did you ever
8  speak with Mr. Kronen yourself?
9      A.   No.
10     Q.   At what point did the Secret Service agent
11  tell you there were going to be people right across
12  in the driveway?
13     A.   I don't know.  Maybe an hour ahead of
14  time.  Half hour ahead of time.
15     Q.   Were the people already standing there at
16  the time he told you that?
17     A.   I don't think I was out there at the time
18  that he told me that.
19     Q.   You were in the mayor's residence?
20     A.   I was probably closer by the house.  I
21  don't recall being out there at the time.
22     Q.   Did he ask you for an opinion as to
23  whether they could stand there or did he simply tell
24  you, "We decided to let them stand there."
25     A.   It's private property.  They can do what

Page 40

1  they want.  I certainly can't argue about that.
2      Q.   Well, let's talk for a second then about
3  the private property question.  How far from the
4  tarmac were they actually standing?
5      A.   I don't know.
6      Q.   Did you ever see those people?
7      A.   I don't recall seeing them, no.
8      Q.   Suppose they were standing on the shoulder
9  of the road as opposed to 20 feet back on their own
10  property.  Would that make any difference?
11     A.   Depends.  If they were -- my personal
12  opinion, my professional opinion is they needed to
13  be on the private property is what they needed to
14  be.  If they were on the roadway where we had
15  control of the roadway I would have told them, "Onto
16  your property."
17     Q.   I understand they can't be on the roadway.
18  The anti-Bush demonstrators back down at the
19  southern perimeter are on the shoulder of the
20  roadway, the space you and I were talking about
21  before that is -- from the place where the cement or
22  the tarmac or whatever it is starts to the end where
23  the fences exist.
24        The question I am asking is now is if the
25  people across from the driveway were in that same

Page 41

1  location -- that is within the space between where
2  the highway ends and the property line begins --
3  would they have been allowed to stand there?
4      A.   Depends at what time.  I mean, my
5  understanding of this is that they were -- I can't
6  recall.  They were either here or here but they were
7  in the inner perimeter for the outer perimeter on
8  the roadway.  I think my recollection is they were
9  going to be pretty much right across the street
10  wherever the president was coming.
11     Q.   Right.
12     A.   And what I would have done, professionally
13  speaking, is if they were on the shoulder I would
14  have told them, "Get off the shoulder because you
15  are on the inside perimeter.  You are inside the
16  perimeter.  I don't want you on the shoulder.  If
17  you are going to be out there, be on your private
18  property."
19     Q.   But that wasn't your decision on that day
20  where they would stand?
21     A.   The Secret Service told me they were going
22  to be on their property.  Not on the shoulder.  They
23  said, "Look, they are going to be on the property
24  across the road.  That's their right."  I said,
25  "Fine."

Page 42

1    **Q.   You never saw them so you don't know if**
2  **they were on the shoulder?**
3    A.   I don't have a direct recollection.  I
4  don't.  I don't.
5    **Q.   How many of them were there?**
6    A.   He said there was going to be some people.
7    **Q.   Assume it was somewhere in the vicinity of**
8  **half a dozen.**
9    A.   Okay.
10   **Q.   If the purpose of creating an outer**
11 **perimeter is to create a completely secure location,**
12 **why is it not insecure to allow them to be right**
13 **across the street from the driveway?**
14   A.   This is the way that I look at this.
15 These people -- we were closing this down because
16 the motorcade was coming in.  We had pretty much
17 control and direct access of the properties here.
18 The Secret Service, as I mentioned earlier, will
19 generally contact the people in the houses and the
20 roadways and do the threat analysis and everything
21 else.
22        There is some substantial distance here.
23 I am concerned about this roadway and the motorcade
24 coming in and everything in the inner perimeter is
25 what I am concerned about.  If this is their

Page 43

1  property and they want to live there and he is not a
2  direct threat to the president, that's the Secret
3  Service's call, not mine, then I'm going to let them
4  be on the property.  I don't have any ability to
5  remove people from private property.
6    **Q.   Well --**
7    A.   If the Secret Service -- like I said
8  earlier, that's their call.
9    **Q.   That's precisely what I wanted to be 100**
10 **percent clear on.  The decision as to where the**
11 **people who were across from the driveway were to be**
12 **allowed to stand was made by the Secret Service, not**
13 **by you?**
14   A.   Yeah.  I mean, he came up to me.  If you
15 want to look at it that way, he said, "There's going
16 to be people on private property.  That's their
17 right."  I said, "Fine."
18   **Q.   You all didn't have a discussion about how**
19 **far back they should be?**
20   A.   No, he said, "It's private property, they
21 are going to be there, that's their right," and I
22 said, "Fine."
23   **Q.   Did you communicate that piece of**
24 **information once the Secret Service agent told you**
25 **that to anyone else?**

Page 44

1    A.   I am sure I told Sergeant Mimms.
2    **Q.   Sergeant Mimms at one point drew a picture**
3  **for us as to where those people were standing.  You**
4  **would trust his recollection as to where it was?**
5    A.   Yes.
6    **Q.   And you wouldn't have any reason to doubt**
7  **it because you didn't actually see them yourself?**
8    A.   I don't recall seeing them out there.  I
9  may have, but we are talking many, many months ago
10 so I don't have a specific recollection.
11   **Q.   I want to show you a copy of a newspaper**
12 **article from the local paper that shows the pro-Bush**
13 **demonstrators who were standing directly across from**
14 **the mayor's driveway.  I want to ask you if that**
15 **helps your memory in terms of whether you saw them**
16 **or not?**
17   A.   I don't think I did.  I don't have any
18 specific recollection.
19   **Q.   Okay.  Since it doesn't refresh your**
20 **recollection I'm not going to mark it.**
21        MS. CRUZ:  Why don't we mark it so we know
22 what he looked at.
23        (Note:  Exhibit 16 marked for
24 identification.)
25   **Q.   We have marked as Exhibit 16 the newspaper**

Page 45

1  photograph I showed you; is that correct?
2    A.   Correct.
3    **Q.   After the event occurred, did you have any**
4  **discussions with Sergeant Mimms about the**
5  **demonstrators?**
6    A.   I may have.  I don't recall, again, any of
7  that specifically.
8    **Q.   After the event occurred, did you have any**
9  **conversations with the sheriff or the undersheriff**
10 **about the demonstrators?**
11   A.   No.
12   **Q.   When the newspapers started calling to**
13 **complain or to ask, better yet to inquire about the**
14 **relationship between the pro-Bush demonstrators and**
15 **the anti-Bush demonstrators, were you involved in**
16 **the how to respond to the newspapers?**
17   A.   I don't recall that, no.
18   **Q.   After the department was sued over this**
19 **incident were you involved in discussions within the**
20 **agency about how the department should react to**
21 **that, other than conversations you had with lawyers?**
22   A.   No.  I mean, this is -- you know, we have
23 a job to do.  We went out and did the job to the
24 best of our ability, and there hasn't been any
25 uproar.

12 (Pages 42 to 45)

34ce7f72-fe5a-4b65-8655-08cbae709514

```
 1
                IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF NEW MEXICO
 3
 4  JEANNE PAHLS, ET AL.,
              Plaintiffs,
 5
    VS.                          NO. 1:08-cv-53 (LH)(ACT)
 6
    BOARD OF COUNTY COMMISSIONERS
 7  FOR THE COUNTY OF BERNALILLO, ET AL.,
              Defendants.
 8
 9
10
        ****************************************
11              DEPOSITION OF JUSTIN DUNLAP
                      June 4, 2008
12                      3:05 p.m.
                     1410 Coal SW
13            Albuquerque, New Mexico 87104
        ****************************************
14
15
16         PURSUANT TO THE FEDERAL RULES OF CIVIL
17  PROCEDURE, this deposition was:
18
19
20  TAKEN BY:   Ms. Alexa Kolbi-Molinas
                ATTORNEY FOR PLAINTIFF ACLU
21
22  REPORTED BY:Jeannine K. Sims, RPR, NM CCR #12
                Paul Baca Court Reporters
23              500 Fourth Street, NW, Suite 105
                Albuquerque, New Mexico  87102
24
25
```

Page 14

1  site, I didn't -- I mean, usually in the past when we
2  have done these kind of things there's people that show
3  up. But I believe it was invitation only at a private
4  residence, so --
5      Q.  Okay.
6      A.  -- unless they had an invitation they
7  weren't going to get in.
8      Q.  I just want to walk through what you did on
9  August 27th, 2007. So can you just start at the
10  beginning of your work day and tell me what happened.
11     A.  On that day we would have had a briefing. I
12  believe we had a briefing at our North Area Command,
13  which is on 4th Street. And after that we -- after the
14  briefing and everyone was told what they were supposed to
15  do we then moved to the house on Rio Grande.
16         We were positioned in two SUVs at the
17  residence that was just to the south. We basically were
18  -- had our gear on and we stood around until the event
19  was over and then we went home.
20     Q.  And there was -- did you have any
21  interaction with any other of the agencies that were
22  there on the site that day?
23     A.  Other than, you know, briefly talking with a
24  couple Secret Service guys when we first got there and
25  they were going around making sure that we were where we

Page 15

1  were supposed to be. That was the only contact I had
2  with anybody that day.
3      Q.  And do you remember the names any of those
4  people?
5      A.  I don't remember who I talked to that day.
6      Q.  And did you have any contact with any of the
7  demonstrators when you were on the site that day?
8      A.  No.
9      Q.  Could you see them from where you were?
10     A.  No.
11     Q.  You didn't see them?
12     A.  It's a kind of a narrow, tree-lined driveway
13  where we were at. And the driveway of the house kind of
14  makes a hard left turn off the actual drive. We were
15  positioned back there and we really couldn't see the
16  street or anything where we were at; we could just see
17  kind of a straight shot to where the venue was occurring
18  and the tent outside the residence.
19     Q.  Could you see the supporters from where you
20  were standing?
21     A.  Not even that very much. They actually
22  brought in a bunch of like shrubbery and stuff and placed
23  trees and things to try to block the -- to try to make it
24  not such a clear view of the event, being that the event
25  was kind of held in an open part of a very large yard.

Page 16

1      Q.  Where did they bring -- they brought in the
2  shrubbery around where?
3      A.  Around the tent where the event was set up.
4      Q.  Could you see -- there were some Bush
5  supporters who were not attendees of the event but who
6  were just lining the motorcade route. And they were
7  standing across -- they were standing across the street
8  from the Mayor's driveway. Could you see them?
9      A.  No. The only thing I saw of even when the
10  President arrived that day was the motorcade pulling in
11  the driveway. Very -- a few -- a couple times we could
12  hear him, you know, a little bit of his speech but not
13  anything very clear just from a distance. And I saw the
14  motorcade leave and that was my extent of that.
15     Q.  Did you hear while you were on the event
16  site did you hear any discussions either over the radio
17  or from other agents who were walking around about any
18  demonstrators that were there?
19     A.  I do recall hearing something about
20  demonstrators. And I don't recall exactly what it was,
21  but the ERT team were the people that were actually
22  dealing with the demonstrators. I didn't have any
23  contact with any demonstrators at all.
24     Q.  And the same question for the supporters who
25  were standing across the street. Do you remember hearing

Page 17

1  any discussions --
2      A.  No.
3      Q.  -- about --
4      A.  We were there much earlier than the event
5  started at our posts. And by the time those people came,
6  we were already where we were at. And by the time those
7  people were gone we were still there and then we left
8  after.
9      Q.  And do you know if BCSO or any of the other
10  agencies were videotaping the site in any way?
11     A.  That, I don't know.
12     Q.  Any others, audio or photographs of the --
13     A.  No. I don't believe so, that I know of. If
14  I would have had photographs then I probably wouldn't
15  have had to physically go to the address; I could have
16  done the map off the photographs. But that I recall, I
17  don't remember seeing any photographs.
18     Q.  And what agency was in charge of securing
19  the event site?
20     A.  Secret Service.
21     Q.  And so Secret Service was giving orders to
22  BCSO?
23     A.  Correct.
24     Q.  So they were making all the final --
25     A.  Right. We were just there to supplement

5 (Pages 14 to 17)

08551df5-15b7-4c30-9540-460c2f3bf2ff

Page 18

1  their detail.
2      Q.  Okay.  Are you aware -- I know you didn't
3  see them, but are you aware that the anti-Bush
4  demonstrators were required to move far away from where
5  the motorcade was entering the site?
6          MR. GARCIA:  Object to the form.  Go ahead.
7      A.  I don't -- I don't recall any specifics
8  about anybody being -- having to be moved.  The only
9  thing I heard afterwards was from a couple ERT people
10  saying that the demonstrators weren't happy about where
11  they were staged or where they were allowed to protest.
12  But I didn't actually see where that took place.
13      Q.  (BY MS. KOLBI-MOLINAS)  And what was -- sort
14  of anticipated my question.  Did you have any discussions
15  with any of the other BCSO or other agency officers that
16  were on the ground after the event about the
17  demonstrators?
18      A.  Not in particular, not other than what I
19  just told you.  And I don't recall who I spoke with
20  exactly.  That was just kind of the word, you know, as
21  far as what had happened, what was going on outside the
22  things that we couldn't see from where our CAT team was
23  positioned.
24      Q.  And did any of those discussions talk about
25  the people who were there supporting Bush?

Page 19

1      A.  Not that I recall.
2      Q.  Okay.  Is it your understanding from where
3  you were standing on private property that if other
4  individuals, non-law enforcement, wanted to stand around
5  private property near the event site that they would be
6  allowed to do so?
7      A.  From where we were at, Secret Service had
8  made arrangements to -- with the people who lived there.
9  And basically there wasn't supposed to be anybody outside
10  anywhere around the location that we were securing unless
11  they were identified as a law enforcement officer or a
12  Secret Service agent.  But there was no pedestrian foot
13  traffic or anything on the road that we were stationed
14  on.
15      Q.  So in the area that you were -- this I guess
16  it was a driveway --
17      A.  Uh-huh.
18      Q.  -- that you were stationed, if the people
19  who lived in that house had wanted to come out on their
20  driveway, would they be allowed?
21      A.  They weren't home at the time.  But I would
22  say either they would be escorted by one of us from the
23  house to the street or something like that.  They
24  wouldn't be able to just freely walk down the street.  I
25  mean, we were given orders to secure the site and there

Page 20

1  wasn't supposed to be anybody that wasn't actively
2  securing that site in that area.
3      Q.  Uh-huh.  And when you say walk down the
4  street, do you mean walking down Rio Grande or walking up
5  and down their own driveway?
6      A.  The private drive that we were on.  It's my
7  understanding that Rio Grande was shut down on both sides
8  of the residence as well.  But that was Secret Service's
9  call as far as, you know, what they feel they need to do
10  to provide adequate security for the President so ...
11      Q.  And the driveway that you were on, was it
12  secured in that way because there was a CAT team on it or
13  were all driveways around the Mayor's residence secured
14  in that way?
15      A.  I don't know about all driveways.  The
16  driveway we were on was secured that way and we were
17  stationed where we were at it was my understanding
18  because if someone were to be in that area they would
19  have a clear view of where the President was at in that
20  rent.  And they wanted to try to avoid that.
21      Q.  Are you aware if there was any policy about
22  other people say the residents lining Rio Grande, would
23  the people who lived in those properties be allowed to
24  come stand on their private property?
25          MR. GARCIA:  Object to the form.

Page 21

1      A.  I don't know.  I don't know.
2      Q.  (BY MS. KOLBI-MOLINAS)  You only know about
3  the --
4      A.  I only -- I didn't -- that was ERT's
5  assignment out there.  The ERT Sergeant was taking care
6  of that and I was assisting on the CAT team stuff.  I'm
7  not sure about the actual street.
8      Q.  And just to be clear, if the people had been
9  home in the house that you were at and they wanted to
10  stand outside and listen, stand outside their house and
11  listen to the President, would they have been allowed to
12  do that?
13          MR. GARCIA:  Object to the form, calls for
14  speculation.  Go ahead.
15      A.  I don't know.  Whenever we have done this
16  usually those people are contacted by the Secret Service,
17  as they were on that day, and they made arrangements to
18  where they weren't even home.
19      Q.  (BY MS. KOLBI-MOLINAS)  Okay.  I just want
20  to show you the caption of our complaint and just ask you
21  if you recognize any of the names of the plaintiffs.
22  Those are these people.
23      A.  No.  The Stop the War Machine I've heard
24  that.  But I don't know who those people are.
25          MS. KOLBI-MOLINAS:  Okay.  We are going to

6 (Pages 18 to 21)

08551df5-15b7-4c30-9540-460c2f3bf2ff

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 05-cv-02355-WYD-CBS

_____

DEPOSITION OF:  MICHAEL DON CASPER - March 2, 2007

_____

LESLIE WEISE, ALEX YOUNG,

Plaintiffs,

v.

MICHAEL CASPER, in his individual capacity;
JAY BOB KLINKERMAN, in his individual capacity;
JOHN/JANE DOES 1-5, all in their individual capacities,

Defendants.

_____

        PURSUANT TO NOTICE, the deposition of
MICHAEL DON CASPER was taken on behalf of the Plaintiffs
at Alfred A. Arraj U.S. Courthouse, 901 19th Street,
Fourth Floor, Denver, Colorado 80294, on March 2, 2007,
at 10:41 a.m., before Darcy Curtis, Certified Shorthand
Reporter and Notary Public within Colorado.

Weise v. Casper    MICHAEL DON CASPER    3/2/2007

Page 2

1
2        A P P E A R A N C E S
For the Plaintiffs:    MARTHA M. TIERNEY, ESQ.
                JEREMY M. RAMP, ESQ.
3        Kelly Haglund Garnsey +
                Kahn, LLC
4        1441 18th Street, Suite 300
                Denver, Colorado 80202
5
                MARK SILVERSTEIN, ESQ.
6        American Civil Liberties Union
                Foundation of Colorado
7        400 Corona Street
                Denver, Colorado 80218
8
        For the Defendant:    SEAN R. GALLAGHER, ESQ.
9    Michael Casper    DUGAN BLISS, ESQ.
                Hogan &, Hartson, LLP
10        1200 17th Street, Suite 1500
                Denver, Colorado 80202
11
        For the Defendant:    BRETT R. LILLY, ESQ.
12    Jay Bob Klinkerman    Doyle Zakhem Suhre Lilly, LLC
                700 17th Street, 20th Floor
13        Denver, Colorado 80202
14    Also Present:    Jay Bob Klinkerman
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        INDEX
2    EXAMINATION OF MICHAEL DON CASPER:        PAGE
    March 2, 2007
3
    By Ms. Tierney            4
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        WHEREUPON, the following proceedings were
2    taken pursuant to the Federal Rules of Civil Procedure.
3        *   *   *   *   *
4        MICHAEL DON CASPER,
5    having been first duly sworn to state the whole truth,
6    testified as follows:
7        EXAMINATION
8    BY MS. TIERNEY:
9        Q.  Good morning, Mr. Casper.  My name is Martha
10    Tierney, and I represent the plaintiffs in this case.
11    Have you ever had your deposition taken before?
12        A.  No.
13        Q.  You just witnessed Mr. Klinkerman's, so I'm
14    sure you understand the drill.  I ask you questions, and
15    the court reporter takes down both my questions and your
16    answers, and you're under oath during this process.  Do
17    you understand that?
18        A.  Yes.
19        Q.  If I ask a question that you don't understand,
20    tell me, and I'll try to rephrase it.
21        A.  Okay.
22        Q.  If you answer the question, I'll assume you
23    understood the question.
24        A.  Correct.
25        Q.  If you want to talk to your attorney during

Page 5

1    the deposition, that's fine.  I would just ask that you
2    finish your answer if we're in the middle of the answer,
3    and then you can talk to your attorney.  Okay?
4        A.  Okay.
5        Q.  Are you taking any medication that might make
6    it difficult for you to understand and answer my
7    questions today?
8        A.  No.
9        Q.  Is there any reason you can think of why you
10    would not be able to answer my questions fully and
11    truthfully?
12        A.  No.
13        Q.  Can you state your full name for the record.
14        A.  Michael Don Casper.
15        Q.  Let me turn you now to the events of March 21,
16    2005.  You were present at the Wings Over the Rockies
17    Museum on that day for a speech event with President
18    George W. Bush?
19        A.  Yes.
20        Q.  What were you told that prompted the actions
21    you took against Ms. Weise and Mr. Young?
22        MR. GALLAGHER:  You can answer.
23        A.  I was told to ask them to leave the facility.
24        Q.  (BY MS. TIERNEY)  Were those the exact words
25    that were used?

depo@huntergeist.com        HUNTER + GEIST, INC. 303.832.5966 / 800.525.8490

e11d5ada-3185-4c81-9f38-2fc7d95f7b62

Weise v. Casper    MICHAEL DON CASPER                    3/2/2007

|  | Page 6 |
|---|---|
| 1 | A.  To the best of my recollection, yes. |
| 2 | Q.  And who told you that? |
| 3 | MR. GALLAGHER:  Answer. |
| 4 | A.  Jamie O'Keefe. |
| 5 | Q.  (BY MS. TIERNEY)  And who is Mr. O'Keefe? |
| 6 | A.  He is a lead advance person for the White |
| 7 | House. |
| 8 | Q.  Do you have the spelling of his name? |
| 9 | A.  I believe it's O-k-e-e-f-e.  That's a guess, |
| 10 | but I think it's correct. |
| 11 | Q.  And the first name, do you know? |
| 12 | A.  J-e. |
| 13 | Q.  Okay.  Were you told -- what did you tell |
| 14 | Mr. O'Keefe? |
| 15 | A.  When? |
| 16 | Q.  When he responded and told you to ask |
| 17 | Ms. Weise and Mr. Young to leave the facility. |
| 18 | A.  Can you repeat that, please. |
| 19 | Q.  What did you tell Mr. O'Keefe such that he |
| 20 | responded, "Ask Ms. Weise and Mr. Young to leave the |
| 21 | facility"? |
| 22 | A.  I asked them to leave. |
| 23 | Q.  No.  What did -- what did you tell |
| 24 | Mr. O'Keefe? |
| 25 | A.  What did I tell Mr. O'Keefe? |

|  | Page 7 |
|---|---|
| 1 | Q.  Yes, such that he then responded to you, "Tell |
| 2 | Ms. Weise and Mr. Young to leave." |
| 3 | A.  He didn't say, "Tell them."  He said, "Ask |
| 4 | them," if we clarify the words. |
| 5 | Q.  I'm sorry. |
| 6 | A.  That they had come in with a group of people |
| 7 | that were known to be people that protest at events. |
| 8 | And they had gone to the back row where they're out of |
| 9 | the way of people and can't be gotten too quickly when |
| 10 | they upset events.  And they had been identified by |
| 11 | other people in the crowd. |
| 12 | Q.  Who else identified them? |
| 13 | MR. GALLAGHER:  You can answer that. |
| 14 | A.  I don't know names.  It was people that were |
| 15 | at the event that saw me moving around and had come up |
| 16 | to me and told me that these people back here -- and |
| 17 | they pointed out numerous people -- were known to |
| 18 | protest events of the Republican party. |
| 19 | Q.  (BY MS. TIERNEY)  How many people approached |
| 20 | you and told you that? |
| 21 | A.  I mean, just a guess -- and this is purely a |
| 22 | guess -- I would say four. |
| 23 | Q.  Were these four separate people, or were these |
| 24 | four people together in a group? |
| 25 | A.  No, it was four separate people. |

|  | Page 8 |
|---|---|
| 1 | Q.  So did Mr. O'Keefe tell you to do anything |
| 2 | else regarding Ms. Weise and Mr. Young? |
| 3 | A.  No. |
| 4 | Q.  Did you -- did anyone else tell you something |
| 5 | that prompted the actions you took against Ms. Weise and |
| 6 | Mr. Young? |
| 7 | A.  I can say yes. |
| 8 | Q.  Who? |
| 9 | A.  Steve Atkiss. |
| 10 | Q.  Can you spell that name? |
| 11 | A.  A-t-k-i-s-s. |
| 12 | Q.  And who is Mr. Atkiss? |
| 13 | A.  He was the trip director for the White House. |
| 14 | Q.  Trip director? |
| 15 | A.  Yes.  Deputy director of advance. |
| 16 | Q.  And what did Mr. Atkiss tell you? |
| 17 | A.  He said the same thing, "Ask them to please |
| 18 | leave." |
| 19 | Q.  What did you tell Mr. Atkiss that led him to |
| 20 | tell you that? |
| 21 | A.  It was the same exact thing that was told to |
| 22 | Mr. O'Keefe.  It was over a radio, so . . . |
| 23 | Q.  So did you contact them separately, or was it |
| 24 | you made an announcement over the radio and they both |
| 25 | responded? |

|  | Page 9 |
|---|---|
| 1 | A.  We were on a channel that everybody talks |
| 2 | through. |
| 3 | Q.  So you got on the channel and said what? |
| 4 | A.  The same thing I said there. |
| 5 | Q.  That there was a group that were known to |
| 6 | protest at events? |
| 7 | A.  Uh-huh. |
| 8 | Q.  And once you broadcasted this over the |
| 9 | channel, Mr. O'Keefe and Mr. Atkiss both responded? |
| 10 | A.  Jamie was the -- |
| 11 | THE DEPONENT:  Is that okay to answer? |
| 12 | MR. GALLAGHER:  Yes, you can answer. |
| 13 | A.  Jamie was the lead of the event, so my main |
| 14 | direction was from Jamie. |
| 15 | Q.  (BY MS. TIERNEY)  Was there further discussion |
| 16 | on the channel before Mr. Atkiss responded? |
| 17 | MR. GALLAGHER:  You can answer that. |
| 18 | A.  I don't remember. |
| 19 | Q.  (BY MS. TIERNEY)  How did Mr. Atkiss come to |
| 20 | respond? |
| 21 | A.  He's on the channel.  So, I mean, there's a |
| 22 | lot of different talk back and forth. |
| 23 | Q.  And so at some point he just chimed in? |
| 24 | A.  To the best of my recollection, yes. |
| 25 | Q.  And do you recall his exact words? |

3 (Pages 6 to 9)

e11d5ada-3185-4c81-9f38-2fc7d95f7b62

Weise v. Casper    MICHAEL DON CASPER                3/2/2007

---

Page 10

1    A.  Ask them to please leave.
2    Q.  When these four separate people came up to you
3  to tell you about the plaintiffs, what specifically did
4  they say?
5    A.  I can't recollect that.
6    Q.  Well, you testified that they said that they
7  were known to protest events, Republican party events?
8    A.  Right.  That's the general.  I mean, I don't
9  know the specific.  I mean, that's the broad.
10   Q.  Is there anything else about that exchange
11  that you recall?
12       MR. GALLAGHER:  You can answer that.
13   A.  No.
14   Q.  (BY MS. TIERNEY)  And this was the same
15  conversation you had with four separate people?
16   A.  Generally, yes.  I mean, I can't recollect
17  what was said to four people two years ago, and there
18  was so much going on.
19   Q.  Who told you that attendees known for
20  protesting events should be -- or merited a call to the
21  individuals you called?
22   A.  Can you repeat the question, please.
23   Q.  Who told you that individuals who were known
24  to protest at events would merit a call on your radio?
25   A.  I would say my common sense.

---

Page 11

1    Q.  Other than your common sense, did anybody else
2  tell you that?
3    A.  Not to my recollection.
4    Q.  Other than Mr. O'Keefe and Mr. Atkiss, did
5  anybody else on the channel respond to your statements?
6       MR. GALLAGHER:  You can answer that.
7    A.  No.
8    Q.  (BY MS. TIERNEY)  You testified that
9  Mr. O'Keefe was the lead advance person for the White
10  House.  Do you know what his title was, or was that it?
11   A.  I --
12       MR. GALLAGHER:  You can answer, if you can.
13   A.  I don't know his exact title.  I mean, at an
14  event, he's called the lead.
15   Q.  (BY MS. TIERNEY)  Okay.  And he was on the
16  advance team?
17       MR. GALLAGHER:  You can answer that.
18   A.  Yes.
19   Q.  (BY MS. TIERNEY)  You heard the statements of
20  Mr. Klinkerman in his deposition, and I'm trying to
21  understand the chronology.  You testified that four
22  separate people came up to you and had pointed out the
23  plaintiffs.  Was that before or after Mr. Klinkerman
24  spoke to you about the plaintiffs?
25       MR. GALLAGHER:  You can answer that.

---

Page 12

1    A.  After.
2    Q.  (BY MS. TIERNEY)  When Mr. Klinkerman
3  contacted you about the plaintiffs, what did he tell
4  you?
5       MR. GALLAGHER:  You can answer that.
6    A.  I don't recall that it was Mr. Klinkerman.
7  Since I had -- it could have been him, but there were so
8  many different people outside.  It was just somebody
9  from outside that had called me.  And I don't know.  I
10  can't tell you for sure that it was him.  I don't deny
11  that it was, but I can't tell you truthfully that it was
12  him.
13   Q.  (BY MS. TIERNEY)  And how did he call you?
14   A.  I don't recall.
15   Q.  So when you went and made contact with the
16  plaintiffs first, what was your understanding of why you
17  were making contact with them?
18       MR. GALLAGHER:  You can answer that.
19   A.  It was plaintiff.  It's not plural, because
20  the gentleman was never outside that I saw.
21   Q.  (BY MS. TIERNEY)  So you only had contact with
22  Ms. Weise outside?
23   A.  There was two females outside.
24   Q.  Okay.  And do you remember my question?
25   A.  No.

---

Page 13

1    Q.  Darn, because I don't either.
2       MR. GALLAGHER:  That's why we have a court
3  reporter.
4       MS. TIERNEY:  Can you read it back?
5       MR. LILLY:  The question was what was
6  Mr. Casper's understanding of why he contacted Ms. Weise
7  outside the event.
8       MR. GALLAGHER:  Can you answer that?
9    A.  Yeah.  My recollection of going outside and
10  talking to the two females was they -- somebody had
11  overheard or somebody had known them to be people that
12  disrupted events.  That's why I went outside to talk to
13  them.
14   Q.  (BY MS. TIERNEY)  And is it your testimony
15  that you don't remember who told you that initially?
16   A.  I do not.
17   Q.  So other than the four individuals who came up
18  to you inside and someone who told you this outside, did
19  anybody else speak to you about the plaintiffs?
20       MR. GALLAGHER:  Answer.
21   A.  No.
22   Q.  (BY MS. TIERNEY)  So when you went outside to
23  meet with the two females -- first of all, do you recall
24  that one of those females is one of the plaintiffs,      —
25  Leslie Weise?

---

4  (Pages 10 to 13)

Weise v. Casper    MICHAEL DON CASPER    3/2/2007

Page 14

1    A. I was outside with two females.
2    Q. But do you know that now?
3    A. I don't know who they are. I mean, I don't
4    know them, no.
5    Q. Do you know that the identity of one of those
6    women you spoke to outside is Leslie Weise?
7    A. Yeah. I mean, it's obvious. That's why I'm
8    here, I would say. I don't know who --
9    MR. GALLAGHER: I'm going to object to the
10    question.
11    MS. TIERNEY: I just asked him if he knew.
12    MR. GALLAGHER: Okay. If you know, you know.
13    If you don't, you don't.
14    A. Yeah. I don't know who they are.
15    Q. (BY MS. TIERNEY) Do you recall what the -- do
16    you recall what role the person had who told you to come
17    outside and talk to them?
18    MR. GALLAGHER: You can answer that.
19    A. Well, I don't know how I was contacted. So I
20    don't know if it was a volunteer that came in and told
21    me, or if I was contacted some other way and I went
22    outside, but I don't honestly know. Outside it was all
23    volunteers.
24    Q. (BY MS. TIERNEY) So when you went outside to
25    speak to the two females --

Page 15

1    A. Uh-huh.
2    Q. -- did you first speak to a volunteer or
3    somebody who told you something about them?
4    MR. GALLAGHER: You can answer that.
5    A. I can't honestly answer that. I mean, I would
6    say, yes, because I would have to have been given
7    information, but can I identify that person? No. I --
8    Q. (BY MS. TIERNEY) Do you remember what was
9    said?
10    A. What I said earlier, that they --
11    THE DEPONENT: Can I answer?
12    MR. GALLAGHER: You can answer.
13    A. I think it's what I said earlier, that they
14    were known to upset events or -- I don't know the exact
15    wording.
16    Q. (BY MS. TIERNEY) And did you -- what did you
17    do? What did you tell the two females at that point?
18    MR. GALLAGHER: You can answer that, I guess.
19    A. I went outside and talked to them, smiled,
20    said, "How are you doing today," and apologized for
21    their delay getting into the event and said that
22    somebody had identified you in line and "Just have fun.
23    Go inside. There's nothing we can do, to please enjoy
24    yourself, and don't act dumb." I said, "Have a good
25    time." They got in line and went inside.

Page 16

1    Q. (BY MS. TIERNEY) Did you tell them the reason
2    that someone had identified them?
3    MR. GALLAGHER: You can answer that.
4    A. I don't remember.
5    Q. (BY MS. TIERNEY) Do you have any contact
6    information for Mr. O'Keefe or Mr. Atkiss?
7    A. No.
8    Q. Okay. You testified that you got on the radio
9    and made an announcement that there were some
10    individuals that came in with a group who were known to
11    protest at events. Did you say anything else on the
12    radio?
13    A. Not to my recollection, no.
14    Q. So after you had contact with the two females
15    outside, you let them inside?
16    A. Uh-huh.
17    Q. And then later you asked them to leave?
18    MR. GALLAGHER: You can answer it.
19    A. Yes. Or can I go back to that?
20    Q. (BY MS. TIERNEY) Yes.
21    A. The two --
22    THE DEPONENT: Can I answer?
23    MR. GALLAGHER: Sure.
24    A. The two females -- I asked one female with
25    longer hair and a gentleman to leave. The other female

Page 17

1    was in the bathroom, and when she came out, I informed
2    her that both her friends had left the event. She
3    grabbed her coat and left.
4    Q. (BY MS. TIERNEY) Do you recall the specific
5    words you used?
6    A. To who?
7    Q. To -- let's start with the female with the
8    longer hair and the gentleman.
9    A. I asked them to please leave, walked them to
10    the corner of the event, and they walked about 60, 70,
11    80 feet by themselves, and walked out the door.
12    Q. And were those the exact words you used?
13    A. I said, "We're asking you to please leave."
14    Q. And what were the words you used with the
15    other female?
16    MR. GALLAGHER: You can answer that.
17    A. I saw her coming out of the bathroom. She
18    walked over. I said, "Your two friends have just walked
19    out the door." And this was back in the event -- there
20    was separation from where the event was to the doors.
21    It could have been 70, 80, 100 feet. And I said, "They
22    have left." And she grabbed her coat and walked out the
23    door with them.
24    Q. (BY MS. TIERNEY) Let me back up to
25    Mr. O'Keefe and Mr. Atkiss one more time. Do you know

5 (Pages 14 to 17)

Weise v. Casper    MICHAEL DON CASPER    3/2/2007

Page 18

1  their present whereabouts or job titles?
2        THE DEPONENT: Can I answer that?
3        MR. GALLAGHER: If you know.
4     A.  The last I knew -- but this could have been a
5  year ago -- Jamie was still at the White House. And
6  Steve Atkiss works for Department of Homeland Security.
7  That's the last I knew, and that's months and months and
8  months ago.
9     Q.  (BY MS. TIERNEY) Do you know if their
10  titles -- do you know their present titles?
11        MR. GALLAGHER: You can answer that.
12     A.  Jamie, I mean, he's still a lead from the last
13  that I knew. And what I knew, Steve Atkiss was chief of
14  staff inside one of the organizations --
15  suborganizations of the Department of Homeland Security.
16  I believe it might be border patrol, customs and border
17  patrol.
18     Q.  (BY MS. TIERNEY) You testified that you spoke
19  to the two females outside, told them to go in and have
20  fun, and then at some subsequent time, four individuals
21  approached you and told you that they were part of a
22  group known to protest. What -- was there anything else
23  that led you to ask them to leave?
24        MR. GALLAGHER: You can answer.
25     A.  No.

Page 19

1     Q.  (BY MS. TIERNEY) So you knew when you
2  approached them outside that they were, you testified,
3  members of a group known to protest. What changed to
4  change your mind and ask them to leave?
5        MR. GALLAGHER: I'll allow this question, but
6  I think we're getting pretty far beyond the scope here.
7  And we're also running up against the 30-minute
8  deadline. We've got about one minute left.
9        MS. TIERNEY: Okay.
10     A.  I mean, my recollection of this is that
11  outside I had talked to Jamie, and he said, "Just let
12  them in. Tell them to have fun and not do anything."
13  I'm sorry. What was the second part of the question?
14     Q.  (BY MS. TIERNEY) Well, what changed?
15        THE DEPONENT: Can I answer that?
16        MR. GALLAGHER: Yes.
17     A.  Just all of the people coming up that, I mean,
18  identified -- not only were they identified outside as
19  people that were going to cause trouble, but they were
20  identified multiple times inside. So that's why I
21  simply asked them to leave.
22     Q.  (BY MS. TIERNEY) Did you contact -- did you
23  make the announcement on the radio when you were outside
24  or when you were inside?
25        MR. GALLAGHER: You can answer.

Page 20

1     A.  I can't recall that. I mean, there's so much
2  talk going on. I don't know.
3     Q.  (BY MS. TIERNEY) Well, was it before the four
4  separate people came up or after?
5     A.  So, I mean, what are you trying to find in the
6  time line?
7     Q.  I'm trying to understand when you were told to
8  ask them to leave.
9        MR. GALLAGHER: You can answer.
10     A.  It was inside. I mean, not when they were
11  outside.
12     Q.  (BY MS. TIERNEY) Okay. Was there more than
13  one call to Jamie?
14        MR. GALLAGHER: You can answer that.
15     A.  There was more than --
16     Q.  (BY MS. TIERNEY) About -- regarding the two
17  females outside.
18     A.  I can't recollect that. I mean, I would say
19  yes, if you're saying outside and inside, but I can't
20  recall. I mean, what I said before, there's so much
21  going on to try to make everything work.
22     Q.  Okay. Let me ask just a wrap-up question, two
23  wrap-up questions, if that's okay. Have you now told me
24  the names of every person you spoke with about the
25  plaintiffs at the event?

Page 21

1     A.  Yes.
2     Q.  And as to each of the persons identified, have
3  you now told me what each person told you that prompted
4  you to ask Ms. Weise and Mr. Young to leave?
5     A.  Yeah. To the best of my recollection, yes.
6        MS. TIERNEY: Can I have one more?
7        MR. GALLAGHER: We'll see.
8     Q.  (BY MS. TIERNEY) Were the individuals who
9  identified the plaintiffs as known protestors working at
10  the event?
11        MR. GALLAGHER: If you know.
12     A.  I don't know. I can't answer that.
13        MR. GALLAGHER: Are we done?
14        MS. TIERNEY: Can I have one chronology
15  question? Sorry.
16        MR. GALLAGHER: Sure. That's fine.
17     Q.  (BY MS. TIERNEY) I'm just trying to
18  understand if you contacted Jamie outside and said,
19  "Hey, I've got those two known protesters. What do I
20  do?" Did that happen?
21     A.  To the best of my knowledge, yes.
22     Q.  And so then -- and he said, "Let them in"?
23     A.  Uh-huh.
24     Q.  And then you contacted him, again, inside and
25  told him that four separate people had come up and

6  (Pages 18 to 21)

e11d5ada-3185-4c81-9f38-2fc7d95f7b62

Page 22

1  identified them again?
2     MR. GALLAGHER: You can answer that.
3  A.  Yes.
4  Q.  (BY MS. TIERNEY) And at that point, his
5  answer changed?
6     MR. GALLAGHER: You can answer.
7  A.  Yes.
8  Q.  (BY MS. TIERNEY) And he then told you to ask
9  them to leave?
10  A.  Correct.
11     MR. GALLAGHER: Okay. Thank you.
12     WHEREUPON, the within proceedings were
13  concluded at the approximate hour of 11:13 a.m. on the
14  2nd day of March, 2007.
15          *  *  *  *  *
16
17
18
19
20
21
22
23
24
25

Page 23

1     I, MICHAEL DON CASPER, do hereby certify that
2  I have read the above and foregoing deposition and that
3  the same is a true and accurate transcription of my
4  testimony, except for attached amendments, if any.
5     Amendments attached   ( ) Yes  ( ) No
6
7     _____
      MICHAEL DON CASPER
8
9
10
11     The signature above of MICHAEL DON CASPER was
12  subscribed and sworn to before me in the county of
13  _____, state of Colorado, this _____ day of
14  _____, 2007.
15
16     _____
      Notary Public
      My commission expires
17
18  Leslie Weise, et al. 3/2/2007 (dc)
19
20
21
22
23
24
25

Page 24

REPORTER'S CERTIFICATE
STATE OF COLORADO   )
                    ) ss.
CITY AND COUNTY OF DENVER  )
     I, Darcy Curtis, Certified Shorthand Reporter
and Notary Public, State of Colorado, do hereby certify
that previous to the commencement of the examination,
the said MICHAEL DON CASPER was duly sworn by me to
testify to the truth in relation to the matters in
controversy between the parties hereto; that the said
deposition was taken in machine shorthand by me at the
time and place aforesaid and was thereafter reduced to
typewritten form; that the foregoing is a true
transcript of the questions asked, testimony given, and
proceedings had.
     I further certify that I am not employed by,
related to, nor counsel for any of the parties herein,
nor otherwise interested in the outcome of this
litigation.

     IN WITNESS WHEREOF, I have affixed my
signature this 5th day of March, 2007.
     My commission expires May 2, 2010.

__X__  Reading and Signing was requested.

_____  Reading and Signing was waived.

_____  Reading and Signing is not required.

March 5, 2007

Sean R. Gallagher, Esq.
Hogan & Hartson, LLP
1200 17th Street, Suite 1500
Denver, Colorado 80202

Re: Leslie Weise, et al. v. Michael Casper, et al.

Deposition of: Michael Don Casper

Dear Mr. Gallagher:

Enclosed are the original signature pages(s) of the
above-named deposition(s). It was agreed that you would
arrange for signature of same by means of your copy
transcript(s) and the enclosed signature page(s).
Also enclosed are amendment sheets for changes if necessary.
Please return the signed and notarized signature page(s) and
amendment sheet(s), if any, to our office for filing within
30 days from the date of this letter to comply with the
statute.
Thank you for your attention to this matter.
Sincerely,

Darcy Curtis, CSR
HUNTER + GEIST, INC.
Registered Professional Reporters

c: Martha M. Tierney, Esq.
   Mark Silverstein, Esq.
   Brett R. Lilly, Esq.

7 (Pages 22 to 25)



# PRESIDENTIAL ADVANCE MANUAL

## OFFICE OF PRESIDENTIAL ADVANCE

## October 2002

*NOTE: It is a violation of Federal law to duplicate or reproduce this manual without permission. It is not to be photocopied or released to anyone outside of the Executive Office of the President, White House Military Office or United States Secret Service. It has been developed for your guidance and is intended for your personal use. For more information, please contact the Office of Presidential Advance at (202) 456-5309.*

Manual # _____

## SENSITIVE – DO NOT COPY



US 12

1

# TABLE OF CONTENTS

I.       Introduction to Advance

II:      The Role of Advance: Office and Team Structure

III:     Types of Presidential Events, Building the Event Site, and
         Technical Requirements

IV:      Building the Local Organization and Working with Vendors

V.       Crowd-Raising and Ticket Distribution

VI.      Press Advance

VII.     Backstage and "The Announce"

VIII.    The President's Schedule, Scenarios, and Diagrams

IX.      Other Agencies and Divisions: White House Military Office,
         United States Secret Service and White House Office of
         Administration

X.       Hotel Advance

         XI.   Motorcade Procedures

         XII.  Quick References
               -Advance Checklists
               -Important Callers/Contact List
               -Flag Etiquette
               -Advance Glossaries
               -Press Advance Materials
               -Sample Event Diagram
               -Sample Event Scenario
               -Chronology of an Advance Trip

US 13

[Pages 2-11 redacted]

[redacted]

**Summary**

[redacted]

The President participates in various types of events.  However, the principles and guidelines covered in this manual can be applied to any type of event.  Common events are speeches (to both large and small groups), rallies, roundtable meetings and tours.

[Pages 13-31 redacted]

# Section V. Crowd Raising and Ticket Distribution

[redacted]

       *ed*
       *o*

[redacted]

The Lead Advance will assign a member of the Advance Team or trusted volunteer to help raise the crowd and to organize a ticket distribution system. Proper ticket distribution is vital to creating a well-balanced crowd and deterring potential protestors from attending events. The amount and type of tickets will be determined on an event basis by the Lead Advance and the Advance Office. Each ticket type will be numbered in order to track distribution and facilitate the placement of groups or people at the event.

## Distribution

Tickets will be sent to the Lead Advance for distribution. The Office of Presidential Advance, the Office of Political Affairs, and the division responsible for the event will determine the distribution groups. In most cases, tickets should be distributed from the Advance Staff office. The Lead Advance will choose a trusted local volunteer to handle the actual distribution of tickets. Groups will be allocated tickets by number and must sign for tickets upon pick-up. Groups should be encouraged to request <u>only the amount</u> of tickets that they can use and tickets that are not issued must be returned to the Lead Advance.

[redacted]

US 17

[redacted]

Typically, tickets will be divided into two different categories. In some cases, depending on the type and event size, there will be additional categories added. There will also be an additional 15-20 percent above the tickets ordered printed in order to ensure that the event is full and there are no empty seats or areas. The categories are:

VIP

These tickets should be used to highlight a group involved in the theme of event and in limited numbers to members of the State Party, Local Officials, the Host of the Event, or other groups extremely supportive of the Administration. These seats are usually located behind the podium or in the area between the stage and the main camera platform.

GENERAL

Tickets distributed as general seating. These tickets represent the bulk of the seating at large events.

**Ticket Collection**
Ticket collection at events should take place prior to the magnetometer checkpoint. Volunteers should be used to form the crowd into lines, check for signs or protestors, and to remove the stubs on official tickets. Homemade signs are not allowed at events.

[redacted]

## Demonstrators

Always be prepared for demonstrators, even if the local organization tells you that there will not be any. It is the responsibility of the Lead Advance to have in place an effective plan for dealing with demonstrators.

US 18

**Preventing Demonstrators**

As mentioned, all Presidential events must be ticketed or accessed by a name list. This is the best method for preventing demonstrators. People who are obviously going to try to disrupt the event can be denied entrance at least to the VIP area between the stage and the main camera platform. That does not mean that supporters without tickets cannot be given tickets at the door and gain entrance to the event. It is also not the responsibility of the Secret Service to check the tickets of the people entering.    They are concerned whether the person is a threat physically to The President and not a heckler.    It is important to have your volunteers at a checkpoint before the Magnetometers in order to stop a demonstrator from getting into the event.    Look for signs that they may be carrying, and if need be, have volunteers check for folded cloth signs that demonstrators may be bringing to the event.

For fundraising events,    [redacted]

**Preparing for Demonstrators**

There are several ways the advance person can prepare a site to minimize demonstrators. First, as always, work with the Secret Service and have them ask the local police department to designate a protest area where demonstrators can be placed, preferably not in view of the event site or motorcade route.

The formation of "rally squads" is a common way to prepare for demonstrators by countering their message. This tactic involves utilizing small groups of volunteers to spread favorable messages using large hand held signs, placards, or perhaps a long sheet banner, and placing them in strategic areas around the site.

These squads should be instructed always to look for demonstrators. The rally squad's task is to use their signs and banners as shields between the demonstrators and the main press platform. If the demonstrators are yelling, rally squads can begin and lead supportive chants to drown out the protestors (USA!, USA!, USA!). As a last resort, security should remove the demonstrators from the event site. The rally squads can include, but are not limited to, college/young republican organizations, local athletic teams, and fraternities/ sororities.

For larger rallies, the squads should be broken up into groups of approximately 15-25 people. A squad should be placed immediately in front of the stage, immediately in front of the main camera platform, close to the cut platform, immediately behind the stage area (if people are being used as the backdrop), and at least one squad should be 'roaming' throughout the perimeter of the event to look for potential problems.

**Being aware of Demonstrators**

It is important for the Advance Team and all volunteers to be on the lookout for potential demonstrators. Volunteers should be instructed to contact the Advance person on site (whether it is the Lead, Press or Site Advance) when they see demonstrators. Always check with local police to inquire of any demonstration permits issued prior to a visit.

34

## Handling Demonstrators

Once a group of demonstrators has been identified, the Advance person must decide what action to take. If it is determined that the media will not see or hear them and that they pose no potential disruption to the event, they can be ignored. On the other hand, if the group is carrying signs, trying to shout down the President, or has potential to cause some greater disruption to the event, action needs to be taken <u>immediately</u> to minimize the demonstrator's effect.

Before reacting to demonstrators, the Advance person should inform the rest of the Advance Team, the Tour Director, and the Press Advance Director of the situation. Be prepared to give the number of demonstrators, location(s), a description, and their issue/organization.

If the demonstrators appear to be a security threat notify the Secret Service immediately. If demonstrators appear likely to cause only a political disruption, it is the Advance person's responsibility to take appropriate action. Rally squads should be dispatched to surround and drown out demonstrators immediately.

**Remember - <u>avoid physical contact with demonstrators!</u>**   Most often, the demonstrators want a physical confrontation. Do not fall into their trap! Also, do not do anything or say anything that might result in the physical harm to the demonstrators. Before taking action, the Advance person must decide if the solution would cause more negative publicity than if the demonstrators were simply left alone.

US 20

[Pages 36-66 redacted]

## The White House Office of Administration (OA)

[redacted]

### Events

While on the road, you will encounter two classifications of events: Official and Political. Official events are those that the President is participating in on behalf of the Administration. These may include Education, Welfare, Defense or any topic on which the President is introducing or advocating an issue. All costs from these events are handled by OA, regardless of the source of payment. Your OA Representative will be responsible for payment for all costs associated with the event, such as sound, light, staging, pipe and drape, bike rack, etc. It is extremely important that you collect invoices from vendors as soon as possible, allowing you and the OA Representative to review the invoice for inaccuracies and validity.

The OA Representative handles no part of and is not responsible for any cost incurred for a political event. Political events are those held on behalf of a particular candidate or office holder and typically involve fundraising activities. Federal law prohibits OA Representatives from having any participation in such events.

[redacted]

**If you are handling the political part of a trip, the Republican National Committee will handle your per diem and expenses.**

US 22

[Pages 68-103 redacted]



U.S. Department of Homeland Security
## UNITED STATES SECRET SERVICE
June 17, 2008

950 H Street, NW
Washington, DC 20223

Catherine Crump
ACLUF
125 Broad Street
18th Floor
New York, NY 10004

Re:    Jeanne Pahls, et al, v. Board of County Commissioners for the County of
       Bernalillo, et al.  08-CV-53 (LH) (ACT)

Dear Ms. Crump:

Reference is made to the subpoena issued on May 9, 2008, requesting the production of
documents and 30(b)(6) testimony, in addition to a telephone call occurring on June 5,
2008 between yourself and Department of Justice attorney Jeffrey Smith in which it was
agreed that the United States Secret Service (Secret Service) would provide a response to
your Touhy request by June 18, 2008, relating to the above referenced matter.

Pursuant to 5 U.S.C. § 301, a federal agency may create procedures for responding to
subpoenas and requests for testimony.  See 5 U.S.C. § 301 (authorizing an Agency head
to "prescribe regulations for the government of his department, and the conduct of its
employees, the distribution and performance of its business, and the custody, use, and
preservation of its records, papers, and property.")  These procedures are often termed
"Touhy regulations," in reference to the Supreme Court's decision in United States ex rel.
Touhy v. Eagen, 340 U.S. 462 (1951).

In Touhy, the Supreme Court held that a Department of Justice employee could not be
held in contempt for refusing to comply with a subpoena duces tecum when his
compliance had been prohibited by an order of a superior acting pursuant to valid federal
regulations governing the release of official documents.  The regulations at issue in
Touhy were promulgated under the statutory predecessor of 5 U.S.C. § 301. Under
Touhy, neither state court nor federal court litigants may obtain a subpoena ad
testificandum against an employee of a federal agency that has enacted a Touhy
regulation.

The Department of Homeland Security has enacted Touhy regulations pursuant to 5
U.S.C. § 301. See 6 C.F.R. § 5.44 et seq.   Pursuant to 6 C.F.R. § 5.44(a), Secret Service
employees are prohibited from providing oral or written testimony by deposition,

declaration, affidavit, or otherwise concerning any information acquired while such person is an employee of the Secret Service as part of the performance of that person's official duties or by virtue of that person's official status, unless authorized to do so by the Office of the Chief Counsel. In reviewing your request and pursuant to 6 C.F.R. § 5.44(a), the Secret Service will make available Special Agent Kerry Sheehan to address the items stated in the "Categories for Deposition." Special Agent Sheehan was the Presidential Protective Detail Site Agent at the event you identified in your request. Given Special Agent Sheehan's availability and the considerations set forth in 6 C.F.R. § 5.48, it does not appear that 30(b)(6) testimony would be necessary.

Moreover, pursuant to a review of the facts and circumstances involved in this matter, including the considerations listed in 6 C.F.R. § 5.48, a decision has been made to provide certain documents in response to your document request pertaining to categories #5 and #6, identified under the heading "Categories for Deposition" in Exhibit A attached to your subpoena, as well as two documents that do not appear to be clearly responsive to your document request.

Specifically, regarding category #5, identified under the heading "Categories for Deposition" in Exhibit A, which pertains to "policies, procedures, guidelines, and/or training materials concerning expressive activities or speech," the Secret Service is providing the following documents: (1) an official message entitled "Secret Service Policies Regarding Demonstrations;" (2) Intelligence Division Advance Manual, IDAM-25, "Demonstrations" and (3) Investigative Manual, INT-10, "Groups/Demonstrations." The Secret Service has redacted only email addresses and an internal phone number from the "Secret Service Policies Regarding Demonstrations." The other documents are provided in their entirety.

Also, in regard to category #6, the Secret Service has been a party in lawsuits involving "other complaints of First Amendment/free speech violations by individuals demonstrating along presidential motorcade routes." At this time, we are aware of one pending lawsuit that appears potentially responsive to this request. That lawsuit is A.N.S.W.E.R. Coalition v. Gale A. Norton, Secretary, United States Department of the Interior, et al., 05-CV-00071 (PLF), which is pending in the United States District Court for the District of Columbia.

In addition, although they do not appear to be responsive to any of the categories identified under the heading "Categories for Deposition," the Secret Service is providing two trip abstracts that relate to the event in question.

With respect to the additional requested categories identified under the heading "Categories for Deposition" in Exhibit A attached to your subpoena, we are not aware of any other responsive documents.

To contact Special Agent Sheehan, please call Agent/Attorney Advisor Tamara Weber at (202) 406-6279.

Sincerely,

Don Personette
Chief Counsel

Enclosures

cc:    Jeffrey Smith, DOJ

**Subject:** FW: 670.000 Intelligence Advisory #07-08 / Secret Service Policies Regarding Demonstrations

**From:** INT [mailto
**Sent:** Tuesday, March 06, 2007 3:26 PM
**To:**
**Subject:** 670.000 Intelligence Advisory #07-08 / Secret Service Policies Regarding Demonstrations

//ROUTINE//

```
FROM:     Headquarters (AD-Protective Research)        File: 670.000
                     (AD-Investigations)
TO:       Director
          Deputy Director
          Assistant Directors
          Chief Counsel
          Headquarters SAICs and Division Chiefs
          Chief - Uniformed Division
          Field Offices (SAICs, RAICs, and RAs)
          Interpol

SUBJECT:  Intelligence Advisory #07-08
          Secret Service Polices Regarding Demonstrations
```

It has recently come to the attention of the Intelligence Division that
demonstrations have occurred at protectee sites that have not been reported to the
Intelligence Division Duty Desk as required in IDAM-26.
This protective intelligence information is required to assist the Intelligence
Division in formulating threat assessments.

All offices are reminded that the ID Duty Desk,            , should be
telephonically notified of any demonstration that occurs in relation to a protectee
visit.  This notification should include the site of the demonstration and its
proximity to the protectee site, the name of the group(s) demonstrating, the
beginning and ending times of the demonstration, the number of individuals
involved, whether permits were required and obtained, and any incidents or arrests
that occur as a result of the demonstration(s).  If arrests do occur, the names and
identifiers of each arrestee must be provided to the Intelligence Division as soon
as possible. Interviews, following any arrests by local police, should be conducted
at the discretion of the field office, in consultation with the Intelligence
Division, and depend on the totality of the circumstances after careful review.

It is incumbent upon all agents and officers to be familiar with Secret Service
policy regarding demonstration activities.  Secret Service guidelines regarding
demonstrations are described in the Investigative Manual, INT-10 and the Protective
Research Intelligence Division Advance Manual, IDAM-25, and were previously set out
in an official message dated April 11, 2005.  You must also familiarize yourself
with the reporting requirements for demonstrations and incidents occurring during
protectee visits as contained in IDAM-26.

It is recognized that investigations of protest groups and the establishment of
designated demonstration areas are often carried out by state or local law
enforcement based on their own policies or authorities.

The following is a summary of the Secret Service policy concerning

demonstrations:

In the absence of a specific fact or observable actions that would indicate a demonstration may pose a security threat to a Secret Service protectee, protected facility, foreign mission or to public safety, demonstrators are to be treated as members of the general public and should not be segregated from the public. Secret Service personnel should not initiate any action to segregate demonstration activity from public areas. Only in cases when the Secret Service has information that a demonstration poses a potential risk to a Secret Service protectee, protected facility, foreign mission or to the public safety, should Secret Service personnel initiate and participate in discussions with a demonstration group, or suggest that the group be segregated from the general public area. Any meeting or contact with demonstration organizers should include local law enforcement authorities.

Any agreement reached with demonstration organizers should comply with local, state, and federal laws. In the event the demonstration organizers agree to a segregated site, it will be the responsibility of the organizers and local law enforcement authorities to enforce the terms of the agreement.

The Secret Service does not prohibit the presence of signs based on their content. The only exception pertains to signs containing messages that threaten the life of our protectees in violation of 18 U.S.C. §§ 871 and 879. Agents and officers can exercise discretion and exclude signs made of or supported by materials that could be used in a threatening or injurious manner. As an example, such signs could include those made of metal or wood that could be thrown at a protectee or signs made from large pieces of plywood that could be used to ram passages through crowds precipitating disturbances and panic. Most frequently, the Secret Service will reject signs supported by sticks, poles or other supporting items that may be used as a weapon. Upon removal of the stick or other supporting item, the signs will be admitted. Each decision to admit or reject such sticks or supporting material is a discretionary decision based on the judgment and experience of the Secret Service personnel responsible for entry point security. That decision, however, is not based on the content of the sign or other item attached to the stick, pole or other supporting device.

The following statement distributed by Intelligence Division advance agents sets out Secret Service policy regarding hecklers:

In recent months, protest activity at USSS protectee sites has become increasingly common. Much of the protest activity is peaceful and does not impact the security of the site. Some of the protests have included disruptive activity by one or more persons outside and inside the event site. It is important to note that although such activity may be disruptive, it usually involves audible protest and non-threatening behavior. Such disruptive behavior should be monitored but should not involve USSS action without further display of threatening behavior or extenuating circumstances. Behavior warranting further USSS action may include, but is not limited to, furtive movements towards a protectee or threatening statements.

A decision to further investigate the subject(s) should be made on a case by case basis. Audible protest and non-threatening behavior alone should not justify the need to interview a subject. Additional protestor actions should be noted when deciding whether to conduct subject interviews. Such actions may include, but are not limited to, an attempt by a subject to circumvent security, a subject located in a restricted area and/or refusal to leave restricted areas. If applicable, investigative inquiries should be conducted as to how a subject gained access to restricted areas and/or obtained a pass or credential.

In most cases, a protestor who disrupts an event site with audible protest should be addressed by members of the host committee and local police.

While USSS agents should monitor the situation closely for escalation, if the subjects are merely expressing their opinions, agents should refrain from direct

involvement and should take into consideration the factors noted above in deciding whether to conduct subject interviews.

Personnel should continue to be diligent in identifying demonstration activity that may pose a risk to the Secret Service protective mission and its facilities.

All supervisors are requested to review these policies.


Headquarters (AD-Protective Research)        Prewitt/Stenger
          (AD-Investigations)


3/6/2007

Manual : Intelligence Division Advance Manual                      Section : IDAM-25
RO     : INT                                                       Date    : 04/14/2000

# DEMONSTRATIONS

The Intelligence Division is interested in groups or organizations that, because of their continuing actions and the appearance of a charter or direction of purpose, may be a threat or potential threat to the safety of a Secret Service protectee, protected facility, or foreign diplomatic mission.

It is incumbent upon the intelligence advance agent to be familiar with Secret Service policy concerning demonstration activities. Secret Service guidelines regarding the investigations of public demonstrations, including the type of information that may be collected, the methods of acquisition, under what circumstances contacts with demonstration groups may be made, and what information may be retained, are described in the Investigative Manual, INT-10.

The following is a summary of the Secret Service policy concerning demonstrations:

"In the absence of specific fact or observable actions which would indicate a demonstration may pose a risk to a USSS protectee, protected facility, foreign mission or to public safety, demonstrators are to be treated as members of the general public. USSS personnel should not initiate any action to segregate demonstration activity from public areas.

"Only in cases when the USSS has information that a demonstration poses a potential risk to a USSS protectee, protected facility, foreign missions or to the public safety, should USSS personnel initiate and participate in discussions with the demonstration group, or suggest that the group be segregated from the general public area. Any meeting or contact with the demonstration organizers should include local law enforcement authorities.

"Any agreement reached with demonstration organizers should comply with local, state, and federal laws. In the event the organizers agree to a segregated site, it will be the responsibility of the organizers and local law enforcement authorities to enforce the terms of the agreement.

"Personnel should continue to be diligent in identifying demonstration activity that may pose a risk to the USSS protective mission and its facilities."

Manual :  Investigative
RO    :  INT

United States Secret Service
Directives System

Section :  INT-10
Date   :  10/15/86

# GROUPS/DEMONSTRATIONS

The Intelligence Division is interested in groups or organizations that, because of their continuing actions and the appearance of a charter or direction of purpose, may be a threat or potential threat to the safety of a Secret Service protectee, protected facility, or foreign diplomatic mission.

The Division assigns file numbers to the above type of groups as follows:

1. 675 - Organization of Domestic Nationals. These groups have their headquarters in the United States, or its territories.

2. 676 - Organization of Foreign Nationals. These groups have their headquarters outside the United States.

When an individual within a group displays the potential to be a threat to protectees of the Secret Service, he or she will be made the subject of a separate intelligence investigation.

Each investigation concerning a group will result in an evaluation of that group. Groups that are evaluated as a potential threat to protectees may be the subject of some follow-up investigations by the appropriate field offices. However, the concept of Class 3 Investigation will not be used for groups.

Follow-up investigation for groups will usually entail maintaining liaison with appropriate federal and local law enforcement agencies and monitoring any active investigations. These investigations will not usually require personal contact with groups members. The purpose of the investigation will be to report any actions, statements, movements or other pertinent information that may affect our protective mission. The investigation will also ensure continued liaison with appropriate agencies and provide updated evaluations.

The Intelligence Division will set the reporting requirements for follow-up investigations on a case by case basis. The requirements will be based upon the evaluation provided by the field and the status of the other agency investigation. Reports will usually be requested every 30 to 90 days.

# Reporting Format - Groups

Field offices will report investigation of either 675 or 676 groups via teletype or SSF 1588 (Memorandum Report) using the following format.

1

United States Secret Service
Intelligence Division



**PRISM  TRIP ABSTRACT**

**CASE TITLE:** BUSH GEORGE W, ALBUQUERQUE, New Mexico

**CASE NMBR:** 127-674-0110601

**DATE ESTB:** 08/20/2007          **DATE UPDATED:** 04/14/2008

**CASE SUMMARY**

On 08-27-07, ID advance advised during President Bush's motorcade back to the airport for departure a member of the Rio Rancho Police Department lost control of his motorcycle and was involved in a fatal one vehicle accident.

On 08-27-07, ID advance advised 50 members of Code Pink conducted a peaceful anti Iraq War demonstration adjacent to the scheduled visit site of President George W. Bush.  The visit was conducted without incident and there was no known media coverage.  See case 673-0084470.

Current as of: June 04, 2008

United States Secret Service
Intelligence Division



## PRISM DEMONSTRATIONS ABSTRACT

**CASE TITLE:** Demonstration
**CASE NMBR:** 127-673-0084470
**DATE ESTB:** 08/29/2007          **DATE UPDATED:** 09/04/2007

---

### TICKLERS

| CFO | DATE DUE | DAYS ALLOCATED | REGION | DESK | SECTION | BRANCH | REMARKS |
|-----|----------|----------------|--------|------|---------|--------|---------|

### KEYTERMS

SELECTED KEYTERMS

### CROSS REFERENCE

| CROSS REF TYPE | CASE NUMBER | SUBJECT NUMBER |
|----------------|-------------|----------------|
| CASE-TO-CASE | 127-674-0110601 | |

### OTHER USSS REFERENCES

### CASE SUMMARY

On 08-27-07, ID advance advised 50 members of Code Pink conducted a peaceful anti Iraq War demonstration adjacent to the scheduled visit site of President George W. Bush. The visit was conducted without incident and there was no known media coverage.

No further USSS investigation was conducted.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re Subpoenas in                          )
JEANNE PAHLS, *et al.*,                     )
                                            )
                  Plaintiffs,               )
                                            )
        v.                                  )          No. 08-mc-0362 (RJL)
                                            )
BOARD OF COUNTY COMMISSIONERS               )
FOR THE COUNTY OF BERNALILLO, *et al.*,     )
                                            )
                  Defendants.               )
                                            )
EXECUTIVE OFFICE OF THE                     )
PRESIDENT OF THE UNITED STATES              )
                                            )
                  Third-Party Movant.       )
_____      )

**ORDER**

Upon consideration of the motion to quash the subpoena dated May 23, 2008,

issued by the plaintiffs seeking a deposition of the White House Office of Presidential

Advance pursuant to Fed. R. Civ. P. 30(b)(6), and the opposition thereto, it is hereby

ORDERED that the motion to quash is denied.

June ____, 2008.                    _____
                                    Richard J. Leon
                                    United States District Judge