UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re Subpoenas in<br>JEANNE PAHLS et al., | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | |
| BOARD OF COUNTY COMMISSIONERS<br>FOR COUNTY OF BERNALILLO, et al., | ) ) | No. 08-mc-0362 (RJL) |
| Defendants | ) ) ) | |
| and EXECUTIVE OFFICE OF THE<br>PRESIDENT OF THE UNITED STATES | ) ) ) | |
| Petitioner | ) ) | |

**REPLY IN SUPPORT OF EXECUTIVE OFFICE OF THE PRESIDENT'S
MOTION TO QUASH SUBPOENA *AD TESTIFICANDUM* AND *DUCES TECUM*
ISSUED IN <u>PAHLS, ET AL. V. BOARD OF COUNTY COMMISSIONERS FOR
COUNTY OF BERNALILLO, ET AL., CIV. A. NO. 1:08-CV-53 (D.N.M.)</u>**

## PRELIMINARY STATEMENT

Plaintiffs have misapplied the well-established standards that govern whether third-party discovery directed at the White House is appropriate and rely on mere speculation to argue that White House officials were involved in any decision to move the plaintiff protestors away from the motorcade route at a private event attended by the President in August, 2007. Despite their strained efforts to link the White House to these events, plaintiffs have failed to meet the exacting standards that must be met to enforce a subpoena directed to the White House and nothing that plaintiffs set forth in their opposition to the Executive Office of the President's Motion to Quash supports a different conclusion.

First, plaintiffs' argument that the normal rules of discovery, not the heightened standards set forth in Cheney v. United States District Court for the District of Columbia, 542 U.S. 367, 382 (2004), apply to their subpoena against the White House is erroneous. The Supreme Court's decision that different rules apply to discovery directed to the White House was expressly based on the unique position of, and high respect due, the Executive Office of the President. Id. at 385. The speculative discovery that plaintiffs seek against the White House Advance Office is *precisely* the type of "vexatious litigation" from which the Supreme Court has held the Executive Office of the President must be protected. Id. at 382.

Second, plaintiffs have not satisfied their heightened burden of showing that they need the discovery they seek from the White House. Plaintiffs' suggestion that they cannot get the answers they need in discovery from the defendants is simply mistaken. More accurately, plaintiffs did not get the answers they *want* from discovery. During the last few weeks, plaintiffs have had the opportunity to ask at least nine local law enforcement officials in discovery exactly

-1-

what involvement, if any, the White House Advance Office had in the placement of protestors at the event in question. The response to that question from those local officials has been unequivocally "*none*." In all nine of the depositions taken by plaintiffs of local law enforcement officials at the scene in August, 2007, the witnesses have testified that they spoke to no White House officials and that the White House had no involvement in the placement of protestors at the event. The fact that plaintiffs have not received the answers they expected (or hoped for) from these witnesses underscores that plaintiffs have no basis for seeking third-party discovery against the White House.

Third, if the discovery taken by plaintiffs to date has confirmed anything, it has confirmed that the only "federal actors" with whom the local officials had contact relating to the placement of demonstrators were Secret Service agents, not members of the White House Advance Office. Ignoring clear testimony from nine different witnesses, plaintiffs suggest that the reason local law enforcement officials identified only the Secret Service and not the White House as being involved is because all Secret Service and White House officials looked the same to local officers. Plaintiffs cite to nothing indicating such confusion by any of these nine witnesses, presumably because the local law enforcement officials testified that the "federal actors" with whom they spoke specifically identified themselves as Secret Service agents. Plaintiffs have issued a third-party subpoena to the Secret Service and, therefore, will have the opportunity to discover from the Secret Service what role, if any, the Secret Service had in determining where protestors could stand and whether White House officials had any involvement in any such decision. Plaintiffs simply do not need to burden the White House with such unwarranted discovery.

Finally, plaintiffs' suggestion that responding to the subpoena would not be a burden to the White House entirely misses the point. If third-party discovery of this type were allowed any time a party hopes to pin blame on White House officials, but nevertheless fails to show an evidentiary foundation for such discovery, the normal functioning of the Executive Office of the President would be seriously impaired. That is the very reason that the heightened standards of Cheney apply to discovery directed to the White House. Plaintiffs' subpoena here is based on pure speculation and for that reason plaintiffs are not entitled to third-party discovery from the White House whether or not the burden on the White House can be overcome with sufficient time to respond.[1] In any event, as Spencer Geissinger, the Director of the Office of Presidential Advance, explained in his declaration, the members of the Advance Office are currently engaged in numerous foreign and domestic trips scheduled through the end of August. See Declaration of Spencer Geissinger ("Geissinger Decl.") at ¶ 7 (Att. 4 to Memorandum in Support of Executive Office of the President's Motion to Quash Subpoena *Ad Testificandum* and *Duces Tecum* ("EOP Mem.")). Plaintiffs may be dismissive of the burden, but having to prepare for and appear at a deposition and gather and review the documents plaintiffs have requested would require the White House to set aside important duties for the President during this time of intense travel to respond to what amounts to a fishing expedition by plaintiffs. Even if this discovery were allowed under Cheney standards – which it is not – the discovery plaintiffs seek would pose an undue burden on the White House.

---

[1] Plaintiffs did not, as they assert, properly serve a subpoena on the White House Advance Office on May 13, 2008. See Plaintiffs' Opposition to the Executive Office of the President's Motion to Quash Subpoena *Ad Testificandum* and *Duces Tecum* ("Plfs. Opp.") at 7. Nor did the "White House Deputy Counsel," id., or any member of the White House Counsel's Office instruct plaintiffs' counsel on how to serve their subpoena.

In short, this Court should deny plaintiffs' attempt to obtain speculative discovery against the White House and quash their subpoena.

## ARGUMENT

## I.    HEIGHTENED *CHENEY* STANDARDS APPLY TO THIRD-PARTY DISCOVERY AGAINST THE WHITE HOUSE

Plaintiffs have not and cannot demonstrate an evidentiary foundation for the discovery they seek against the White House. Accordingly, plaintiffs' attempt to analogize their third-party discovery request to the usual "liberal" discovery allowed by the Federal Rules of Civil Procedure must fail. See Plfs. Opp. at pg. 8. Because they do not meet the heightened standards required for discovery against the White House as set forth in Cheney, 452 U.S. 367 (2004), plaintiffs also argue that the Supreme Court's decision in Cheney was only directed to "unimportant discovery requests to senior Executive Branch officials" and thus "has nothing to do with this case." Plfs. Opp. at 10.

Plaintiffs' attempt to distinguish Cheney is unpersuasive. As explained in greater detail below, even after extensive discovery, plaintiffs have failed to establish *any* evidentiary foundation for their belief that the White House was involved in the placement of protestors at the August, 2007 New Mexico event. In fact, nine different witnesses have testified to the contrary. Thus, the discovery directed to the White House is nothing but a fishing expedition that has no hope of garnering any evidence that plaintiffs can actually use to support their claims. This is precisely the type of "vexatious litigation" against the White House that the Supreme Court cautioned must be avoided due to "[t]he high respect that is owed to the office of the Chief Executive." Cheney, 542 U.S. at 382 & 385 (citation omitted). Moreover, in Cheney, the

Supreme Court considered the importance of the discovery sought in that case, reasoning that the only consequence of the respondent's inability to obtain the discovery they sought against the Executive Office of the President was to make it "more difficult for private complainants to vindicate Congress' policy objectives under FACA." Id. at 384-385. However, as demonstrated below, the evidentiary record fails to substantiate even that same level of need for the discovery plaintiffs seek.

In addition, plaintiffs' argument that Cheney must be read narrowly to apply only to discovery against "senior Executive Branch officials" misses the point. See Plfs. Opp. at 10. In Cheney, the Supreme Court recognized "the unique position" that the Executive Office of the President occupies. Cheney, 542 U.S. at 382. The Court further recognized the "paramount necessity" of protecting the Executive Office of the President from "vexatious litigation" that may detract it from the performance of its duties. Id. The discovery that plaintiffs have directed to the White House Advance Office fits squarely in the Cheney rubric. The sole purpose of the White House Advance Office is to serve the President and assist him in his executive functions. That fact makes the White House Advance Office an obvious target of civil suits and discovery orders, a factor that the Supreme Court considered in denying the discovery sought in Cheney. See Cheney, 542 U.S. at 386. If third-party discovery against the White House Advance Office were allowed based on the type of factually unsupported theories that plaintiffs present here, third-party discovery against the White House would become routinely available to any plaintiff who feels aggrieved by government action and speculates, without support, that the White House was behind it. It was precisely to avoid just such a result that the Supreme Court in Cheney counseled "'judicial deference and restraint'" in the conduct of litigation against the Executive

Office of the President. Id. at 385 (*quoting* Nixon v. Fitzgerald, 457 U.S. 731, 753 (1982)).

**II.    PLAINTIFFS HAVE NOT DEMONSTRATED A NEED FOR THE DISCOVERY THEY SEEK AGAINST THE WHITE HOUSE.**

    **A.    The Discovery Plaintiffs Have Conducted to Date Has Disproved Their Theory That the White House Was Involved in Placement of Protestors at the 2007 Event.**

Plaintiffs have failed to show a need for the discovery they seek against the White House, much less the urgent need that is necessary under the heightened standards of Cheney. From the commencement of their suit, plaintiffs' apparent goal has been to implicate the White House in allegedly placing the plaintiff protestors in a disadvantageous position along the motorcade route. See Complaint ¶ 20 (Att. 2 to EOP Mem.). Plaintiffs, however, admit in their opposition brief that "[p]laintiffs' only contact was with local law enforcement." Plfs. Opp. at 1. Accordingly, they have nothing but their personal supposition that the White House Advance Office was involved in the placement of demonstrators (both supporters and protestors) along the motorcade route.

In its Memorandum in Support of its Motion to Quash, the Executive Office of the President pointed out that plaintiffs have no need for third-party discovery against the White House because the parties' discovery would "either confirm or disprove" plaintiffs' unsupported assumption that defendants' alleged conduct was either directly ordered by federal officials or somehow influenced by alleged White House policies or procedures. EOP Mem. at 11. And that is exactly what has occurred. During the last few weeks, plaintiffs have taken the depositions of *nine* City and County law enforcement officials. As described in detail below, none of those

-6-

officials has identified the White House Advance Office as being involved in the placement of

protestors or supporters along the motorcade route leading up to the private event.[2]

For example, Ron Hetes, a police commander with Albuquerque Police Department,

testified as follows about involvement of the Secret Service and the White House Advance

Office at the August, 2007 New Mexico event:

> Q. Okay. And what is the relationship then between you and the County and the feds, either the Secret Service or the White House?
> A. It's almost like a symbiotic relationship. Whenever an event like that occurs, phone calls are made, this is what we are looking at. Subsequently, if it's set in stone that a certain entity is coming into town, then it will be a briefing prior to the event, if you will. **Secret Service comes out en masse. They say who they are, what their specific job functions are.** Representatives from all the agencies will be there.
> Once that initial meeting is over they break down into subparts. In other words, our tactical people will talk to their tactical people. Our motor officers will talk to their transportation safety, and so forth. And then those areas will devise strategies to come up with a plan to safeguard the president and everything else.
>
> * * * * * * * * * * * * * * * *
>
> Q. And would it necessarily be that person who would be in charge?
> A. It just depends on the event. On that particular event, there's a local detail, and again, I'm trying to get into some nomenclature with them that I am familiar with. Some things they run I am not familiar with, but they do send out Washington entities with the Secret Service and try to marriage with counterparts out here.
> Q. And roughly how many people are in this meeting?
> A. There are probably 15 to 20 Secret Service agents and roughly the same amount as far as police, Kirtland personnel, BCSO personnel.

---

[2] In their opposition brief, plaintiffs state that "all nine of the City and County law enforcement officers who have already testified in this action have confirmed that *federal officials* dictated the differential treatment." Plfs. Opp. at 11 (emphasis added) (citing only *two* of the nine deposition transcripts). As shown below, plaintiffs' statement is misleading in two respects. First, use of the term "federal officials" seems to imply that the White House Advance Office was implicated by the testimony which is simply not the case. Second, plaintiffs' statement mis-characterizes the testimony of the nine local officers as confirming allegedly "differential treatment" – a fact which remains in dispute.

Q. And does someone say, "Okay, now we are all here, here is the agenda?" **And if so, is that a Secret Service person?**
A. **Yes. They are the ones that facilitate the meeting. They start the meeting. They get up and introduce their counterparts. When they are done introducing themselves they give a brief synopsis of what their job responsibility is.** Once that initial, I guess, introduction is over, then the counterparts from the city level and the county level, they kind of migrate to their area of expertise.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. Okay. **What about from the Office of Presidential Advance, which is located in the White House, which is responsible for coordinating the presidential travel? Was anyone present from that office?**
A. **Not that I recall either. The only ones I can recall from the federal branch is the Secret Service.**

<u>See</u> Transcript of Deposition of Ron Hetes (relevant pages attached hereto as Exhibit 1) at pgs. 5-

6, 7-8 and 10 (emphasis added).

Les Brown, Lieutenant of the Metro Operational Support Section testified in a similar

fashion:

[Discussing a planning meeting before the President's visit]
Q. So there was a meeting. **Was the meeting being run by the Secret Service?**
A. **Yes.**
Q. Do you know the name of the– was there an officer in charge of the meeting overall?
A. They had people from Washington come in. They had the special agent in charge from– I think Albuquerque was there.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. **Was there anyone there from the White House?**
A. **I don't think at that meeting, no, not that I recall. It think it was just Secret Service that I remember.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

[In answer to questions about people attending a second meeting]
Q. Anyone from the Secret Service?
A. No.
Q. **Anyone from the White House?**
A. **No, just us.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

[About Secret Service determining zone for demonstrators]

Q. **I think what you told me is the Secret Service decided where the safe zone was, and that was communicated to BCSO and they told you?**

A. **I am assuming. I got it from BCSO.**

Q. Yes. Did BCSO tell that you the Secret Service had drawn that particular line?

A. I don't have any independent recollection of that. I am just– I don't know whether I assumed that because the lieutenant was with the Secret Service guy or whether they said, "Secret Service wants this zone blocked off here." I honestly don't remember specifically.

Q. You said it would be typical practice for the Secret Service to designate that kind of secure zone?

A. Yeah; usually we have an area where they say, "We don't want anybody south of the area for arrival and we don't want anybody north of this area." That's pretty typical.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. **At the event site, did you see anyone from the Office of Presidential Advance in the White House?**

A. **I didn't from where I was.**

Q. Did you see anyone from the border patrol?

A. No.

Q. **Did you see anyone from any federal agency other than the Secret Service?**

A. **Not that I remember, no.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. **And you never saw anyone– did you see any politicians or people from the White House during this event?**

A. No.

Q. So the only federal officers you saw were the Secret Service officers?

A. Yes.

Q. **Did they ever mention anyone from the Office of Presidential Advance?**

A. **No.**

Q. **Have you ever heard of the Office of Presidential Advance Manual?**

A. **No, I am not privy to that information.**

See Transcript of Deposition of Les Brown (relevant pages attached hereto as Exhibit 2) at pgs.

15, 17, 23, 39-40, 41, and 59-60 (emphasis added).

-9-

Similarly, Matthew Thomas, Lieutenant with the Bernalillo County Sheriff's Department,

whose deposition transcript was one of two actually cited by plaintiffs, confirmed the

involvement by the Secret Service, but not the White House Advance Office, in setting the outer

parameters at the August, 2007 event:

> **Q. Who makes the decision where the inner and outer parameters are?**
> **A. Secret Service.**
> **Q. If the Secret Service says to you, "I want it at this corner," and you think that corner is farther than you think it needs to be, you would nevertheless defer to the Secret Service?**
> **A. Yeah, they have their briefing and policies and I'm not going to get in the middle of how they do things.** We let them set the parameters and we will walk through. We may make suggestions. For instance, if we go down a road and I may say, "Look, we need another guy here, another guy here." I will be with the ERT guy and we will walk it down.
>
> *********************
>
> Q. Do you recall ever consulting the Secret Service agent about the demonstrators during this event?
> A. Yes.
> Q. What was the nature of that conversation?
> A. Okay. Well, first of all – well, I will just let that go. The only time I recall talking to the Secret Service– if I remember right there was a Secret Service agent right here on the driveway at Rio Grande with Sergeant Mimms [sic], if I recall correctly. So if Ed talked to him, that was his doing. What I remember is Ed telling me about the protesters, and I gave him some instructions about that. The only time that I really had any substantive contact with Secret Service is the guy who ran the site survey said, "Look, there's going to be some people right across the roadway."
> I said, "Okay." He said, "They live there, it's private property." I said, "It's one of the things you have to deal with." That was it.
>
> ***********************
>
> **Q. That's precisely what I wanted to be 100 percent clear on. The decision as to where the people who were across from the driveway were to be allowed to stand was made by the Secret Service, not by you?**
> **A. Yeah. I mean, he came up to me. If you want to look at it that way, he said, "There's going to be people on private property. That's their right." I said, "Fine."**
> Q. You all didn't have a discussion about how far back they should be?

A. No, he said, "It's private property, they are going to be there, that's their right," and I said, "Fine."

See Transcript of Deposition of Matthew Thomas (relevant pages attached as Exhibit 3) at pgs.

19, 38-39, and 43 (emphasis added).

David Linthicum, Chief Deputy of the Bernalillo County Sheriff's Department, testified

as follows when asked about the involvement of the White House Advance Office:

**Q. Do you ever hear from anyone from the White House during the course of the visits?**
**A. I haven't.**
**Q. Do you know if anyone else within the BCSO has?**
**A. Not any personal recollection, no.**
**Q. Have you heard of the Office of Presidential Advance?**
**A. I have heard of advance parties through the Secret Service. Yes, I know about them.**
Q. What are they?
A. The advances that come in before a presidential visit to work with the local agencies and the local Secret Service office to make sure that the event goes off and the security is what it's supposed to do.
Q. Are those agents that you are discussing right now Secret Service agents that come as part of the advance?
A. I think there's a group of them. I have seen Secret Service agents, I have seen press people. I have seen press as part of the advance. There's been different– my experience is there's different people within the parties.
Q. If you wanted to know who was part of the advance party for a particular presidential visit, how would you figure that out?
A. Try to call the local Secret Service office and ask them. I really wouldn't have a reason to do that but if I were looking for that, that's who I would call.
Q. In the first highlighted paragraph on Page 2 of this document, Sheriff White is quoted as saying that the Secret Service makes the final calls for security at presidential events. Is that statement accurate?
A. You would have to ask Sheriff White that. He's the one that said that.
Q. He may have said it, but in your experience is it accurate?
A. I would say it's a joint decision-making process, but I would say the Secret Service, since they are ultimately responsible for the dignitary's protection, they would have the final say-so, but that doesn't mean that we have to agree to it either.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

-11-

Q.  If you and the Secret Service disagreed about where protesters stand along the
president's route, how would you resolve it?
A.  I would discuss it with the Secret Service and hopefully we would come to some type
of understanding.
Q.  Would you ultimately defer to their understanding?
A.  I can't tell you I would or wouldn't.  It would depend on the discussion.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q.  Does the Secret Service have more authority over these types of events when
compared to your organization?
A.  Yes.
Q.  Why is that?
A.  Because they are ultimately charged with protection of the president and that's their
purview and we are there to assist them, to help them with resources.

See Transcript of Deposition of David Linthicum (relevant pages of transcript attached hereto as

Exhibit 4) at 12-14, 26, and 35 (emphasis added).

Greg Rees, Sergeant with Bernalillo County Sheriff's Department, Basic training, SWAT

team and Academy Supervisor, testified as follows:

Q.  Did you see anyone from– any politicians or– let me try that again.  **Did you see
anyone from the Office of Presidential Advance during the day?**
**A.  No.**

See Transcript of Deposition of Greg Rees (relevant pages attached hereto as Exhibit 5) at pg. 18

(emphasis added).

Todd Parkins, Lieutenant with Albuquerque Police Department, Metro Section Traffic

Division, also denied during his deposition that the White House had any involvement in telling

local officials where to place protestors:

[About a planning meeting]
**Q.  Was anyone from the Office of White House Advance present?**
**A.  Office of what, ma'am?**
**Q.  White House Advance**
**A.  Which office is that?**

-12-

Q. These are the advance guys who work in the White House. They generally choreograph the president's visits.
A. You are talking about the Presidential Protection Detail, the PPD.
Q. Well, they are not– the PPD is part of Secret Service, right?
A. Right.
Q. I am talking about people who are not Secret Service and who actually work with the president in the White House.
A. I don't believe so.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Q. Was anyone from the border patrol present?
A. I don't recall.
Q. How about any other federal employees?
A. Other than Secret Service?
Q. Other than Secret Service?
A. Possibly the FBI, but I don't recall specifically. They have been there in past times.

See Transcript of Deposition of Todd Parkins (relevant pages attached as Exhibit 6) at pgs. 18-19

and 22 (emphasis added).

When asked whether the Office of Presidential Advance was in the motorcade, Edward

Mims, Sergeant with Bernalillo County Sheriff's Department, replied as follows:

Q. Was there any– anybody from the Office of Presidential Advance?
A. Maybe. I don't know.

See Transcript of Deposition of Edward Mims (relevant pages of transcript attached as Exhibit 7)

at pg. 37. Likewise, John McCauley, Lieutenant with Bernalillo County Sheriff's Department

testified that officials with the Secret Service were in charge of the event:

Q. And you started to say that some federal– some federal agency was in charge of this meeting?
A. The Secret Service.
Q. The Secret Service was, not the other federal agency?
A. No, ma'am.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. Was there any discussion of demonstrators or protestors or people who might be lining the sides of the streets during the escort?
A. I don't think there was– I don't recall there being any specific things mentioned. But if I do recall right, it was like their general what they normally put out. Whether it's supporters, demonstrators, whatever, people will not be allowed to get any closer than "X." That's primarily for onsite.

*****************

Q. Was Secret Service also in charge?
A. I see what you're getting at. Overall Secret Service is in charge of the whole thing. Within particular elements of the event, an agency, broken down further, a commander or someone is in charge of ensuring whatever that element of the event is carried out correctly.

See Transcript of Deposition of John McCauley (relevant pages attached hereto as Exhibit 8) at

pgs. 11, 13, and 36 (emphasis added).

Finally, Justin Dunlap, Sergeant with Bernalillo County Sheriff's Department – the other

deponent cited by plaintiffs – testified as follows:

Q. Okay. And at either meeting on Friday or the site visit on Sunday, did the topic of demonstrators come up?
A. Yes, it did. And when I was reading through this, I noted one of the categories on this is intelligence, what do we know about what's going to happen before that day actually started. And when talking to the agents I wrote down that it is unknown at this time if protests are planned in the area of the event. So prior to that day we didn't have any solid knowledge that anything was happening.
Q. And did you have any knowledge that there would be supporters of Bush at the event around the event site?
A. In the event site, yes. Around the event site, I didn't– I mean, usually in the past when we have done these kind of things there's people that show up. But I believe it was invitation only at a private residence, so–
Q. Okay.
A. –unless they had an invitation they weren't going to get in.

**********************

Q. And what agency was in charge of securing the event site?
A. Secret Service.

-14-

Q. And so Secret Service was giving orders to BCSO?
A. Correct.
Q. So they were making all the final–
A. Right. We were just there to supplement their detail.

See Transcript of Deposition of Justin Dunlap (relevant pages attached hereto as Exhibit 9) at

pgs. 13-14 and 17-18 (emphasis added).

All of this testimony decisively demonstrates one thing: That contrary to plaintiffs'

theory, all roads do *not* lead to the White House. Plaintiffs' effort to raise a smokescreen with

their use of the deceptive term "federal actors" is fatally undermined by the overwhelming record

set forth above. To the extent local officials had contact with and were instructed by "federal

actors" during the event, that contact was limited to members of the Secret Service, not the White

House Advance Office.

Plaintiffs try to deflect this uncontroverted testimony by suggesting that because the

duties of the Advance Office are to plan and coordinate the logistics for all Presidential travel,

that necessarily means that the Advance Office "is likely to have knowledge about what

happened along Rio Grande Boulevard on August 27, 2007." Plfs. Opp. at 12-13. They further

argue, without support, that the reason the witnesses failed to identify White House officials as

being involved is because "[l]ocal law enforcement officials often assume, mistakenly, that all

federal officials wearing suits and earpieces at a Presidential event are with the Secret Service."

Id. at 13-14. But plaintiffs' leap in logic ignores several salient facts. First, as the above-

testimony indicates, the Secret Service agents identified themselves and their functions to the

local law enforcement officials. See Transcript of Deposition of Ron Hetes at pgs. 6-7 & 8.

Local officers knew exactly to whom they were speaking, as their testimony unambiguously

indicates. Second, because the event in question was a private event on a private ranch set off the road, there was no expectation of protestors at the event. See Transcripts of Depositions of Justin Dunlap (at pgs. 13-14 – explaining that because it was a private event, it was by invitation only) and John McCauley (at pg. 13 – confirming that the advance meetings did not discuss expected demonstrators or protestors). Therefore, the Advance Office would have had no reason to discuss the placement of protestors with the local officials in advance of the event and, as the local officers' testimony indicates, did not do so. Third, the fact that the Advance Office performs most of its functions *in advance* of the President's travel is undisputed. But plaintiffs are merely speculating that the White House Advance Office members participated in deciding where the protestors should be placed along the motorcade route, and that speculation has been affirmatively disproved by the discovery that plaintiffs have obtained to date.

Plaintiffs also argue that the fact that the White House Advance Office is involved in other litigation arising from public events in West Virginia in 2004 and Colorado in 2005 is sufficient to impute some involvement to the White House Advance Office in the handling of demonstrators outside of this private event in New Mexico several years later. Plfs. Opp. at 10-11. The notion that if someone alleges it happened once, it must have happened again is unwarranted.[3] As the Supreme Court noted in Cheney, the White House is an obvious target of

---

[3] Plaintiffs are also incorrect in stating that these cases demonstrate that the subpoena here would not impose an undue burden on the White House. Plaintiffs illogically assume that because "six individuals from the Advance Office" were deposed in the West Virgina case, Rank v. Hamm, No. 04-cv-0997 (D. W. Va.), the Rule 30(b)(6) testimony sought in this matter would not cause an undue burden on the White House Advance Office. Plfs. Opp. at 18. In fact, none of the six deponents in the Rank case were employees of the Advance Office when they were deposed, including Michael Heath, who according to his testimony, worked at the Department of Treasury. See Deposition Transcript of Michael Heath at pg. 7 (relevant pages attached hereto as Exhibit 10). Moreover, in both the Rank case and the case in Colorado, Weise v. Casper, 507 F.3d 1260

lawsuits. See Cheney, 542 U.S. at 386. If the mere fact that the White House was involved in similar litigation in prior years could provide the cornerstone for third-party discovery against the White House, the White House would be exposed to virtually unlimited third-party discovery demands, regardless of merit. As the testimony of nine witnesses indicates, there is simply no basis for plaintiffs' assumption that the White House Advance Office was involved in a decision, if any, about the placement of demonstrators along the motorcade route during *this* event.

Likewise, plaintiffs' theory that the Presidential Advance Manual may have influenced the actions of local law enforcement officials is contradicted by the testimony of one of the witnesses, Les Brown, who denied that he had ever heard of the Presidential Advance Manual. See Transcript of Deposition of Les Brown at pgs. 59-60. The testimony of the nine deponents also indicates that it was the local officials and the Secret Service, not the White House Advance Office, who had primary responsibility for setting the "safe zone" along the motorcade route and that local officers did not have contact with the White House Advance Office on the day in question. See e.g., id. at pgs. 39-40, & 41.

Plaintiffs' speculation about the involvement of the White House is simply not supported by the discovery that plaintiffs have obtained to date. Plaintiffs obviously did not receive the responses to discovery that they wanted or expected. But contrary to their argument, that fact

---

(10th Cir. 2007), representatives of the White House Advance Office were named as defendants and, as plaintiffs here acknowledge, specific allegations were raised in discovery about the involvement of the White House Advance Office in those cases. See Plfs. Opp. at 10-11. No such allegations have been made in this case.

-17-

does not entitle them to press for *more* discovery, this time from the White House, in the mere

hope that they may get a different response.[4]

---

[4] Because plaintiffs cannot demonstrate that they need discovery from the White House Advance Office as a factual matter or that *any* discovery from the White House would be appropriate under Cheney's exacting standards, their subpoena must be quashed irrespective of whether such discovery poses an undue burden on the White House. Nevertheless, in its Memorandum in Support of its Motion to Quash, the EOP pointed out that, even under normal discovery rules, plaintiffs' subpoena requesting Rule 30(b)(6) testimony and numerous documents by a June 12, 2008 deadline – a deadline that plaintiffs refused to extend – would have posed an undue burden on an already burdened White House, providing a separate basis for quashing the subpoena. See EOP Mem. pgs. at 12-17. Circumstances have changed since the EOP filed its Motion to Quash. First, the deadline of June 12, 2008 has passed. Second, unbeknownst to the White House at the time it filed its Motion to Quash, the deadline for plaintiffs to amend their complaint to add new parties was extended from June 20, 2008 to July 21, 2008. See Plfs. Opp. at 6. Although the burden imposed on the White House is not as great as it was under the deadline of the subpoena when finally served on May 23, 2008, neither is it negligible, especially when weighed against the plaintiffs' lack of need for the information sought. As Spencer Geissinger explained in his declaration, producing documents relating to "complaints" against the White House would require the White House to contact scores of Advance Office volunteers and former employees located throughout the country and search potentially millions of emails in the White House email system just to uncover potential complaints formerly brought by persons demonstrating along presidential motorcade routes. See Geissinger Decl. at ¶ 9. Moreover, plaintiffs miss the point when suggesting that the White House's burden is "producing a modest quantity of documents." Plfs. Opp. at 15. It is not the production that is the burden, but the search, which given the record, likely will yield no documents. Plaintiffs' document requests will require a search of the White House email system in its entirety to determine if anyone discussed an incident involving demonstrators at the August, 2007 event or if anyone – ever – discussed other "complaints" by protestors along a presidential motorcade route.

     Moreover, contrary to plaintiffs' suggestion that the President's travel schedule has been completed, see Plfs. Opp. at 17 n. 3, the President has a particularly heavy travel schedule this summer. In July, the President will be traveling to Asia for the G-8 Summit and again to Asia for the Olympics in August. See Geissinger Decl. at ¶ 7. As one might suspect, foreign travel, especially on high-profile trips such as the G-8 Summit and the Olympics, require substantial planning and coordination by the Advance Office. Id. Plaintiffs' supposition that dedicating a few members of an already small White House Advance Office to respond to plaintiffs' discovery requests would not negatively impact the normal functioning of that office is simply constructed out of whole cloth. Given the plaintiffs' failure to demonstrate even a modicum of need for such discovery, the burden of responding to plaintiffs' subpoena should not be imposed on the White House.

B.     **Plaintiffs Can Obtain the Information They Seek From the Defendants and The Secret Service; They Do Not Need To Resort To Unnecessary Third-Party Discovery Against the White House.**

Having received the unwanted responses from the local officials confirming that the only "federal actors" with whom they had contact during the event in question was the Secret Service, not the White House, plaintiffs overreach by speculating that the White House Advance Office is still the "likely culprit" because the Secret Service has a policy against making protestors move for any other reason than security. Plfs. Opp. at 12. But, as noted *supra*, the depositions of local law enforcement officials confirm that only Secret Service agents, not White House officials, were actually involved with the decisions relating to security of the event on the day in question. Plaintiffs should not be allowed to just ignore that evidence.

In any event, plaintiffs have issued a third-party subpoena to the Secret Service. See Plfs. Opp. at 7. By letter dated June 17, 2008, the Secret Service offered to make available Secret Service "Special Agent Kerry Sheehan to address the items stated in the 'Categories for Deposition.'" Exhibit L to Plfs. Opp. at pg. 2. As the Secret Service explained, "Special Agent Sheehan was the Presidential Protective Detail Site Agent at the event." Id. Just as the testimony by the local law enforcement officials at the scene disproved plaintiffs' theory of White House involvement, so too can the testimony of Special Agent Sheehan confirm whether or not the Secret Service "took directions" from the White House as plaintiffs surmise. Plfs. Opp. at 14.

In short, contrary to plaintiffs' assertion that they have "exhausted other avenues" of discovery, plaintiffs can determine from the Secret Service directly whether or not the White House was involved in the placement of demonstrators at the August, 2007 event. There is simply no need for them to obtain third-party discovery from the White House.

-19-

## CONCLUSION

For the reasons stated herein and as set forth in its Memorandum of Points and
Authorities in Support of the Executive Office of the President's Motion to Quash Subpoena *Ad
Testificandum* and *Duces Tecum*, the Executive Office of the President respectfully requests that
the subpoena *ad testificandum* and *duces tecum* issued by the American Civil Liberties Union on
behalf of plaintiffs in *Jeanne Pahls et al. v. Board of County Commissioners for the County of
Bernalillo, et al.*, Civil Action No. 08-53 (D.N.M.)(LH/ACT) be quashed under Federal Rule of
Civil Procedure 45(c)(3)(A).

Dated: June 27, 2008

Respectfully submitted,

GREGORY KATSAS
Acting Assistant Attorney General

JOHN O'QUINN
Deputy Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ARTHUR R. GOLDBERG (D.C. 180661)
Assistant Director


  /s/ Karen Richardson
KAREN RICHARDSON
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., NW
Washington, D.C. 20044
Tel:     (202) 514-3374
Fax:     (202) 616-8460
E-mail: Karen.Richardson@usdoj.gov
Attorneys for the Third-Party Movant,
the Executive Office of the President

-20-

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 27, 2008, a true and correct copy of Executive Office of the President's Reply in Support of its Motion to Quash Subpoena *Ad Testificandum* and *Duces Tecum* Issued in <u>Pahls, et Al. V. Board of County Commissioners for County Of Bernalillo, et Al., Civ. A. No. 1:08-cv-53 (D.N.M.)</u>, was served via first class mail upon the following counsel:

Catherine Crump
Christopher A. Hansen
Josh Hsu
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2606


George Bach
Staff Attorney
American Civil Liberties Union of New Mexico
P.O. Box 566
Albuquerque, New Mexico 87106
(505) 243-0046

Ernestina Cruz, Esq.
H. Nicole Werkmeister
Narvaez Law Firm, P.A.
P.O. Box 25967
Albuquerque, N.M. 87125-0967
(505) 247-1344


Kathryn Levy
City of Albuquerque Legal Department
P.O. Box 2248
Albuquerque, New Mexico 87103-2248
(505) 768-4525


Karen K. Richardson

EXHIBIT 1

TRANSCRIPT OF DEPOSITION OF
RON HETES

Page 1

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW MEXICO


JEANNE PAHLS, et al.,

                        Plaintiffs,

  -vs-                        NO:  1:08-cv-53


BOARD OF COUNTY COMMISSIONERS, et al.,

                        Defendants.
```

```
            DEPOSITION OF RON HETES

              June 3, 2008
              10:00 p.m.
              1410 Coal, S.W.
              Albuquerque, New Mexico
```

```
       PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  CHRISTOPHER HANSEN
           ATTORNEY FOR PLAINTIFFS

REPORTED BY:  Jan Gibson, CCR, RPR, CRR
              Paul Baca Court Reporters
              500 Fourth Street, NW - Suite 105
              Albuquerque, New Mexico  87102
```

Page 3

1    (Note:   In session at 12:00.)

2                        RON HETES

3    after having been first duly sworn under oath,

4    was questioned and testified as follows:

5                        EXAMINATION

6        BY MR. HANSEN

7        Q.    Good morning.

8        A.    Good morning.

9        Q.    Would you state your name -- barely.  Good

10   afternoon.  Would you state your name and current

11   occupation, please.

12       A.    Yes, my name is Ronald R. Hetes, and I am

13   a police commander with the Albuquerque Police

14   Department.

15       Q.    Is the proper title for me to use

16   commander or captain?

17       A.    At the present time it would be commander.

18       Q.    Okay.  It's about to change?

19       A.    Well, we were captains until January, and

20   now we have migrated to the rank of commander and we

21   are still trying to get used to that.

22       Q.    So you will answer to either title then?

23       A.    Correct.

24       Q.    I assume you know that we are here to talk

about what happened on August 27, 2007 when the

f82b9655-7e39-4409-b79b-dd12febf5c5a

1  at is kind of what the command structure is for

2  something like this.

3      A.     On something like that, you essentially

4  have which agency is the lead agency of the overall

5  operation.

6      Q.     I see.

7      A.     In this particular situation, since it was

8  being hosted in Bernalillo County, the lead agency

9  was the Bernalillo County Sheriff's Office, but

10 since Albuquerque has the largest majority of motor

11 officers and quite frankly the best training in the

12 entire state, we did take that role and

13 responsibility for escorting the president from

14 Point A to Point B and back, and I was in charge of

15 that leg.

16     Q.     But in a technical sense, the

17 Bernalillo -- the County people were in charge?

18     A.     They were the lead agency of the

19 operation, and I was the commanding officer with the

20 motorcade.

21     Q.     Okay.  And what is the relationship then

22 between you and the County and the feds, either the

23 Secret Service or the White House?

24     A.     It's almost like a symbiotic relationship.

   Whenever an event like that occurs, phone calls are

made, this is what we are looking at.  Subsequently,

2  if it's set in stone that a certain entity is coming

3  into town, then it will be a briefing prior to the

4  event, if you will.  Secret Service comes out en

5  masse.  They say who they are, what their specific

6  job functions are.  Representatives from all the

7  agencies will be there.

8        Once that initial meeting is over they

9  break down into subparts.  In other words, our

10 tactical people will talk to their tactical people.

11 Our motor officers will talk to their transportation

12 safety, and so forth.  And then those areas will

13 devise strategies to come up with a plan to

14 safeguard the president and everything else.

15    Q.    Did a meeting like that take place for

16 this visit?

17    A.    Yes.

18    Q.    Where was that meeting held?

19    A.    I believe that one was held at the

20 Northeast Area Command.

21    Q.    Which is a city police facility?

22    A.    That's correct.

23    Q.    And there were some people there from the

24 City Police Department?

   A.    Yes.

Q.     Including you?

A.     I was there.

Q.     And there were some people there from the
County Police?

A.     Correct.

Q.     And there were some people from the Secret
Service?

A.     Yes.

Q.     Who -- was there someone from the Secret
Service who was in charge of that meeting?

A.     There was an overall agent, yes.

Q.     What was his or her name?

A.     I do not recall.

Q.     Is there an agent from the Secret Service
that works full-time in Albuquerque?

A.     I believe there are a few.

Q.     And would it necessarily be that person
who would be in charge?

A.     It just depends on the event.  On that
particular event, there's a local detail, and again,
I'm trying to get into some nomenclature with them
that I am familiar with.  Some things they run I am
not familiar with, but they do send out Washington
entities with the Secret Service and try to marriage
with counterparts out here.

Page 8

Q.    And roughly how many people are in this meeting?

A.    There are probably 15 to 20 Secret Service agents and roughly the same amount as far as police, Kirtland personnel, BCSO personnel.

Q.    And does someone say, "Okay, now we are all here, here is the agenda?"  And if so, is that a Secret Service person?

A.    Yes.  They are the ones that facilitate the meeting.  They start the meeting.  They get up and introduce their counterparts.  When they are done introducing themselves they give a brief synopsis of what their job responsibility is.  Once that initial, I guess, introduction is over, then the counterparts from the city level and the county level, they kind of migrate to their area of expertise.

Q.    At this first meeting, other than sort of introducing yourselves to each other and setting some very broad guidelines, do you start talking things like what route is he going to take and where is he going to go and things like that?

A.    You know, at the first one I kind of bounced back and forth.  Because again, I had what they call the metro area command so I may have four

f82b9655-7e39-4409-b79b-dd12febf5c5a

Page 10

so there was no one from the party or the people

2  that were trying to raise money present at that

3  meeting?

4      A.    Not that I was aware of.

5      Q.    Okay.  What about from the Office of

6  Presidential Advance, which is located in the White

7  House, which is responsible for coordinating the

8  presidential travel?  Was anyone present from that

9  office?

10     A.    Not that I recall either.  The only ones I

11  can recall from the federal branch is the Secret

12  Service.

       Q.    Okay.  And there was a Secret Service guy

14  in charge, you just don't remember what his name

15  was?

16     A.    Correct.  That's -- it changes all the

17  time, and it's kind of -- you see that person for a

18  couple hours and that's it, you never see him again.

19     Q.    Male?  The person was male?

20     A.    Yes.

21     Q.    White?

22     A.    I can't say.

23     Q.    And so other than telling you all that he

24  is going to come to Albuquerque and he is going to

   the mayor's house and that we need -- here are the

EXHIBIT 2

TRANSCRIPT OF DEPOSITION OF
LES BROWN

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


JEANNE PAHLS, et al.,

                        Plaintiffs,

  -vs-                    NO:  1:08-CV-53


BOARD OF COUNTY COMMISSIONERS, et al.,

                        Defendants.



            DEPOSITION OF LES BROWN

                June 3, 2008
                2:00 p.m.
                1410 Coal, S.W.
                Albuquerque, New Mexico



        PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  CATHERINE CRUMP
            ATTORNEY FOR PLAINTIFFS

REPORTED BY:  Jan Gibson, CCR, RPR, CRR
              Paul Baca Court Reporters
              500 Fourth Street, NW - Suite 105
              Albuquerque, New Mexico  87102

6c651b0f-6ef1-4ca1-b4e4-465e4123b574

Page 3

1    (Note:   In session at 2:10)

2                        LES BROWN

3    after having been first duly sworn under oath,

4    was questioned and testified as follows:

5                        EXAMINATION

6        BY MS. CRUMP

7        Q.    Would you please state your name and your

8    position.

9        A.    Sure.   Leslie Brown, and I am the

10   lieutenant of the Metro Operational Support Section.

11       Q.    What is the Metro Operational Support

12   Section?

13       A.    Basically it's part of the metro division

14   but I handle DWI, DWI seizures, air support and the

15   mayor's protection detail.

16       Q.    I should have asked you this in the

17   beginning.   Have you been deposed before?

18       A.    About ten years ago.

19       Q.    I suppose I should go over some of the

20   ground rules.  Do you understand that you are under

21   oath during the deposition?

22       A.    I do.

23       Q.    And if you could, please try to answer the

24   questions verbally so that the court reporter can

     take them down.

6c651b0f-6ef1-4ca1-b4e4-465e4123b574

Page 15

we are the lead agency and we need to take control,

2 we do more -- have to do like an operation plan, but

3 when we are support we just say, "Where do you want

4 me and how many people do you need?"

5 Q.    But you found out a matter of days before

6 rather than weeks before?

7 A.    Yeah, probably a day before Secret Service

8 arrived is most likely when I found out.  Usually

9 it's very short notice.

10 Q.    Then after that notice, you learned there

11 was going to be a meeting and you went to the

12 meeting, yes?

A.    Yes.

Q.    Did the meeting have a name or is it just

15 the law enforcement meeting?

16 A.    Honestly, I can't tell you.  They just

17 tell me show up here.  "Yes, sir."  I go.

18 Q.    So there was a meeting.  Was the meeting

19 being run by the Secret Service?

20 A.    Yes.

21 Q.    Do you know the name of the -- was there

22 an officer in charge of the meeting overall?

23 A.    They had people from Washington come in.

24 They had the special agent in charge from -- I think

Albuquerque was there.  And I can't even attest to

there.  Airport, I think, was there, airport police,

2   because they come through the airport.  State Police

3   maybe.

4       Q.    Was anyone from the Air Force there?

5       A.    No, not that I recall.  I don't remember

6   seeing anybody from the Air Force.

7       Q.    What about border patrol?

8       A.    No, not that I recall.

9       Q.    Was there anyone there from the White

10  House?

11      A.    I don't think at that meeting, no, not

12  that I recall.  I think it was just Secret Service

    that I remember.

14      Q.    Do you remember approximately how many

15  BCSO officers were there?

16      A.    I'm sure they had one from traffic because

17  they had to help in the motorcade.  I'm sure that

18  they had somebody doing the -- I know that the

19  lieutenant was there for -- maybe -- I would say

20  maybe no more than half a dozen.  Just an estimate,

21  but I don't think there was too much more than that.

22      Q.    About how many APD officers were there?

23      A.    Maybe a dozen.  That's probably because

    they probably had somebody from -- like I said, the

    S.W.A.T., canine, bomb squad and I was there for

call it. North Sector out on 4th Street or 2nd

2  Street. Way out north.

3       So that morning I had all my guys notified

4  they all needed to meet at their substation at

5  whatever time. Whatever time they decided. It was

6  going to be prior to the event. They did their

7  briefing for on-site security for us, and we

8  attended that. It maybe lasted 15 minutes maybe.

9       Q.    Who was present at that meeting?

10      A.    All their BCSO guys who were out there for

11  ERT and site security. And that lieutenant. I know

12  there was probably a sergeant or two. I don't know.

    I don't know a lot of them.

14      Q.    Anyone from the Secret Service?

15      A.    No.

16      Q.    Anyone from the white house?

17      A.    No, just us.

18      Q.    Were all of your agents present at the

19  meeting?

20      A.    All of our APD guys?

21      Q.    Yes.

22      A.    Well, I think one team was because

23  originally they wanted one team and I think we ended

24  up saying we need more manpower and called on a

    second team, so I think I briefed them on-site

6c651b0f-6ef1-4ca1-b4e4-465e4123b574

Page 39

Q.    And I'm not a police officer so I have to
ask you, if you are stopping people from standing,
why is it safe to allow cars to continue to drive?

A.    I think once the protesters actually
started getting there, within an hour, if I remember
correctly, they actually blocked off and rerouted
traffic on Rio Grande, if I remember.

Q.    Who is this they?

A.    Bernalillo County.  Whoever was doing
traffic.  I think it was Bernalillo County.  Because
we couldn't see the traffic post to the south.  I
mean -- and I didn't have any involvement in setting
up the route like where spaces were going to be to
be blocked off for traffic.  So I just know that at
a certain point they stopped having vehicle traffic
coming down.

Q.    I think what you told me is the Secret
Service decided where the safe zone was, and that
was communicated to BCSO and they told you?

A.    I am assuming.  I got it from BCSO.

Q.    Yes.  Did BCSO tell that you the Secret
Service had drawn that particular line?

A.    I don't have any independent recollection
of that.  I am just -- I don't know whether I
assumed that because the lieutenant was with the

6c651b0f-6ef1-4ca1-b4e4-465e4123b574

Page 40

Secret Service guy or whether they said, "Secret
Service wants this zone blocked off here."    I
honestly don't remember specifically.

Q.    You said it would be typical practice for
the Secret Service to designate that kind of secure
zone?

A.    Yeah; usually we have an area where they
say, "We don't want anybody south of the area for
arrival and we don't want anybody north of this
area."  That's pretty typical.

Q.    And you said that when you were
congregating on the dirt road, did BCSO or Secret
Service officials come over to you and indicate --
how did you know that's where the line was supposed
to be, that no one was supposed to be north of the
road?

A.    They were in kind of a little golf cart.
They kind of came up, and they were riding back and
forth, which I was a little jealous about because
they had their little drinks in their little golf
cart and they got to ride back and forth.  But yeah,
they came up and made contact and basically said --
a couple things, I think, were probably over the
radio, you know, saying if I had a question I
usually try to get them on the radio or the cell

6c651b0f-6ef1-4ca1-b4e4-465e4123b574

Page 41

phone.

2          If I remember right, we were out of the --

3    the radios weren't very effective out there, and

4    even cell phone service was a pain.  I kept dropping

5    calls.  I remember that because they would call me

6    and I would hear three words and the call would

7    drop, so a lot of it was walking up face-to-face

8    type of stuff because we had no communication out

9    there.

10        Q.    The people in the golf cart, which agency

11   were they in?

12        A.    The Secret Service and the BCSO.

         Q.    So they were together in the golf cart?

-4       A.    Yes, at least one of them was together.

15        Q.    At the event site, did you see anyone from

16   the Office of Presidential Advance in the White

17   House?

18        A.    I didn't from where I was.

19        Q.    Did you see anyone from the border patrol?

20        A.    No.

21        Q.    Did you see anyone from any federal agency

22   other than the Secret Service?

23        A.    Not that I remember, no.

24        Q.    So you set up this barricade.  And what

     did the barricade consist of?

6c651b0f-6ef1-4ca1-b4e4-465e4123b574

Page 59

1  remember it was totally open.

2      Q.    Do you think that it would have been

3  possible for someone physically located where the

4  president was located to have seen the protesters'

5  signs?

6      A.    Yes.  It was basically a banner across the

7  whole roadway and they had signs.

8      Q.    The anti-Bush protesters had a big banner?

9      A.    Yes, and I could see all the cars turning

10  into the driveway from where I was.  I mean, it

11  wasn't like a little dot where they were turning.

12  You could basically see -- I can't give you -- I

13  don't know how to describe it but it's -- it

14  wasn't -- far enough away to where you could easily

15  read the banner.  That's my guess.  I shouldn't say

16  guess.  That would be my estimate.

17      Q.    All right.  Were the protesters chanting?

18      A.    I think so, yeah.

19      Q.    Do you think it would be possible for

20  someone located by the mayor's driveway to have

21  heard their chants?

22      A.    They were chanting pretty loud.  There

23  were a bunch of them.  I could hear them pretty

24  well.

25      Q.    And you never saw anyone -- did you see

Page 60

any politicians or people from the White House

2 during this event?

3      A.    No.

4      Q.    So the only federal officers you saw were

5 the Secret Service officers?

6      A.    Yes.

7      Q.    Did they ever mention anyone from the

8 Office of Presidential Advance?

9      A.    No.

10      Q.    Have you ever heard of the Office of

11 Presidential Advance Manual?

12      A.    No, I am not privy to that information.

       Q.    Why don't we take a break.

-4           (Note:  The deposition stood in recess at

15 3:10 to 3:15.)

16      Q.    (By Ms. Crump)  We just have a couple

17 additional questions.  Our understanding is that

18 there were some protesters south that we talked

19 about.

20      A.    Yes.

21      Q.    And also the pro-Bush group sort of

22 directly across the driveway.  Is that right?

23 Directly across the mayor's driveway?

24      A.    From my angle I couldn't tell.  I know

   they were that direction but I couldn't tell exactly

6c651b0f-6ef1-4ca1-b4e4-465e4123b574

# EXHIBIT 3

## TRANSCRIPT OF DEPOSITION OF
## MATTHEW THOMAS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


JEANNE PAHLS, et al.,

                        Plaintiffs,

  -vs-                  NO:  1:08-cv-53


BOARD OF COUNTY COMMISSIONERS, et al.,

                        Defendants.



DEPOSITION OF MATTHEW THOMAS

            June 6, 2008
            10:00 a.m.
            1410 Coal, S.W.
            Albuquerque, New Mexico


        PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  CATHERINE CRUMP, ESQ.
           and CHRISTOPHER HANSEN, ESQ.
           ATTORNEY FOR PLAINTIFFS

REPORTED BY:  Jan Gibson, CCR, RPR, CRR
              Paul Baca Court Reporters
              500 Fourth Street, NW - Suite 105
              Albuquerque, New Mexico  87102

1    (Note:  In session at 10:00.)

2                    MATTHEW THOMAS

3    after having been first duly sworn under oath,

4    was questioned and testified as follows:

5                    EXAMINATION

6        BY MR. HANSEN

7        Q.    Would you state your name, please?

8        A.    Matthew Thomas, T-H-O-M-A-S.

9        Q.    Where are you currently employed?

10       A.    Bernalillo County Sheriff's Department.

11       Q.    What is your position there?

12       A.    I am a lieutenant.

13       Q.    What is your area of responsibility?

         A.    I have several, actually.  At the time of

15   this event, I was the Emergency Response Team

16   commander, the S.W.A.T. commander.  Those are

17   secondary duties.  My primary duty is I am a

18   regional task force commander for a six-county

19   narcotics task force.

20       Q.    Do you hold all three of the positions

21   still today?

22       A.    I recently relinquished the Emergency

23   Response Team position because I wear too many hats

24   and I am a little bit tired.

         Q.    Who is your immediate supervisor?

Page 19

A.    Correct.

Q.    Who makes the decision where the inner and outer parameters are?

A.    Secret Service.

Q.    If the Secret Service says to you, "I want it at this corner," and you think that corner is farther than you think it needs to be, you would nevertheless defer to the Secret Service?

A.    Yeah, they have their briefing and policies and I'm not going to get in the middle of how they do things.   We let them set the parameters and we will walk through.   We may make suggestions. For instance, if we go down a road I may say, "Look, we need another guy here, another guy here."   I will be with the ERT guy and we will walk it down.

Q.    After you then went out to the site and walked it with the Secret Service and one or both of your sergeants, what did you do next?

A.    Probably nothing.   I'll tell those guys to get the out borders out and do what they need to do and then I will attend the briefings and I will have an emergency response team in place about 8:00 o'clock in the morning.

Q.    So you don't have anymore briefings with your guys until essentially the morning of the

34ce7f72-fe5a-4b65-8655-08cbae709514

1    about this, but this is the way I remember his

2    testimony, his recollection is he called you and you

3    and the Secret Service agent consulted each other

4    and you relayed back to him instructions as to what

5    he should do. Does that ring a bell?

6        A.    No.

7        Q.    Do you recall ever consulting the Secret

8    Service agent about the demonstrators during this

9    event?

10       A.    Yes.

11       Q.    What was the nature of that conversation?

12       A.    Okay. Well, first of all -- well, I will

13   just let that go. The only time I recall talking to

14   the Secret Service -- if I remember right there was

15   a Secret Service agent right here on the driveway at

16   Rio Grande with Sergeant Mimms, if I recall

17   correctly. So if Ed talked to him, that was his

18   doing. What I remember is Ed telling me about the

19   protesters, and I gave him some instructions about

20   that. The only time that I really had any

21   substantive contact with Secret Service is the guy

22   who ran the site survey said, "Look, there's going

23   to be some people right across the roadway."

24       I said, "Okay." He said, "They live

     there, it's private property." I said, "It's one of

Page 39

1  the things you have to deal with."  That was it.

2      Q.      What was that agent's name?

3      A.      The same guy that ran the site survey.  I

4  don't recall.

5      Q.      Larry Kronen is the name of the lawyer

6  that Sergeant Mimms was negotiating with on behalf

7  of the demonstrators on that date.  Did you ever

8  speak with Mr. Kronen yourself?

9      A.      No.

10     Q.      At what point did the Secret Service agent

11 tell you there were going to be people right across

12 in the driveway?

      A.      I don't know.  Maybe an hour ahead of

14 time.  Half hour ahead of time.

15     Q.      Were the people already standing there at

16 the time he told you that?

17     A.      I don't think I was out there at the time

18 that he told me that.

19     Q.      You were in the mayor's residence?

20     A.      I was probably closer by the house.  I

21 don't recall being out there at the time.

22     Q.      Did he ask you for an opinion as to

23 whether they could stand there or did he simply tell

24 you, "We decided to let them stand there."

      A.      It's private property.  They can do what

34ce7f72-fe5a-4b65-8655-08cbae709514

property and they want to live there and he is not a

2    direct threat to the president, that's the Secret

3    Service's call, not mine, then I'm going to let them

4    be on the property.  I don't have any ability to

5    remove people from private property.

6         Q.    Well --

7         A.    If the Secret Service -- like I said

8    earlier, that's their call.

9         Q.    That's precisely what I wanted to be 100

10   percent clear on.  The decision as to where the

11   people who were across from the driveway were to be

12   allowed to stand was made by the Secret Service, not

     by you?

     A.    Yeah.  I mean, he came up to me.  If you

15   want to look at it that way, he said, "There's going

16   to be people on private property.  That's their

17   right."  I said, "Fine."

18        Q.    You all didn't have a discussion about how

19   far back they should be?

20        A.    No, he said, "It's private property, they

21   are going to be there, that's their right," and I

22   said, "Fine."

23        Q.    Did you communicate that piece of

24   information once the Secret Service agent told you

     that to anyone else?

EXHIBIT 4

TRANSCRIPT OF DEPOSITION OF
DAVID LINTHICUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


JEANNE PAHLS, et al.,

                        Plaintiffs,

  -vs-                       NO:  1:08-cv-53


BOARD OF COUNTY COMMISSIONERS, et al.,

                        Defendants.



              DEPOSITION OF DAVID LINTHICUM

                June 5, 2008
                10:00 a.m.
                1410 Coal, S.W.
                Albuquerque, New Mexico



        PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  CATHERINE CRUMP, ESQ.
           and CHRISTOPHER HANSEN, ESQ.
           ATTORNEY FOR PLAINTIFFS

REPORTED BY:  Jan Gibson, CCR, RPR, CRR
              Paul Baca Court Reporters
              500 Fourth Street, NW - Suite 105
              Albuquerque, New Mexico  87102

1    (Note:   In session at 10:00)

2                    DAVID LINTHICUM

3    after having been first duly sworn under oath,

4    was questioned and testified as follows:

5                    EXAMINATION

6        BY MS. CRUMP

7        Q.      Please state your name.

8        A.      David Linthicum.

9        Q.      Where are you employed?

10       A.      Bernalillo County Sheriff's Department.

11       Q.      What is your position?

12       A.      I am a chief deputy.

13       Q.      Have you been deposed before?

14       A.      I have.

15       Q.      So you are a veteran, so you probably

16   don't need all the of the normal rules set up for

17   you?

18       A.      Unfortunately, I am a veteran.  Hopefully

19   I will make it painless.

20       Q.      I will just mention a couple of them.  If

21   you don't understand a question I ask, please let me

22   know.

23       A.      I will do that.

24       Q.      Please answer yes or no so the court

reporter can take down your answer, okay?

bc9df7f7-9245-4ad8-864a-970369a4e5fc

A.    I don't know any off the top of my head.

2    Q.    How often in a month do you deal with the

3  Secret Service agents?

4    A.    Very rarely.  In fact, I haven't -- I

5  mean, we deal with them when there is a visit and

6  that's the only time I hear from them pretty much,

7  or if there's some kind of incident they need help

8  on.  Probably -- obviously, less than once a month

9  unless there's a visit.  If there's three or four

10  visits, I will hear from there three or four times

11  during that month or in a week, which recently has

12  happened with some of the visits in Albuquerque.  I

13  talked to them three or four times to make sure

14  everything is squared away.

15    Q.    Do you ever hear from anyone from the

16  White House during the course of the visits?

17    A.    I haven't.

18    Q.    Do you know if anyone else within the BCSO

19  has?

20    A.    Not any personal recollection, no.

21    Q.    Have you heard of the Office of

22  Presidential Advance?

23    A.    I have heard of advance parties through

24  the Secret Service.  Yes, I know about them.

    Q.    What are they?

bc9df7f7-9245-4ad8-864a-970369a4e5fc

Page 13

A.     The advances that come in before a
presidential visit to work with the local agencies
and the local Secret Service office to make sure
that the event goes off and the security is what
it's supposed to do.

Q.     Are those agents that you are discussing
right now Secret Service agents that come as part of
the advance?

A.     I think there's a group of them.  I have
seen Secret Service agents, I have seen press
people.  I have seen press as part of the advance.
There's been different -- my experience is there's
different people within the parties.

Q.     If you wanted to know who was part of the
advance party for a particular presidential visit,
how would you figure that out?

A.     Try to call the local Secret Service
office and ask them.  I really wouldn't have a
reason to do that but if I were looking for that,
that's who I would call.

Q.     In the first highlighted paragraph on Page
2 of this document, Sheriff White is quoted as
saying that the Secret Service makes the final calls
for security at presidential events.  Is that
statement accurate?

Page 14

A.      You would have to ask Sheriff White that.
He's the one that said that.

Q.      He may have said it, but in your
experience is it accurate?

A.      I would say it's a joint decision-making
process, but I would say the Secret Service, since
they are ultimately responsible for the dignitary's
protection, they would have the final say-so, but
that doesn't mean that we have to agree to it
either.

MS. CRUZ:  Really quickly, for the
purposes of clarification, the first paragraph is
not really quoted, it's a statement as to what was
interpreted that he said.

MS. CRUMP:  That's correct, yes.  It's a
paraphrase.

MS. CRUZ:  Right.

Q.      Lieutenant Thomas, was he the person in
charge of the overall event from the BCSO's
perspective?

A.      As far as I know he was.  He was obviously
one of the main supervisors in that.  Obviously, I
don't remember the exact event on who was there but
I know Lieutenant Thomas was there.

Q.      Do you know who else might have had

bc9df7f7-9245-4ad8-864a-970369a4e5fc

Page 26

there, I don't know what context it was talked

2   about.  I don't know how they talked about it.  I

3   just don't have the information to give you a decent

4   answer.  Anything that could be anywhere deemed as

5   accurate.  I just don't have that information.

6       Q.    Putting aside this specific event, is

7   there any generalized rule about how that works?

8       A.    No generalized rule.  I can tell you how I

9   would do it, but not without all of the information

10  so there really isn't.  I think it's

11  incident-driven, information-driven with the most

12  current information, and it's based on just many,

    many different factors.

14      Q.    If you and the Secret Service disagreed

15  about where protesters stand along the president's

16  route, how would you resolve it?

17      A.    I would discuss it with the Secret Service

18  and hopefully we would come to some type of

19  understanding.

20      Q.    Would you ultimately defer to their

21  understanding?

22      A.    I can't tell you I would or wouldn't.  It

23  would depend on the discussion.

24      Q.    Is there a policy of keeping any

    documentation about an event such as this?

bc9df7f7-9245-4ad8-864a-970369a4e5fc

Page 35

food chain and where you were at.  I want to liken

2  you to the Secret Service and you all --

3       A.     Where the sun lies?  I'm going to remember

4  that.

5       Q.     Does the Secret Service have more

6  authority over these types of events when compared

7  to your organization?

8       A.     Yes.

9       Q.     Why is that?

10       A.     Because they are ultimately charged with

11  protection of the president and that's their purview

12  and we are there to assist them, to help them with

    resources.

        MS. CRUZ:  No further questions.  We will

15  read and sign.

16        (Note:  The deposition was concluded at

17  10:46).

18

19

20

21

22

23

24

bc9df7f7-9245-4ad8-864a-970369a4e5fc

# EXHIBIT 5

# TRANSCRIPT OF DEPOSITION OF
# GREG REES

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


JEANNE PAHLS, et al.,

                    Plaintiffs,

  -vs-                    NO:  1:08-cv-53


BOARD OF COUNTY COMMISSIONERS, et al.,

                    Defendants.



DEPOSITION OF GREG REES

        June 5, 2008
        1:15 P.M.
        1410 Coal, S.W.
        Albuquerque, New Mexico



     PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  CATHERINE CRUMP, ESQ.
        and CHRISTOPHER HANSEN, ESQ.
        ATTORNEY FOR PLAINTIFFS

REPORTED BY:  Jan Gibson, CCR, RPR, CRR
        Paul Baca Court Reporters
        500 Fourth Street, NW - Suite 105
        Albuquerque, New Mexico  87102

704de9a4-58c3-446c-b3b9-d193bced7497

Page 3

(Note:  In session at 1:15.)

GREG REES

after having been first duly sworn under oath,

was questioned and testified as follows:

EXAMINATION

BY MS. CRUMP

Q.    Will you please state your name?

A.    Greg Rees.

Q.    Where do you work?

A.    Bernalillo County Sheriff's Department.

Q.    What is your job description?

A.    I am a sergeant assigned to in-service training and also the S.W.A.T. team.  I'm sorry, I said in-service.  Basic training, the academy supervisor and the S.W.A.T. team.

Q.    Have you been deposed before?

A.    I have.

Q.    Then I won't go on too long about this, but I will go over a few of the ground rules. Please speak clearly and not too quickly so the court reporter can get everything you say down.  The most important thing is to provide verbal answers instead of shaking your head or nodding so the court reporter can record what you are saying.

A.    Okay.

704de9a4-58c3-446c-b3b9-d193bced7497

Page 18

1    A.    No.

2    Q.    So you all were just given your orders to

3    secure that driveway area and then left to do your

4    jobs?  Is that fair?

5    A.    Yeah.  My responsibility was the south

6    side of the mayor's house.  In the event there's

7    attack, we are to deal with the attack.

8    Q.    Did you see anyone from -- any politicians

9    or -- let me try that again.  Did you see anyone

10   from the Office of Presidential Advance during the

11   day?

12   A.    No.

13   Q.    Other than BCSO and the APD and the Secret

14   Service, were any other law enforcement agencies

15   represented that day?

16   A.    Not to my knowledge.

17   Q.    Were you working in conjunction with APD?

18   A.    Yes, via radio channel.

19   Q.    But in terms of securing the south side of

20   the mayor's house?

21   A.    No, APD came in with the motorcade.  When

22   the motorcade staged, they basically were staged on

23   the north side of the house so they would be

24   responsible for anything north of the house and we

     were going to be responsible for anything south of

704de9a4-58c3-446c-b3b9-d193bced7497

# EXHIBIT 6

# TRANSCRIPT OF DEPOSITION OF
# TODD PARKINS

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


JEANNE PAHLS, et al.,

                    Plaintiffs,

  -vs-                    NO:  1:08-cv-53


BOARD OF COUNTY COMMISSIONERS, et al.,

                    Defendants.



        DEPOSITION OF TODD PARKINS

            June 3, 2008
            10:00 a.m.
            1410 Coal, S.W.
            Albuquerque, New Mexico



      PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  CATHERINE CRUMP
           and ALEXA KILBI-MOLINAS, ESQ.
           ATTORNEY FOR PLAINTIFFS

REPORTED BY:  Jan Gibson, CCR, RPR, CRR
              Paul Baca Court Reporters
              500 Fourth Street, NW - Suite 105
              Albuquerque, New Mexico  87102

Page 4

1    you don't understand me, please let me know and I

2    will rephrase the question.

3        A.    I certainly will.

4        Q.    If at any time during my questioning you

5    feel like taking a break, that's fine.  Please just

6    answer the question before continuing on, all right?

7        A.    Yes, ma'am.

8        Q.    Where are you currently employed?

9        A.    The Albuquerque Police Department.

10       Q.    What is your position there?

11       A.    I am a lieutenant with the Metro Section

12   Traffic Division.

13       Q.    What are your primary job

14   responsibilities?

15       A.    Traffic enforcement, special event

16   coordination and management, and I guess that's

17   probably it.

18       Q.    Did you have other positions at the APD

19   before this one?

20       A.    Yes.

21       Q.    What were they?

22       A.    I have been a vice detective in the

23   Special Investigations Division.  I have been a gang

24   unit detective under the Field Services Bureau.  I

     have work in Internal Affairs.  I have been a bike

Page 18

when those two guys took over this office, they
would know who was there at that time, I would
imagine.

Q.    Were any documents distributed at that
meeting?

A.    Yes.

Q.    What was distributed?

A.    Phone numbers of all of the people that
were present.  We would go in and sign in.  And also
I guess you would call it a tactical plan from the
service secret.  I don't know what they call that
specifically, but it has to do with the event and
who is there and all of the things you are asking me
now.

Q.    Was anyone from the Office of White House
Advance present?

A.    Office of what, ma'am?

Q.    White House Advance.

A.    Which office is that?

Q.    These are the advance guys who work in the
White House.  They generally choreograph the
president's visits.

A.    You are talking about the Presidential
Protection Detail, the PPD.

Q.    Well, they are not -- the PPD is part of

bee5af49-12db-42e9-b26e-ffa843ad5479

Secret Service, right?

2      A.    Right.

3      Q.    I am talking about people who are not

4  Secret Service and who actually work with the

5  president in the White House.

6      A.    I don't believe so.

7      Q.    Okay.  Does the APD have copies of this

8  phone number list?

9      A.    No.

10      Q.    Who would have that?

11      A.    The Secret Service, if they kept it.

12      Q.    Was it -- what did the document look like?

      A.    Basically it was a blank form with Secret

14  Service guys' names typed on there generally, I

15  think.  They could either be handwritten or typed,

16  and when we walk in we sign our names, put our phone

17  numbers, usually our E-mail address, our home phone

18  and cell numbers and that part is definitely

19  handwritten, and they make copies of it and

20  distribute it.

21      Q.    And do you have copies of the tactical

22  plan?

23      A.    No.

24           MS. CRUMP:  So Kathy, was the tactical

    plan the document that you are refusing to disclose?

PAUL BACA PROFESSIONAL COURT REPORTERS

Page 22

Q.    And you said the BC --

A.    BCSO, Bernalillo County Sheriff's Office.

Q.    How many individuals were present from there?

A.    One that I can recall.

Q.    Who was that?

A.    Robert Boland.

Q.    And was anyone from the Los Ranchos de Albuquerque Department present?

A.    The Los Ranchos de Albuquerque --

Q.    They are part of the County so they don't have their own?

A.    That's right.  They are part of Bernalillo County.

Q.    Was anyone from the border patrol present?

A.    I don't recall.

Q.    How about any other federal employees?

A.    Other than Secret Service?

Q.    Other than Secret Service?

A.    Possibly the FBI, but I don't recall specifically.  They have been there in past times.

Q.    And when you have this many law enforcement agencies in charge of an event, how do you decide who does what?

A.    It's very compartmentalized, like I said

# EXHIBIT 7

# TRANSCRIPT OF DEPOSITION OF EDWARD MIMS

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


JEANNE PAHLS, ET AL.,
        Plaintiffs,

VS.                          NO. 1:08-cv-53 (LH)(ACT)

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF BERNALILLO, ET AL.,
        Defendants.



*****************************************
DEPOSITION OF EDWARD MIMS
June 4, 2008
1:05 p.m.
1410 Coal SW
Albuquerque, New Mexico 87104
*****************************************



PURSUANT TO THE FEDERAL RULES OF CIVIL

PROCEDURE, this deposition was:




TAKEN BY:  Ms. Alexa Kolbi-Molinas
           ATTORNEY FOR PLAINTIFF ACLU


REPORTED BY:Jeannine K. Sims, RPR, NM CCR #12
            Paul Baca Court Reporters
            500 Fourth Street, NW, Suite 105
            Albuquerque, New Mexico  87102

d60a77c4-4126-475c-844a-8ec96d387b10

1       A.    I'm employed as a sergeant with the

2   Bernalillo County Sheriff's Department.

3       Q.    And what is your position there?

4       A.    My primarily duty assignment as -- is the

5   supervisor for the Advanced Training Section.

6       Q.    And how long have you held that position?

7       A.    Since approximately July of 2002.

8       Q.    And what are your primary job

9   responsibilities in that position?

10      A.    My primary job responsibilities as the

11  advanced training sergeant are to coordinate all the

12  advanced training for the deputies to ensure that they

13  have met their state-mandated requirements for advanced

    training.  And I also supervise the firearms range so I'm

15  also tasked with ensuring that the deputies meet the

16  state standards for their firearms qualifications as well

17  as any additional standards for the contract.

18      Q.    Do any of the advance trainings that you do

19  with the officers involve protestors?

20      A.    Not as part of my normal duty assignment,

21  no.

22      Q.    Is that part of a separate or additional

23  duty assignment?

24      A.    Yes.

    Q.    Describe that please.

Page 37

1    A.    No.  Nothing.  Nothing.  No.  No.

2    Q.    What other agencies were on the scene on the

3  site with you?

4    A.    I don't know if I can give an entire list.

5  I know APD was present --

6    Q.    Uh-huh.

7    A.    -- in the motorcade we had deputies and

8  officers from all kinds of surrounding agencies.  We

9  clearly had Rio Rancho represented because one of their

10  officers was killed.  It would not be unusual for State

11  Police and those folks there to have arrived with the

12  motorcade.  Typically the motorcade will arrive with a

13  couple of rescue units.  I don't know if they were Los

14  Ranchos or AFD or BCFD.  The Secret Service was also

15  present.  I don't know specifically who else would have

16  been there.

17    Q.    Was there any -- anybody from the Office of

18  Presidential Advance?

19    A.    Maybe.  I don't know.

20    Q.    And did you speak with any of the Secret

21  Service agents that were on the event site that day?

22    A.    Yes, I did.

23    Q.    Do you remember the names of anybody?

24    A.    I don't.  I don't.  Our conversation

25  occurred -- it occurred at the driveway.  And they had

EXHIBIT 8

TRANSCRIPT OF DEPOSITION OF
JOHN McCAULEY

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


JEANNE PAHLS, ET AL.,
        Plaintiffs,

VS.                         NO. 1:08-cv-53 (LH)(ACT)

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF BERNALILLO, ET AL.,
        Defendants.



*****************************************
        DEPOSITION OF JOHN McCAULEY
                June 4, 2008
                 10:04 a.m.
                1410 Coal SW
        Albuquerque, New Mexico 87104
*****************************************



        PURSUANT TO THE FEDERAL RULES OF CIVIL

PROCEDURE, this deposition was:




TAKEN BY:   Ms. Alexa Kolbi-Molinas
            ATTORNEY FOR PLAINTIFF ACLU


REPORTED BY:Jeannine K. Sims, RPR, NM CCR #12
            Paul Baca Court Reporters
            500 Fourth Street, NW, Suite 105
            Albuquerque, New Mexico  87102

Page 4

1                    JOHN McCAULEY,

2    having been first duly sworn testified as follows:

3                        EXAMINATION

4    BY MS. KOLBI-MOLINAS:

5          Q.    Would you please state your name.

6          A.    Lieutenant John McCauley.

7          Q.    And do you understand that you are under

8    oath for the duration of the deposition?

9          A.    Yes, ma'am.

10         Q.    And have you ever been deposed before?

11         A.    Yes, ma'am.

12         Q.    So you probably are pretty familiar with

13   what I'm about to say, but I'll go through a couple

14   preliminaries.  Please try to answer the questions

15   verbally rather than gestures so the court reporter --

16         A.    Yes.

17         Q.    -- can write them down.  Please speak

18   clearly and not too quickly so that the court reporter

19   can also get your answers down.  If you don't understand

20   me or a question that I've asked, just let me know and

21   I'll try to rephrase it and speak clearly.  If at any

22   time you want to take a break just let us know and

23   that'll fine.  I just ask that you finish answering

24   whatever question I've asked and then we can take a

25   break.

d06d9db3-e116-46cc-b354-24b2b206b6bd

Page 5

1    A.    Okay.

2    Q.    Where are you currently employed?

3    A.    Bernalillo County Sheriff's Department.

4    Q.    And what is your position?

5    A.    I'm an Assistant Division Commander for

6    Field Services.

7    Q.    And what are your primary job

8    responsibilities?

9    A.    I'm the commander of the traffic, DWI,

10   street crimes, crossing guards, of those units.  Oversee

11   their function and make sure that they accomplish their

12   assigned duties.  I also assist a considerable amount

13   with the Division Commander in the operations of field

14   services.

15   Q.    And how long have you held this position?

16   A.    It would be two years in August.  And I was

17   also in there for a time -- couple different times prior

18   to that in the absence of the field commander and the

19   assistant commander at that time.

20   Q.    How does the command structure work for you

21   at the BCSO?  Who's above you?

22   A.    The captain of field services is directly

23   above me.

24   Q.    What's his name?

25   A.    Captain Blaske.

1  ones that run the briefing.  And of course all the people

2  involved of any rank from our department.

3           Q.    And you started to say that some federal --

4  some federal agency was in charge of this meeting?

5           A.    The Secret Service.

6           Q.    The Secret Service was, not the other

7  federal agency?

8           A.    No, ma'am.

9           Q.    And about how many Secret Service agents

10 were there?

11          A.    I'm guessing eight approximate.

          Q.    And so how did this meeting run?  What did

13 they -- how did they organize the meeting?  What is the

   first thing they discussed?

15          A.    They give you a packet with the addresses

16 and times, approximate times where they are going, where

17 they are going to be, locations for the safe houses,

18 there's always an alternate.

19          Q.    Uh-huh.

20          A.    And for medical emergencies.  And the routes

21 that they would want to take should those events occur.

22 They also have the -- I forget what they call it -- but

23 it's a listing and pictures of the designated pins that

   would be worn that day for security.  If you don't have

25 this pin you don't belong.  Do you understand?

Page 13

1    an intersection to make sure it's clear, that type of

2    thing.  Not doing it too early so you don't hold traffic

3    up too long.  That's basically it.

4         Q.   Was there any discussion of demonstrators or

5    protestors or people who might be lining the sides of the

6    streets during the escort?

7         A.   I don't think there was -- I don't recall

8    there being any specific things mentioned.  But if I do

9    recall right, it was like their general what they

10   normally put out.  Whether it's supporters,

11   demonstrators, whatever, people will not be allowed to

     get any closer than "X."  That's primarily for onsite.

13        Q.   Uh-huh.

-4        A.   However, we have to be able to ensure that

15   people that are shutting down traffic understand that

16   thought process also.  I don't recall being anything

17   specific in the meetings for that.

18        Q.   And was it this -- were there Secret Service

19   in this escort breakout group?

20        A.   Yes.

21        Q.   And was it -- was it the Secret Service who

22   was saying, "Okay, you know, this is going to be our

23   route and we want to, you know, handle where people are

     standing along the route in this way"?

-5        A.   No, they didn't say where they want to have

PAUL BACA PROFESSIONAL COURT REPORTERS

Page 36

1    quickness.  They have a lot of motors.

2              We have just become involved in that issue

3    or that part of the events because we have started to get

4    motorcycles.  We have always been involved to a limited

5    degree because of the cars and what they can do.  Yeah,

6    they are in charge.

7              What I was coming to in my own mind, they

8    worked real hard at working with us because it was within

9    our jurisdiction, outside their jurisdiction, and we were

10   going through theirs theoretically although it's still

11   within ours because it's within the county, but to a site

    that's exclusively ours not theirs.  And so we had a lot

13   of involvement in that type of thing.

4         Q.    And BCSO -- you said BCSO was in charge of

15   the site.

16        A.    Yes, ma'am.

17        Q.    Was Secret Service also in charge?

18        A.    I see what you're getting at.  Overall

19   Secret Service is in charge of the whole thing.  Within

20   particular elements of the event, an agency, broken down

21   further, a commander or someone is in charge of ensuring

22   whatever that element of the event is carried out

23   correctly.

              BCSO onsite Lieutenant Thomas was in charge

25   of maintaining the security within guidelines and

EXHIBIT 9

TRANSCRIPT OF DEPOSITION OF
JUSTIN DUNLAP

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


JEANNE PAHLS, ET AL.,
          Plaintiffs,

VS.                              NO. 1:08-cv-53 (LH)(ACT)

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF BERNALILLO, ET AL.,
          Defendants.



****************************************
          DEPOSITION OF JUSTIN DUNLAP
                 June 4, 2008
                  3:05 p.m.
                1410 Coal SW
          Albuquerque, New Mexico 87104
****************************************



          PURSUANT TO THE FEDERAL RULES OF CIVIL

PROCEDURE, this deposition was:




TAKEN BY:   Ms. Alexa Kolbi-Molinas
            ATTORNEY FOR PLAINTIFF ACLU


REPORTED BY:Jeannine K. Sims, RPR, NM CCR #12
            Paul Baca Court Reporters
            500 Fourth Street, NW, Suite 105
            Albuquerque, New Mexico  87102

1    Q.    Where are you currently employed?

2    A.    With the Bernalillo County Sheriff's

3  Department.

4    Q.    And what is your position there?

5    A.    I am a sergeant in the Field Services

6  Division.

7    Q.    And what is your primary job -- what are

8  your primary job responsibilities?

9    A.    My primary job responsibilities are to

10 basically make sure that the deputies on my squad get

11 what they need to do their job and things run smoothly.

12   Q.    And what is it that they would need to do

13 their jobs smoothly?

14   A.    I'm just basically there to oversee them.

15 They know what their job is.  If they have any questions

16 or need anything as far as assistance from another agency

17 or decisions made that are above their head then they

18 come through me.

19   Q.    And what exactly are the jobs of the people

20 under you?

21   A.    To serve and protect the community, answer

22 calls for service, to enforce traffic laws, things of

23 that nature.

24   Q.    I'm asking because the other people who we

25 have spoken to have had certain divisions --

Page 13

1    attached to the original Op order, which I don't have

2    that.   That gets turned in.   That map should be attached

3    to it though.   Basically it's -- it would look like a

4    aerial view of that residence and the neighboring --

5    anywhere we were at it would look like an aerial view of

6    that basically.

7            Q.    Would there be markings on it as to where --

8            A.    Yeah, there would be markings to where the

9    CAT teams were positioned and where the Counter

10   Assault -- Counter Sniper Teams were as well.

11           Q.    Okay.   And at either meeting on Friday or

12   the site visit on Sunday, did the topic of demonstrators

13   come up?

14           A.    Yes, it did.   And when I was reading through

15   this, I noted one of the categories on this is

16   intelligence, what do we know about what's going to

17   happen before that day actually started.   And when

18   talking to the agents I wrote down that it is unknown at

19   this time if protests are planned in the area of the

20   event.   So prior to that day we didn't have any solid

21   knowledge that anything was happening.

22           Q.    And did you have any knowledge that there

23   would be supporters of Bush at the event around the event

24   site?

             A.    In the event site, yes.   Around the event

Page 14

site, I didn't -- I mean, usually in the past when we

2   have done these kind of things there's people that show

3   up.  But I believe it was invitation only at a private

4   residence, so --

5          Q.   Okay.

6          A.   -- unless they had an invitation they

7   weren't going to get in.

8          Q.   I just want to walk through what you did on

9   August 27th, 2007.  So can you just start at the

10  beginning of your work day and tell me what happened.

11         A.   On that day we would have had a briefing.  I

12  believe we had a briefing at our North Area Command,

    which is on 4th Street.  And after that we -- after the

    briefing and everyone was told what they were supposed to

15  do we then moved to the house on Rio Grande.

16              We were positioned in two SUVs at the

17  residence that was just to the south.  We basically were

18  -- had our gear on and we stood around until the event

19  was over and then we went home.

20         Q.   And there was -- did you have any

21  interaction with any other of the agencies that were

22  there on the site that day?

23         A.   Other than, you know, briefly talking with a

24  couple Secret Service guys when we first got there and

    they were going around making sure that we were where we

Page 17

1  any discussions --

2          A.    No.

3          Q.    -- about --

4          A.    We were there much earlier than the event

5  started at our posts.  And by the time those people came,

6  we were already where we were at.  And by the time those

7  people were gone we were still there and then we left

8  after.

9          Q.    And do you know if BCSO or any of the other

10 agencies were videotaping the site in any way?

11         A.    That, I don't know.

12         Q.    Any others, audio or photographs of the --

           A.    No.  I don't believe so, that I know of.  If

   I would have had photographs then I probably wouldn't

15 have had to physically go to the address; I could have

16 done the map off the photographs.  But that I recall, I

17 don't remember seeing any photographs.

18         Q.    And what agency was in charge of securing

19 the event site?

20         A.    Secret Service.

21         Q.    And so Secret Service was giving orders to

22 BCSO?

23         A.    Correct.

24         Q.    So they were making all the final --

           A.    Right.  We were just there to supplement

08551df5-15b7-4c30-9540-460c2f3bf2ff

Page 18

their detail.

Q.    Okay.  Are you aware -- I know you didn't
see them, but are you aware that the anti-Bush
demonstrators were required to move far away from where
the motorcade was entering the site?

MR. GARCIA:  Object to the form.  Go ahead.

A.    I don't -- I don't recall any specifics
about anybody being -- having to be moved.  The only
thing I heard afterwards was from a couple ERT people
saying that the demonstrators weren't happy about where
they were staged or where they were allowed to protest.
But I didn't actually see where that took place.

Q.    (BY MS. KOLBI-MOLINAS)  And what was -- sort
of anticipated my question.  Did you have any discussions
with any of the other BCSO or other agency officers that
were on the ground after the event about the
demonstrators?

A.    Not in particular, not other than what I
just told you.  And I don't recall who I spoke with
exactly.  That was just kind of the word, you know, as
far as what had happened, what was going on outside the
things that we couldn't see from where our CAT team was
positioned.

Q.    And did any of those discussions talk about
the people who were there supporting Bush?

PAUL BACA PROFESSIONAL COURT REPORTERS

# EXHIBIT 10

## Deposition Transcript of
## Michael Heath

DEPOSITION OF MICHAEL HEATH
CONDUCTED ON FRIDAY, APRIL 27, 2007

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

- - - - - - - - - - - - - +

JEFFREY RANK and NICOLE RANK,|

      Plaintiffs,    |

v.                 | Civil Action No.

TOM HAMM, et al.,    | 2:04-0997

      Defendants.    |

- - - - - - - - - - - - - +

Deposition of MICHAEL HEATH

Washington, D.C.

April 27, 2007

9:30 a.m.

Job No. 1-101770

Pages 1 - 131

Reported by: Cathy Jardim

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

ad44a040-9575-495b-be10-bb0bb4b78a69

DEPOSITION OF MICHAEL HEATH
CONDUCTED ON FRIDAY, APRIL 27, 2007

Page 7

1              P R O C E E D I N G S

2                  MICHAEL HEATH

3       having been duly sworn, testified as follows:

4          EXAMINATION BY COUNSEL FOR PLAINTIFF

5    BY MR. HANSEN:

6          Q    Good morning.  As I said, my name is Chris

7    Hansen.  I am one of the lawyers representing the

8    plaintiffs, and I am one of the people who is going to

9    ask you questions this morning.  If I ask a question

10   that is unclear, feel free to say so and I will try to

11   ask it in a clearer way, if I can.  If at any point

12   you would like to take a break, just say so.  It is

13   not a big deal.  Okay?

14         A    Okay.

15         Q    Where are you currently employed?

16         A    Department of the Treasury.

17         Q    And what is your position there?

18         A    I am the director of operations.

19         Q    How long have you held that position?

20         A    Just under nine months.

21         Q    Where were you employed prior to that?

22         A    The Federal Emergency Management Agency.

ad44a040-9575-495b-be10-bb0bb4b78a69

DEPOSITION OF MICHAEL HEATH
CONDUCTED ON FRIDAY, APRIL 27, 2007

Page 8

1      Q    What was your position at FEMA?

2      A    Special assistant to the director.

3      Q    For how long did you hold that position?

4      A    18 months.

5      Q    And where were you employed prior to that?

6      A    The White House.

7      Q    In what position?

8      A    Advance representative.

9      Q    What is an advance representative?

10     A    It is a person responsible for the

11     logistical coordination of presidential travel and

12     events.

13     Q    Does that include travel by other senior

14     administration officials like the vice president or

15     cabinet officers or people like that?

16     A    It depends.

17     Q    Sometimes yes, sometimes no?

18     A    Can you clarify a little bit?

19     Q    What do you mean by "it depends"?

20     A    I mean there are advance people for

21     different offices.  For example, the vice president

22     would have an advance office.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

ad44a040-9575-495b-be10-bb0bb4b78a69