## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re Subpoenas in | ) | |
| JEANNE PAHLS, *et al.*, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOARD OF COUNTY COMMISSIONERS | ) | No. 08-mc-0362 (RJL) |
| FOR COUNTY OF BERNALILLO, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |
| and EXECUTIVE OFFICE OF THE | ) | |
| PRESIDENT OF THE UNITED STATES | ) | |
| | ) | |
| Petitioner | ) | |

## THE EXECUTIVE OFFICE OF THE PRESIDENT
## OF THE UNITED STATES' STATUS REPORT

Pursuant to the Court's Minute Order of August 11, 2008, the Executive Office of the

President provides this Status Report.  On August 4, 2008, pursuant to Plaintiffs' *Touhy* demand

and in accordance with the applicable regulations, the United States Secret Service produced for

deposition, Agent Kerry Sheehan, who was the agent in charge of security at the site of the

President's August 27, 2007 New Mexico visit.  Consistent with the earlier testimony of local

law enforcement agents, Agent Sheehan testified that the White House Office of Presidential

Advance had no role in the placement of checkpoints or demonstrators:

```
17    Q.   Did the White House Office of Advance have
18   any input into the placement of checkpoints, the outer
19   perimeter or the placement of demonstrators or the
20   general public?
21    A.   No.
```

Deposition of Kerry Sheehan, at 129 (all cited portions attached).  With regard to the respective

roles played by the White House Office of Presidential Advance and the Secret Service, Agent

Sheehan testifed:

```
 1     Q.   Are you familiar with the White House
 2   Advance Office?
 3     A.   Yes.
 4     Q.   What is the White House Advance Office?
 5     A.   You're asking me?
 6     Q.   I am.
 7     A.   They're members of the Presidential staff
 8   who conduct advances.
 9     Q.   What does conducting an advance mean within
10   that context?
11         I guess what I'm trying to understand is
12   what is the difference between what you do when you do
13   advance and what they do when they do advance.
14     A.   The Secret Service side of the advance is
15   strictly security-related, and my understanding of
16   what the staff advance involves would be, you know,
17   making sure that the particular venue looks right,
18   protocol issues, press issues, things of that nature.
19     Q.   And in what ways do the Secret Service and
20   the Presidential Advance Office interact when the
21   President travels someplace?
22     A.   Mostly it's regarding the President's
 1   schedule and kind of the staff's vision for how they
 2   want a particular site to flow.  So once we have the
 3   schedule, the President's schedule, what movements he
 4   is going to make within a particular site, then we
 5   come back and develop a security plan for that.
 6     Q.   Do you ever discuss demonstrators with the
 7   White House Advance Office?
 8     A.   They like to be informed if there are,
 9   obviously, people congregating.  But other than that,
10   not really.
```

*Id.* at 42-43.  Specific to the events in and around Albequerque, Agent Sheehan testified that the

Office of Presidential Advance had no role in the security planning meeting between the Secret

Service and local law enforcement agents:

> 7   Q.   And who ran that meeting in Albuquerque?
> 8   A.   That would be the lead Secret Service
> 9  advance agents meeting, Mr. Konopcek.
> 10   Q.   So Mr. Konopcek ran that meeting?
> 11   A.   Uh-huh.
> 12   Q.   Was anyone from the Office of Presidential
> 13  Advance present?
> 14   A.   No.  It's a strictly police security
> 15  meeting.
> . . . .
> 5   Q.   What about other federal officers or
> 6  agents, were any of those there?
> 7   A.   I don't think there were any other federal
> 8  agencies there.
> 9   Q.   Is it possible that someone from
> 10  Presidential Advance was there?
> 11   A.   No.
> 12   Q.   It's just not a meeting they attend?
> 13   A.   Right.

*Id.* at 50-51.  Similarly, the Office of Presidential Advance did not participate in the security

meetings at the site itself:

> 18   Q.   During the first meeting, was anyone from
> 19  the Office of Presidential Advance present?
> 20   A.   The meeting with the mayor?
> 21   Q.   Yes.
> 22   A.   No.
> 1   Q.   The second meeting you had is when you and
> 2  SA Kitsos and the police counterparts looked at a site
> 3  together, yes?
> 4   A.   Yes.
> 5   Q.   Was anyone from the Office of Presidential
> 6  Advance present at that meeting?
> 7   A.   No.

*Id.* at 68-69.  And finally, the Office of Presidential Advance had no role in the placement of

demonstrators:

> 3    Q.   Did George or anyone else with the White
> 4    House Advance Office give you any instructions
> 5    regarding what to do with political protesters?
> 6    A.   No.

*Id.* at 97; *see also id.* at 129 (quoted *supra* at 1).

In addition to confirming that the Office of Presidential Advance had no role in the events

underlying Plaintiffs' Complaint, Agent Sheehan specifically identified those entities who did

play such a role.  Specifically, Agent Sheehan testified that he, in consultation with local law

enforcement officers, decided on the location of the checkpoint on Rio Grande Boulevard south

of the site entrance[1] – the checkpoint by which Plaintiffs allege they were demonstrating – and

---

[1] It should be noted that the checkpoint was set up to control a potential high speed
avenue of approach to the site for security purposes and not to serve as part of a designated
protest zone:

> 8    Q.   Okay.  What factors did you consider in
> 9    picking that location?
> 10    A.   It was a high-speed avenue approach.  It
> 11    would not interfere with traffic on Rio Grande.  And
> 12    it was a large enough area for a police vehicle and
> 13    some other entities to set up there.

*Id.* at 81.  *See also id.* at 69-70:

> 14    Q.   At what point, if any, did you make
> 15    decisions regarding where political protesters could
> 16    stand?
> 17    A.   I don't make decisions where general public
> 18    can stand unless – and this is a part of my normal
> 19    briefing that I give to my local police counterparts
> 20    as well as our local Secret Service agent, is that if
> 21    the general public is somewhere that they legally can
> 22    be, there's no local ordinances against it, they're
> 1    legally allowed to be there as long as they don't
> 2    impede our motorcade or make any overt action that

that local law enforcement officers were responsible for manning the checkpoint:

   3    Q.   We were talking earlier about the fact that
   4  there was some sort of checkpoint south of the mayor's
   5  property on Rio Grande to the south of which
   6  demonstrators had gathered.  Do you remember this?
   7    A.   Yes, I remember the demonstrators there, or
   8  the general public.
   9    Q.   Was that checkpoint something you
10  established or that the Secret Service established?
11    A.   Yes.  In coordination with the local police
12  department.
13    Q.   And can you describe for me one more time
14  where that checkpoint was located?
15    A.   It was Rio Grande Boulevard.  Like I said,
16  there were three access roads to the west.  So they
17  would be just off of Rio Grande Boulevard on the
18  access road.
19    Q.   And I believe you said earlier that point
20  was about 100 yards to the south of the mayor's
21  driveway; is that accurate?
22    A.   Approximately, yes.
   1    Q.   Would demonstrators have been allowed to
   2  walk beyond that checkpoint going north along Rio
   3  Grande?
   4    A.   The southern checkpoint?
   5    Q.  Yes.
   6    A.   Well, there again, that's a situation where
   7  I would defer to the local police department.  From a
   8  security standpoint, Secret Service, again, if they're
   9  not interfering with the motorcade route, they're not
10   making any overt actions, they're somewhere that
11  they're legally allowed to be, then, yes, they would
12  be allowed to walk there.

---

   3  would threaten the President, then they're allowed to
   4  be there.

*Id.* at 108-10.[2]  Finally, Agent Sheehan testified as to the location of what Plaintiffs' refer to as

the "pro-Bush supporters":

> 17     A.   I was at the main checkpoint, which is the
> 18   lane that enters the mayor's property.  And I can't
> 19   remember exactly why I was out there, but I was
> 20   approached by an elderly gentleman who claimed to own
> 21   the property across the street, and he asked me if it
> 22   was okay if he stood in his property while the
> 1   President's motorcade drove by.
> 2         I said, "Well, that's your property.
> 3   Obviously, it's your private property.  We're not
> 4   going to interfere with your rights on your property
> 5   as long as you don't interfere with the motorcade
> 6   route or make any overt actions while the Presidential
> 7   motorcade is passing by."
> . . . .
> 14     Q.   And what is your understanding of where
> 15   these pro-Bush supporters were standing?
> 16     A.   On their private property, approximately I
> 17   guess 30 to 40 yards off the road.
> 18     Q.   And were they outside the outer perimeter?
> 19     A.   Yes.
> 20     Q.   Is it fair to say that you were the person
> 21   who decided that it was okay for them to stand there?
> 22     A.   Sure.
> . . . .
> 3     Q.   Did the pro-Bush supporters standing just
> 4   across from the mayor's driveway where the President's
> 5   motorcade route was going pose any security threat?

---

[2] *See also id.* at 107-08:

> 16     Q.   In this particular case, were individuals
> 17   allowed to walk up and down the shoulder of Rio Grande
> 18   during this event?
> 19     A.   That I'm not sure.  With those situations,
> 20   I really rely strongly on the local police department.
> 21   There again, if they say, "Hey, they're not allowed to
> 22   be there, it's private property," or whatever the
> 1   local municipal code is for that, then I defer to them
> 2   on that.

6

6    A.    No.
7    Q.    Why not?
8    A.    Because they were far enough away from the
9    road where they couldn't throw anything on the
10   vehicles.  They didn't have any weapons visible.
11       Q.    How far from the road were they?
12       A.    I think it was 30 to 40 yards, 25, 30
13   yards, somewhere in there.
14       Q.    If they had presented a threat, would you
15   have moved them?
16       A.    Yes.
17       Q.    Would you have been able to do that even
18   though they were on private property?
19       A.    Yes.
20       Q.    Even though they were outside the
21   perimeter?
22       A.    Yes.

*Id.* at 99-101, 103.  The testimony of Agent Sheehan thus makes it clear that the White House

Office of Presidential Advance played no role in the events underlying this litigation, and it

makes clear what entities did.  Plaintiffs thus have no basis for continuing to seek testimony and

documents from the White House.  The Executive Office of the President thus retains its position

that Plaintiffs' subpoena to the White House should be quashed.

August 18, 2008                             Respectfully submitted,

                                            GREGORY G. KATSAS
                                            Assistant Attorney General

                                            JOHN O'QUINN
                                            Deputy Assistant Attorney General

                                            JEFFREY A. TAYLOR
                                            United States Attorney

                                            ARTHUR R. GOLDBERG (D.C. Bar #180661)
                                            Assistant Branch Director

                                            */s/ Jeffrey M. Smith*_____
                                            JEFFREY M. SMITH (D.C. Bar # 467936)
                                            Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Ave., NW,
                                            Washington, D.C. 20530
                                            Tel: (202) 514-5751
                                            Fax: (202) 616-8202

                                            *Counsel for the Executive Office of the President*

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____ )

JEANNE PAHLS, et al.,             )     Civil Action
                                  )
        Plaintiffs,               )     08-CV-53 (LH)(ACT)
                                  )
vs.                               )
                                  )
BOARD OF COUNTY COMMISSIONERS     )
FOR THE COUNTY OF BERNALILLO,     )
et al.,                           )
                                  )
        Defendants.               )
_____ )

DEPOSITION OF

KERRY SHEEHAN

Washington, D.C.

Monday, August 4, 2008

12:05 p.m.

Job No.: 1-134948
Pages 1 through 134
Reported by:  John L. Harmonson, RPR

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 2

1                          Deposition of

2                          KERRY SHEEHAN

3

4

5    Held at the offices of:

6              U.S. DEPARTMENT OF JUSTICE

7              CIVIL DIVISION

8              20 Massachusetts Avenue, Northwest

9              Washington, D.C.   20530

10

11

12

13        Taken pursuant to the Federal Rules of Civil

14   Procedure, before John L. Harmonson, Registered

15   Professional Reporter, Notary Public in and for the

16   District of Columbia, who officiated in administering

17   the oath to the witness.

18

19

20

21

22

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 3

1                              APPEARANCES

2

3     ON BEHALF OF PLAINTIFFS:

4              CATHERINE CRUMP, ESQUIRE

5              CHRIS HANSEN, ESQUIRE

6              American Civil Liberties Union Foundation

7              125 Broad Street, 18th Floor

8              New York, New York   10004-2400
               (212) 549-2500
9

               ARTHUR B. SPITZER, ESQUIRE
10             American Civil Liberties Union of the
                National Capital Area
11             1400 20th Street, Northwest, Suite 119
               Washington, D.C.   20036
12             (202) 457-0800

13

14

15

       ON BEHALF OF DEFENDANTS BOARD OF COUNTY COMMISSIONERS
16     FOR THE COUNTY OF BERNALILLO and BERNALILLO COUNTY
       SHERIFF'S DEPARTMENT:
17     (Participating via telephone)

18             ERNESTINA R. CRUZ, ESQUIRE
               Narvaez Law Firm, PA
19             601 Rio Grande, Northwest
               PO Box 25967
20             Albuquerque, New Mexico   87125-0967
               (505) 248-0500
21

22

99ad0e7b-65b6-41b5-a864-e5285089ab82

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 4

1                  APPEARANCES (Cont.'d)

2

3   ON BEHALF OF DEFENDANTS ALBUQUERQUE POLICE DEPARTMENT

4   and CITY OF ALBUQUERQUE:

5   (Participating via telephone)

6           DAVID NAVA, ESQUIRE

7           City Attorney's Office

8           One Civic Plaza, Northwest
            City/County Building
9           4th Floor, Room 4015
            Albuquerque, New Mexico  87102
10          (505) 768-4500

11

12  ON BEHALF OF THE UNITED STATES AND THE WITNESS:

13          JEFFREY M. SMITH, ESQUIRE
            U.S. Department of Justice
14          Civil Division
            20 Massachusetts Avenue, Northwest
15          Washington, D.C.  20530
            (202) 514-5751

16

            TAMARA WEBER, ESQUIRE
17          U.S. Department of Homeland Security
            U.S. Secret Service
18          Office of the Chief Counsel
            950 H Street, Northwest, Suite 8300
19          Washington, D.C.  20223
            (202) 406-5771

20

21  ALSO PRESENT:

22          JOSHUA GOODBAUM, Intern

99ad0e7b-65b6-41b5-a864-e5285089ab82

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 5

1                        EXAMINATION INDEX

2                                                      PAGE

3     EXAMINATION BY MS. CRUMP                          6

4     EXAMINATION BY MS. CRUZ                         124

5     EXAMINATION BY MS. CRUMP                        128

6     EXAMINATION BY MR. SMITH                        128

7                        *    *    *    *    *

8

9                        EXHIBIT INDEX

10          (Exhibits attached to transcript.)

11    EXHIBIT              DESCRIPTION              PAGE

12    18     Portion of Investigative Manual titled   16

13           "Groups/Demonstrations"

14    19     Presidential Advance Manual              43

15    20     PRISM Demonstrations Abstract           120

16

17

18

19

20

21

22

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 6

1              P R O C E E D I N G S

2

3              KERRY SHEEHAN,

4    after having been first duly sworn, was examined

5    and did testify under oath as follows:

6                   EXAMINATION

7    BY MS. CRUMP:

8         Q.    Will you please state your name.

9         A.    Kerry Sheehan.

10        Q.    And have you ever been deposed before?

11        A.    Yes.

12        Q.    How many times?

13        A.    One time.

14        Q.    And what were the circumstances?

15        A.    That was for an internal investigation on

16   an employee.  I was a computer forensics agent before

17   I went to the President's detail.  I did the computer

18   exam.

19        Q.    All right.  Well, since you're a veteran, I

20   won't go into the deposition background questions in

21   too much detail, but I will ask you to please try to

22   answer all the questions verbally instead of nodding

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 41

1    Division is responsible for protecting the facility.

2    So in this example the Uniform Division advance would

3    be in charge of magnetometer, metal detector assets,

4    and conducting that advance.

5        Q.    Did anyone else travel with you?

6        A.    I don't think.  That's pretty much the core

7    group right there.  And there was the airport site

8    agent advance.

9            I think that's almost everybody.  I'm just

10   going through it in my head here.  Yeah, I think

11   that's pretty close.

12       Q.    Is there a motorcade site agent?

13       A.    Yes.  That would be the TS advance.  TS is

14   transportation section, and motorcade advance are one

15   and the same.

16       Q.    Is this a typical collection of

17   individuals?

18       A.    Yes.

19       Q.    Now, prior to the point that you arrived in

20   Albuquerque, did you have any contact with anyone from

21   the White House advance office?

22       A.    No.

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 42

1      Q.    Are you familiar with the White House
2  Advance Office?

3      A.    Yes.

4      Q.    What is the White House Advance Office?

5      A.    You're asking me?

6      Q.    I am.

7      A.    They're members of the Presidential staff
8  who conduct advances.

9      Q.    What does conducting an advance mean within
10  that context?

11          I guess what I'm trying to understand is
12  what is the difference between what you do when you do
13  advance and what they do when they do advance.

14      A.    The Secret Service side of the advance is
15  strictly security-related, and my understanding of
16  what the staff advance involves would be, you know,
17  making sure that the particular venue looks right,
18  protocol issues, press issues, things of that nature.

19      Q.    And in what ways do the Secret Service and
20  the Presidential Advance Office interact when the
21  President travels someplace?

22      A.    Mostly it's regarding the President's

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 43

1  schedule and kind of the staff's vision for how they

2  want a particular site to flow.  So once we have the

3  schedule, the President's schedule, what movements he

4  is going to make within a particular site, then we

5  come back and develop a security plan for that.

6      Q.    Do you ever discuss demonstrators with the

7  White House Advance Office?

8      A.    They like to be informed if there are,

9  obviously, people congregating.  But other than that,

10 not really.

11     Q.    So if people are congregating, does the

12 Secret Service tell the White House about that, the

13 White House Advance Office about that?

14     A.    It depends.  I mean, sometimes.  You know,

15 if it would impact -- say like we would have to go to

16 an alternate motorcade route or things of that nature,

17 then yes, definitely I would let them know.

18     Q.    I'd like to have you take a look at another

19 document.

20         MS. CRUMP:  Would you mind marking this as

21 an exhibit for us.

22         (Exhibit 19 marked for identification and

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 49

1          A.     It's basically just if -- I'm trying to

2     think of an easy way to explain it.   When the

3     President's detail travels -- for example, me, if I'm

4     assigned a site, if the local field office has the

5     manpower available, they will assign me a local Secret

6     Service field agent to assist me with my advance.   And

7     we do that for every -- or try to request it for every

8     different part of the Presidential security advance.

9          Q.     So what you're saying is ideally you as a

10     site agent would have a double, if you will, in the

11     local field office?

12          A.     Yes.

13          Q.     And the same would be true for the

14     transportation guy?

15          A.     Correct.

16          Q.     By the way, did you tell me that

17     individual's name?

18          A.     I can't remember who that was.

19          Q.     Okay.   And then the first thing you do when

20     you arrive is you have this law enforcement meeting;

21     is that correct?

22          A.     Yes.

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 50

1      Q.    And what goes on at that meeting?

2      A.    Normally it's just a broad overview of the

3  itinerary that we have at that point, the President's

4  schedule, the planned stops.  And then we ask the

5  different police entities to provide counterparts for

6  the Secret Service.

7      Q.    And who ran that meeting in Albuquerque?

8      A.    That would be the lead Secret Service

9  advance agents meeting, Mr. Konopcek.

10     Q.    So Mr. Konopcek ran that meeting?

11     A.    Uh-huh.

12     Q.    Was anyone from the Office of Presidential

13  Advance present?

14     A.    No.  It's a strictly police security

15  meeting.

16     Q.    What law enforcement agents were present at

17  that meeting?

18     A.    Boy.  I believe there was the -- and I'm

19  probably going to butcher it -- the Bernalillo --

20     Q.    Bernalillo?

21     A.    The Bernalillo Sheriff's Department and the

22  Albuquerque Police Department.

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 51

1    Q.    Anyone else that you can think of?

2    A.    I think there might have been a couple of

3  representatives from the state police or the state

4  patrol.

5    Q.    What about other federal officers or

6  agents, were any of those there?

7    A.    I don't think there were any other federal

8  agencies there.

9    Q.    Is it possible that someone from

10 Presidential Advance was there?

11   A.    No.

12   Q.    It's just not a meeting they attend?

13   A.    Right.

14   Q.    So the first thing that happens at the

15 meeting is you provide an overview of the President's

16 visit; is that accurate?

17   A.    Yes.

18   Q.    And then you break down into groups

19 according to function; is that accurate?

20   A.    Yes.

21   Q.    And you were involved in the site security

22 meeting; is that correct?

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 52

1      A.      I'm sorry, repeat that.

2      Q.      Which, if any, of these groups were you

3  involved in?

4      A.      The group of individuals that would be

5  working on the mayor Rio Rancho's site.

6      Q.      Were you in charge of that group?

7      A.      Yes.  From the Secret Service side, yes.

8      Q.      From the Secret Service side, but not in

9  charge of the overall groups?

10      A.      Well, I have no real jurisdiction over the

11  local police officer.  We try not to get down to "I'm

12  in charge, you're in charge."  We try to work as a

13  team.

14      Q.      Do they defer to you?

15      A.      Sometimes.  Sometimes they don't.

16      Q.      If you have disagreement with one of the

17  local officers about how something should be done, how

18  is that disagreement resolved?

19      A.      Well, normally it goes -- in my personal

20  policy, the way that I work is I don't get in

21  arguments with police officers.  If we have a

22  disagreement, I just let them know, "Hey, our bosses

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 68

1      Q.    Was Rio Grande Road inside or outside the

2   site perimeter?

3      A.    Outside.

4      Q.    All right.  At this first meeting that you

5   had with the mayor and his spouse and that Greg Kitsos

6   attended, is that where you made initial decisions

7   about where the outer perimeter could be?

8      A.    I don't think it was during the meeting

9   with the mayor.  As I mentioned previously, that was

10  more of a "How you doing, nice to meet you, we'll try

11  to stay out of your house as much as possible" type of

12  thing.

13          I believe it was the next meeting that was

14  either immediately following that or the next day

15  where I actually walked around with SA Kitsos and the

16  police counterparts where we looked at, there again,

17  high-speed avenues of approach.

18     Q.    During the first meeting, was anyone from

19  the Office of Presidential Advance present?

20     A.    The meeting with the mayor?

21     Q.    Yes.

22     A.    No.

99ad0e7b-65b6-41b5-a864-e5285089ab82

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 69

1    Q.    The second meeting you had is when you and

2    SA Kitsos and the police counterparts looked at a site

3    together, yes?

4    A.    Yes.

5    Q.    Was anyone from the Office of Presidential

6    Advance present at that meeting?

7    A.    No.

8    Q.    What did you do during that second meeting?

9    A.    We walked the site.  We walked his acreage

10   and basically just looked around.

11   Q.    Did you make decisions during that meeting

12   regarding where political protesters could stand?

13   A.    No.

14   Q.    At what point, if any, did you make

15   decisions regarding where political protesters could

16   stand?

17   A.    I don't make decisions where general public

18   can stand unless -- and this is a part of my normal

19   briefing that I give to my local police counterparts

20   as well as our local Secret Service agent, is that if

21   the general public is somewhere that they legally can

22   be, there's no local ordinances against it, they're

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 70

1   legally allowed to be there as long as they don't

2   impede our motorcade or make any overt action that

3   would threaten the President, then they're allowed to

4   be there.

5        Q.    So the reason I'm asking you these

6   questions is we know from our clients and our previous

7   depositions that our clients were on Rio Grande about

8   approximately 150 yards south of the event site, and

9   there was some sort of police checkpoint there, and

10  they were not allowed to protest closer to the event

11  site than that checkpoint.

12            Are you familiar with this situation?

13       A.    I did see the general public down there.

14       Q.    Did you play any role in setting up that

15  checkpoint?

16       A.    Which checkpoint are you talking about?

17       Q.    Well, what checkpoints were there?  The one

18  I'm talking about is we understood there were some

19  officers along the road to the south of Rio Grande

20  that were not permitting protesters to move further

21  north along the road.

22            It's our understanding that was the outer

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 80

1    A.    You're talking the southern --

2    Q.    Yes.

3    A.    The access road?

4    Q.    I'm talking Rio Grande -- Let's assume Rio

5    Grande Boulevard runs north and south and to the west

6    there's the mayor's property.  I'm talking about a

7    point south on Rio Grande that's about 150 yards south

8    of the mayor's driveway.

9    A.    I don't think there was an agent posted at

10   that location.

11   Q.    How did that checkpoint get set up?

12   A.    You mean physically how did the officers go

13   out there and set it up?

14   Q.    Who made the decision to establish that

15   checkpoint?

16   A.    I believe in coordination with myself and

17   the local police department, we had identified that

18   area as a high-speed avenue approach that needed to be

19   posted.  And I believe it ended up with a police

20   officer post.

21   Q.    Do you know whether the Albuquerque Police

22   Department or the Bernalillo County officers were the

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 81

1    ones manning that post?

2        A.    I can't remember.

3        Q.    How did you pick that location to set up

4    this post?

5        A.    It was at -- It just made the most sense to

6    me when I looked at it.  I guess that's the easiest

7    way to say it.

8        Q.    Okay.  What factors did you consider in

9    picking that location?

10       A.    It was a high-speed avenue approach.  It

11   would not interfere with traffic on Rio Grande.  And

12   it was a large enough area for a police vehicle and

13   some other entities to set up there.

14       Q.    What do you remember about what that area

15   looks like?

16       A.    I think there was an open field to the

17   west.  I think it was like a horse pasture possibly or

18   something like that.  It was a fairly open area.

19       Q.    And are you the person who made the

20   decision to establish that checkpoint at that

21   location?

22       A.    Yes, in conjunction with the local police

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 82

1    department.

2         Q.    About how far from the mayor's driveway was

3    that checkpoint?

4         A.    Approximately a hundred yards, maybe a

5    little more.  And I guess if we're saying north/south,

6    it would have been south.

7         Q.    I know you chose that area because you said

8    there was a field where it looks like there could be

9    police cars.

10         Did the distance of that location from the

11    mayor's driveway play into it?

12         A.    The distance?

13         Q.    I'm sorry, it's a bad question.  I'll take

14    it back.

15         Did the ability of demonstrators to be

16    within sight and sound of the President factor into

17    your calculation of where to put that checkpoint?

18         A.    No.

19         Q.    Did you anticipate that demonstrators might

20    gather to the south of that checkpoint?

21         A.    It's always a possibility.  We have general

22    public show up at almost all of our sites.

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 96

1      Q.    George from the Advance Office?

2      A.    I don't know his last name.

3      Q.    How old is George?

4      A.    Mid to upper 30s.

5      Q.    What does he look like?

6      A.    About my height.

7      Q.    How tall are you?

8      A.    Five-nine.  Probably 240.  Hispanic.  Dark

9 hair.

10     Q.    Was he a White House employee or was he

11 some sort of volunteer?

12     A.    I'm not sure if he's a full-time staffer or

13 a volunteer.

14     Q.    Was he from Washington, or was he from

15 Albuquerque or somewhere else?

16     A.    He talked about Texas a lot, so I don't

17 know.  He may be from Texas, but I don't know.

18     Q.    And was George the person you told about

19 the presence of demonstrators?

20     A.    Yes.

21     Q.    And what did George say when you mentioned

22 the presence of demonstrators?

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 97

1      A.    Nothing, really.  "Okay, thanks for the

2   update."

3      Q.    Did George or anyone else with the White

4   House Advance Office give you any instructions

5   regarding what to do with political protesters?

6      A.    No.

7      Q.    Do you remember the name of any other White

8   House Advance Office people who were there in addition

9   to George?

10      A.    No, I don't.

11      Q.    Other than advance people from the Advance

12   Office and agents from the Secret Service, were any

13   other federal officials present that day, putting

14   aside the President, of course?  Was the Border Patrol

15   there, for instance?

16      A.    No.

17      Q.    Anyone else?  Any other agents you can

18   think of?

19      A.    Federal?

20      Q.    Yes.

21      A.    I don't believe so.

22      Q.    Was any one law enforcement agency in

99ad0e7b-65b6-41b5-a864-e5285089ab82

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 98

1    charge that day?

2        A.    Well, the Secret Service is overall

3    responsible for the security of the President and the

4    visit.  We work, obviously, hand in hand with the

5    local jurisdictions.

6        Q.    You mentioned that you -- I think you

7    mentioned that you had some interaction with

8    demonstrators.  Is that correct?

9        A.    Very limited.  I had a golf cart that I

10   would get from one part of the site to the other site

11   quickly just to check on things.  I may have driven by

12   and said, "Hey, how you doing?"  But other than that,

13   no.

14       Q.    Are you aware that there was a group of

15   pro-Bush supporters who were holding up signs that

16   day?

17       A.    Yes.

18       Q.    Who were they?

19       A.    They were the property owners adjacent to

20   the mayor's acreage.

21       Q.    How do you know that?

22       A.    They told me.

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 99

1    Q.    Did you speak with them directly?

2    A.    Yes.

3    Q.    What were their names?

4    A.    I can't remember their names.

5    Q.    Would you have that written down somewhere?

6    A.    Probably not.

7    Q.    By 'adjacent,' were they on the other side

8    of Rio Grande or were they on the same side of the

9    street?

10    A.    Well, using the north/south Rio Grande,

11    east.

12    Q.    They were to the east?

13    A.    East.

14    Q.    And you personally spoke with them, yes?

15    A.    Yes.

16    Q.    What did you all discuss?

17    A.    I was at the main checkpoint, which is the

18    lane that enters the mayor's property.  And I can't

19    remember exactly why I was out there, but I was

20    approached by an elderly gentleman who claimed to own

21    the property across the street, and he asked me if it

22    was okay if he stood in his property while the

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 100

1    President's motorcade drove by.

2          I said, "Well, that's your property.

3    Obviously, it's your private property.  We're not

4    going to interfere with your rights on your property

5    as long as you don't interfere with the motorcade

6    route or make any overt actions while the Presidential

7    motorcade is passing by."

8          Q.    About what time did they arrive?

9          A.    The President?

10         Q.    The pro-Bush supporters.

11         A.    It was sometime before arrival.  I'm not

12   sure.  Maybe two hours.

13         Q.    Where were they located?

14         A.    They were to the east -- Are you talking on

15   arrival?  Because I didn't see them on arrival.  My

16   understanding is they were located on that private

17   property to the east of Rio Grande.

18         Q.    Where do you get your understanding?

19         A.    The agent that was at that post.

20         Q.    Who is that?

21         A.    I can't remember.

22         Q.    If you wanted to figure out that agent's

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 101

1    name, how would you do it?

2         A.    The site post log.

3         Q.    Could you describe that agent for me?

4         A.    No.

5         Q.    Was he your age?

6         A.    I really can't remember.  He was younger, I

7    think.

8         Q.    Were you speaking with him over the radio

9    or how --

10        A.    Yeah, we had radio communications.

11        Q.    Have you had conversations with him after

12   this event?

13        A.    No.

14        Q.    And what is your understanding of where

15   these pro-Bush supporters were standing?

16        A.    On their private property, approximately I

17   guess 30 to 40 yards off the road.

18        Q.    And were they outside the outer perimeter?

19        A.    Yes.

20        Q.    Is it fair to say that you were the person

21   who decided that it was okay for them to stand there?

22        A.    Sure.

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 102

1      Q.     If a group of anti-Bush demonstrators had

2    been standing on that private property, would you have

3    permitted them to stand there?

4      A.     I probably would have informed the local

5    police department.  The fact that they're pro or anti

6    has nothing to do with it.  But a large group of

7    people standing next to the motorcade route would

8    obviously be something that I would bring up to my

9    police counterparts.

10     Q.     What if it had been a small group of

11   individuals?

12     A.     I would probably still raise it with them.

13     Q.     And why would you raise it with them

14   instead of just making the decision yourself?

15     A.     Situational awareness for Secret Service as

16   well as other local police entities involved.

17     Q.     And by "situational awareness," what do you

18   mean by that?

19     A.     That we have a group of people next to the

20   motorcade route.

21     Q.     But you didn't consult with local police

22   before deciding that the pro-Bush supporters could be

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 103

1    there, did you?

2        A.    I think I did tell them that, yeah.

3        Q.    Did the pro-Bush supporters standing just

4    across from the mayor's driveway where the President's

5    motorcade route was going pose any security threat?

6        A.    No.

7        Q.    Why not?

8        A.    Because they were far enough away from the

9    road where they couldn't throw anything on the

10   vehicles.  They didn't have any weapons visible.

11       Q.    How far from the road were they?

12       A.    I think it was 30 to 40 yards, 25, 30

13   yards, somewhere in there.

14       Q.    If they had presented a threat, would you

15   have moved them?

16       A.    Yes.

17       Q.    Would you have been able to do that even

18   though they were on private property?

19       A.    Yes.

20       Q.    Even though they were outside the

21   perimeter?

22       A.    Yes.

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 107

1    interfering with the motorcade route or possibly their

2    own safety, public safety.

3        Q.    Would there ever have been a time when, as

4    far as the Secret Service is concerned, private

5    individuals couldn't walk along that shoulder?

6        A.    From a security standpoint?  I mean, if

7    there was a security issue, then, yes.  If they were

8    in the roadway, if there was a possibility that one of

9    the cars in the motorcade could hit them, then

10   obviously, yes, we would.

11           MR. SMITH:  I think she's asking you a

12   specific question, though, not a hypothetical.

13           THE WITNESS:  What's the question again?

14   I'm sorry.

15   BY MS. CRUMP:

16       Q.    In this particular case, were individuals

17   allowed to walk up and down the shoulder of Rio Grande

18   during this event?

19       A.    That I'm not sure.  With those situations,

20   I really rely strongly on the local police department.

21   There again, if they say, "Hey, they're not allowed to

22   be there, it's private property," or whatever the

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 108

1    local municipal code is for that, then I defer to them

2    on that.

3        Q.    We were talking earlier about the fact that

4    there was some sort of checkpoint south of the mayor's

5    property on Rio Grande to the south of which

6    demonstrators had gathered.  Do you remember this?

7        A.    Yes, I remember the demonstrators there, or

8    the general public.

9        Q.    Was that checkpoint something you

10   established or that the Secret Service established?

11       A.    Yes.  In coordination with the local police

12   department.

13       Q.    And can you describe for me one more time

14   where that checkpoint was located?

15       A.    It was Rio Grande Boulevard.  Like I said,

16   there were three access roads to the west.  So they

17   would be just off of Rio Grande Boulevard on the

18   access road.

19       Q.    And I believe you said earlier that point

20   was about 100 yards to the south of the mayor's

21   driveway; is that accurate?

22       A.    Approximately, yes.

Page 109

1    Q.    Would demonstrators have been allowed to

2    walk beyond that checkpoint going north along Rio

3    Grande?

4    A.    The southern checkpoint?

5    Q.    Yes.

6    A.    Well, there again, that's a situation where

7    I would defer to the local police department.  From a

8    security standpoint, Secret Service, again, if they're

9    not interfering with the motorcade route, they're not

10   making any overt actions, they're somewhere that

11   they're legally allowed to be, then, yes, they would

12   be allowed to walk there.

13   Q.    During the President's visit to

14   Albuquerque, did the Secret Service play any role in

15   preventing demonstrators from moving to the north of

16   the checkpoint we've been discussing?

17   A.    Moving to the north of the southern

18   checkpoint?

19   Q.    Yes.

20   A.    No.

21   Q.    Would that have been a decision the local

22   officers would have made?

Page 110

1      A.      Possibly.

2      Q.      You mentioned earlier that in addition to

3  you being in charge of the site, there was another

4  agent who was in charge of the motorcade route.

5      A.      Yes.

6      Q.      I'm having a little difficulty

7  understanding the relationship between the two of you.

8  Would the motorcade agents -- I know I'm not using the

9  right term.

10     A.      That's okay.  I understand.

11     Q.      Would he also have set up a perimeter

12  around the mayor's estate?

13     A.      He would establish a perimeter around the

14  motorcade and the route.  And there is a little bit of

15  overlap, obviously, between sites.  But there is a

16  specific point that's coordinated between myself and

17  the motorcade advance agent as to where his

18  responsibilities end and mine begin.

19     Q.      The checkpoint we've been discussing, that

20  was within your area of responsibility, correct?

21     A.      The southern checkpoint?

22     Q.      Yes.

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

Page 129

1      Q.    Is it fair to say that the decisions that

2  you made regarding setting up checkpoints, setting up

3  the outer perimeter and similar decisions were based

4  on your views of security and public safety?

5      A.    Yes.

6      Q.    Were there any other factors that went into

7  your decisions?

8      A.    No.

9      Q.    Is it fair to say that the person that you

10  named as George had no input in your security

11  decisions?

12      A.    That's correct.

13      Q.    Did the White House Office of Advance have

14  any input into any decisions regarding the placement

15  of checkpoints, the outer perimeter or protesters?

16      A.    I'm sorry, could you say that again?

17      Q.    Did the White House Office of Advance have

18  any input into the placement of checkpoints, the outer

19  perimeter or the placement of demonstrators or the

20  general public?

21      A.    No.

22           MR. SMITH:  That's all I have.