UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re Subpoenas in
JEANNE PAHLS, *et al.*,

                Plaintiffs,

      v.                                                              No. 08-mc-0362 (RJL)

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF BERNALILLO, *et al.*,

                Defendants;

EXECUTIVE OFFICE OF THE
PRESIDENT OF THE UNITED STATES,

                Third-Party Movant.

## PLAINTIFFS' STATUS REPORT

As directed, plaintiffs file this status report subsequent to taking the deposition of a witness provided by the United States Secret Service. As shown below, the testimony given at that deposition strongly supports plaintiffs' need to depose the Office of Presidential Advance.

### Background

The event from which this lawsuit arose was a presidential visit to the home of the mayor of Los Ranchos de Albuquerque in August 2007. The Mayor's home is located on the west side of Rio Grand Boulevard, a two-lane road in a semi-rural area outside of Albuquerque, New Mexico. Rio Grand Boulevard runs north and south.

Plaintiffs, a group of peaceful demonstrators wishing to voice their opposition to the President's policies, were forced to stand on Rio Grand Boulevard behind a police line approximately 150 yards south of the Mayor's driveway, and thus approximately 150

yards south of the President's motorcade, which arrived from the north. By contrast, a group of presidential supporters was permitted to stand directly across from the Mayor's driveway as the motorcade entered. Plaintiffs sued the local law enforcement agencies involved, alleging that this viewpoint-discriminatory treatment violated their First Amendment rights.

Plaintiffs deposed several local law enforcement officers, who testified that it was Secret Service agents who made the decisions about where the two groups were permitted to stand. The officers testified that the police line where plaintiffs and other anti-Bush demonstrators were stopped was staffed by the Albuquerque Police Department, commanded by Lieutenant Les Brown. Brown Tr. (Exhibit A) at 9-10. Lieutenant Brown testified that he was told by an officer from the Bernalillo County Sheriff's Department, which was the lead local law enforcement agency, that the Secret Service had decided that protesters could not move north of that point. *Id*. at 37 ("This is where the lieutenant said Secret Service wanted"). Lieutenant Matthew Thomas of the Bernalillo County Sheriff's Department, who was the Sheriff's Department Commander for the President's visit, Thomas Tr. (Exhibit B) at 4, 13, testified that the Secret Service established the security perimeters for the event site, *id*. at 19, and that demonstrators were not allowed to stand inside the security perimeter, *Id*. at 47.

### Deposition of Secret Service Agent Kerry Sheehan

Plaintiffs deposed Special Agent Kerry Sheehan of the United States Secret Service on August 4, 2008. Special Agent Sheehan was the "site agent" for the August 2007 event, meaning he was in charge of security in and around the site of the presidential event. Sheehan Tr. (Exhibit C) at 36.

Special Agent Sheehan testified that the "outer perimeter" of his security responsibilities began on the west side of Rio Grande Boulevard and extended west to a canal behind the Mayor's home, and north and south to the dirt "access roads" west of Rio Grande Boulevard that bordered the Mayor's property. *Id*. at 66.  He established security checkpoints on each of these access roads, *id*. at 74-75, 108, 111, and a main checkpoint on the lane leading to the Mayor's house.  *Id*. at 74, 99.  However, his security perimeter did not include Rio Grande Boulevard itself.  *Id*. at 66.  He testified that local law enforcement officers were incorrect when they stated that Rio Grande Boulevard was included in the outer security perimeter of the site.  *Id*. at 84.[1]

Special Agent Sheehan testified that, as far as the Secret Service was concerned, demonstrators would have been free to walk north along the east shoulder of Rio Grande Boulevard to a position much closer to the Mayor's driveway.  *Id*. at 83-84, 106-107, 109 ("yes, they would be allowed to walk there"), 120.  If they had been standing on the shoulder just 30 feet south of the pro-Bush demonstrators, they would have posed no threat to the President.  *Id*. at 104.  Thus:

> Q.   During the President's visit to Albuquerque, did the Secret Service
>        play any role in preventing demonstrators from moving to the north
>        of the checkpoint we've been discussing?
>
> A.   Moving to the north of the southern checkpoint?
>
> Q.   Yes.

---

[1]  Special Agent Sheehan testified that Rio Grande Boulevard was the responsibility of the Secret Service's Transportation Section Agent for the Albuquerque event, id. at 66, and that the Transportation Section Agent would have established a security perimeter "around the motorcade," from which the public would have been excluded.  *Id*. at 111-112.  In light of this information, both plaintiffs and defendant Bernalillo County Sheriff's Department have requested testimony from the Transportation Section Agent.

    A.   No.

    Q.   Would that have been a decision the local officers would have made?

    A.   Possibly.

*Id*. at 109-110.  Special Agent Sheehan further testified that he "would defer to the local police department" regarding whether any local laws or property boundaries might restrict the ability of members of the public to walk along the road.  *Id*. at 109; 107-08 ("With those situations, I really rely strongly on the local police department.").

Of particular relevance to the pending motion to quash, Special Agent Sheehan testified that agents from the Office of Presidential Advance were present at the site of the August 2007 event, *id*. at 94, and were informed that there were some demonstrators congregating outside the site.  *Id*. at 95.[2]  He confirmed that agents from the Office of Presidential Advance dress the same way as Secret Service agents:  "We all have suits, earpieces, different lapel pins.  But unless you know specifically which pin belongs to which group, I'm sure it's difficult [to distinguish]."  *Id*. at 115.  Indeed, he agreed that "the Secret Service sometimes gets unfairly blamed for the actions of other people in regard to demonstrators," specifically because "[s]ometimes we may be confused with other entities that possibly would purposely, or not purposely, possibly say they're Secret Service agents."  *Id*. at 128.[3]

---

[2]  Special Agent Sheehan said that people from the Advance Office "normally wouldn't" speak with local police officers, *id*. at 114, but he didn't know whether they did on this occasion.  *Id*.  However, evidence in *Rank v. Hamm*, No. 04-cv-0997 (S.D.W.Va.) shows that people from the Advance Office do, indeed, interact with local police officers, including giving them instructions about how to treat demonstrators.  *See* Deposition of H.P. Epperhart (Exhibit D) at 32, 38-39, 61; Deposition of Gary R. Daniels (Exhibit E) at 23.

[3]  Special Agent Sheehan responded "No" to a question from government counsel about whether the Office of Advance had "any input into the placement of checkpoints, the outer perimeter or the placement of demonstrators or the general public," *id*. at 129,

**Plaintiffs are Entitled to Depose the Office of Presidential Advance**

Special Agent Sheehan's testimony powerfully supports plaintiffs' need to depose the Office of Presidential Advance:

1.  He testified that the Secret Service would have had no objection to demonstrators walking north to a position much closer to the Mayor's driveway, where they could have been seen by the President and others in the motorcade, and that only local police staffed the barrier where the demonstrators were blocked, far to the south.

2.  But local police, who blocked the demonstrators from walking north, have testified that they were simply following instructions from the Secret Service.

3.  And Special Agent Sheehan testified that agents from the Office of Presidential Advance were at the scene, were aware of the demonstrators, were wearing business suits, earpieces and lapel pins like the Secret Service Agents, and that the Secret Service sometimes gets unfairly blamed for the actions of "other entities that possibly would purposely, or not purposely, possibly say they're Secret Service agents."

Plaintiffs have therefore shown a strong possibility that agents from the Office of Presidential Advance may have been instrumental in the unconstitutional act of blocking anti-Bush demonstrators from walking closer to the Mayor's driveway when there was no security justification for that obstruction.

Moreover, given that the individuals from the Office of Presidential Advance who were present at the Albuquerque event were apparently volunteers and not White House staff at all, *see* Motion to Quash at 15 n.7, the movant's arguments based on *Cheney v.*

---

but it is clear from the rest of his testimony that "no" meant only "not to my knowledge" or "not within my security perimeter."

*U.S. District Court*, 542 U.S. 367 (2004), about the need to protect the White House Staff from discovery are largely irrelevant.[4]

Wherefore the motion to quash should be denied.[5]

Respectfully submitted,

/s/ *Arthur B. Spitzer*

_____

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street NW, Suite 119
Washington DC 20036
Tel (202) 457-0804
Fax (202) 452-1868

Attorney for Plaintiffs

August 18, 2008

---

[4]  Plaintiffs hereby withdraw item 6 of their subpoena, seeking testimony and documents regarding complaints about "First Amendment/free speech violations" on other occasions.  This will eliminate the need for the Advance Office to conduct any search of voluminous files or e-mail records.

[5]  Alternatively, the Court may wish to postpone its decision until the testimony of the Secret Service's Transportation Agent at the Albuquerque event has been obtained, *see* n.1, *supra.*

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW MEXICO

2

3    JEANNE PAHLS, et al.,

4                              Plaintiffs,

5     -vs-                     NO:  1:08-CV-53

6

     BOARD OF COUNTY COMMISSIONERS, et al.,

7

                               Defendants.

8

9

10                 DEPOSITION OF LES BROWN

11                     June 3, 2008
                       2:00 p.m.

12                     1410 Coal, S.W.
                       Albuquerque, New Mexico

13

14

         PURSUANT TO THE FEDERAL RULES OF CIVIL

15   PROCEDURE, this deposition was:

16   TAKEN BY:  CATHERINE CRUMP
                ATTORNEY FOR PLAINTIFFS

17

     REPORTED BY:  Jan Gibson, CCR, RPR, CRR

18                 Paul Baca Court Reporters
                   500 Fourth Street, NW - Suite 105

19                 Albuquerque, New Mexico  87102

20

21

22

23

24

25

6c651b0f-6ef1-4ca1-b4e4-465e4123b574

Page 6

1    A.    I think it was in the morning I started.
2    I'm not sure what time I came in, because it was
3    such a -- it was a one-day thing. I ran one of
4    the -- I was the ERT commander, one of the
5    commanders, but it was for such a short time because
6    I got promoted, took over as one of the commanders
7    in, like, January of '07, and then when I moved into
8    there in September, I no longer had the duties, so
9    it was only nine months.
10        During those nine months I had a bunch of
11   different events come up, so I can't really give you
12   super specifics. I don't recall. It wasn't our
13   event, it was BCSO's.
14   Q.    Let me make sure I understand. So from
15   January of '07 -- January of 2007 until September of
16   2007 your position was an ERT commander?
17   A.    That was additional duty. I was in the
18   field, but some field service lieutenants also
19   have -- like that's an additional role that we do.
20   It's like a part-time -- you get called out, you do
21   those additional duties. So for about nine months
22   that's what I did. When I went into metro, you have
23   to be in field services. They want their people in
24   field services, so they said, "You can't do it
25   anymore," and I went on my merry way and had ten

Page 7

1    times more duties than I had before.
2    Q.    What is ERT?
3    A.    Emergency Response Team. Basically we
4    handle primary for like demonstrations. We handle
5    like security for the visits. We will handle
6    call-outs. Say we have like an officer-related
7    shooting or something like that and they need
8    additional manpower. We are more like a rapid
9    response unit, getting manpower out there quickly.
10   We handle stuff like search and rescue, like if
11   somebody is lost in the mountains we will call out a
12   team. Support like the Search and Rescue Squad,
13   additional manpower. We do like -- you name it.
14   Anything where they need additional resources
15   quickly they call us basically.
16   Q.    During that time that you were the ERT
17   commander how frequently did you deal with
18   protesters?
19   A.    I used to do it actually as a sergeant
20   when I was a sergeant probably for -- actually, I
21   take that back. I was the first -- one of the first
22   members of the ERT team which was created back in
23   like 1995 or 1996. I was an officer. Did that
24   until I got promoted to sergeant, and until I went
25   into DWI, so probably about three years I was a

Page 8

1    sergeant. Actually, not that long. Probably two
2    years I was a sergeant in ERT and the duties as a
3    lieutenant. So basically I was there from the
4    inception kind of in different roles.
5    Q.    Why did ERT get created?
6    A.    Basically for those exact reasons. More
7    like a rapid response for any duties. We had a lot
8    of issues with -- at that time, not so much with
9    protester stuff. It was more like -- just like if
10   they needed a lot of -- a number of people quickly,
11   like I said, officer-related shooting or they used
12   to use us for fatal call-outs where you block the
13   freeway. They didn't have enough officers actually
14   working on shift, they would call us out, the
15   additional ones, and we would come out and block and
16   put those into service to take calls.
17   Q.    That's why you had the crazy hours?
18   A.    That's pretty much it, yeah. We worked on
19   call. We rotated on call basically once a month for
20   a week, and anything that came up we would respond
21   to. So then eventually I think probably a year or
22   so into it, or I can't be specific, it's been so
23   long, but we started training basically for protests
24   and things such as that, how to deal with
25   protesters. That was kind of added to our plate and

Page 9

1    we learned how to do that.
2    Q.    That would have been like the mid/late
3    90s?
4    A.    Yeah, probably.
5    Q.    You had formal training dealing with
6    protesters?
7    A.    Yes, we trained with horses, we trained
8    with canine, we trained with the S.W.A.T. team.
9    They had people come in from the riots in L.A., and
10   eventually they taught, "Hey, don't do this. Didn't
11   work out for us very well. Don't do this, do this."
12   So we usually had some type of updated training.
13   Not necessarily related just to protesters or stuff
14   like that but throughout the whole, you know, every
15   year, probably two or three times a year they have
16   some type of in service.
17   Q.    Sounds like you had a great deal of
18   training in dealing with protest?
19   A.    Some, I would say. I shouldn't say as
20   much recently as in the past. I had more.
21   Q.    Are you among the more experienced
22   officers in the department dealing with protesters?
23   A.    Probably, probably.
24   Q.    All right. So let's go back to the day of
25   the event. You were the ERT commander at the event?

Page 10

1    A.    That's correct.
2    Q.    And so where did you go and what did you
3  do first?
4    A.    I will probably take you back just the day
5  before that a little bit.
6    Q.    Yeah, great.
7    A.    So what we did was we were support. We
8  were asked by Bernalillo County Sheriff's Department
9  to help support their visit, because it was out in
10  the county, to act basically as support for them.
11  They wanted us to basically secure any detail, I
12  guess, basically to deal with the protesters. Kind
13  of had a little area assigned to us. "We want you
14  to deal with this area. Any protesters in this area
15  is your responsibility."
16    Q.    What area was that?
17    A.    We were on the south end of Rio Grande.
18  We handled the south end of Rio Grande.
19    Q.    Were you by the protesters?
20    A.    Yeah, we were right by the protesters. I
21  am trying to think of what the attorney's name was.
22  I dealt with him all the time.
23    Q.    Was his name Larry Kronen?
24    A.    Yeah, Larry Kronen. I was basically
25  face-to-face with him through most of the event. I

Page 11

1  have had dealings with Larry since I came back, you
2  know, never had any problems. Pretty much we get
3  along pretty well.
4    Q.    So the structure was the BCSD was in
5  charge of the sites?
6    A.    Right. They are basically in control of
7  the event, I would say, other than probably our --
8  the actual motorcade was probably -- during the
9  motorcade, I would say we were in charge, I would
10  think, and I am not sure because I didn't handle
11  that but usually that's the way it works because we
12  usually have most of the manpower. So we do the
13  motorcade, the route and stuff like that, work with
14  the Secret Service to do the route. My duties --
15  I'm sorry.
16    Q.    No, go ahead.
17    A.    Basically, I met with BCSO day or two
18  before, talked to -- I'm sorry, I don't have names.
19  I didn't have anything written down or we kind of
20  met. My duties were very specific, so I didn't have
21  to like -- I need to contact so-and-so. So I had
22  one contact, the lieutenant who was over in charge
23  of the site security or the -- not the motorcade but
24  the site security part.
25    Q.    Do you not know his name?

Page 12

1    A.    I have no idea what his name was. I don't
2  remember. I can describe him perfectly but I don't
3  know what his name was.
4    Q.    Describe him then.
5    A.    Dark hair, mustache. I think he was also
6  in charge of the criminal division or something like
7  that. He had another role. He wasn't wearing a
8  uniform. He was basically in a suit and tie.
9    Q.    Would you have written his name down
10  anywhere?
11    A.    If I did it would be in a notepad or
12  something from years ago. I don't specifically
13  recall.
14    Q.    Did you exchange E-mails with him?
15    A.    No, I didn't have any E-mail contact with
16  him. I just -- I got E-mail for the first visit
17  basically when they had Secret Service brief
18  everybody what they wanted. I went to that meeting
19  with the commander, and I think Lieutenant Parkins
20  was there. There was a bunch of people like I think
21  some people -- our spot commander was there
22  probably. And so after that, after that initial
23  briefing, I kind of met with -- they said okay, you
24  go over here talk to the Secret Service agent in
25  charge of site security. This guy is in charge of

Page 13

1  air support and this guy is in charge of whatever.
2  So I met with site security.
3          The lieutenant from -- I believe it was
4  the lieutenant from the County at that time was
5  basically talking to him and had set out their
6  little -- whatever they were going to do.
7    Q.    And "him" was the Secret Service?
8    A.    I didn't even know the Secret Service's
9  name. I didn't really have any contact with the guy
10  because once they had their little talk, I walked up
11  and said, "Okay, I am here for ERT." He said,
12  "Okay. You will meet with the lieutenant and he
13  will tell you what your role or duties and
14  responsibilities will be." I said okay.
15          So I met with him probably a short little
16  meeting there. He probably -- I gave him my phone
17  number or vice versa, I don't remember, but we got
18  in touch with each other.
19          I went out actually on my own to see the
20  site where I thought it would be, where they
21  described here is where you will be, getting an idea
22  of what the layout was, and then just met with him,
23  I think, even just once and basically said, you
24  know -- I said, "How much manpower do you need?
25  What kind of support do you need?"

Page 34

1    there.
2       Q.   At that point all of your cars -- how many
3    patrol cars were there?
4       A.   We actually left some at the substation.
5    They kind of doubled up, I think, so we maybe had --
6    of ours we maybe half a dozen.  At least for the
7    initial team maybe a half dozen and when the other
8    ones arrived we probably added another half dozen,
9    so maybe a dozen.  Twelve, 15 cars maybe.
10      Q.   So is the initial team you and your 12
11   people?
12      A.   Yes.
13      Q.   And then who are the additional people who
14   showed up?
15      A.   The other team we called out.  I don't
16   remember if it was Keith or McDonald but his eleven
17   guys.
18      Q.   The relief people?
19      A.   Yeah.  ERT people, correct.
20      Q.   So how long were you there before the
21   protesters showed up?
22      A.   Oh, I was thinking the president.  Sorry.
23   I think they were there maybe an hour before the
24   president was supposed to be there.  Somewhere
25   around there.  They were coming from -- coming from

Page 35

1    different directions, so we got the ones basically
2    coming in and parking along the road.
3         We had to basically tell them to find --
4    most of them found parking and walked up because
5    there's no shoulder there at all to park on.  If I
6    remember correctly, Bernalillo County had already
7    arranged -- they talked to whoever was in charge of
8    the protesters and told them basically, "There's no
9    parking.  You will need to find a place a little
10   farther south to park or north to park because
11   there's no shoulder," so they basically just started
12   walking up.  On bikes, walking up, that kind of
13   thing.
14      Q.   Would you mind describing the area you
15   were located in?
16      A.   It's a rural -- it's in Albuquerque but
17   fairly rural.  It's big properties, you know, quite
18   a few acres per property.  Not any kind of
19   subdivision.  Ranching, horses, stuff like that.
20   Like I said, there's not really a shoulder.  It's
21   like a two-lane road basically.  It goes through
22   real small shoulders and driveways off the shoulder
23   of the road.
24      Q.   Did you look into -- do you know whether
25   the shoulders are public property or private

Page 36

1    property?  Is that something you would have looked
2    into?
3       A.   I didn't.  Out there usually -- because we
4    deal with stuff in the city.  We know
5    sidewalk/street.  It's pretty easy to tell okay, you
6    are in the street or the sidewalk, all right?  It
7    wasn't really my job.  They told us there's really
8    no parking.  It was obvious there was no place to
9    park.  It really didn't matter.  We basically told
10   them unless you have permission, to stay off -- like
11   in the driveways.  They could stand on the shoulder
12   or we eventually gave them the road and everything
13   else so it didn't matter.
14      Q.   So the protesters started trickling in?
15      A.   Uh-huh.
16      Q.   Did you give them instructions about where
17   they could or could not stand?
18      A.   I just told them to stay basically south
19   of the driveway.  We had a position there where they
20   were inside of the mayor's driveway.  I guess it's
21   the mayor of Los Ranchos.  I don't remember if we
22   were told who it was.  We just said, "Stand there."
23   But we were told this position, I think maybe 100
24   feet south probably, 50 to 100 feet south of the
25   dirt road.

Page 37

1       Q.   Who told you to stop the protesters at
2    that point?
3       A.   If I remember right, lieutenant of BCSO is
4    pretty much -- he gave us the general area and said,
5    "We want them south of the driveway, south of the
6    drive," and I think I kind of went back, like I
7    said, 50 feet or so and said, "Okay, here is a good
8    place."  I think it had a little more room that
9    wasn't a driveway.  The driveway was a driveway
10   further south and there was a driveway further
11   north.  It was kind of in between driveways and
12   that's where I placed them.
13      Q.   And that place was chosen because of the
14   relatively ample shoulder space?
15      A.   Just because it was in between driveway
16   spaces so they wouldn't be going into private
17   property.  That wouldn't be an issue and it had a
18   little more of the shoulder where you can stand.
19      Q.   Why weren't protesters allowed to be
20   further north than where you were stationed?
21      A.   I think they had some further north on the
22   other side, if I remember correctly.  This is where
23   the lieutenant said Secret Service wanted, basically
24   to give a protective distance from the president's
25   vehicle.

10 (Pages 34 to 37)

Page 38

1    **Q.  So is it your impression that it was okay**
2 **for protesters to be south and north but that there**
3 **was some zone around the driveway where protesters**
4 **weren't allowed?**
5    A.  Correct. Something to that effect
6 basically. That's pretty much typical on most of
7 the -- it's usually a safety issue, not just for the
8 president but for our motors as well. Because
9 sometimes we get people who throw things and
10 something like that. You throw a thing while a
11 motorcycle is going down and it hits it, yeah, and
12 this is one where a motorcyclist got killed from Rio
13 Rancho so usually if the motorcycles are involved we
14 give them a clear distance without having to worry
15 about running into something.
16    **Q.  Do you know how far north the sort**
17 **no-protest zone extended?**
18    A.  I can't tell you. I honestly can't. I
19 was on the south end. I didn't deal with anything
20 on the north. Bernalillo County had that area, if I
21 remember correctly.
22    **Q.  My impression is that for most of the**
23 **morning there was through traffic allowed on the**
24 **street, right?**
25    A.  Yes.

Page 39

1    **Q.  And I'm not a police officer so I have to**
2 **ask you, if you are stopping people from standing,**
3 **why is it safe to allow cars to continue to drive?**
4    A.  I think once the protesters actually
5 started getting there, within an hour, if I remember
6 correctly, they actually blocked off and rerouted
7 traffic on Rio Grande, if I remember.
8    **Q.  Who is this they?**
9    A.  Bernalillo County. Whoever was doing
10 traffic. I think it was Bernalillo County. Because
11 we couldn't see the traffic post to the south. I
12 mean -- and I didn't have any involvement in setting
13 up the route like where spaces were going to be to
14 be blocked off for traffic. So I just know that at
15 a certain point they stopped having vehicle traffic
16 coming down.
17    **Q.  I think what you told me is the Secret**
18 **Service decided where the safe zone was, and that**
19 **was communicated to BCSO and they told you?**
20    A.  I am assuming. I got it from BCSO.
21    **Q.  Yes. Did BCSO tell that you the Secret**
22 **Service had drawn that particular line?**
23    A.  I don't have any independent recollection
24 of that. I am just -- I don't know whether I
25 assumed that because the lieutenant was with the

Page 40

1 Secret Service guy or whether they said, "Secret
2 Service wants this zone blocked off here." I
3 honestly don't remember specifically.
4    **Q.  You said it would be typical practice for**
5 **the Secret Service to designate that kind of secure**
6 **zone?**
7    A.  Yeah; usually we have an area where they
8 say, "We don't want anybody south of the area for
9 arrival and we don't want anybody north of this
10 area." That's pretty typical.
11    **Q.  And you said that when you were**
12 **congregating on the dirt road, did BCSO or Secret**
13 **Service officials come over to you and indicate --**
14 **how did you know that's where the line was supposed**
15 **to be, that no one was supposed to be north of the**
16 **road?**
17    A.  They were in kind of a little golf cart.
18 They kind of came up, and they were riding back and
19 forth, which I was a little jealous about because
20 they had their little drinks in their little golf
21 cart and they got to ride back and forth. But yeah,
22 they came up and made contact and basically said --
23 a couple things, I think, were probably over the
24 radio, you know, saying if I had a question I
25 usually try to get them on the radio or the cell

Page 41

1 phone.
2    If I remember right, we were out of the --
3 the radios weren't very effective out there, and
4 even cell phone service was a pain. I kept dropping
5 calls. I remember that because they would call me
6 and I would hear three words and the call would
7 drop, so a lot of it was walking up face-to-face
8 type of stuff because we had no communication out
9 there.
10    **Q.  The people in the golf cart, which agency**
11 **were they in?**
12    A.  The Secret Service and the BCSO.
13    **Q.  So they were together in the golf cart?**
14    A.  Yes, at least one of them was together.
15    **Q.  At the event site, did you see anyone from**
16 **the Office of Presidential Advance in the White**
17 **House?**
18    A.  I didn't from where I was.
19    **Q.  Did you see anyone from the border patrol?**
20    A.  No.
21    **Q.  Did you see anyone from any federal agency**
22 **other than the Secret Service?**
23    A.  Not that I remember, no.
24    **Q.  So you set up this barricade. And what**
25 **did the barricade consist of?**

11 (Pages 38 to 41)

6c651b0f-6ef1-4ca1-b4e4-465e4123b574

Page 1

1             IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW MEXICO
2

3   JEANNE PAHLS, et al.,
4                              Plaintiffs,
5     -vs-                     NO:  1:08-cv-53
6

    BOARD OF COUNTY COMMISSIONERS, et al.,
7
                              Defendants.
8
9
10            DEPOSITION OF MATTHEW THOMAS
11                   June 6, 2008
                     10:00 a.m.
12                   1410 Coal, S.W.
                     Albuquerque, New Mexico
13
14
         PURSUANT TO THE FEDERAL RULES OF CIVIL
15   PROCEDURE, this deposition was:
16   TAKEN BY:  CATHERINE CRUMP, ESQ.
                and CHRISTOPHER HANSEN, ESQ.
17           ATTORNEY FOR PLAINTIFFS
18   REPORTED BY:  Jan Gibson, CCR, RPR, CRR
                   Paul Baca Court Reporters
19                 500 Fourth Street, NW - Suite 105
                   Albuquerque, New Mexico  87102
20
21
22
23
24
25

34ce7f72-fe5a-4b65-8655-08cbae709514

Page 2

1      APPEARANCES
2  For the Plaintiffs:
3      AMERICAN CIVIL LIBERTIES UNION FOUNDATION
       125 Broad Street, 18th FL.
4      New York, NY 10004-2400
       BY: CATHERINE CRUMP and CHRISTOPHER HANSEN
5
6  For the Defendants:
7      ALBUQUERQUE CITY ATTORNEY'S OFFICE
       P.O. Box 2248
8      Albuquerque, NM 87103-2248
       505-768-4500
9      BY: SHELLEY MUND
10 and
       NARVAEZ LAW FIRM, P.A.
11     601 Rio Grande Blvd., N.W.
       Albuquerque, New Mexico 87104
12     BY: ERNESTINA R. CRUZ
13
14            INDEX
15 THE WITNESS:              PAGE
16 MATTHEW THOMAS
17     Examination by Mr. Hansen        3
18     Examination by Ms. Cruz         61
19
20
21            EXHIBIT
22 16.  News Article              44
23
24
25

Page 3

1  (Note: In session at 10:00.)
2          MATTHEW THOMAS
3  after having been first duly sworn under oath,
4  was questioned and testified as follows:
5          EXAMINATION
6  BY MR. HANSEN
7      Q.   **Would you state your name, please?**
8      A.   Matthew Thomas, T-H-O-M-A-S.
9      Q.   **Where are you currently employed?**
10     A.   Bernalillo County Sheriff's Department.
11     Q.   **What is your position there?**
12     A.   I am a lieutenant.
13     Q.   **What is your area of responsibility?**
14     A.   I have several, actually. At the time of
15 this event, I was the Emergency Response Team
16 commander, the S.W.A.T. commander. Those are
17 secondary duties. My primary duty is I am a
18 regional task force commander for a six-county
19 narcotics task force.
20     Q.   **Do you hold all three of the positions**
21 **still today?**
22     A.   I recently relinquished the Emergency
23 Response Team position because I wear too many hats
24 and I am a little bit tired.
25     Q.   **Who is your immediate supervisor?**

Page 4

1      A.   Depends. If it's for ERT or S.W.A.T.,
2  that would be captain Russell Blaschke. If it was
3  an investigative nature, the narcotics end of
4  things, it would be Captain Darcy Blaschke.
5      Q.   **I am tempted to ask a lot of questions**
6  **about that, but I don't think it's any of my**
7  **business.**
8      A.   Probably none of mine, either.
9      Q.   **And starting with the ERT captain, who is**
10 **his immediate supervisor?**
11     A.   Above him would be Chief Linthicum.
12     Q.   **How long have you been with the County**
13 **Police Force?**
14     A.   January 17, 1989.
15     Q.   **Were you employed in law enforcement prior**
16 **to that point?**
17     A.   I was employed by the U.S. Department of
18 Energy.
19     Q.   **Did you work on the day of August 27, 2007**
20 **when President Bush came to the County for a**
21 **fundraising visit?**
22     A.   Yes.
23     Q.   **What was your area of responsibility?**
24     A.   I was commander for that detail.
25     Q.   **Let's start at the beginning from the**

Page 5

1  **first point when you heard he was coming. Who told**
2  **you he was coming?**
3      A.   I can't recall specifically in this
4  particular incident. Usually I am advised via
5  E-mail through the chain of command at some point
6  that there's a visit coming, and then there will be
7  a location set where we have a meeting with the
8  Secret Service.
9      Q.   **Did that meeting occur?**
10     A.   It did.
11     Q.   **Where was that meeting?**
12     A.   If I remember correctly, I think this one
13 happened at the APD station at Osuna and Wyoming.
14     Q.   **Who was present at that meeting?**
15     A.   There was a lot of people present. I
16 couldn't recall everybody that was there.
17     Q.   **Who was in charge?**
18     A.   Generally it's a briefing held by the
19 Secret Service.
20     Q.   **Who was the Secret Service agent that gave**
21 **the briefing?**
22     A.   I don't recall.
23     Q.   **How many Secret Service agents were**
24 **present?**
25     A.   Usually what happens in these details is

Page 10

1  occurs?  Before the 27th.
2      A.   No, not with the agents or anything like
3  that, no.
4      Q.   With your own guys?
5      A.   No, generally because I would have just
6  called them up.  I probably would have had my ERT
7  sergeants there.  I can't remember.  Greg was busy
8  during this particular one so I can't remember if my
9  TAC sergeant was there or not.  I think Justin
10 Dunlap was the one who took over on this one.
11     Q.   You are the fifth or sixth or seventh
12 officer we have deposed during the course of the
13 week.  One of the prior officers, we can't now
14 immediately remember -- Dunlap -- said that the
15 Secret Service agent in charge of the entire event
16 was Greg Kitsos.  Does that help you remember?
17     A.   Well, Greg is an agent here, part of this
18 office, but this is my understanding of what happens
19 on these things.  We are talking a little bit about
20 Secret Service protocol so by no means am I an
21 expert.  The presidential detail, it's a rotating
22 bunch of guys.  I don't think it's any one set bunch
23 of guys because any time I have done these -- and I
24 have done these on and off for a long time now, too
25 long -- it's guys they are pulling out of various

Page 11

1  offices and they are doing this advance detail.
2      So it's six, seven, eight guys who are
3  here four or five days in advance who coordinate
4  with the office here.  Greg is an agent here.  My
5  understanding of this is he may have been -- I am
6  speaking for Secret Service and I probably shouldn't
7  do this, but he may have been the contact but he
8  wouldn't be running the advance presidential detail.
9  That would have been the other guys that came in.
10     Q.   Somebody from Washington?
11     A.   Right.  I think he was just a liaison for
12 the office.
13     Q.   Were there other law enforcement agencies
14 represented at that meeting besides Secret Service
15 and the County and the City?
16     A.   Yes, Rio Rancho was there.
17     Q.   How many --
18     A.   That's what I remember, because we had a
19 fatality on that detail.
20     Q.   I am asking at the meeting.  You think
21 someone from Rio Rancho was there?
22     A.   I'm sure they would have been because they
23 wouldn't have been in the motorcade if they weren't
24 at the general meeting.
25     Q.   How many people were at the general

Page 12

1  meeting?
2      A.   I don't know, fifty?
3      Q.   Oh, a lot.
4      A.   Yeah, there's a lot of people at the
5  meetings.
6      Q.   Does it work in such a way that there's
7  first a general briefing for everybody and then you
8  break up into separate groups?
9      A.   Yes, and it's very generalized.  These
10 things are very fast.  The tactical guys with the
11 City, we work well together.  The ERT guys and the
12 County, we work well together.  We all pretty much
13 know what to do.  What we get told is he is coming
14 in this date, these hours.  We go through a brief
15 itinerary about what the schedule is supposed to be.
16 Then they introduce who will be the leads.  There's
17 a guy that does the site, there's a guy that's
18 counter sniper, there's a guy that does ERT, there's
19 a guy that does intel.  And we just break up,
20 depending on what usually the city commander and I
21 decide.  We split up those details and we just issue
22 our people out to those people and they do the
23 liaison and we trust our people to do the job the
24 right way.
25     Q.   How many people from the County attended

Page 13

1  that meeting?
2      A.   Well, I was there.
3      Q.   I got that part.  And you said you thought
4  at least one or more of the sergeants?
5      A.   Yeah, I am pretty sure Justin was there --
6  Dunlap was there.  I am fairly certain Ed Mimms was
7  there.  There probably would have been a
8  representative on the motorcade, maybe Robert
9  Boland or but that's really sole and separate from
10 what the site is.  It's motorcade detail.
11     Q.   Anybody else you remember at that meeting?
12     A.   Not off the top of my head.  You could
13 maybe refresh my memory.
14     Q.   I'm not sure it's that important.  The way
15 we have been -- the way that the assignments that
16 were handed out at that meeting have been described
17 to us, the City essentially got responsibility for
18 the motorcade and the County essentially got
19 responsibility for the site.  Is that your --
20     A.   Yes, that's correct.  Although we did have
21 people working.  I'm pretty sure we did.
22     Q.   And of all of County law enforcement, you
23 were the lead officer?
24     A.   Correct.
25     Q.   And so did you -- as the meeting -- after

Page 18

```
1    him.  It wasn't a real tall guy.  Five eight, five
2    ten.  Somewhere around there, stocky, light-colored
3    hair.
4        Q.   Age?
5        A.   This is where I get in trouble with women
6    all the time.
7        Q.   He is a guy.  He won't care.
8        A.   I don't know, 30s.
9        Q.   Race?
10       A.   Caucasian.
11       Q.   Have you worked with him since?
12       A.   No, or before then, no.
13       Q.   That description really narrows it down.
14       A.   I'm sure.  It's like Albuquerque.  Five
15   seven and Hispanic.
16       Q.   No offense but --
17       A.   Dark hair.  I get that all the time.  That
18   helps.
19       Q.   I should be asking scars and
20   distinguishing characteristics?
21       A.   I didn't get that close to him.
22       Q.   When you are out there on the site with
23   the Secret Service guy and your sergeants, is that
24   where you at least tentatively establish the inner
25   and outer parameters?
```

Page 19

```
1        A.   Correct.
2        Q.   Who makes the decision where the inner and
3    outer parameters are?
4        A.   Secret Service.
5        Q.   If the Secret Service says to you, "I want
6    it at this corner," and you think that corner is
7    farther than you think it needs to be, you would
8    nevertheless defer to the Secret Service?
9        A.   Yeah, they have their briefing and
10   policies and I'm not going to get in the middle of
11   how they do things.  We let them set the parameters
12   and we will walk through.  We may make suggestions.
13   For instance, if we go down a road I may say, "Look,
14   we need another guy here, another guy here."  I will
15   be with the ERT guy and we will walk it down.
16       Q.   After you then went out to the site and
17   walked it with the Secret Service and one or both of
18   your sergeants, what did you do next?
19       A.   Probably nothing.  I'll tell those guys to
20   get the out borders out and do what they need to do
21   and then I will attend the briefings and I will have
22   an emergency response team in place about 8:00
23   o'clock in the morning.
24       Q.   So you don't have anymore briefings with
25   your guys until essentially the morning of the
```

Page 20

```
1    event?
2        A.   Yeah.  There's probably -- I mean, don't
3    get me wrong.  I mean, there's conversation
4    throughout while we are planning the thing.  I mean,
5    you know, we are looking for vehicles, probably
6    looking for equipment on occasion.  We may move how
7    things are done.  We may come up with better areas
8    and there may be other threats that come up during
9    the planning stages and we may add or remove people
10   or adjust accordingly.
11       Q.   Prior to the day of the event did you have
12   any conversations with the sheriff himself about
13   this?
14       A.   No, I didn't talk to the sheriff at all.
15       Q.   There's a number two person.  His title is
16   undersheriff?
17       A.   Yes, Sal Baragiola.
18       Q.   Did you have any conversations with him?
19       A.   No, in fact I was surprised the sheriff
20   was there.  I was unaware that he was in the
21   motorcade until he arrived, and when he arrived on
22   the premises I did not see him.  I try very hard not
23   to.
24       Q.   Was he a motorcyclist or in a car or --
25       A.   Who?
```

Page 21

```
1        Q.   -- or in a car?  The sheriff?  You said
2    the sheriff was there?
3        A.   He was with the president.  That's his
4    business.
5        Q.   He was functioning as a dignitary, not a
6    law enforcement officer?
7        A.   No, he wasn't -- I don't know.  Ask the
8    sheriff.  I'm not going to get into that.
9        Q.   I understand that.  Although he is not
10   going to be sheriff much longer.
11       A.   Maybe not.
12       Q.   So we hear anyway.
13       A.   My job is security, so I will protect the
14   people who are there.
15       Q.   And during the event you never saw him?
16       A.   No.
17       Q.   So the morning of the event, what happens?
18       A.   Probably had a briefing, and I know we did
19   with ERT and I had the ERT people in place at about
20   8:00 o'clock.  We will adjust accordingly.  You
21   know, I mean, parking areas will shift or, you know,
22   Secret Service may request additional people in one
23   spot or something.
24       Q.   The briefing that you had the morning of
25   included only people from your department?
```

Page 46

1    Q.    Except for the fact that you got sued?
2    A.    You know what?  In this day and age people
3  like to sue.
4    Q.    Do you understand why people sued here?
5  Do you remember the people across -- I'm sure you
6  read the people across from the driveway were
7  expressing support for the president, right?
8    A.    According to the picture, correct.
9    Q.    And the people way down by Roadrunner Lane
10  were expressing disapproval of the president, right?
11    A.    Yes.
12    Q.    So you can understand why the people who
13  were expressing disapproval felt it was unfair for
14  them to be two blocks away while the pros were
15  allowed to stand right across from the driveway?
16    A.    Well, is that a question?
17    Q.    Yes, that is a question.  Did you
18  understand why they are aggrieved by that?
19    A.    No, and I will tell you why.  I don't care
20  if they are pro-Bush or anti-Bush.  I treat
21  everybody the same.  My job is site security.  If
22  the people across the street were anti-Bush I am
23  okay with that.  I want not involved in politics.  I
24  don't want to be involved in politics.  My job is
25  site security.  I gave the demonstrators a choice.

Page 47

1  My concern was their safety and keeping them off the
2  roadway.  I was concerned.  I didn't want anybody to
3  get hurt, including the president, but that goes for
4  my guys, the public or anybody else.  I want to make
5  sure that everybody is safe, and so they were given
6  choices that day.
7    Q.    What choices were they given?
8    A.    They were told they could demonstrate
9  where they wanted to demonstrate.  There was no
10  designated area.  They were told, and I specifically
11  told the sergeant, "Let them choose where they want
12  to go.  I don't care where they go.  I don't want
13  them in the perimeter.  If they want to go north,
14  let them go north.  If they want to go south, let
15  them go south.  That's their decision."
16    Q.    As long as they are outside the outer
17  perimeter?
18    A.    Right.
19    Q.    At the point when you were on-site you
20  knew the president was going to drive from north to
21  south on Roadrunner?
22    A.    I think I knew at some point, correct.
23    Q.    If the demonstrators said to you, "I want
24  to be in a location where the president will see my
25  sign.  Is he coming from the south or coming from

Page 48

1  the north" would you have told them?
2    A.    Maybe.
3    Q.    You don't think there's a prohibition
4  against conveying that kind of information?
5    A.    No, I don't care there's a prohibition.
6  If they wanted to go north, I don't have any
7  problems with that.  I don't.  There was nothing to
8  say they couldn't be all along the roadway.  I don't
9  have any issues with that.  What I am concerned with
10  is the perimeter.  That's all I care about.  But the
11  fact of the matter was I wasn't asked.
12    Q.    The reason I asked you that whole series
13  of questions about the SUV filled with passengers
14  all of whom were carrying signs, at one point,
15  according to our clients, a woman drove by going
16  from south to north on Rio Grande before you did the
17  full lockdown.  She was in a van and she lived in
18  one of the homes inside the outer perimeter.
19         She said to the demonstrators, "You guys
20  want to stand closer, jump in the van.  I will take
21  you to a site closer to the scene.  The president
22  can see your signs better."
23         They all said fine.  They consulted with
24  the county officers on-site and they said, "No, you
25  can't do that."

Page 49

1         Does that ring a bell at all?
2    A.    What was the question?
3    Q.    Did the county officers act properly?
4    A.    That's a judgment call.
5    Q.    Assuming that's true?
6    A.    That's a hypothetical.
7    Q.    No, it actually happened.
8    A.    It is to me, because I don't know that to
9  be true.
10    Q.    Assume it's true.  Did the county officers
11  act properly in this circumstance?
12    A.    I wasn't the county officers on scene.
13    Q.    Sounds likes they are acting contrary to
14  your orders.  Your orders are they can stand writer
15  they want.  Assuming that fact is true, your
16  officers were disobeying your orders, weren't they?
17    A.    No, not necessarily.
18    Q.    You instructed your officers to let the
19  people stand wherever they want.  Your officers did
20  not let the people stand where they wanted.
21    A.    If they were going to go down Roadrunner,
22  some of this was locked down over here, okay?  So
23  there was probably some issues with that.  I wasn't
24  advised that there was demonstrators in the van.
25  It's a hypothetical.  I mean, these things are

34ce7f72-fe5a-4b65-8655-08cbae709514

Case 1:08-mc-00362-RJL    Document 114    Filed 08/18/2008    Page 1 of 15
DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

1 (Pages 1 to 4)

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF NEW MEXICO
 3
 4   _____
                            )
 5   JEANNE PAHLS, et al.,   )   Civil Action
                            )
 6       Plaintiffs,         )   08-CV-53 (LH)(ACT)
                            )
 7   vs.                     )
                            )
 8   BOARD OF COUNTY COMMISSIONERS )
     FOR THE COUNTY OF BERNALILLO,  )
 9   et al.,                 )
                            )
10       Defendants.         )
     _____)
11
12
13           DEPOSITION OF
14           KERRY SHEEHAN
15           Washington, D.C.
16         Monday, August 4, 2008
17             12:05 p.m.
18
19
20
21   Job No.: 1-134948
     Pages 1 through 134
22   Reported by:  John L. Harmonson, RPR
```

**Page 2**

```
 1          Deposition of
 2          KERRY SHEEHAN
 3
 4
 5   Held at the offices of:
 6   U.S. DEPARTMENT OF JUSTICE
 7   CIVIL DIVISION
 8   20 Massachusetts Avenue, Northwest
 9   Washington, D.C.  20530
10
11
12
13      Taken pursuant to the Federal Rules of Civil
14   Procedure, before John L. Harmonson, Registered
15   Professional Reporter, Notary Public in and for the
16   District of Columbia, who officiated in administering
17   the oath to the witness.
18
19
20
21
22
```

**Page 3**

```
 1               APPEARANCES
 2
 3   ON BEHALF OF PLAINTIFFS:
 4       CATHERINE CRUMP, ESQUIRE
 5       CHRIS HANSEN, ESQUIRE
 6       American Civil Liberties Union Foundation
 7       125 Broad Street, 18th Floor
 8       New York, New York  10004-2400
         (212) 549-2500
 9
         ARTHUR B. SPITZER, ESQUIRE
10       American Civil Liberties Union of the
          National Capital Area
11       1400 20th Street, Northwest, Suite 119
         Washington, D.C.  20036
12       (202) 457-0800
13
14
15
     ON BEHALF OF DEFENDANTS BOARD OF COUNTY COMMISSIONERS
16   FOR THE COUNTY OF BERNALILLO and BERNALILLO COUNTY
     SHERIFF'S DEPARTMENT:
17   (Participating via telephone)
18       ERNESTINA R. CRUZ, ESQUIRE
         Narvaez Law Firm, PA
19       601 Rio Grande, Northwest
         PO Box 25967
20       Albuquerque, New Mexico  87125-0967
         (505) 248-0500
21
22
```

**Page 4**

```
 1           APPEARANCES (Cont'd)
 2
 3   ON BEHALF OF DEFENDANTS ALBUQUERQUE POLICE DEPARTMENT
 4   and CITY OF ALBUQUERQUE:
 5   (Participating via telephone)
 6       DAVID NAVA, ESQUIRE
 7       City Attorney's Office
 8       One Civic Plaza, Northwest
         City/County Building
 9       4th Floor, Room 4015
         Albuquerque, New Mexico  87102
10       (505) 768-4500
11
12   ON BEHALF OF THE UNITED STATES AND THE WITNESS:
13       JEFFREY M. SMITH, ESQUIRE
         U.S. Department of Justice
14       Civil Division
         20 Massachusetts Avenue, Northwest
15       Washington, D.C.  20530
         (202) 514-5751
16
         TAMARA WEBER, ESQUIRE
17       U.S. Department of Homeland Security
         U.S. Secret Service
18       Office of the Chief Counsel
         950 H Street, Northwest, Suite 8300
19       Washington, D.C.  20223
         (202) 406-5771
20
21   ALSO PRESENT:
22       JOSHUA GOODBAUM, Intern
```

Case 1:08-mc-00362-RJL    Document 14    Filed 08/18/2008    Page 2 of 15
DEPOSITION OF KERRI SHERIDAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

9 (Pages 33 to 36)

**33**

1  A.  Yes.
2  Q.  And I assume there is sort of a subset of
3  agents from the detail who travel with the President?
4  A.  What do you mean by "subset"?
5  Q.  A smaller group than the whole thing?
6  A.  Right.  Obviously, we can't all travel with
7  him at the same time, so it's a rotational-type basis
8  depending on which shift you're working, availability,
9  other assignments.
10  Q.  And is there a protocol or routine that the
11  Presidential Protective Detail follows when the
12  President decides he's going on a trip?
13  A.  Yes.
14  Q.  What is it?
15  A.  Normally there would be advance teams
16  designated, and then we would travel to the particular
17  city or country that he's visiting and start advancing
18  the visit.
19  Q.  What is an advance team?
20  A.  An advance team is normally -- It's a group
21  of agents that have been assigned, like myself, to
22  conduct site advance for a particular site that the

**34**

1  President is going to visit.
2  Q.  Okay.  So the President decides he wants to
3  go somewhere.  An advance team is designated.
4  A.  Uh-huh.
5  Q.  I assume agents in your position, are you
6  just told that you're going to be part of a particular
7  advance?  Is that how that works?
8  A.  Sometimes.  Sometimes we have a choice, but
9  often, let's say, you just volunteer for whatever
10  visit.
11  Q.  All right.  And that's the first thing that
12  happens is this advance team is formed.
13       Then what does the advance team do?
14  A.  We travel to the city or the country,
15  wherever the President happens to be going.  We meet
16  with local police counterparts, and if there is a
17  particular individual in charge of a certain site, we
18  like to meet with those folks.  Basically, everybody
19  involved with the facility or the city we like to
20  touch base with.
21  Q.  And in the course of this process, does the
22  Presidential Protective Detail make any particular

**35**

1  plans regarding demonstrators?
2  A.  Make any plans?  We don't really designate
3  protesters.  Is that what you're asking?
4  Q.  Yes.  Does the Presidential Protective
5  Detail make an effort to figure out in advance whether
6  there will be protesters in a particular location?
7  A.  As far as from the shift side of it, not
8  really.  I mean, we do plan for public around the
9  site, because obviously that would impact our security
10  plan for any type of emergency action that we may have
11  to take.  If we have a thousand people congregating in
12  a certain area, we want to have a plan for that as far
13  as how to get our protectee in and out safely.
14  Q.  Why don't we talk a little bit about the
15  President's visit to Albuquerque.
16  A.  Sure.
17  Q.  And I may ask you some more general
18  questions about how your office works a little later,
19  but I think this may become clearer to me if we talk
20  about a specific example.
21  A.  Okay.
22  Q.  So the letter we received from the Secret

**36**

1  Service indicated that you were the site agent for the
2  President's visit to Albuquerque.  Is that correct?
3  A.  That's correct.
4  Q.  What is a site agent?
5  A.  A site agent is an agent who has been
6  assigned to come up with the overall security plan for
7  a particular venue or Presidential site.
8  Q.  Does that mean you're in charge of that
9  Presidential visit?
10  A.  Yes and no.  Yes, I am responsible for the
11  security plan for that particular site or whatever
12  advance piece of the pie that I have.
13  Q.  And you said yes and no.  What's the "no"
14  part of it?
15  A.  Well, there's always other people who can
16  weigh in on that stuff.
17  Q.  How far in advance did you learn that the
18  President was going to be traveling to Albuquerque?
19  A.  I believe it was around two weeks prior.
20  Ten to 14 days.
21  Q.  What did you do when you learned of the
22  planned visit?

Case 1:08-mc-00362-RJL     Document 11-4     Filed 08/18/2008     Page 3 of 15
DEPOSITION OF KERRY SHERIDAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

17 (Pages 65 to 68)

65

1    site. To control access in and out of the site.
2         Q.    The way I've had it described to me
3    previously, and I just want to know if you agree with
4    this description, is that the outer perimeter is
5    permeable at times during the event, right? People
6    can go in and out of it and it only hardens when the
7    President is in the immediate vicinity. Is that
8    accurate?
9         A.    Not necessarily. And there again, it's
10   situation-specific. There are times when the outer
11   perimeter would not be permeable even though the
12   President is not at that particular location.
13        Q.    What are those circumstances?
14        A.    For example, like if it's -- it's hard to
15   figure out how to say this -- an emergency access
16   area, there again, going back to a one way in, one way
17   out type thing, we have to keep that open.
18        MS. CRUZ:  Catherine, this is Tina. When
19   you all said you were going on break, I started
20   heading out to the restroom. Now that we've come
21   back, I have to say I need to take a restroom break.
22   If we could take a break for five minutes, that would

66

1    be helpful.
2         MS. CRUMP:  I guess we'll take a break.
3         (A recess was then taken.)
4    BY MS. CRUMP:
5         Q.    Where was the outer perimeter at this
6    event?
7         A.    The outer perimeter? A specific area or --
8         Q.    Yes. Just where was it?
9         A.    I'll start at the Rio Grande. It started
10   at the -- right off of Rio Grande, the lane where you
11   turned west to go down to the mayor's acreage. It
12   extended to the rear past the canal. Left and right,
13   it would be the access roads that were -- I guess it
14   would be kind of south and north of the property.
15        Q.    Was Rio Grande Road itself part of the
16   perimeter?
17        A.    My perimeter? No.
18        Q.    Was it part of someone else's perimeter?
19        A.    Yes.
20        Q.    Whose perimeter?
21        A.    That would be the motorcade or the TS
22   advance.

67

1         Q.    And by "your perimeter," we're talking
2    about the site perimeter?
3         A.    Yes.
4         Q.    Did your perimeter extend to the east of
5    Rio Grande?
6         A.    So we're talking --
7         MR. SMITH:  The residential on the west of
8    the Rio Grande?
9         MS. CRUMP:  Yes.
10        THE WITNESS:  So across the street?
11   BY MS. CRUMP:
12        Q.    Yes.
13        A.    No.
14        Q.    Where did the site perimeter end in
15   relation to Rio Grande?
16        A.    The site perimeter ended at the first
17   checkpoint, which was that lane. Basically, if you're
18   on Rio Grande and let's say you're traveling -- that
19   would be north, and you turn left onto a dirt road,
20   there were a series of three gates there, and that was
21   where my furthermost post was on that side of the
22   site.

68

1         Q.    Was Rio Grande Road inside or outside the
2    site perimeter?
3         A.    Outside.
4         Q.    All right. At this first meeting that you
5    had with the mayor and his spouse and that Greg Kitsos
6    attended, is that where you made initial decisions
7    about where the outer perimeter could be?
8         A.    I don't think it was during the meeting
9    with the mayor. As I mentioned previously, that was
10   more of a "How you doing, nice to meet you, we'll try
11   to stay out of your house as much as possible" type of
12   thing.
13        I believe it was the next meeting that was
14   either immediately following that or the next day
15   where I actually walked around with SA Kitsos and the
16   police counterparts where we looked at, there again,
17   high-speed avenues of approach.
18        Q.    During the first meeting, was anyone from
19   the Office of Presidential Advance present?
20        A.    The meeting with the mayor?
21        Q.    Yes.
22        A.    No.

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

19 (Pages 73 to 76)

73

1      And Exhibit 4 is, we scrolled down the page
2  a little bit, and this is to the south of Rio Grande
3  from the first image, although we made it so they
4  overlapped a little bit.  Do you see that?
5      Just take a minute to look at these.
6      A.   So Exhibit 4, you moved which direction
7  from 3?
8      Q.   South.
9      A.   South.  So Exhibit 3 goes on top of
10 Exhibit 4?
11     Q.   Or Exhibit 4 goes on top of Exhibit 3.
12          MR. SMITH:  No, Exhibit 4 is to the south,
13 so it's below.
14          MS. CRUMP:  Yes.  Yes.
15          MR. SMITH:  It's like this (indicating).
16          THE WITNESS:  I think I'm backwards.
17 BY MS. CRUMP:
18     Q.   Do you recognize this?
19     A.   I really don't.
20     Q.   Okay.  All right.  So then let's talk about
21 the site in a little more detail.  Rio Grande
22 Boulevard was a major road running along one side of

74

1  the mayor's property, correct?
2      A.   Yes.
3      Q.   Was it the eastern boundary of the
4  property?  Do you recall?
5      A.   I really don't recall which direction it
6  was.  If you're saying the general public was located
7  to the south, north -- the mayor's residence would
8  have been west.
9          MR. SMITH:  Of the road?
10          MS. CRUMP:  Yes.
11          THE WITNESS:  Correct.
12 BY MS. CRUMP:
13     Q.   And the perimeter you established, was that
14 closer to the mayor's property than Rio Grande
15 Boulevard, or was it on the mayor's property?
16     A.   I'm sorry, could you repeat that?
17     Q.   Where was the perimeter in relation to Rio
18 Grande Boulevard?
19     A.   The easternmost post would be at the main
20 entrance off of Rio Grande.  When you turn off of Rio
21 Grande Boulevard west, it would be right there where
22 those gates are.  There were two additional posts on

75

1  the access roads north and south.
2      Q.   Okay.
3          MR. SMITH:  Is Roadrunner Lane one of the
4  access roads?
5          THE WITNESS:  You know, I'm trying to
6  recognize the mayor's residence here, and it's not
7  popping up at me.
8  BY MS. CRUMP:
9      Q.   Could it be the red roofed building?
10     A.   Which one is that?
11     Q.   On the top there.
12          MR. SMITH:  With the swimming pool?
13          MS. CRUMP:  Yes.
14          THE WITNESS:  I don't think so.  I don't
15 remember a swimming pool there.
16 BY MS. CRUMP:
17     Q.   Did you say earlier that part of the
18 perimeter involved the ditch behind the mayor's
19 property?
20     A.   Yes.
21     Q.   Was that one extreme part of the perimeter?
22     A.   I believe it extended slightly beyond that.

76

1      Q.   Okay.  So it went slightly beyond the
2  ditch --
3      A.   Yes.
4      Q.   -- to not quite as far as Rio Grande
5  Boulevard, yes?
6      A.   Yes.
7      Q.   Okay.  And then in terms of its other
8  boundaries, there were access roads that paralleled
9  the mayor's property?
10     A.   Yes.
11     Q.   And those access roads are where the
12 perimeter was placed?
13     A.   Yes.
14     Q.   How far north and south were the access
15 roads from the mayor's driveway?
16     A.   An estimate, I would say around a
17 hundred yards, maybe a little over.
18     Q.   For both of them?
19     A.   Right, both, a hundred yards this way and a
20 hundred yards north.
21     Q.   And these are the boundaries you came up
22 with during the second meeting when you were walking

Case 1:08-mc-00362-RJL    Document 14    Filed 08/18/2008    Page 5 of 15
DEPOSITION OF KERRY STIPELMAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

20 (Pages 77 to 80)

**77**

1  around with the police counterparts?

2  **A.  I'm not sure if we had tightened it up to**

3  **that extent, but yes, eventually that was the**

4  **boundaries for the site.**

5  Q.  And was establishing these boundaries your

6  primary job at this event?

7  **A.  One of my jobs, yes.**

8  Q.  What were your other jobs?

9  **A.  To come up with a plan for public access,**

10  **ticketed access, press access.  Coordinate sweeps.**

11  Q.  What kind of plan did you come up with

12  regarding public access?

13  **A.  You're talking as far as the invited guests**

14  **that attended?**

15  Q.  Did you come up with any plan regarding

16  members of the general public and their access to the

17  event site?

18  **A.  Were they invited or were they not invited?**

19  Q.  People who were not invited.

20  **A.  Basically, the only thing there again, was**

21  **that if they're legally allowed to be there and they**

22  **don't interfere with the motorcade route or make an**

**78**

1  **overt action towards the President, that was pretty**

2  **much the extent of it.**

3  Q.  Was there any public property inside the

4  perimeter you established?

5  **A.  I don't think so.**

6  Q.  So in this case, in this specific event,

7  was there any way for the public to be within the

8  perimeter that you established unless they had a

9  ticket to the event?

10  **A.  No.  I believe it was all private property**

11  **within the perimeter.**

12  Q.  And you had no responsibility for anything

13  that happened outside of the perimeter you

14  established, correct?

15  **A.  No.**

16  Q.  So to go back to my question earlier about

17  where the demonstrators were standing, did you have

18  any role deciding where they could stand?

19  **A.  No.**

20  Q.  Who made that decision?

21  **A.  I don't know.**

22  Q.  How would you find out if you were trying

**79**

1  to figure that out?

2  **A.  That's a good question.  I don't know.**

3  Q.  We've talked about there being a site

4  perimeter.  Would there also have been a motorcade

5  route perimeter?

6  **A.  Yes.  There again, I wasn't a TS agent.  So**

7  **I know a little bit about that, but yes, there is a**

8  **perimeter around the motorcade.**

9  Q.  Do you think that could have been the

10  motorcade perimeter?

11  **A.  Which area?**

12  Q.  I'm trying to figure out why there was a

13  line of officers preventing the political protesters

14  from approaching the property closer than about

15  150 yards south of the mayor's driveway.  And I had

16  thought that that was the site perimeter line, but it

17  seems, based on your testimony, that that's not

18  correct because it's too far away.

19  **A.  Yeah.  I don't know if I can answer that**

20  **question.  I was not there.**

21  Q.  Is that the type of checkpoint where a

22  Secret Service officer would have been present?

**80**

1  **A.  You're talking the southern --**

2  Q.  Yes.

3  **A.  The access road?**

4  Q.  I'm talking Rio Grande -- Let's assume Rio

5  Grande Boulevard runs north and south and to the west

6  there's the mayor's property.  I'm talking about a

7  point south on Rio Grande that's about 150 yards south

8  of the mayor's driveway.

9  **A.  I don't think there was an agent posted at**

10  **that location.**

11  Q.  How did that checkpoint get set up?

12  **A.  You mean physically how did the officers go**

13  **out there and set it up?**

14  Q.  Who made the decision to establish that

15  checkpoint?

16  **A.  I believe in coordination with myself and**

17  **the local police department, we had identified that**

18  **area as a high-speed avenue approach that needed to be**

19  **posted.  And I believe it ended up with a police**

20  **officer post.**

21  Q.  Do you know whether the Albuquerque Police

22  Department or the Bernalillo County officers were the

21 (Pages 81 to 84)

---

81

1  ones manning that post?
2     A.  I can't remember.
3     Q.  How did you pick that location to set up
4  this post?
5     A.  It was at -- It just made the most sense to
6  me when I looked at it.  I guess that's the easiest
7  way to say it.
8     Q.  Okay.  What factors did you consider in
9  picking that location?
10    A.  It was a high-speed avenue approach.  It
11 would not interfere with traffic on Rio Grande.  And
12 it was a large enough area for a police vehicle and
13 some other entities to set up there.
14    Q.  What do you remember about what that area
15 looks like?
16    A.  I think there was an open field to the
17 west.  I think it was like a horse pasture possibly or
18 something like that.  It was a fairly open area.
19    Q.  And are you the person who made the
20 decision to establish that checkpoint at that
21 location?
22    A.  Yes, in conjunction with the local police

---

82

1  department.
2     Q.  About how far from the mayor's driveway was
3  that checkpoint?
4     A.  Approximately a hundred yards, maybe a
5  little more.  And I guess if we're saying north/south,
6  it would have been south.
7     Q.  I know you chose that area because you said
8  there was a field where it looks like there could be
9  police cars.
10       Did the distance of that location from the
11 mayor's driveway play into it?
12    A.  The distance?
13    Q.  I'm sorry, it's a bad question.  I'll take
14 it back.
15       Did the ability of demonstrators to be
16 within sight and sound of the President factor into
17 your calculation of where to put that checkpoint?
18    A.  No.
19    Q.  Did you anticipate that demonstrators might
20 gather to the south of that checkpoint?
21    A.  It's always a possibility.  We have general
22 public show up at almost all of our sites.

---

83

1     Q.  Were demonstrators allowed to be north of
2  that checkpoint along Rio Grande Avenue?
3     A.  Were they allowed to be?
4     Q.  Yeah.  Let's say I wanted to engage in
5  political protest activity.  Could I have seen that
6  checkpoint, kept walking north and held up my sign
7  somewhere?
8     A.  From a Secret Service standpoint?
9     Q.  Yes.
10    A.  If you're legally allowed to be there.  And
11 normally we would defer to our local counterparts who
12 obviously know the local codes, regulations and laws
13 regarding that.  If you're legally allowed to be
14 there, the Secret Service would not stop you.
15    Q.  That area was not inside your perimeter,
16 correct?
17    A.  Correct.
18    Q.  So the Secret Service doesn't have an
19 opinion under those circumstances as to whether or not
20 someone can be there?
21    A.  An opinion --
22       MR. SMITH:  Objection.  I think that

---

84

1  misstates his testimony.
2       But you can answer if you can.
3       THE WITNESS:  Our policy is, you know, if
4  they're legally allowed to be there, and they're not
5  infringing upon the motorcade route or making overt
6  actions, public safety issues, then they're allowed to
7  be there.
8  BY MS. CRUMP:
9     Q.  The local law enforcement officers we spoke
10 with indicated that Rio Grande Boulevard was included
11 in the outer perimeter.
12       Do you know why they would have had that
13 impression?
14    A.  No.
15    Q.  But that impression is incorrect --
16    A.  Yes.
17    Q.  -- as far as you're concerned?
18    A.  (Nodding head.)
19    Q.  Yes?
20    A.  Yes.
21    Q.  After this second meeting you had where you
22 tightened up this perimeter, what happens next?

---

Case 1:08-mc-00362-RJL    Document 14    Filed 08/18/2008    Page 7 of 15
DEPOSITION OF KERRIE SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

24 (Pages 93 to 96)

**93**

1    A.    There again, it depends on the size.  Three
2  to four hours possibly.  Longer if it's a larger site.
3    Q.    All right.  So you man the posts.  And
4  then what happened?
5    A.    The TSD sweeps begin.  Once the sweeps are
6  conducted or concluded, then the main checkpoints are
7  opened up to allow ticketed guests, press, other
8  allowed to access the site.
9    Q.    And what happens after that?
10    A.    Then we just run it.  We run controlled
11  access to the site.  The President arrives.  He comes
12  in, he does his scheduled events, and then he departs.
13    Q.    And what was your specific role during all
14  of this?
15    A.    As the site advance agent, as I said
16  before, I'm overall responsible for the security of
17  the site.  If something were to occur, an incident,
18  then the traveling shift as well as the detail leader
19  would look to me to safely handle the situation.
20    Q.    And so practically speaking, what does that
21  mean you're doing?  Are you visiting the people who
22  are at the posts?  Or how are you spending your time?

**94**

1    A.    Normally while the President is on site,
2  that is the local Secret Service agent's
3  responsibility.  While the President is on the ground,
4  I'm in close proximity to the President in the detail
5  area.
6    Q.    So the local Secret Service agents were the
7  ones who were manning the perimeter that we have been
8  discussing, together with local officers?
9    A.    Yes.  They may not have been from the
10  Albuquerque office.  They may have been from New York
11  or Los Angeles and traveled to Albuquerque.
12    Q.    But those positions are filled by people
13  who are in the various field offices; is that
14  accurate?
15    A.    Yes.
16    Q.    And then the folks from the Presidential
17  Protective Detail are the ones who are in proximity to
18  the President himself; is that correct?
19    A.    Yes.
20    Q.    Did you interact with the Office of
21  Presidential Advance that day?
22    A.    Yes.

**95**

1    Q.    What role or roles did they play?
2    A.    I guess I'm confused with that question.
3    Q.    What were they doing there?  What did they
4  do during the event?
5    A.    They're doing their staff functions, making
6  sure that the event is being set the way that they
7  have decided to have it set up.  Backdrops, making
8  sure the whole room is set up correctly, things of
9  that nature.
10    Q.    Did you have any conversations with them
11  regarding demonstrators that day?
12    A.    I think I told them there that were some
13  people congregating outside the site but at the time
14  it wasn't impacting the motorcade route.
15    Q.    What do you mean by "impacting the
16  motorcade route"?
17    A.    Where it would come to a stop, say, if
18  somebody would get on the road and cause the motorcade
19  to stop.
20    Q.    First of all, do you remember who you spoke
21  with from the Presidential Advance Office?
22    A.    His name was George.

**96**

1    Q.    George from the Advance Office?
2    A.    I don't know his last name.
3    Q.    How old is George?
4    A.    Mid to upper 30s.
5    Q.    What does he look like?
6    A.    About my height.
7    Q.    How tall are you?
8    A.    Five-nine.  Probably 240.  Hispanic.  Dark
9  hair.
10    Q.    Was he a White House employee or was he
11  some sort of volunteer?
12    A.    I'm not sure if he's a full-time staffer or
13  a volunteer.
14    Q.    Was he from Washington, or was he from
15  Albuquerque or somewhere else?
16    A.    He talked about Texas a lot, so I don't
17  know.  He may be from Texas, but I don't know.
18    Q.    And was George the person you told about
19  the presence of demonstrators?
20    A.    Yes.
21    Q.    And what did George say when you mentioned
22  the presence of demonstrators?

Case 1:08-mc-00362-RJL    Document 114    Filed 08/18/2008    Page 8 of 15
DEPOSITION OF KERRY SHERIDAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

25 (Pages 97 to 100)

97

1    A.   Nothing, really.  "Okay, thanks for the
2    update."
3    Q.   Did George or anyone else with the White
4    House Advance Office give you any instructions
5    regarding what to do with political protesters?
6    A.   No.
7    Q.   Do you remember the name of any other White
8    House Advance Office people who were there in addition
9    to George?
10    A.   No, I don't.
11    Q.   Other than advance people from the Advance
12    Office and agents from the Secret Service, were any
13    other federal officials present that day, putting
14    aside the President, of course?  Was the Border Patrol
15    there, for instance?
16    A.   No.
17    Q.   Anyone else?  Any other agents you can
18    think of?
19    A.   Federal?
20    Q.   Yes.
21    A.   I don't believe so.
22    Q.   Was any one law enforcement agency in

98

1    charge that day?
2    A.   Well, the Secret Service is overall
3    responsible for the security of the President and the
4    visit.  We work, obviously, hand in hand with the
5    local jurisdictions.
6    Q.   You mentioned that you -- I think you
7    mentioned that you had some interaction with
8    demonstrators.  Is that correct?
9    A.   Very limited.  I had a golf cart that I
10    would get from one part of the site to the other site
11    quickly just to check on things.  I may have driven by
12    and said, "Hey, how you doing?"  But other than that,
13    no.
14    Q.   Are you aware that there was a group of
15    pro-Bush supporters who were holding up signs that
16    day?
17    A.   Yes.
18    Q.   Who were they?
19    A.   They were the property owners adjacent to
20    the mayor's acreage.
21    Q.   How do you know that?
22    A.   They told me.

99

1    Q.   Did you speak with them directly?
2    A.   Yes.
3    Q.   What were their names?
4    A.   I can't remember their names.
5    Q.   Would you have that written down somewhere?
6    A.   Probably not.
7    Q.   By 'adjacent,' were they on the other side
8    of Rio Grande or were they on the same side of the
9    street?
10    A.   Well, using the north/south Rio Grande,
11    east.
12    Q.   They were to the east?
13    A.   East.
14    Q.   And you personally spoke with them, yes?
15    A.   Yes.
16    Q.   What did you all discuss?
17    A.   I was at the main checkpoint, which is the
18    lane that runs into the mayor's property.  And I can't
19    remember exactly why I was out there, but I was
20    approached by an elderly gentleman who claimed to own
21    the property across the street, and he asked me if it
22    was okay if he stood in his property while the

100

1    President's motorcade drove by.
2    I said, "Well, that's your property.
3    Obviously, it's your private property.  We're not
4    going to interfere with your rights on your property
5    as long as you don't interfere with the motorcade
6    route or make any overt actions while the Presidential
7    motorcade is passing by."
8    Q.   About what time did they arrive?
9    A.   The President?
10    Q.   The pro-Bush supporters.
11    A.   It was sometime before arrival.  I'm not
12    sure.  Maybe two hours.
13    Q.   Where were they located?
14    A.   They were to the east -- Are you talking on
15    arrival?  Because I didn't see them on arrival.  My
16    understanding is they were located on that private
17    property to the east of Rio Grande.
18    Q.   Where do you get your understanding?
19    A.   The agent that was at that post.
20    Q.   Who is that?
21    A.   I can't remember.
22    Q.   If you wanted to figure out that agent's

---

**101**

1   name, how would you do it?
2     **A.**  **The site post log.**
3     Q.  Could you describe that agent for me?
4     **A.**  **No.**
5     Q.  Was he your age?
6     **A.**  **I really can't remember. He was younger, I**
7   **think.**
8     Q.  Were you speaking with him over the radio
9   or how --
10     **A.**  **Yeah, we had radio communications.**
11     Q.  Have you had conversations with him after
12   this event?
13     **A.**  **No.**
14     Q.  And what is your understanding of where
15   these pro-Bush supporters were standing?
16     **A.**  **On their private property, approximately I**
17   **guess 30 to 40 yards off the road.**
18     Q.  And were they outside the outer perimeter?
19     **A.**  **Yes.**
20     Q.  Is it fair to say that you were the person
21   who decided that it was okay for them to stand there?
22     **A.**  **Sure.**

---

**102**

1     Q.  If a group of anti-Bush demonstrators had
2   been standing on that private property, would you have
3   permitted them to stand there?
4     **A.**  **I probably would have informed the local**
5   **police department. The fact that they're pro or anti**
6   **has nothing to do with it. But a large group of**
7   **people standing next to the motorcade route would**
8   **obviously be something that I would bring up to my**
9   **police counterparts.**
10     Q.  What if it had been a small group of
11   individuals?
12     **A.**  **I would probably still raise it with them.**
13     Q.  And why would you raise it with them
14   instead of just making the decision yourself?
15     **A.**  **Situational awareness for Secret Service as**
16   **well as other local police entities involved.**
17     Q.  And by "situational awareness," what do you
18   mean by that?
19     **A.**  **That we have a group of people next to the**
20   **motorcade route.**
21     Q.  But you didn't consult with local police
22   before deciding that the pro-Bush supporters could be

---

**103**

1   there, did you?
2     **A.**  **I think I did tell them that, yeah.**
3     Q.  Did the pro-Bush supporters standing just
4   across from the mayor's driveway where the President's
5   motorcade route was going pose any security threat?
6     **A.**  **No.**
7     Q.  Why not?
8     **A.**  **Because they were far enough away from the**
9   **road where they couldn't throw anything on the**
10   **vehicles. They didn't have any weapons visible.**
11     Q.  How far from the road were they?
12     **A.**  **I think it was 30 to 40 yards, 25, 30**
13   **yards, somewhere in there.**
14     Q.  If they had presented a threat, would you
15   have moved them?
16     **A.**  **Yes.**
17     Q.  Would you have been able to do that even
18   though they were on private property?
19     **A.**  **Yes.**
20     Q.  Even though they were outside the
21   perimeter?
22     **A.**  **Yes.**

---

**104**

1     Q.  If another group of demonstrators had been
2   standing on the shoulder of Rio Grande 30 feet south
3   of the pro-Bush demonstrators, would they have
4   presented a greater, lesser or the same threat as the
5   pro-Bush demonstrators?
6     **A.**  **I'm sorry, what's their location?**
7     Q.  Say 30 they're feet south of the pro-Bush
8   supporters.
9     **A.**  **30 feet south?**
10     Q.  Yes.
11     **A.**  **It would be the same thing.**
12     Q.  Why is that?
13     **A.**  **No threat. There would be no threat to the**
14   **protectee. You're saying 30 feet to the south, which**
15   **is farther down the road from the arrival point, so**
16   **that's even better, in our eyes.**
17     Q.  What if the group had been 30 feet to the
18   north of the pro-Bush supporters?
19     **A.**  **That may have caused a little extra**
20   **attention.**
21     MS. CRUMP: Were you about to say
22   something?

---

Case 1:08-mc-00362-RJL    Document 11    Filed 09/19/2008    Page 10 of 15
DEPOSITION OF KERRY SHERIFAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

27 (Pages 105 to 108)

105
1    MR. SMITH: No.
2    BY MS. CRUMP:
3    Q.  You're aware, aren't you, that there were
4    also a group of anti-Bush demonstrators present that
5    day?
6    A.  Yes.
7    Q.  Why were the pro-Bush supporters allowed to
8    stand so much closer to the event site than the
9    anti-Bush demonstrators?
10   A.  It was their private property.
11   Q.  So if the anti-Bush demonstrators had had
12   access to private property close to the event site,
13   would they have been allowed to stand there?
14   A.  Yes.
15   Q.  Were any of the anti-Bush demonstrators on
16   private property?
17   A.  That I don't know.
18   MS. CRUMP: Can we take a break for a few
19   minutes?
20   (A recess was then taken.)
21   MR. SMITH: I think the witness
22   misunderstood an earlier question and he wanted to

106
1    clarify.
2    Go ahead.
3    THE WITNESS: I guess you had asked
4    something about if there were anti-Bush protesters on
5    the same private property, if I would treat them
6    different. Was that a question?
7    BY MS. CRUMP:
8    Q.  Yes.
9    A.  The answer would be no, obviously, if they
10   were on their private property.
11   Q.  So I just have a few more questions.
12   A.  Sure.
13   Q.  Assume that Rio Grande Boulevard is a
14   public road and there is a shoulder along the road.
15   As far as the Secret Service is concerned,
16   could private individuals walk along that shoulder?
17   A.  Yes.
18   Q.  During the event, would the Secret Service
19   have allowed members of the public to walk along the
20   shoulder?
21   A.  Yes. There again, if they're somewhere
22   that they're legally allowed to be, and they're not

107
1    interfering with the motorcade route or possibly their
2    own safety, public safety.
3    Q.  Would there ever have been a time when, as
4    far as the Secret Service is concerned, private
5    individuals couldn't walk along that shoulder?
6    A.  From a security standpoint? I mean, if
7    there was a security issue, then, yes. If they were
8    in the roadway, if there was a possibility that one of
9    the cars in the motorcade could hit them, then
10   obviously, yes, we would.
11   MR. SMITH: I think she's asking you a
12   specific question, though, not a hypothetical.
13   THE WITNESS: What's the question again?
14   I'm sorry.
15   BY MS. CRUMP:
16   Q.  In this particular case, were individuals
17   allowed to walk up and down the shoulder of Rio Grande
18   during this event?
19   A.  That I'm not sure. With those situations,
20   I really rely strongly on the local police department.
21   There again, if they say, "Hey, they're not allowed to
22   be there, it's private property," or whatever the

108
1    local municipal code is for that, then I defer to them
2    on that.
3    Q.  We were talking earlier about the fact that
4    there was some sort of checkpoint south of the mayor's
5    property on Rio Grande to the south of which
6    demonstrators had gathered. Do you remember this?
7    A.  Yes, I remember the demonstrators there, or
8    the general public.
9    Q.  Was that checkpoint something you
10   established or that the Secret Service established?
11   A.  Yes. In coordination with the local police
12   department.
13   Q.  And can you describe for me one more time
14   where that checkpoint was located?
15   A.  It was Rio Grande Boulevard. Like I said,
16   there were three access roads to the west. So they
17   would be just off of Rio Grande Boulevard on the
18   access road.
19   Q.  And I believe you said earlier that point
20   was about 100 yards to the south of the mayor's
21   driveway; is that accurate?
22   A.  Approximately, yes.

Case 1:08-mc-00362-RJL    Document 11-4    Filed 09/18/2008    Page 11 of 15
DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

28 (Pages 109 to 112)

109

1    Q.   Would demonstrators have been allowed to
2    walk beyond that checkpoint going north along Rio
3    Grande?
4    **A.   The southern checkpoint?**
5    Q.   Yes.
6    **A.   Well, there again, that's a situation where**
7    **I would defer to the local police department. From a**
8    **security standpoint, Secret Service, again, if they're**
9    **not interfering with the motorcade route, they're not**
10   **making any overt actions, they're somewhere that**
11   **they're legally allowed to be, then, yes, they would**
12   **be allowed to walk there.**
13   Q.   During the President's visit to
14   Albuquerque, did the Secret Service play any role in
15   preventing demonstrators from moving to the north of
16   the checkpoint we've been discussing?
17   **A.   Moving to the north of the southern**
18   **checkpoint?**
19   Q.   Yes.
20   **A.   No.**
21   Q.   Would that have been a decision the local
22   officers would have made?

110

1    **A.   Possibly.**
2    Q.   You mentioned earlier that in addition to
3    you being in charge of the site, there was another
4    agent who was in charge of the motorcade route.
5    **A.   Yes.**
6    Q.   I'm having a little difficulty
7    understanding the relationship between the two of you.
8    Would the motorcade agents -- I know I'm not using the
9    right term.
10   **A.   That's okay. I understand.**
11   Q.   Would he also have set up a perimeter
12   around the mayor's estate?
13   **A.   He would establish a perimeter around the**
14   **motorcade and the route. And there is a little bit of**
15   **overlap, obviously, between sites. But there is a**
16   **specific point that's coordinated between myself and**
17   **the motorcade advance agent as to where his**
18   **responsibilities end and mine begin.**
19   Q.   The checkpoint we've been discussing, that
20   was within your area of responsibility, correct?
21   **A.   The southern checkpoint?**
22   Q.   Yes.

111

1    **A.   Yes. From that point west.**
2    Q.   Was there a northern checkpoint along Rio
3    Grande Boulevard also?
4    **A.   Yes.**
5    Q.   Were there demonstrators present around
6    that checkpoint?
7    **A.   Not to my knowledge.**
8    Q.   Our understanding is that there were some
9    demonstrators who were originally situated to the
10   north of the mayor's estate who were required to move
11   to the south of the mayor's estate.
12       What do you know about that?
13   **A.   I don't know anything about that.**
14   Q.   Did you observe some demonstrators walking
15   along Rio Grande?
16   **A.   No. As I said, the general public was all**
17   **congregated at the southern end down there.**
18   Q.   You mentioned that the motorcade agent also
19   had a perimeter set up. Is that perimeter basically
20   along the roads that the President is going to travel?
21   Is that how that works?
22   **A.   It's around the motorcade, yes.**

112

1    Q.   And is that perimeter a zone in which the
2    general public is not allowed?
3    **A.   Normally, yes.**
4    Q.   To get more information about that, who
5    would I talk to?
6    **A.   The specific TS agent possibly.**
7    Q.   Do you know the parameters of the perimeter
8    around the motorcade route on Rio Grande?
9    **A.   I don't know.**
10   Q.   Would that be in a document somewhere?
11   **A.   I don't think so, but I'm not sure. There**
12   **again, that's kind of out of my area.**
13   Q.   After you spoke with the group of pro-Bush
14   supporters and said it was okay for them to
15   demonstrate on their property, did you have any
16   further interaction with them?
17   **A.   I don't believe so. I did request that --**
18   **obviously, he proved that that was his residence. I**
19   **believe he showed me a driver's license.**
20   Q.   Did anyone else from the Secret Service
21   have any other interactions with them?
22   **A.   I believe the intelligence advance agent**

Case 1:08-mc-00362-RJL    Document 11-4    Filed 08/18/2008    Page 12 of 15
DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

29 (Pages 113 to 116)

113

1  may have spoken with them also.
2      Q.  What did they discuss?
3      A.  I don't know.
4      Q.  Who was that?
5      A.  I don't know.
6      Q.  You mentioned that you had some
7  conversations with individuals from the White House
8  Advance Office. Where physically were those
9  individuals located?
10     A.  I guess I don't understand the question.
11     Q.  You talked to George.
12     A.  George, yes.
13     Q.  Where was George located when you spoke
14  with him?
15     A.  Specially? I mean, we had, obviously,
16  several conversations throughout the week. Most of
17  the time it was on the mayor's acreage in the vicinity
18  of the house.
19     Q.  Did you speak to him elsewhere as well?
20     A.  I'm sure I did. I'm sure we spoke at the
21  hotel and at dinner, possibly.
22     Q.  Did you ever speak with individuals from

114

1  the Advance Office who were, for example, standing
2  along Rio Grande Boulevard?
3      A.  No.
4      Q.  With whom did the Advance Office interact
5  other than you?
6      A.  Are you talking from the Secret Service
7  side of the house?
8      Q.  Yes.
9      A.  They would interact with the lead advance
10  agent, Mr. Konopcek. I'm sure the airport agent.
11     Q.  Did they speak with any county or city
12  police officers?
13     A.  I don't think so. I don't know, though.
14  They normally wouldn't.
15     Q.  How do individuals from the Advance Office
16  dress?
17     A.  You mean day to day?
18     Q.  When they're fulfilling their job
19  responsibilities.
20     A.  On the day of the visit, normally it's
21  whatever the President's attire is of the day.
22     Q.  Are they wearing suits?

115

1      A.  If the President is in a suit, they're in a
2  suit. If the President is wearing, say, khakis and a
3  polo shirt, then we try to mirror what the protectee
4  is wearing.
5      Q.  So that's true for both the Secret Service
6  and the Presidential advance folks?
7      A.  Yes.
8      Q.  What were you wearing during this
9  particular visit?
10     A.  Business suit.
11     Q.  If I'm a local cop, how do I distinguish
12  someone from the Secret Service from someone who is
13  with the Advance Office?
14         MR. SMITH: Objection; calls for
15  speculation.
16         You can answer.
17         THE WITNESS: I'm sure it's kind of hard.
18  We all have suits, earpieces, different lapel pins.
19  But unless you know specifically which pin belongs to
20  which group, I'm sure it's difficult, unless you ask
21  him, "Hey, who are you? What group are you with?"
22

116

1  BY MS. CRUMP:
2      Q.  During the course of this event, did you
3  communicate by radio?
4      A.  Yes.
5      Q.  Would there be recordings of that radio
6  traffic?
7      A.  Possibly. I think they do record the radio
8  traffic for the Presidential visits. I don't know.
9      Q.  Who would you have been in communication
10  with over the radio?
11     A.  The site counterpart, the lead advance
12  agent, the detail leader, the shift leader.
13     Q.  Did you have any conversations about
14  demonstrators over the radio?
15     A.  Specifically, I think we do mention in the
16  situation report if there are individuals along the
17  motorcade route. So there again, for situational
18  awareness, to let the drivers know that there are
19  pedestrians possibly near the arrival point, yes, I
20  would let them know.
21     Q.  Is that something that would be on the
22  radio traffic?

117

1    A.   Yes.
2    Q.   Approximately how many pro-Bush
3  demonstrators were present?
4    A.   **Five, six. I really only spoke with the**
5  **one gentleman.**
6    Q.   One of our clients, an individual named
7  Terry Reiley, said that he asked if he could move from
8  the area south of the mayor's driveway to the area
9  north of the mayor's driveway but was denied
10 permission.
11       Do you recognize Mr. Reiley's name?
12   A.   **No.**
13   Q.   Do you know anything about this incident?
14   A.   **No.**
15   Q.   Who would know?
16   A.   **I don't know.**
17   Q.   Mr. Reiley was told that it would not be
18 safe for him to move from the south of the mayor's
19 driveway to the north of the mayor's driveway.
20       Can you explain the safety rationale?
21       MR. SMITH:  Objection; calls for
22 speculation.

118

1        You can answer if you can.
2        THE WITNESS:  I can possibly see why he
3  would be that if it was at a point where the
4  motorcade was a very short distance away.  Obviously,
5  we drive as fast as humanly possible.  So it becomes
6  an issue if somebody is walking on the side of the
7  road, a vehicle may come off the side of the road a
8  little bit, come around a corner, and obviously we
9  don't want any fatalities on the public side.
10       There could be a lot of heavy vehicle
11 traffic on the road.  Same situation.  You know, it's
12 hard to speculate.
13 BY MS. CRUMP:
14   Q.   Are you aware that a woman offered the
15 anti-Bush demonstrators a place to stand on private
16 property that was to the north of the mayor's
17 driveway?
18   A.   **No.**
19   Q.   So the demonstrators apparently first tried
20 to reach her property by walking north along Rio
21 Grande by foot but were denied permission.
22       Do you know anything about that?

119

1    A.   **No.**
2    Q.   One of our clients, a gentleman named
3  Carter Bundy, was told that he could not stand closer
4  to the event site because the land along the road was
5  a utility company easement.
6        Do you recognize Mr. Bundy's name?
7    A.   **No.**
8    Q.   Do you know anything about this incident?
9    A.   **No. And there again, that's where I would**
10 **defer to the local police department.**
11   Q.   Was there any reason to believe that any of
12 the demonstrators posed a security risk?
13   A.   **From the Secret Service point of view?**
14   Q.   Yeah.
15   A.   **No.**
16   Q.   As the motorcade approached the event site
17 from the north, Rio Grande Boulevard was closed
18 entirely, correct?
19   A.   **I believe it would be. I'm not exactly**
20 **sure there, though. Again, that's the TS agent's area**
21 **of responsibility.**
22   Q.   Let's assume that was the case.

120

1    A.   **Okay.**
2    Q.   Could our clients have moved north on Rio
3  Grande so that they were as close to the mayor's
4  driveway as the pro-Bush demonstrators?
5    A.   **I'm sorry, can you repeat that?**
6    Q.   Could our clients have moved north along
7  Rio Grande Boulevard so that they were as close to the
8  mayor's driveway as the pro-Bush supporters?
9    A.   **There again, if they're legally allowed to**
10 **be there and walk on that property, yes.**
11   Q.   Would the Secret Service have had any
12 objection to their moving north?
13   A.   **As long as it didn't interfere with the**
14 **motorcade route or make an overt action towards any of**
15 **the cars in the motorcade, no.**
16   Q.   I'm going to hand you --
17       MS. CRUMP:  Would you mark this as the next
18 exhibit.
19       (Exhibit 20 marked for identification and
20 attached hereto.)
21 BY MS. CRUMP:
22   Q.   I'm going to hand you a document which was

DEPOSITION OF KERRY SHEEHAN
CONDUCTED ON MONDAY, AUGUST 4, 2008

32 (Pages 125 to 128)

---

**125**

1  enforcement as to the proposed security plan?
2      A.  Specifically, no.  But we did have a
3  lengthy discussion regarding, you know, where exactly
4  the police posts should be located, what their
5  responsibilities would be, where the agent posts would
6  be located and how we can actually secure the site as
7  a team.
8      Q.  Do you have any recollection as to the
9  individuals that you worked with who were employed by
10 Bernalillo County Sheriff's Department?
11     A.  No, ma'am.
12     Q.  You also mentioned that when you became
13 aware of the event, you contacted your local Secret
14 Service counterpart.
15         Do you recall who that individual was?
16     A.  Yes.  That was Special Agent Greg Kitsos,
17 K-i-t-s-o-s.
18     Q.  Do you have any information related to who
19 specifically made the decisions as to where the
20 demonstrators were to stand on that day?
21     A.  No.
22     Q.  At any time during this event or after,

---

**126**

1  were any concerns articulated to you regarding where
2  the demonstrators had gathered?
3      A.  I'm sorry, could you repeat that question?
4      Q.  Sure.  The question is:  At any time during
5  the event were any concerns articulated to you
6  regarding the area where the demonstrators gathered
7  that day?
8      A.  I don't know if I would necessarily say
9  concerns.  But yeah, there were some communications
10 between myself and the local police department
11 officers regarding the location of the general public.
12     Q.  And specifically, what was communicated to
13 you at that time?
14     A.  I believe it was something to the effect
15 that "They're not interfering with traffic; they're
16 safe; and it will not impact the motorcade route at
17 their current location."
18     Q.  Okay.  At some point when the President is
19 being transported to the event location, was there a
20 period where there was no traffic allowed in the area?
21     A.  I'm sure there was, ma'am.  But there
22 again, that would be our TS, our motorcade advance

---

**127**

1  agent.  That would be something that he would
2  coordinate.
3      Q.  Who specifically would be involved with
4  reference to deciding whether pedestrian traffic would
5  have been allowed during that time period?
6      A.  Could you repeat the question?
7      Q.  Yes.  The question is:  During that time
8  period, assuming that there would be a period where
9  there's not traffic allowed to be moving when the
10 President is being transported to the event site, who
11 is the person that would have been in charge of making
12 those decisions?  You said it would be the
13 transportation motorcade individual, but what was that
14 person's name?
15     A.  You're correct, that would be the
16 transportation agent, but I don't know what his name
17 is.
18     Q.  Okay.
19     A.  I can't remember who it was.
20     Q.  With reference to the Secret Service
21 policies, is there a restriction on pedestrian traffic
22 that would be imposed at any time?

---

**128**

1      A.  On roadways?
2      Q.  Yes, sir.
3      A.  I'm not aware of a specific policy.
4  Normally it's a judgment call on the ground regarding
5  the safety of those people as they're moving as well
6  as interfering with the motorcade route.
7          MS. CRUZ:  Okay, that's all I have.
8          MR. NAVA:  The City has no questions.
9          MR. SMITH:  I have a couple of questions.
10         MS. CRUMP:  I have one follow-up question.
11             EXAMINATION
12 BY MS. CRUMP:
13     Q.  Do you feel that the Secret Service
14 sometimes gets unfairly blamed for the actions of
15 other people in regard to demonstrators?
16     A.  Yes.
17     Q.  Can you elaborate on that?
18     A.  Sometimes we may be confused with other
19 entities that possibly would purposely, or not
20 purposely, possibly say they're Secret Service agents.
21             EXAMINATION
22 BY MR. SMITH:

---

33 (Pages 129 to 132)

129

1    Q.    Is it fair to say that the decisions that
2  you made regarding setting up checkpoints, setting up
3  the outer perimeter and similar decisions were based
4  on your views of security and public safety?
5    A.    Yes.
6    Q.    Were there any other factors that went into
7  your decisions?
8    A.    No.
9    Q.    Is it fair to say that the person that you
10  named as George had no input in your security
11  decisions?
12    A.    That's correct.
13    Q.    Did the White House Office of Advance have
14  any input into any decisions regarding the placement
15  of checkpoints, the outer perimeter or protesters?
16    A.    I'm sorry, could you say that again?
17    Q.    Did the White House Office of Advance have
18  any input into the placement of checkpoints, the outer
19  perimeter or the placement of demonstrators or the
20  general public?
21    A.    No.
22        MR. SMITH:  That's all I have.

130

1        MS. CRUMP:  We're done.
2      (Whereupon, the deposition was concluded at
3    2:53 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

131

1            WITNESS CERTIFICATE
2
3      I, KERRY SHEEHAN, have read or have had the
4  foregoing testimony read to me and hereby certify that
5  it is a true and correct transcription of my testimony
6  with the exception of any attached corrections or
7  changes.
8
9      _____
10            KERRY SHEEHAN
11  [ ] No corrections
12  [ ] Correction sheet(s) enclosed
13
14      SUBSCRIBED AND SWORN TO BEFORE ME, the
15  undersigned authority, by the witness, KERRY SHEEHAN,
16  on this the _____ day of _____, _____.
17
18
19      _____
20            NOTARY PUBLIC IN AND FOR
21            THE STATE OF _____
22  My Commission Expires: _____

132

1            REPORTER'S CERTIFICATE
2
3      I, the undersigned Registered Professional
4  Reporter and Notary Public, do hereby certify that
5  KERRY SHEEHAN, after having been first duly sworn by
6  me to testify to the truth, did testify as set forth
7  in the foregoing pages, that the testimony was
8  reported by me in stenotype and transcribed under my
9  personal direction and supervision, and is a true
10  and correct transcript.
11      I further certify that I am not of
12  counsel, not related to counsel or the parties
13  hereto, and not in any way interested in the outcome
14  of this matter.
15      SUBSCRIBED AND SWORN TO under my hand and
16  seal this 5th day of August, 2008.
17
18      _____
19  JOHN L. HARMONSON, RPR
20  Notary Public in and for
21  the District of Columbia
22  My Commission Expires:  10/14/2010

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JEFFERY RANK and
NICOLE RANK,

                     Plaintiffs,

v.                             CASE NO:  2:04-0997
                             Hon. John T. Copenhaver

TOM HAMM, et al.,

                    Defendants.

The deposition of H.P. EPPERHART in the above-styled suit was taken pursuant to the Federal Rules of Civil Procedure before Mary K. Comer, a Certified Court Reporter and Notary Public within and for the State of West Virginia at Large, commencing at 11:20 a.m., on April 21, 2006, in the law offices of Pullin, Fowler & Flanagan, PLLC, JamesMark Building, 901 Quarrier Street, Charleston, Kanawha County, West Virginia.

2

APPEARANCES

In behalf of the Plaintiff:

        HARVEY D. PEYTON, ESQUIRE
        The Peyton Law Firm
        Post Office Box 216
        Nitro, West Virginia  25143-0216
            and
        CHRISTOPHER A. HANSEN, ESQUIRE
        SCOTT MICHELMAN, ESQUIRE
        American Civil Liberties Union Foundation
        125 Broad Street, 18 Floor
        New York City, New York  10004

No appearance on behalf of Defendant Tom Hamm

In behalf of the Defendants Trooper John Hamilton,
Tim M. Johnson, G. Scott Fernatt and H.P. Epperhart:

        GARY PULLIN, ESQUIRE
        JUSTIN L. WOODFORD, ESQUIRE
        Pullin, Fowler & Flanagan, PLLC
        JamesMark Building
        901 Quarrier Street
        Charleston, West Virginia  25301

In behalf of the Defendant H.E. Shaver:

        ERIN ANDERSON, ESQUIRE
        Steptoe & Johnson, PLLC
        707 Virginia Street, East
        Bank One Center, Eighth Floor
        Post Office Box 1588
        Charleston, West Virginia  25326-1588

INDEX

Witness                              Page No.,Line No.
H.P. Epperhart. . . . . . . . .(Michelman)     3-7

32

1    them is my impression.

2              Q       And them meaning White House Staff?

3              A       White House Staff, uh-huh.

4              Q       Okay.

5              A       And then if some problem ensued,

6    we would have to deal with that.

7              Q       If White House Staff went to one

8    of the people who you were supervising that day

9    and said, "I have revoked this guy's ticket",

10   what was your instructions to law enforcement

11   that they were to do next?

12             A       Try to ask the people to leave.

13             Q       And if the people refused?

14             A       They would be escorted out.

15             Q       And arrested?

16             A       I don't know that I said that they

17   would be arrested, but that was -- that is

18   another implied or assumed possibility, yes.

19             Q       But let me make sure I understand

20   this.  Law enforcement personnel that you were

21   supervising did not have the discretion to

22   overrule White House Staff on who could enter or

23   remain in the event?

38

1    usually involve the locals, but an Advance Team

2    usually sets up the event.

3            Q        The Advance Team means somebody

4    from Washington?

5            A        Someone -- well.

6            Q        Someone from the Secret Service

7    and not from Charleston?

8            A        Someone from the Secret Service,

9    but not from Charleston.

10           Q        Okay, now going back to Corporal

11   Daniels' report.  "He continued" -- he's still

12   quoting what he says is your briefing that

13   morning -- "he continued to inform us that for

14   people to attend this function, they had to have

15   a ticket."  That's accurate, right?  You told

16   the staff that?

17           A        Yes.

18           Q        "Also the White House Staff had the

19   authority to revoke any person's ticket if they

20   had a valid reason to do so."  Is that accurate?

21           A        I don't know if that is the exact

22   quote, but that is probably something along the

23   lines that I said.  That we did not have the

39

1    authority to revoke them.  The only persons that

2    I knew of who could do that would be the Staff,

3    something to that effect.

4        Q    And one of the things that

5    intrigued me about that particular sentence from

6    Corporal Daniels is the White House Staff had

7    the authority to revoke a ticket if they had a

8    valid reason to do so.

9        A    I don't know the word valid.

10        Q    Did you understand that if the

11    White House Staff revoked a ticket that that was

12    the end of the discussion?

13        A    That's pretty much the impression.

14        Q    Okay.  And yesterday we took a

15    deposition from a guy named Tom Hamm who was

16    wearing a White House Staff badge during the

17    event.  Do you know Mr. Hamm?

18        A    No I don't.

19        Q    Okay, let me a show you what was

20    marked as Deposition 2 from his deposition and

21    ask you to look at the guy in the red shirt.  Do

22    you recognize that guy?  And here's --

23    Deposition 1 is also another picture of the same

61

```
 1          Q      Did he tell you that the White

 2   House Staff person revoked the ticket of the

 3   people who were involved in the disturbance?

 4          A      At some point, he or Johnson one,

 5   I guess, said that, but I'm not sure which one.

 6          Q      And you think that was in the

 7   second call -- the same call where he is

 8   requesting an arrest team?  Do you think that's

 9   when he told you about the revocation?

10          A      I don't recall when or who even.

11          Q      Is there -- so he -- when he

12   requested an arrest team, did you dispatch one?

13          A      Yes.

14          Q      How did you decide which arrest

15   team to dispatch?

16          A      Location, based on their location.

17          Q      Why -- presumably Officer Fernatt

18   and Trooper Hamilton have arrest powers under

19   state law.  Why didn't you just have them do the

20   arrest?

21          A      Because the arrest teams were set

22   up to be at our disposal, and by that I mean

23   they didn't have a specific assignment that
```

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

JEFFERY RANK and
NICOLE RANK,

                    Plaintiffs,

vs.                          CIVIL ACTION NO: 2:04-0997
                             Hon. John T. Copenhaver

TOM HAMM, et al.,

                    Defendants,

          The discovery deposition of GARY R. DANIELS
in the above-styled suit was taken pursuant to the Federal
Rules of Civil Procedure before Mary K. Comer, a Notary
Public within and for the State of West Virginia at Large,
commencing at 1:12 p.m., on July 19, 2006, in the law offices
of Pullin, Fowler & Flanagan, PLLC, 901 Quarrier Street,
Charleston, Kanawha County, West Virginia.

                                                      2

                    APPEARANCES
In behalf of the Plaintiffs:
          HARVEY D. PEYTON, ESQUIRE
          The Peyton Law Firm Post Office Box 216 2801
          First Avenue
Nitro, West Virginia  25143-0216
                    and
          SCOTT MICHELMAN, ESQUIRE
          American Civil Liberties Union Foundation 125
          Broad Street, 18th Floor
             New York, New York  10004-2400
                    and
          TERRI S. BAUR, ESQUIRE
          Legal Director
             American Civil Liberties Union
          Post Office Box 3952
          Charleston, West Virginia  25339-3952
In behalf of the Defendant Tom Hamm:
          ASHLEY SUMMITT, ESQUIRE
          Pauley, Curry, Sturgeon & Vanderford, PLLC Post
          Office Box 2786
          Charleston, West Virginia  25330-2786
In Behalf of the Defendants Trooper John Hamilton, Tim M.
Johnson, G. Scott Fernatt and H. P. Epperhart:
          JUSTIN L. WOODFORD, ESQUIRE Pullin, Fowler &
          Flanagan, PLLC JamesMark Building
                    901 Quarrier Street
          Charleston, West Virginia  25301

                                                      3

                    APPEARANCES (Continued)
In behalf of the Defendant H. E. Shaver:
          ERIN ANDERSON, ESQUIRE Steptoe & Johnson,
          PLLC 707 Virginia Street, East
Bank One Center, Eighth Floor Post Office Box 1588
Charleston, West Virginia  25326-1588
In behalf of the Deponent:

PERRY ELLIS, ESQUIRE
City Attorney
Post Office Box 2749
Charleston, West Virginia  25330-2749

INDEX

Witness                                    Page No., Line No.
Gary R. Daniels . . . . . . . . .(Peyton)      4-7
. . . . . . . . . . . . . . . . .(Woodford)   37-14
. . . . . . . . . . . . . . . . .(Peyton)     44-19

Deposition Exhibits                        Page No., Line No.
Exhibit Number 1, Charleston Police
Department General Investigative
Supplementary Report. . . . . . .(Marked)     10-19
Exhibit Number 2, Uniform Citation Number
262763, 7/4/01 for Nicole Rank. . .(Marked)   14-14
Exhibit Number 3, Uniform Citation Number
262762, 7/4/01 for Jeffery Rank . .(Marked)   14-22

4

1                     (Witness sworn)

2    WHEREUPON,

3       C O R P O R A L    G A R Y    R.    D A N I E L S,

4    called as a witness in behalf of the Plaintiffs

5    herein, who, having been first duly sworn

6    according to law, testified as follows:

7                      EXAMINATION

8    BY MR. PEYTON:

9            Q     Could you state your full name,

10   please?

11           A     Gary R. Daniels.

12           Q     And are you employed by the

13   Charleston West Virginia Police Department?

14           A     Yes, sir, I am.

15           Q     How long have you been employed

16   with that department?

17           A     Ten years.

18           Q     Mr. Daniels, my name is Harvey

19   Peyton and I represent two individuals named

5    their tickets was revoked.

6                        At that point, they were asked to

7    leave.  Fernatt and the Trooper tried to talk to

8    them, tried to get them to leave.  The crowd was

9    yelling, screaming, stuff like that.

10                       When they grabbed each other's

11   arms and sat down and said, we wasn't leaving,

12   Sergeant Shaver was the first who went up and

13   placed I'm thinking Mr. Rank in handcuffs.  I

14   can't remember exactly which one, but then we

15   followed suit and placed the other one in

16   handcuffs and then led them out of the area to

17   where the transport vehicle was at to take them

18   down to the station.

19       Q    Okay, let me go back to that a

20   little bit.  And if you could refer to your

21   report, the bottom of page one, the sentence

22   that starts there and goes to the next page

23   says, "Officer Fernatt then took us to the side

                                              23

1    and advised us what the problem was."

2            A    Okay, sir.

3            Q    Do you remember what Fernatt told

4    you?

5            A    He told us that the White House

6    Staff had revoked their tickets and they were

7    asked to leave.  Then the White House Staff once

8    again done it in our presence.

9          Q        Okay, that's what I was going to

10   ask you.  Fernatt told you first?

11         A        Yes, sir.

12         Q        That someone from the White House

13   Staff had revoked the tickets of these

14   individuals?

15         A        Yes, sir.

16         Q        But you didn't see that first

17   conversation?

18         A        Right, sir, no, sir, I didn't.

19         Q        Were you present, actually there

20   with the Ranks and Fernatt and Shaver and

21   Hamilton and yourself when a member of the White

22   House Staff that you could hear said their

23   tickets are revoked?

                                                    24

1          A        Yes, sir.

2          Q        Can you recall as nearly as you

3    can what that individual said?

4          A        I mean, I can't remember exactly

5    what they said.

6          Q        Sure, but as close as you can

7    recall?

8          A        Probably by the way, your ticket is

9    revoked, you need to leave, something around that.

10         Q        And was the staff member so far as

11   you said addressing those comments to Mr. and

12   Mrs. Rank?